IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICK MCDERMID, *individually and on behalf of all others similarly situated*,<br><br>   *Plaintiff*,<br><br>v.<br><br>INOVIO PHARMACEUTICALS, INC., *et al.*,<br><br>   *Defendants*. | CIVIL ACTION<br>NO. 20-01402 |

**PAPPERT, J.**                                                                               June 18, 2020

**MEMORANDUM**

In this securities class action, six individuals and groups move the Court to appoint them as lead plaintiff and approve their choice of lead counsel. After further briefing and oral argument, only two movants—the Inovio Group and Manuel Williams—still actively seek appointment. The Court denies the Inovio Group's Motion and grants Williams's competing Motion.

I

Inovio Pharmaceuticals, Inc. is a "biotechnology company focused on rapidly bringing to market precisely designed DNA medicines" to combat infectious diseases. (Compl. ¶ 4, ECF No. 1.) In February, Inovio's CEO, J. Joseph Kim, claimed on national television "that Inovio had developed a COVID-19 vaccine" and planned to begin testing the vaccine on humans by early summer. (*Id.*) After Kim's announcement, Inovio's stock price shot up by over ten percent. (*Id.*) A few weeks later, Kim had a televised meeting with President Trump to discuss the COVID-19 pandemic; during that meeting, Kim repeated his claim that Inovio had "construct[ed]

1

[its COVID-19] vaccine within three hours" and would start testing in April. (*Id.* at ¶ 5.) This news sent Inovio's stock soaring. *See* (*id.* at ¶ 19).

Inovio's ascent stalled on March 9 when Citron Research, a well-known securities trader, publicly ridiculed the company's "ludicrous and dangerous claim that [it] designed a vaccine in 3 hours." (*Id.* at ¶ 25.) Citron Research also called on the Securities and Exchange Commission to "immediately HALT" trading of Inovio's stock. (*Id.*) Within a day, the stock tumbled from $19.36 per share to just $5.70 per share. (*Id.* at ¶ 26.)

On March 12, Patrick McDermid filed a class action complaint against Inovio and Kim. *See* (*id.* at ¶¶ 39–44). Comprising those who acquired Inovio stock between February 14 and March 9, 2020, the putative class accused Kim and Inovio of committing securities fraud by making false and misleading statements regarding the company's potential COVID-19 vaccine. *See* (*id.* at ¶¶ 27–44). The next day, lawyers representing McDermid published a notice on a national newswire service alerting potential class members to the lawsuit and advising them that they had until May 12 to move to be appointed as a lead plaintiff. *See* (Inovio Grp. Mot. Ex. A, ECF No. 13-4).

By the deadline, ten individuals and groups moved to serve as lead plaintiff. *See* (ECF Nos. 4, 5, 6, 7, 8, 9, 10, 11, 12, 13). Four movants have since withdrawn their motions. *See* (ECF Nos. 14, 15, 21, 28) (withdrawing ECF Nos. 5, 9, 4, 7). Along with seeking to be named lead plaintiff, the movants ask the Court to approve their choice of counsel to represent the class as lead counsel.

## II

Congress has crafted detailed procedures for the first stages of a securities class action. *See* 15 U.S.C. § 78u-4. Once the complaint is filed, the plaintiff has twenty days

to publish a notice informing class members about the suit. *Id.* § 78u-4(a)(3)(A)(i). This notice must warn class members that they have only sixty days to move to serve as lead plaintiff. *Id.* Those who wish to act as lead plaintiff must, among other things, list any other securities action in which they tried to serve as a lead plaintiff in the past three years and certify that they did not buy the security at issue or join the class action at counsel's direction. *See id.* § 78u-4(a)(2)(A).

Within ninety days of the notice publicizing the class action, the district court must consider any timely motions to be named lead plaintiff. *Id.* § 78u-4(a)(3)(B)(i). The court must pick the person or group who will most "adequately represent the interests of class members." *Id.* Selecting a lead plaintiff is a two-step process. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 262–70 (3d Cir. 2001).

The first step is to identify the presumptive lead plaintiff. *See id.* at 262. To do so, the court begins by determining which movant has "the largest financial interest" in the suit. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The court then assesses whether that movant "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* In this context, Rule 23 requires only that the prospective lead plaintiff have claims that "are typical of the claims . . . of the class" and be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3), (4); *see Cendant*, 264 F.3d at 263. The initial inquiry into a movant's typicality and adequacy "need not be extensive." *Id.* at 264. Indeed, at this stage, the court should not consider "arguments by [other] members of the purported plaintiff class." *Id.* at 263–64. If the movant with the largest financial interest makes a *prima facie* showing of typicality and adequacy, that movant is the presumptive lead plaintiff. *See id.* at 262–68.

With the presumptive lead plaintiff identified, the court then considers whether a rival class member has rebutted that presumption. *Id.* at 268. To rebut the presumption, a rival must prove "that the presumptively most adequate plaintiff" either (1) "will not fairly and adequately protect the interests of the class," or (2) "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). The relevant question "is not whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a fair and adequate job." *Cendant*, 264 F.3d at 268 (emphasis, alterations and internal quotation marks omitted). If no class member succeeds in doing so, the court appoints the presumptive lead plaintiff. *See id.* But after a successful rebuttal, "the court must begin the process anew . . . until a lead plaintiff is selected." *Id.*

Once the court appoints a lead plaintiff, that "plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(V). Though "the lead plaintiff's right to select and retain counsel is not absolute," *Cendant*, 264 F.3d at 273, the court should defer to the lead plaintiff's selection so long as that selection is reasonable, *see id.* at 276. In assessing the chosen counsel, courts should consider, among other things, "the qualifications and experience of counsel" and the lead plaintiff's "legal experience and sophistication." *Id.* But "the ultimate inquiry is always whether the lead plaintiff's choices were the result of a good faith selection and negotiation process and were arrived at via meaningful arms-length bargaining." *Id.*

III

Six individuals or groups move to be named lead plaintiff. *See* (ECF Nos. 6, 8, 10, 11, 12, 13). Four of those movants concede that they lack the largest financial interest and voice no opposition to the other motions. *See* (ECF Nos. 16, 17, 25, 29). The two remaining active movants are the Inovio Group—comprising Dr. Stephen Brockway, Dwayne Lerma, Joseph Stefko, Scott E. Dahlstrom and Kenneth C. Ness— and Manuel Williams.[1] *See* (ECF Nos. 12 & 13).

As explained below, though the Inovio Group enjoys the presumption as the most adequate plaintiff, Williams successfully rebuts that presumption. Of the remaining active movants, Williams has the next largest financial interest, and no class member has impugned his ability to adequately represent the class. The Court therefore appoints Williams as lead plaintiff and approves his chosen lawyers as lead counsel.

A

1

The Inovio Group has the largest financial interest. In assessing a movant's financial interest, courts look to (1) the number of shares purchased during the class period; (2) "the total net funds expended . . . during the class period; and (3) the approximate losses suffered." *Cendant*, 264 F.3d at 262. The Inovio Group claims to have lost almost $1.3 million after buying over 425,000 shares of Inovio stock worth about $5.5 million during the class period. *See* (Inovio Grp. Mot. Ex. H, at 4, ECF No. 13-11); (*id.* Ex. I, at 7, ECF No. 13-12); (*id.* Ex. J, at 3, ECF No. 13-13); (*id.* Ex. K, at 3,

---

[1] Both the Inovio Group and Williams filed all the necessary certifications. *See* 15 U.S.C. § 78u-4(a)(2)(A); (Williams Mot. Ex. B, ECF No. 12-4); (*id.* Ex. C, ECF No. 12-5); (*id.* Ex. D, ECF No. 12-6); (Inovio Grp. Mot. Ex. C, ECF No. 13-6); (*id.* Ex. D, ECF No 13-7); (*id.* Ex. E, ECF No. 13-8); (*id.* Ex. F, ECF No. 13-9); (*id.* Ex. G, ECF No. 13-10).

ECF No. 13-14); (*id.* Ex. L, at 3, ECF No. 13-15).  No other individual or group bought more shares of Inovio stock, spent more money doing so or suffered greater losses.  *See* (ECF Nos. 6-6, 8-5, 10-5, 11-5, 12-5).

Williams disputes this conclusion.  He points out that the Complaint alleges that Citron Research exposed Inovio's misrepresentations "before trading commenced" on March 9.  (Compl. ¶ 6); *see* (Williams Opp'n 17–19 & n.18, ECF No. 31).  All purchases made on March 9, Williams reasons, would therefore postdate the only corrective disclosure alleged in the Complaint.  *See* (*id.* at 17 & n.16).  And to his knowledge, no court has included "purchases made after the final corrective disclosure alleged in the complaint" when calculating a movant's financial interests.  (*Id.* at 19 n.18.)  So Williams concludes that excluding all March 9 purchases from the calculations "would be consistent with" this caselaw.  (*Id.*)  And if the Court excludes the March 9 purchases, "Williams has, by far, the largest financial interest of any movant."  (*Id.*)

The Court declines to exclude the March 9 purchases.  The Third Circuit instructs district courts to count all purchases made "during the class period."  *Cendant*, 264 F.3d at 262.  The class period here includes March 9.  (Compl. ¶ 1.)  Absent authority—and Williams offers none—empowering the Court to unilaterally shorten the alleged class period when selecting a lead plaintiff, the Court declines to do so here.  *See* (Hr'g Tr. 28:14–29:12, ECF No. 52) (backing away from the argument that the Court should exclude March 9 purchases from its calculations).

2

The Inovio Group makes a *prima facie* showing of typicality.  *See Cendant*, 264 F.3d at 265 (framing the issue as "whether the movant has *preliminarily* satisfied the typicality requirement" (emphasis added)).  Both the Group and the putative class

6

accuse Inovio and Kim of falsely claiming that the company had developed a COVID-19 vaccine that would be ready for human trials in April or early summer of 2020. *See* (Compl. ¶¶ 4–6, 15–26); (Mem. Supp. Inovio Grp. Mot. 1–2, 5–6, ECF No. 13-1). Those supposed lies then fraudulently induced investors to buy Inovio stock at artificially high prices. *See* (*id.*); (Compl. ¶¶ 33–44). And when Citron Research exposed those lies, the allegedly duped investors suffered huge losses. *See* (*id.*); (Mem. Supp. Inovio Grp. Mot. 1–2, 5–6). At first blush, nothing suggests that the Inovio Group's claims differ in any material way from those of the class as a whole. *See* (Mem. Supp. Inovio Grp. Mot. 6); (Inovio Grp. Mot. Ex. B, at ¶¶ 10–21, ECF No. 13-5) (Joint Decl.); *see also Cendant*, 264 F.3d at 263–64 (instructing courts ignore "arguments by [other] members of the purported plaintiff class" at this stage).

### 3

Rule 23's adequacy requirement seeks to guarantee that the movant with the greatest financial interest will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). A movant's choice of "competent class counsel" is "one of the best ways for a court to ensure that [the movant] will fairly and adequately represent the interests of the class." *Cendant*, 264 F.3d at 265. If the movant is a group, courts should also consider whether the group's composition or other characteristics "would preclude it from fulfilling the tasks assigned to a lead plaintiff." *Id.* at 266. Though group members need not necessarily "be 'related,'" courts may consider the group members' relationships (or lack thereof) when assessing the group's adequacy. *Id.* Signs that a group "had been created by the efforts of lawyers," for example, portend an inability to "monitor counsel in a sufficient manner" or otherwise faithfully represent the class. *Id.* at 267. For similar reasons, the Third Circuit "presume[s] that groups

with more than five members are too large to work effectively." *Id.* At bottom, the adequacy requirement aims to weed out movants without sufficient cohesion, "sophistication and interest in the litigation . . . to function as an active agent for the class." *Id.* at 266.

On first inspection, the Inovio Group satisfies this "initial adequacy assessment." *Id.* at 265. To start, the Group declares that its members are "sophisticated investors," (Joint Decl. ¶ 13), who understand the responsibilities that come with acting as lead plaintiffs and are committed to faithfully discharging their duties, *see* (*id.* at ¶¶ 10–21). By selecting experienced lead counsel—Block & Leviton LLP—the Inovio Group displays the prudence required of lead plaintiffs. *See* (*id.* at ¶¶ 8–12). With only five listed members, the Group is not presumptively too large to work effectively. *See Cendant*, 264 F.3d at 267. As further indicia of cohesion, it highlights that two members have been friends "for decades." (Joint Decl. ¶ 7.) And all the members, the Group adds, participated in a conference call to discuss whether to move for appointment as lead plaintiff. (*Id.* at ¶¶ 8–12.) During this call, each member agreed to work "in a collective and collaborative manner," (*id.* at ¶ 11), and forego moving individually for appointment as lead plaintiff in favor of doing so as a group and with Block & Leviton as lead counsel, *see* (*id.* at ¶ 10–13). Viewed collectively, this yet-to-be-rebutted evidence makes a *prima facie* showing of the Inovio Group's adequacy. *Cf. Tomaszewski v. Trevena, Inc.*, 383 F. Supp. 3d Cir. 409, 415–17 (E.D. Pa. 2019).

B

Though the Inovio Group is presumptively the most adequate lead plaintiff, Williams rebuts that presumption. He asserts that four law firms colluded to create the Inovio Group. *See* (Williams Opp'n 10–12). Williams points out that, according to the

Group's own declaration, three firms participated in the conference call during which the Group was formed. *See* (*id.*); (Joint Decl. ¶ 10). A fourth firm then appeared on the Group's Motion as proposed local counsel for the class. *See* (Mem. Supp. Inovio Grp. Mot. 8). Conspicuously absent from the Group's papers, Williams adds, is any "explanation what role two of [these] law firms . . . played in the formation of the group." (Williams Opp'n 11.) Alerted to this curiosity, the Court pressed for an explanation at oral argument. *See* (Hr'g Tr. 8:21–22). The proposed lead counsel responded that his firm came to represent at least two of the group members through referrals from the two other law firms. (*Id.* at 9:2–9.) To be sure, nothing prohibits lawyers from introducing group members to each other or to the proposed lead counsel. *See* 15 U.S.C. § 78u-4(a)(3); *Cendant*, 264 F.3d at 262–70. But that so many law firms midwifed the Inovio Group gives the impression that lawyers created the Group or at least partly assembled its members. *See id.* at 267 (noting that a group may be inadequate if the court believes that lawyers created the group).

The circumstances of the Inovio Group's formation raise questions about the Group's size. On paper, the Inovio Group has five members: Brockway, Lerma, Stefko, Dahlstrom and Ness. *See* (Joint Decl. ¶¶ 2–6). In Lerma's individual declaration, he explains that he intends to act as a lead plaintiff on his own behalf and on behalf of his wife, Jo Anne Emi Goya. *See* (Inovio Grp. Mot. Ex. D, at ¶¶ 3–4, ECF No. 13-7). And some of the losses the Group attributes to Lerma come from accounts held solely in Goya's name. *See* (*id.* at ¶ 3); (Hr'g Tr. 7:18–24). But because Goya "was content to have her husband . . . manage this litigation," she granted Lerma power of attorney to "act on her behalf in the group." (*Id.* at 7:22–24.) Through this maneuver, the Inovio

Group manages to exclude Goya from its headcount while still benefiting from her losses when calculating the Group's financial interest. *See* (Joint Decl. ¶ 3); (Inovio Grp. Mot. Ex. M, ECF No. 13-16). Had Williams not pointed out the way the lawyers seemingly shepherded some members into the Inovio Group, the Court may have dismissed as speculation his claim that the Group "bootstrapped Ms. Goya with Mr. Lerma." (Williams Opp'n 12); *see Cendant*, 264 F.3d at 270 ("Allegations of impropriety are not proof of wrongdoing.") But this added information lends credence to Williams's skepticism and supports the concern that lawyers manipulated the Inovio Group's composition to evade the presumption "that groups with more than five members are too large to work effectively." *Id.* at 267.

But perhaps most revealing, one Inovio Group member—Stefko—filed dueling motions to be named lead plaintiff. As Williams highlights, in one motion Stefko individually moved to be named lead plaintiff. *See* (Williams Opp'n 4–6); (Stefko Individual Mot., ECF No. 5). But later that day Stefko moved as part of the Inovio Group and with new counsel. (Inovio Grp. Mot.) To both motions he attached signed declarations dated just days apart. *Compare* (Stefko Individual Decl., ECF No. 5-3), *with* (Joint Decl.) *and* (Stefko Grp. Decl., ECF No. 13-8). In one breath, Stefko claimed that he wants to be the sole lead plaintiff and proclaims Kahn Swick and Foti LLC as his chosen counsel. (Stefko Individual Decl. ¶ 1.) In the next, he dubbed Block & Leviton as the best firm to represent the class and inexplicably asserted that he considered moving as an individual but instead "affirmatively decided" to seek "appointment as Lead Plaintiff[] in a cohesive group." (Joint Decl. ¶ 17); *see* (*id.* at ¶¶ 8, 12, 19).

The Inovio Group's explanation (or lack thereof) for Stefko's contradictory motions further undermines the Group's purported adequacy.  Though the Group notes that Stefko promptly withdrew his individual motion, *see* (ECF No. 14), neither the Group nor Stefko himself has explained to the Court why he filed competing motions, *see* (Inovio Grp. Reply 5 & n.5, ECF No. 33); (Hr'g Tr. 15:16–17:22).  To the contrary, the Inovio Group seems to concede that Stefko's conduct renders him inadequate.  *See* (*id.* at 17:18–22).  And hoping to salvage its Motion, the Group at oral argument distanced itself from Stefko, claiming that "his decision" should not "taint the rest of the group."  (*Id.* at 21–22.)  Indeed, the Group now wants to jettison Stefko and continue without him.  *See* (*id.* at 15:21–16:3, 17:13–22).  Even if the Court has the power to boot Stefko from the Group, *see* (Inovio Grp. Opp'n n.7, ECF No. 30) (collecting out-of-circuit cases), it declines to do so here.  Congress instructs courts to consider timely motions and select a lead plaintiff from among those movants.  15 U.S.C. § 78u-4(a)(3)(B)(i).  The Inovio Group "decided to move together as a group."  (Joint Decl. ¶ 12.)  That group motion is the one before the Court, and the Court will not retroactively amend it because some group members regret their decision.  But more importantly, Stefko's multiple motions betray a lack of cohesion, and the Group's eleventh-hour willingness to discard Stefko completes the betrayal.  *Cf. Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-2204-PHX-FJM, 2008 WL 942273, at *4 (D. Ariz. Apr. 7, 2008) (unpublished); *Singer v. Nicor, Inc.*, No. 02-C-5168, 2002 WL 31356419, at *2 (N.D. Ill. Oct. 17, 2002) (unpublished).

Cementing the Court's conclusion that the Inovio Group is unable to adequately represent the class, Williams points out that the Group is subject to unique defenses.

11

Each member of the Inovio Group bought most of its shares of Inovio stock on March 9. (Williams Opp'n 18.) But as Williams observes, the Complaint—drafted by the Inovio Group's proposed lead counsel—alleges that Citron Research exposed the falsity of Kim's representations "before trading commenced" on March 9. (Compl. ¶ 6); *see* (Williams Opp'n 17–19). Williams thus reasons that the Inovio Group's post-disclosure purchases expose it to "a unique reliance defense." (*Id.* at 18); *see Semerenko v. Cendant Corp.*, 223 F.3d 165, 181–82 (3d Cir. 2000) (discussing this defense). Whether Inovio will ultimately raise—let alone prevail on—such a defense is unclear. But given that almost sixty percent of the Inovio Group's purchases occurred on March 9, the Court worries that the specter of this reliance defense will hinder the Group's ability to adequately represent the class. *Cf. In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204 & n.13 (E.D. Pa. 2008); *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 455–56 (S.D. Tex. 2002). Were this the only reason to doubt the Inovio Group, the Court perhaps could overlook it. *Cf. City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 178 (S.D.N.Y. 2012). But the potential unique defense is another brick in a wall of circumstantial evidence that the Inovio Group is unable to adequately represent the class. And viewed collectively, that evidence supplies the proof necessary to rebut the presumption that the Inovio Group is the most adequate plaintiff.

## C

Having rebutted the presumption in the Inovio Group's favor, Williams must now show that he has the next highest financial interest and meets Rule 23's typicality and adequacy requirements. *See Cendant*, 264 F.3d at 269. Of the five remaining movants, the Sal Isabella Group has the greatest financial interest, with about $430,000 in losses. *See* (Sal Isabella Grp. Mot. Ex. 3, ECF No. 8-5). But that group

declined to oppose the competing motions, *see* (Notice of Non-Opposition, ECF No. 16); rejected the Court's invitation to respond to objections raised against it, *see* (ECF No. 32); and failed to participate in oral argument, *see* (ECF No. 35) (scheduling argument); (Hr'g Tr. 3:1–4:22). The Sal Isabella Group has thus abandoned its motion or, at a minimum, proved that it is unwilling to vigorously represent the class. After that group, Williams's roughly $187,000 loss is the next largest, giving him the highest financial interest. *See* (Williams Mot. Ex. B, at 3, ECF No. 12-4).

Williams easily satisfies the typicality requirement. Like the class, he alleges that Kim's tale about developing a promising COVID-19 vaccine induced him to buy Inovio stock, which tanked once the truth emerged. *See* (Compl. ¶¶ 4–6, 15–26); (Williams Mot. 5). But unlike the Inovio Group, Williams's purchases all preceded Citron Research's disclosing Inovio's misrepresentations. *See* (Williams Mot. Ex. B, at 3). The Court therefore has no reason to think that Williams's claims differ in any material way from those of the class.

Nor is there cause to doubt that Williams will fairly and adequately represent the class. With fifteen "years of experience investing in the capital markets" and past "experience hiring and overseeing attorneys," (Williams Mot. Ex. D, at ¶¶ 3–4, ECF No. 12-6) (Williams Decl.), Williams is financially sophisticated and well-positioned to supervise class counsel, *see Cendant*, 264 F.3d at 276. This sophistication is evidenced by Williams's choice of Robbins Geller Rudman & Dowd LLP as lead counsel. (Williams Decl. ¶ 9.) And as an individual, Williams poses none of the problems surrounding groups. *See Cendant*, 264 F.3d at 266. Nor need the Court worry that Robbins Geller picked Williams rather than the other way around; Williams was familiar with the firm

13

from the *Enron* litigation and duly vetted the firm before retaining it. *See* (Williams Decl. ¶ 9). No other class member has attempted to show that Williams is subject to unique defenses or otherwise unable to adequately represent the class. *See* (ECF No. 22) (setting May 29 as the deadline to do so). With nothing to rebut the presumption that Williams is the most adequate lead plaintiff, the Court appoints Williams to that position.

D

The Court likewise approves Williams's chosen counsel. He has selected Robbins Geller as lead counsel for the class and Saxton & Stump LLC as local counsel. *See* (Mem. Supp. Williams Mot. 6–7, ECF No. 12-1). Robbins Geller is a preeminent litigation firm with a record of winning complex securities class actions. *See* (Mem. Supp. Williams Mot. 6–7). The firm has served as "lead or named counsel in hundreds of securities class action[s]," including *In re Enron*, which yielded "the largest securities class action recovery in history." (Williams Mot. Ex. E, at 2, ECF No. 12-7). Robbins Geller will be supported by retired federal judge Lawrence Stengel and the Saxton & Stump firm. And as noted, Williams's sophistication and "experience hiring and overseeing attorneys," (Williams Mot. Ex. D, at ¶¶ 3–4), dispel any fears that Williams failed to engage in "meaningful arms-length bargaining" with the law firms, *Cendant*, 264 F.3d at 276. Simply put, the Court is confident that Williams wisely and in good faith chose qualified and capable lawyers.

An appropriate Order follows.

BY THE COURT:

 */s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.