IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICK MCDERMID, individually and on behalf of all other similarly situated, | Case No. 2:20-cv-01402-GJP |
| Plaintiff, | CLASS ACTION |
| v. | |
| INOVIO PHARMACEUTICALS, INC., et al., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1
II.     STATEMENT OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS ........ 2
        A.      Inovio and the Individual Defendants. ................................................... 2
        B.      Inovio's DNA Medicines Platform. ....................................................... 3
        C.      The Vaccine Development Process. ........................................................ 3
        D.      Inovio's Development of a COVID-19 Vaccine Candidate. ................... 4
        E.      Inovio's Plans for Large Scale Manufacturing of Its Vaccine............... 4
        F.      Inovio Contracts with Additional Manufacturers to Produce Its Vaccine. ............ 5
III.    LEGAL STANDARD ........................................................................................... 6
IV.     ARGUMENT ....................................................................................................... 7
        A.      Plaintiffs Fail to Plead Falsity............................................................... 7
                1.      Kim's statements regarding the creation of a COVID-19 vaccine in three hours were neither false nor misleading. ........................... 8
                2.      Defendants' statements regarding Inovio's production plans for 2020 and beyond are not actionable........................................... 9
                        a.      Plaintiffs' theory of falsity is founded on speculation. .................. 9
                        b.      The statements are protected under the PSLRA Safe Harbor. ......... 9
                        c.      The alleged omissions did not render any statement misleading.. 12
                                i.      Inovio's production plans did not depend on VGXI......... 12
                                ii.     VGXI's refusal to provide the Tech Transfer did not derail Inovio's production plans. .................................. 13
                                iii.    Inovio never claimed that Richter-Helm and Ology would produce one million doses. .................................. 14
                                iv.     VGXI's contract termination did not impact product development or profitability. ............................................. 15
                3.      Inovio's statement regarding Operation Warp Speed was neither false nor misleading.......................................................................... 16
        B.      Plaintiffs Fail to Plead a Strong Inference of Scienter......................... 17
                1.      Plaintiffs allege no facts demonstrating an intent to deceive.................. 18
                        i.      Statements about the vaccine construct. .......................... 18
                        ii.     Statements about production goals. ................................. 18
                        iii.    Statements about Operation Warp Speed. ....................... 20
                2.      Plaintiffs' allegations of motive and opportunity do not support an inference of scienter............................................................ 21
                        i.      Defendants' stock sales do not support scienter. ............. 21
                        ii.     Inovio's capital raises do not support scienter................. 22
                3.      Viewed holistically, Plaintiffs' allegations do not support a cogent and compelling inference of scienter................................................ 23

TABLE OF CONTENTS
(continued)

Page

C.    Plaintiffs Fail to Plead Loss Causation for Statements Regarding the Vaccine Construct and Operation Warp Speed.................................................................. 24

D.    Plaintiffs' Section 20(a) Claim Fails............................................................... 25

V.    CONCLUSION.................................................................................................... 25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
   579 F.3d 878 (8th Cir. 2009) ...............................................................................17

*In re Aetna, Inc. Sec. Litig.*,
   617 F.3d 272 (3d Cir. 2010)......................................................................7, 8, 22

*Alvarez v. Ins. Co. of N. Am.*,
   313 F. App'x 465 (3d Cir. 2008) ...........................................................................9

*In re Amarin Corp. PLC Sec. Litig.*,
   2016 WL 1644623 (D.N.J. Apr. 26, 2016), *aff'd,* 689 F. App'x 124 (3d Cir.
   2017) ................................................................................................................9, 13

*Anderson v. Spirit AeroSystems Holdings, Inc.*,
   105 F. Supp. 3d 1246 (D. Kan. 2015), *aff'd,* 827 F.3d 1229 (10th Cir. 2016) .......................21

*Anderson v. StoneMor Partners, L.P.*,
   296 F. Supp. 3d 693 (E.D. Pa. 2017), *aff'd sub nom. Fan v. StoneMor
   Partners LP*, 927 F.3d 710 (3d Cir. 2019) .....................................................19, 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..............................................................................................7

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988)..............................................................................................12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................6

*In re Boston Sci. Corp. Sec. Litig.*,
   686 F.3d 21 (1st Cir. 2012)...................................................................................24

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014)..............................................................................6, 15

*Costabile v. Natus Med. Inc.*,
   293 F. Supp. 3d 994 (N.D. Cal. 2018) ...........................................................19, 20

*Cozzarelli v. Inspire Pharm. Inc.*,
   549 F.3d 618 (4th Cir. 2008) ...........................................................................18, 23

*In re DotHill Sys. Corp. Sec. Litig.*,
   2009 WL 734296 (S.D. Cal. Mar. 18, 2009) .......................................................15

TABLE OF AUTHORITIES
(continued)

Page(s)

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)...........................................................................................24

*In re DVI, Inc. Sec. Litig.*,
    2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ......................................................24

*Fan v. StoneMor Partners LP*,
    927 F.3d 710 (3d Cir. 2019).........................................................................16, 17

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999).............................................................................21

*Hoey v. Insmed Inc.*,
    2018 WL 902266 (D.N.J., Feb. 15, 2018) ....................................................22, 23

*In re Homebanc Corp. Sec. Litig.*,
    706 F. Supp. 2d 1336 (N.D. Ga. 2010) .............................................................22

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...................................................................... *passim*

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ............................................................................24

*KBZ Commc'ns Inc. v. CBE Techs. LLC*,
    634 F. App'x 908 (3d Cir. 2015) ........................................................................7

*Kocourek v. Shrader*,
    391 F. Supp. 3d 308 (S.D.N.Y. 2019)................................................................22

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ..........................................................................23

*Maresca v. Soufun Holdings Ltd.*,
    2016 WL 6102318 (C.D. Cal. Oct. 18, 2016).....................................................14

*Martin v. GNC Holdings, Inc.*,
    757 F. App'x 151 (3d Cir. 2018) .................................................................18, 23

*In re MELA Scis., Inc. Sec. Litig.*,
    2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012)....................................................22

*In re Molycorp, Inc. Sec. Litig.*,
    2015 WL 1540523 (D. Colo. Mar. 31, 2015) ......................................................9

TABLE OF AUTHORITIES
(continued)

Page(s)

*In re NutriSystem, Inc. Sec. Litig.*,
   653 F. Supp. 2d 563 (E.D. Pa. 2009) ................................................................................22

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
   834 F.3d 481 (3d Cir. 2016)................................................................................................10

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)..............................................................................................................16

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)................................................................................................12

*In re PDI Sec. Litig.*,
   2005 WL 2009892 (D.N.J. Aug. 17, 2005) .........................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................................17

*W. Penn. Elec. Emps. Pension Fund v. Mentor Graphics Corp.*,
   2018 WL 4524107 (D. Or. May 29, 2018), *report and recommendation
   adopted sub nom.* 2018 WL 3618365 (D. Or. July 27, 2018), *aff'd sub nom.*
   788 F. App'x 421 (9th Cir. 2019) ..............................................................................11, 20, 24

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017)......................................................................................11, 15, 16

*Wilson v. Bernstock*,
   195 F. Supp. 2d 619 (D.N.J. 2002) ....................................................................................19

**Statutes**

15 U.S.C.
   § 78u-4 ...........................................................................................................................18, 24
   § 78u-5 .............................................................................................................................9, 10

**Other Authorities**

Fed. R. Civ. P. 9(b) ..................................................................................................................7

Roget's 21st Century Thesaurus (3rd ed. 2013) ........................................................................8

## I.     INTRODUCTION

Inovio Pharmaceuticals, Inc. ("Inovio") designs DNA medicines to address various health needs, including cancer and infectious diseases.  For the last ten months, Inovio has been working diligently to develop a safe and effective vaccine for COVID-19.  The urgency of this moment, however, compels a dual-track approach.  To this end, Inovio has been working tirelessly to line up contract manufacturers who can produce large quantities of the vaccine in the event Inovio receives FDA approval.  If Inovio's vaccine candidate is deemed safe and effective, Inovio wants to get its vaccine into the public's hands as quickly and safely as possible.  Throughout this process, Inovio has kept investors and the public apprised of its efforts.

Plaintiffs, however, allege that in these updates, Inovio has intentionally misled investors about the development of its COVID-19 vaccine candidate and ability to manufacture a vaccine.  More specifically, Plaintiffs have alleged three discrete theories, involving three discrete time periods.  None of these theories withstands scrutiny or is adequate to state a claim against Inovio.

Under the first theory, Plaintiffs allege that J. Joseph Kim, Inovio's Chief Executive Officer, misled the investing public on February 14, 2020 (the start of the alleged Class Period) and March 2, 2020, when he said that Inovio had constructed the vaccine within three hours of receiving the genetic code.  This theory is premised on a purported material distinction between "designing" and "constructing" a vaccine.  But Plaintiffs allege no facts demonstrating there was any confusion.  And the First Amended Complaint ("Complaint") offers no explanation as to how this purported distinction could have misled investors, and thus fails to plead falsity and loss causation.  Nor do Plaintiffs allege that Kim intended to mislead investors through his word choice.  Indeed, Plaintiffs concede that before the first challenged statement was even made, the vaccine had already been produced and used in preclinical trials.  Thus, Plaintiffs also fail to plead scienter.

Plaintiffs' second theory encompasses four statements made between March 24, 2020 and

May 12, 2020 regarding Inovio's plans to produce one million doses of its vaccine in 2020. This theory suffers from a number of defects, the foremost of which is that 2020 is not yet over, so any claim of fraud based on Inovio's purported inability to meet its 2020 production goals is pure speculation. Plaintiffs attempt to obscure this fact by focusing on the various obstacles Inovio has had to overcome in order to ramp up its manufacturing capacity, but notably, Plaintiffs do not allege that any of those obstacles has proven to be insurmountable. Because of this, Plaintiffs have failed to plead both falsity and scienter.

Plaintiffs' third and final theory concerns a single statement, made on June 30, 2020 regarding the inclusion of Inovio's vaccine in Operation Warp Speed—the partnership of various federal entities designed to facilitate and accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics. Plaintiffs allege the statement was misleading because Inovio had not been selected by Operation Warp Speed to receive federal funding to produce its vaccine. But the June 30 press release makes clear that Inovio's vaccine candidate was chosen for inclusion in a non-human primate ("NHP") study organized by Operation Warp Speed, not that it was selected to receive federal funding. In short, this theory is premised on claims Inovio never made, and thus, Plaintiffs fail to plead falsity, scienter, and loss causation.

For these reasons, and those addressed below, the Complaint should be dismissed.

## II.     STATEMENT OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS

### A.     Inovio and the Individual Defendants.

Inovio is a biotechnology company focused on developing precisely designed DNA medicines to treat or prevent infectious diseases, cancer, and diseases associated with HPV. (¶¶ 4, 26.)[1] J. Joseph Kim is the Chief Executive Officer and President of Inovio, Peter D. Kies is the

---

[1] "¶" refers to the First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF 68, the "Complaint"). "Ex." refers to exhibits attached to the

Chief Financial Officer, and Robert J. Juba, Jr. is the Senior Vice President of Biological Manufacturing and Clinical Supply Management.  (¶¶ 27, 31, 35.)

### B.   Inovio's DNA Medicines Platform.

DNA medicines are composed of optimized DNA plasmids, which are small circles of double-stranded DNA that are synthesized or reorganized by a computer sequencing technology and designed to produce a specific immune response in the body.  (Ex. I at 3; *see also* Ex. D at 2.)

Many public health authorities laud DNA medicines for their potential in fighting pandemics.  For example, the World Health Organization ("WHO") has characterized DNA vaccination as a "radically new approach to vaccination" that "offers a number of potential advantages over traditional approaches."  (Ex. U at 1.)  Similarly, the U.S. Department of Health & Human Services has observed that "DNA vaccines are easy and inexpensive to make — and they produce strong, long-term immunity."  (Ex. V at 2.)

### C.   The Vaccine Development Process.

Before any vaccine can be sold in the United States, it must be approved by the Food and Drug Administration ("FDA").  (¶ 53.)  Prior to approval, the FDA typically requires a vaccine to undergo preclinical trials and three stages of clinical trials to test for safety and/or efficacy:  Phase I, in which a small number of participants receive the vaccine; Phase II, which involves hundreds of participants; and Phase III, involving thousands of participants.  (*Id.*)

Thus, despite the relatively quick speed at which DNA vaccines can be designed and manufactured, the development process itself remains time-intensive, often taking 10 or more years.  (¶¶ 5, 53.)  Given this, it is unsurprising that Inovio is still in the development phase for its novel DNA vaccine candidates.  However, as shown below, it is actively working with reputable

---

Declaration of Heather Speers, filed herewith.  Unless otherwise noted, all emphasis is added and all internal alterations, quotation marks, ellipses, and citations are omitted.

private and government organizations to complete development and bring its vaccines to market:

| PRODUCT | INDICATION | ANTIGEN | PRECLINICAL | PHASE 1 | PHASE 2 | PHASE 3 | PARTNER/COLLABORATOR/FUNDER |
|---|---|---|---|---|---|---|---|
| **INFECTIOUS DISEASES (NON HPV-ASSOCIATED)** | | | | | | | |
| PENNVAX-GP | HIV | Gag, pol, env | | | | | NIH NIAID   HIV VACCINE |
| INO-4201 | Ebola | Glycoprotein | | | | | DARPA |
| INO-4700 (GLS-5300) | MERS | Spike | | | | | GENE CEPI |
| INO-4600 (GLS-5700) | Zika | Glycoprotein | | | | | GENE |
| INO-4500 | Lassa Fever | Glycoprotein | | | | | CEPI |
| INO-4800 | COVID-19 (Coronavirus) | Spike | | | | | CEPI   BILL & MELINDA GATES foundation |

**D.    Inovio's Development of a COVID-19 Vaccine Candidate.**

In December 2019, the world learned about a new SARS-2 coronavirus—now known as SARS-CoV-2—that causes the disease known as COVID-19.  (¶ 51.)  On January 10, 2020, Inovio received the genetic sequence of this virus from Chinese researchers.  (*Id.*)  Within three hours of receipt, Inovio created a vaccine using its advanced DNA medicines platform, combined with its prior experience developing a vaccine candidate for Middle East Respiratory Syndrome (MERS)—another "spike" protein coronavirus.  (¶¶ 47, 51.)  Shortly thereafter, in January and February 2020, Inovio began manufacturing a small amount of its COVID-19 vaccine candidate (also referred to as "INO-4800") for pre-clinical testing.  (¶ 51.)

By March 2020, the WHO had declared COVID-19 a pandemic.  (¶ 49.)  In April, Inovio announced that it would begin Phase I clinical testing of INO-4800.  (¶ 56.)  And in June, Inovio announced that its Phase I clinical trial results were positive, and that it planned to publish the full data set in a peer-reviewed medical journal.  (¶ 60.)

**E.    Inovio's Plans for Large Scale Manufacturing of Its Vaccine.**

While Inovio previously had large in-house manufacturing capabilities, it sold its manufacturing operations in 2008 to VGXI, Inc. ("VGXI").  (¶ 65.)  In connection with this sale,

Inovio and VGXI entered into a Supply Agreement, whereby VGXI agreed to produce the DNA plasmids for Inovio's preclinical and clinical trials (the "Supply Agreement"). (*Id.*) Pursuant to a provision (the "Tech Transfer Provision") in the Supply Agreement, if VGXI were ***unable or unwilling*** to take on a project from Inovio, VGXI ***must*** transfer its manufacturing process to a location of Inovio's choosing (a "Tech Transfer"). (¶ 67; Ex. A at 3 (§ 2.9(a)(iii)).)

This provision is critical for two reasons. One, VGXI does not have the required FDA approvals to manufacture DNA plasmids for commercial sale. (¶ 69.) And two, in January 2020, VGXI told Inovio that it did not have ***any*** large-scale manufacturing slots available for over a year. (¶¶ 70–72.) Accordingly, as contemplated under the Tech Transfer Provision, in January 2020, Inovio began contacting other manufacturers. (¶¶ 76–77.) On March 24, 2020, Inovio announced a partnership with Ology Bioservices, Inc. ("Ology") to manufacture Inovio's COVID-19 vaccine, funded by an $11.9 million grant from the Department of Defense ("DoD"). (¶ 80.) In accordance with the Tech Transfer Provision, between late March and early May 2020, Inovio repeatedly asked VGXI to transfer its technology to Ology. (¶ 81.) On May 7, 2020, VGXI notified Inovio that it was terminating the Supply Agreement and that it would not provide the Tech Transfer to Ology. (¶ 93.) On June 3, 2020, Inovio sued VGXI for breaching the Supply Agreement. (¶ 96.)

After a two-day evidentiary hearing, the court denied Inovio's request for a preliminary injunction compelling VGXI to provide the Tech Transfer, in part because it found that "the chronology of events in the first several months of 2020 does not reflect the urgent, categorical need for a technology transfer," nor did the evidence show that Inovio would "be unable to manufacture its vaccine on a timely basis without a technology transfer." (Ex. K at 2–3.)

### F.    Inovio Contracts with Additional Manufacturers to Produce Its Vaccine.

Well before VGXI refused to comply with the Tech Transfer Provision, Inovio was in negotiations with other manufacturers to produce its COVID-19 vaccine. In April 2020, Inovio

announced that it reached an agreement with Richter-Helm BioLogics GmbH & Co. KG ("Richter-Helm") for large-scale manufacturing of INO-4800.  (¶ 82; Ex. F at 1.)  Richter-Helm had prior knowledge of VGXI's technology through an earlier Tech Transfer.  (¶ 83.)  Thus, before 2020 was even halfway through, Inovio had lined up two manufacturers—Ology and Richter-Helm—that could collectively produce at least 750,000 doses, and was in discussions with additional manufacturers—including Kaneka Eurogentec S.A. ("Eurogentec")—that could produce the vaccine without any Tech Transfer from VGXI.  (¶ 84; Ex. H at 5–6.)

On August 10, 2020, Inovio reaffirmed its "target to provide at least 1 million doses of [its] DNA vaccine this year and 100 million doses in 2021" with the support of its "global manufacturing coalition."  (Ex. J at 2.)  Inovio also noted it was "in the process of finalizing additional manufacturing partnerships in the U.S. and in Europe."  (*Id.* at 3–4.)

On September 8, 2020, Inovio announced that it signed a letter of intent with Thermo Fisher Scientific to provide additional manufacturing capacity.  (Ex. M at 1.)  Inovio reaffirmed its plans for 100 million doses in 2021, subject to FDA approval of the vaccine, and stated that "Thermo Fisher projects that it could produce at least 100 million doses [] annually."  (*Id.*)

## III.    LEGAL STANDARD

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation."  *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

In pleading these elements, Plaintiffs must clear three hurdles.  ***First***, the Complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  In making this assessment, the "[C]ourt need not credit a

complaint's bald assertions or legal conclusions." *KBZ Commc'ns Inc. v. CBE Techs. LLC*, 634 F. App'x 908, 910 (3d Cir. 2015); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). ***Second***, the Complaint must satisfy Rule 9(b), which requires Plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). ***Third***, the Complaint must satisfy the PSLRA, which "imposes two exacting and distinct pleading requirements for securities fraud actions." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).

To plead falsity, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)).

To plead scienter, "the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 277–78 (quoting 15 U.S.C. § 78u–4(b)(2)). This second requirement "marks a sharp break with Rule 9(b)," because "a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b)." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

## IV.   ARGUMENT

Plaintiffs fail to adequately plead falsity, scienter, and loss causation.

### A.      Plaintiffs Fail to Plead Falsity.

Plaintiffs challenge seven statements that fall into the following three categories: **(1)** Inovio's creation of a vaccine within three hours (¶¶ 97, 99), **(2)** its plan to produce one million doses of its vaccine by the end of 2020 and hundreds of millions of doses in 2021 (¶¶ 102, 104, 106, 109), and **(3)** inclusion of its vaccine in a non-human primate ("NHP") challenge study for Operation Warp Speed (¶ 111). None of the challenged statements is false or misleading.

1.      **Kim's statements regarding the creation of a COVID-19 vaccine in three hours were neither false nor misleading.**

Plaintiffs allege that Kim's February 14 and March 2 statements regarding the creation of a COVID-19 vaccine (¶¶ 97, 99) were misleading because "the Company had not ***constructed its vaccine*** within three hours, but had actually ***'designed' a vaccine construct*** within three hours." (¶ 101.)  This allegation lacks any merit.

First, Plaintiffs argue a distinction without any difference.  The terms design and construct are synonyms.  Roget's 21st Century Thesaurus, DESIGN, CONSTRUCT (3rd ed. 2013).  Investor and analyst commentary make this point clear, as both reported Kim's statements (we "construct[ed] our vaccine") as referring to the time it took to ***design*** the vaccine construct.  (*See* Ex. B at 1 (noting Inovio "claim[ed] that they ***designed*** a vaccine in 3 hours"); Ex. P at 1 (noting Inovio "***designed*** the vaccine within 3 hours"); Ex. Q at 1 ("We find it impressive that Inovio first ***designed*** INO-4800 on January 10, within three hours of receiving the viral genetic sequence.").)

Second, even if the Court were to credit Plaintiffs' theory that these terms are distinct, the Complaint fails to articulate ***why*** Kim's statements were allegedly misleading.  *See Aetna*, 617 F.3d at 277 (noting the complaint must specify "the reason or reasons ***why*** the statement is misleading").  This pleading failure is particularly notable here because when it comes to vaccines, the value is in the design.  It is the key, the source code, the proverbial formula for *Coca-Cola*.  In other words, the design is the limiting factor, not the physical creation of the substance itself.  And despite Plaintiffs' quibbles with the phrasing, they nonetheless concede that the Company did, in fact, design a vaccine within three hours.  (*See, e.g.*, ¶ 13.)  Nor do Plaintiffs allege that physically creating the vaccine proved to be a limiting factor in this instance.  To the contrary, Plaintiffs admit that "[i]n January and February, Inovio began manufacturing the vaccine and conducting pre-clinical testing."  (¶ 51.)  Thus, by the time the challenged statements were made, the vaccine was

already in use in preclinical trials. (*Id.*) "Because Plaintiff[s] ha[ve] failed to explain why these statements were materially false or misleading, these statements cannot form the basis of [their] Section 10(b) claim." *In re Amarin Corp. PLC Sec. Litig.*, 2016 WL 1644623, at *20 (D.N.J. Apr. 26, 2016), *aff'd,* 689 F. App'x 124 (3d Cir. 2017).

### 2. Defendants' statements regarding Inovio's production plans for 2020 and beyond are not actionable.

The second set of challenged statements addresses Inovio's vaccine production goals and efforts to meet those goals. (¶¶ 102, 104, 106, 109.) These statements are inactionable because **(a)** Plaintiffs' assertion that Inovio will be unable to meet these goals is purely speculative, **(b)** the statements are protected under the PSLRA Safe Harbor for forward-looking statements, and **(c)** none of the purportedly omitted information renders any challenged statement misleading.

### a. Plaintiffs' theory of falsity is founded on speculation.

Plaintiffs' theory of fraud is that Inovio will be unable to produce one million doses by the end of 2020. But this is pure speculation and cannot be credited. *See Alvarez v. Ins. Co. of N. Am.*, 313 F. App'x 465, 468 (3d Cir. 2008) ("speculation as to the existence of fraud [is] insufficient"). The year is not yet over. "Because the Complaint cannot show the lack of veracity as to a statement regarding events that had yet to occur," the allegations regarding Inovio's production plans "are not well pled," and the claims based on these statements should be dismissed. *See In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1540523, at *17 (D. Colo. Mar. 31, 2015).

### b. The statements are protected under the PSLRA Safe Harbor.

Even if Inovio is ultimately unable to achieve its production goals, those statements are protected under the PSLRA Safe Harbor, 15 U.S.C. § 78u-5, and "immunize[d] from liability." *Avaya*, 564 F.3d at 254. Under the Safe Harbor, "any forward-looking statement is protected if it is *either* accompanied by substantive and tailored cautionary statements *or* if the plaintiff fails to

show actual knowledge of falsehood." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490–91 (3d Cir. 2016) (noting the "disjunctive statutory test provides two distinct entrances to the safe harbor"). Here, the statements are protected for both reasons.

**The Statements Are Forward-Looking**.   Under the Safe Harbor, a forward-looking statement includes "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer [and] any statement of the assumptions underlying or relating to [such] statement." 15 U.S.C. § 78u-5(i)(l).   The statements challenged here fall squarely within this definition as they concern Inovio's vaccine production plans, and the assumptions related thereto.  (¶¶ 102, 104, 106, 109.)

**Accompanied by Meaningful Cautionary Language**.   Each of the challenged statements was identified as forward-looking when made and accompanied by language directing investors to the risk disclosures in the Company's 2019 Form 10-K and/or Q1 2020 10-Q.  (Ex. E at 2; Ex. F at 3–4; Ex. G at 2.)  The 2019 10-K and Q1 2020 10-Q, in turn, expressly cautioned investors:

- "[W]e could experience delays in product development and clinical trials."  (Ex. D at 3; Ex. L at 2.)

- "[W]e may face delays in the development and commercialization of our electroporation equipment and product candidates."  (Ex. D at 4; Ex. L at 3.)

- "Manufacturers often encounter difficulties in production, particularly in scaling up for commercial production."  (Ex. D at 4; Ex. L at 3.)

While these risks have not been realized, they are substantive and tailored to the very concerns raised in the Complaint (as well as other potential obstacles that may hinder Inovio's ability to meet its goals) and thus protect Inovio's statements from liability.  *OFI*, 834 F.3d at 502.

**No Actual Knowledge of Falsity**.   Plaintiffs have not alleged that, at the time the challenged statements were made, Defendants had ***actual knowledge*** that Inovio would be unable to meet its production goals.  "Since this provision specifies an 'actual knowledge' standard, the scienter

10

requirement . . . is stricter than that for statements of current fact." *Avaya*, 564 F.3d at 273–74. "Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Id.* Accordingly, "[t]o allege that a forecast is actionably misleading, a plaintiff must allege that, at the time the forecast is made, the author of the forecast had knowledge that it was ***not possible*** to meet the projection." *W. Penn. Elec. Emps. Pension Fund v. Mentor Graphics Corp.*, 2018 WL 4524107, at *16 (D. Or. May 29, 2018), *report and recommendation adopted sub nom.* 2018 WL 3618365 (D. Or. July 27, 2018), *aff'd sub nom.* 788 F. App'x 421 (9th Cir. 2019). "This is because a company can be aware of [] obstacles and yet believe that it will be able to overcome them and meet its projections." *Id.*

Plaintiffs fail to meet this standard. They allege only that Defendants were aware of obstacles that arguably made it more difficult to meet their production goals. (*See, e.g.*, ¶¶ 85, 93.) That is inadequate to allege actual knowledge of falsity. *See Williams v. Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017). In *Williams*, plaintiffs argued that because defendant had terminated its relationship with a distributor, the defendants had actual knowledge their financial projections were false and misleading. *Id.* at 238, 245–46. The court acknowledged that "it may be plausible to infer that [defendants] knew or should have known that ending its relationship with Vortex could have some effect on its sales," but noted "actual knowledge that sales from one source might decrease is not the same as actual knowledge that the company's overall sales projections are false." *Id.* at 246. The Court held that "the more plausible inference . . . is that [defendants] accounted for the change in strategy when it devised its sales projections for the year." *Id.*

The same is true here. Plaintiffs allege that Inovio knew VGXI did not have the capacity to manufacture one million doses (*see, e.g.*, ¶¶ 71–74,), which is precisely why Inovio brought on other manufacturers, *e.g.*, Ology and Richter-Helm—to manufacture its vaccine at a large scale.

(¶¶ 77–78, 80, 82, 84.)  In other words, Defendants had already accounted for VGXI's inability to manufacture one million doses when it set its production goal and made the challenged statements.

      **c.**      **The alleged omissions did not render any statement misleading.**

Even without the Safe Harbor, none of the statements support liability because none of the purportedly omitted facts rendered any statement false or misleading.  To be clear, Plaintiffs do not allege that any of the statements were affirmatively false or factually inaccurate.  For example, Plaintiffs do not dispute that the DoD awarded Ology an $11.9 million contract to work with Inovio on a vaccine (¶¶ 80, 102–03), that Richter-Helm expanded Inovio's production capacity (¶¶ 82, 104–05), that Inovio was reaching out to additional manufacturers (¶¶ 84, 106–08), or that a loss of a collaborator could impact product development and profitability (¶¶ 109–10).  Rather, Plaintiffs allege these statements were misleading because they omitted facts regarding **(i)** VGXI's production capabilities, **(ii)** VGXI's refusal to provide the Tech Transfer to Ology, **(iii)** Richter-Helm's manufacturing capacity, and **(iv)** VGXI's contract termination.  (¶¶ 103, 105, 108, 110.)

But omissions, alone, are not actionable.  *Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5.").  "Even non-disclosure of material information will not give rise to liability under Rule 10b–5 unless the defendant had an affirmative duty to disclose that information."  *Oran v. Stafford,* 226 F.3d 275, 285 (3d Cir. 2000).  "Such a duty to disclose may arise when there is [i] insider trading, [ii] a statute requiring disclosure, or [iii] an inaccurate, incomplete or misleading prior disclosure."  *Id.* at 285–86.  Plaintiffs proceed solely under the third prong but fail to adequately plead that any alleged omission rendered any challenged statement "inaccurate, incomplete or misleading."  *Id.*

      **i.**      **Inovio's production plans did not depend on VGXI.**

Plaintiffs allege that Defendants' April 30 and May 11 statements regarding its production goals (¶¶ 104, 106) and the May 12 Prospectus (¶ 109) were misleading because they omitted that

VGXI did not have the capacity to manufacture one million doses or the necessary FDA approval to manufacture product for commercial sale (¶¶ 105, 108(a)–(f), 110).  But Plaintiffs rightly acknowledge that Inovio was relying on *other* manufacturers—*not VGXI*—to meet its production goals.  (*See, e.g.*, ¶¶ 76, 82.)  Given this, is it far from obvious how the omission of these facts could render any statement misleading, and Plaintiffs fail to provide any explanation.  *Amarin*, 2016 WL 1644623, at *20 (falsity not pled where "nowhere in the [complaint] does Plaintiff explain why such statements would be materially false or misleading").

### ii. VGXI's refusal to provide the Tech Transfer did not derail Inovio's production plans.

Plaintiffs further allege that Defendants' March 24 statement regarding Ology (¶ 102), the April 30 and May 11 statements regarding its production goals (¶¶ 104, 106), and the May 12 Prospectus (¶ 109) were misleading because they did not disclose that VGXI "repeatedly refused" to provide the Tech Transfer, and that any Tech Transfer would take years to accomplish (¶¶ 103, 105, 108(g)–(h), (k)–(m), 110).  These allegations are equally meritless.

First, Plaintiffs' assertion that VGXI "repeatedly refused the transfer request" (¶ 108(k)) is unsupported by any factual allegations.  Plaintiffs identify only one refusal—on May 7—which referenced "repeated *requests*," not repeated refusals.  (¶ 94.)  Meaning, Defendants' March 24 statement regarding the anticipated Tech Transfer to Ology pre-dates VGXI's refusal.

Second, when it entered into the Supply Agreement, VGXI agreed to transfer its manufacturing processes to another manufacturer if it was unable or unwilling to fulfill Inovio's order.  (¶ 67.)  Plaintiffs allege that "[s]ince at least January 2020, VGXI repeatedly and clearly notified Inovio that it had no available large-scale manufacturing slots in 2020."  (¶ 71.) Accordingly, as of January 2020, VGXI was obligated to provide the Tech Transfer.  Its purported termination of the Supply Agreement on May 7 did not void that obligation.  (Ex. A at 2 ("Any

termination of this Agreement shall not affect obligations accrued prior to such termination.").)

Third, Plaintiffs' assertion that the Tech Transfer would take "years" is premised solely on self-serving and speculative testimony from VGXI's CEO in a separate case where VGXI is opposite Inovio.  (¶ 91.)  Notably, VGXI's CEO provides no basis to support his estimate, which vastly exceeds the "seven months" it previously took VGXI to perform the Tech Transfer to Richter-Helm.  (¶ 92.)  *See Maresca v. Soufun Holdings Ltd.*, 2016 WL 6102318, at *7 (C.D. Cal. Oct. 18, 2016) ("speculation, devoid of factual substance, cannot satisfy the pleading standards of the PSLRA").  Moreover, Plaintiffs omit portions of the testimony that contemplate an even shorter period of only 30 days for the Tech Transfer.  (Ex. H at 2–4.)

Fourth, Plaintiffs' assertion that "Inovio's ability to be on track to produce one million doses by the end of 2020 has always been dependent on getting a technology transfer from VGXI" (¶ 108(l)) is unsupported by any well-pled facts.  As an initial matter, Plaintiffs proffer no guidance as to what is and is not considered "on track" in this context, and thus fail to establish that Inovio was not "on track" as of May 11, when this statement was made.  (¶ 106.)  *See Avaya*, 564 F.3d at 254.  In any event, as of June 18, 2020 (*i.e.*, half-way through the year), Inovio had manufacturing lined up for at least 500,000 doses (*i.e.*, half the total goal) ***without using the VGXI technology***. (¶ 105.)  Thus, under a common-sense interpretation of that phrase, Inovio was "on track" despite VGXI's refusal to comply with its contractual obligations.

### iii.    Inovio never claimed that Richter-Helm and Ology would produce one million doses.

Plaintiffs allege that Defendants' April 30 and May 11 statements regarding its agreement with Richter-Helm and its production goals (¶¶ 104, 106) and the May 12 Prospectus (¶ 109) were misleading because they did not disclose that "Ology and Richter-Helm did not have the capability of delivering one million doses by the end of 2020, or hundreds of millions of doses per year

thereafter" (¶ 110; *see also* ¶¶ 105, 108(i), 108(m)).  But none of the statements Plaintiffs challenge indicate—either expressly or implicitly—that Inovio planned for all one million doses to be produced solely by Ology and Richter-Helm.  (*See* ¶¶ 104, 106.)  *See Pfizer*, 754 F.3d at 171 (finding statement was not misleading where plaintiffs "appear to misread [the] statement").

Nor would such an inference be reasonable, as the April 30 press release expressly stated that Inovio was "seeking additional external funding and partnership to scale up the manufacturing capabilities" (Ex. F at 2), and Kim's May 11 statement clarified that Inovio is "relying on our current contract manufacturers of plasmids and *adding on additional manufacturers that can help us scale*" (¶ 106; Ex. G at 3).  Plaintiffs concede this fact, alleging that Inovio "also looked into having [its COVID-19 vaccine] manufactured by companies other than Richter-Helm or Ology." (¶ 84.)  Accordingly, the omission of VGXI's, Ology's, and Richter-Helm's purported inability to produce a million doses did not render any statement misleading.  *See In re DotHill Sys. Corp. Sec. Litig.*, 2009 WL 734296, at *10 (S.D. Cal. Mar. 18, 2009) ("Allegations that are not necessarily inconsistent with the allegedly false statement do not establish falsity.").

### iv.   VGXI's contract termination did not impact product development or profitability.

Finally, Plaintiffs allege that Inovio's risk disclosure (incorporated by reference into the May 12 Prospectus) regarding the potential impact that losing a collaborator could have on product development and profitability (¶ 109) was misleading because VGXI had already given notice of termination of the Supply Agreement.   (¶ 110; *see also* ¶ 108(j).)   Plaintiffs, however, misunderstand the law.  Although "a company may be liable under Section 10b for misleading investors when it describes as hypothetical a risk that has already come to fruition," there is no allegation that occurred here.  *Williams*, 869 F.3d at 242–43.

In *Williams*, the defendant disclosed sales could be "adversely affected" if any of its

distributors stopped doing business with the company.  *Id.* at 242.  While one of the defendant's distributors did cease doing business with it, the court found that plaintiffs failed to plead facts that defendant's sales were adversely affected in the short time between the termination and the risk disclosure.  *Id.* at 242–43.  Accordingly, because the warned-of risk (*i.e.*, the impact on sales) had not actually materialized, the court found that defendant had no duty to disclose the loss of the distributor and the risk disclosures were not materially misleading.  *Id.* at 243.

The same analysis applies here.  In the challenged risk disclosure, the predicate event is the termination of an agreement, but the actual risks described are an impact on product development and profitability/commercialization.  Critically, Plaintiffs do not allege that either of these risks materialized as a result of the VGXI termination.

### 3.    Inovio's statement regarding Operation Warp Speed was neither false nor misleading.

Lastly, Plaintiffs challenge Inovio's June 30 statement that its vaccine was selected for Operation Warp Speed.  (¶ 111.)  Plaintiffs allege it was false and misleading because (i) "Inovio had not been selected to participate in Operation Warp Speed," and (ii) this statement led investors to believe "the federal government would likely fund Inovio's production of [its COVID-19] vaccine."  (¶¶ 111–12; *see also* ¶ 11.)  Neither basis has merit.

First, "when considering whether an alleged misstatement is material, [the court] pay[s] particular attention to whether or not Defendants sufficiently disclosed facts and information that would render the alleged misrepresentations not misleading."  *Fan v. StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).  Here, the statement Plaintiffs challenge was included in a press release, which explained that Inovio's vaccine was "currently being tested in a ferret challenge model as well as in NHP challenge studies as part of Operation Warp Speed."  (Ex. I at

2.)  Noticeably, Plaintiffs do not allege that this portion of the press release was false or misleading.
To the contrary, they concede that Inovio's vaccine was "chosen for inclusion in a preliminary study on rhesus macaque monkeys that had been organized by Warp Speed." (¶ 112.)  Analyst reports published after the press release also note that Inovio's inclusion in Operation Warp Speed was limited to "a non-human primate (NHP) challenge study."  (Ex. S at 1; *see also* Ex. T at 1 (same); Ex. R at 1 ("Selection for inclusion in NHP challenge studies as part of OWS doesn't necessarily run counter to media reports that INO-4800 is excluded as an OWS finalist").)  Thus, Inovio's "disclosures render any such perceived misstatement immaterial." *Fan*, 927 F.3d at 717.

Second, Plaintiffs do not and cannot provide support for their speculation that Inovio's statement would lead investors to believe that the federal government was likely to fund Inovio's production of its vaccine.  (¶ 112.)  The Complaint contains no well-pled facts that every participant in Operation Warp Speed receives federal funding, much less that such funding is provided to support production of the vaccine, as opposed to clinical trials or other development efforts.  (*See* ¶ 11 (noting funding was provided to support clinical trials; no mention of funding to support vaccine production).)  In short, Plaintiffs' conclusory assertion fails to establish any "link between an alleged misleading statement and specific factual allegations demonstrating the reasons why the statement was false or misleading, as the PSLRA requires." *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 883–84 (8th Cir. 2009).

### B.    Plaintiffs Fail to Plead a Strong Inference of Scienter.

A second basis for dismissal is Plaintiffs' failure to plead a strong inference that any Defendant acted with scienter—*i.e.*, an "intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  To plead scienter, Plaintiffs must "allege facts giving rise to a strong inference of either reckless or conscious behavior." *Avaya*, 564 F.3d at 267.  Recklessness is a high bar, requiring "not merely simple, or even inexcusable negligence,

but an ***extreme departure*** from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 153–54 (3d Cir. 2018). To survive dismissal, "[a]n inference that a defendant acted with scienter . . . must be more than merely reasonable or permissible—it must be cogent and compelling." *Id.* at 154.

### 1.    Plaintiffs allege no facts demonstrating an intent to deceive.

Scienter must be alleged "with respect to ***each act or omission***" alleged to violate the statute. 15 U.S.C. § 78u-4. The Complaint fails as to each group of challenged statements.

#### i.    Statements about the vaccine construct.

Plaintiffs allege that Kim's February 14 and March 2 statements were misleading based on a purported distinction between the terms "constructed" and "designed." (¶ 101.) But Plaintiffs do not allege that Kim ***intended*** to mislead investors with his word choice. *See Avaya*, 564 F.3d at 268 ("Omissions and ambiguities count against inferring scienter."). Nor would such an allegation be plausible, given that the two terms are synonymous. (*See* Section IV.A.1.) Where "two terms are more or less interchangeable," the use of one instead of the other "supports at most an inference of imprecise or even negligent use of language, not an inference of scienter." *See Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 626–27 (4th Cir. 2008). As such, Plaintiffs do not (and cannot) plead a strong inference of scienter as to the February 14 and March 2 statements.

#### ii.    Statements about production goals.

With respect to the second group of statements, Plaintiffs allege that Defendants withheld information that was purportedly relevant to Inovio's ability to meet its 2020 production goals. (¶¶ 103, 105, 108, 110.) To plead scienter under an omission-based theory, Plaintiffs must allege facts demonstrating that the omitted fact "was so obviously material that the [D]efendant[s] must have been aware both of its materiality ***and*** that its non-disclosure would likely mislead investors."

*Anderson v. StoneMor Partners, L.P.*, 296 F. Supp. 3d 693, 704 (E.D. Pa. 2017), *aff'd sub nom. Fan v. StoneMor Partners LP*, 927 F.3d 710 (3d Cir. 2019).  Stated differently, the relevant inquiry is "not merely whether the defendant had knowledge of the undisclosed facts; rather, it is the danger of misleading that must be actually known or so obvious that any reasonable man would be legally bound as knowing."  *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 638–39 (D.N.J. 2002).

Here, Plaintiffs rely solely on Defendants purported knowledge of the omitted facts, but fail to adequately allege that Defendants knew the omission of those facts was likely to mislead investors.  For example, Plaintiffs belabor the point that Inovio knew VGXI did not have the manufacturing capacity to produce one million doses by the end of 2020.  (*See, e.g.*, ¶¶ 70–74, 77.)  But knowledge of this fact, alone, is insufficient to plead scienter.  Plaintiffs must demonstrate that Defendants knew "that [the] failure to reveal [this] fact would likely mislead investors."  *In re PDI Sec. Litig.*, 2005 WL 2009892, at *20 (D.N.J. Aug. 17, 2005).  They fail to do so.

Instead, Plaintiffs' allegations demonstrate that Inovio was not relying on VGXI, but rather, was planning to engage other manufacturers to achieve its production goals.  (*See, e.g.*, ¶ 76 ("Knowing that VGXI would be unable to produce INO-4800 on a large scale, Inovio engaged with other manufacturers."); ¶ 82 ("In addition to seeking help from Ology, Inovio also turned to Richter-Helm" and "by February 6, Inovio was working with Richter-Helm to acquire manufacturing slots for the plasmids used for INO-4800."); ¶ 84 ("Inovio has also looked into having INO-4800 manufactured by companies other than Richter-Helm or Ology . . . includ[ing] the Serem Institute, in India, and several manufacturers in China.").)  Because Inovio was not relying upon VGXI to achieve its production goals, any purportedly "misleading implication" resulting from Defendants' omission of VGXI's inability to do so was more plausibly "inadvertent or the result of an oversight," and not indicative of scienter.  *Costabile v. Natus Med. Inc.*, 293 F.

Supp. 3d 994, 1018–19 (N.D. Cal. 2018) (rejecting plaintiff's contention that the statements reflect a "deliberate effort to conceal the true state of affairs" and dismissing the complaint).

Similarly, Plaintiffs allege that Defendants knew VGXI had refused to perform the Tech Transfer.  (¶ 93.)  But again, Plaintiffs fail to connect knowledge of this fact to an intent to mislead investors.  To the contrary, Plaintiffs concede that Kim believed Inovio had a contractual right to the Tech Transfer, and that Inovio would secure the Tech Transfer notwithstanding VGXI's May 7 refusal to voluntarily comply.  (¶¶ 90, 94, 96.)  And this belief was well-founded.  "Under the terms of the Supply Agreement, if VGXI is unable or unwilling to take on a production project from Inovio, VGXI **must** facilitate the transfer of its manufacturing process to a location of Inovio's choosing."  (¶ 67; *see also* Ex. A at 2 (§ 4.2: "Any termination of this Agreement shall not affect obligations accrued prior to such termination.").)

Moreover, "none of the complained-of risk factors of which defendants are alleged to have been aware . . . **compels** the conclusion" that Inovio would "**necessar[ily]**" be unable to meet its production goals, or that such possibility was "an **overwhelmingly likely** outcome."  *Mentor Graphics*, 2018 WL 4524107, at *20.  Indeed, setting aside Kim's reasonable belief that Inovio would get the Tech Transfer, the hearing testimony upon which Plaintiffs rely establishes that Inovio had other means of meeting its production goals.  (*See* ¶¶ 82–83 (Richter-Helm already had the capability to manufacture Inovio's vaccine); Ex. H at 6 ("Eurogentec has its own process"); *id.* at 8 (same); *id.* at 9 (Ology has "a process that they have been working on").)  Given this, the various omissions about which Plaintiffs complain were not "so obviously material that [Defendants] must have been aware both of [their] materiality and that [their] non-disclosure would likely mislead investors."  *StoneMor Partners*, 296 F. Supp. 3d at 704.

### iii.    Statements about Operation Warp Speed.

As to the final June 30 statement, the Complaint contains no well-pled allegations that

Defendants intended to mislead investors about Inovio's participation in Operation Warp Speed. Plaintiffs concede that Inovio vaccine was "***chosen for inclusion*** in a preliminary study on rhesus macaque monkeys that had been ***organized by Warp Speed***." (¶ 112.)  That is precisely what Inovio's June 30 press release stated.  (Ex. I at 2 ("INO-4800 is currently being tested in a ferret challenge model as well as in NHP challenge studies as part of Operation Warp Speed.").) "Disclosures such as these cut against a strong inference that Defendants were attempting to hide information or mislead the public." *Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1266 (D. Kan. 2015), *aff'd,* 827 F.3d 1229 (10th Cir. 2016).

**2.      Plaintiffs' allegations of motive and opportunity do not support an inference of scienter.**

Lacking any facts demonstrating an intent to mislead, Plaintiffs rely solely on allegations of "motive and opportunity"—including Defendants' stock sales and Inovio's capital raises—which "no longer serve as an independent route to scienter." *Avaya*, 564 F.3d at 277.

**i.      Defendants' stock sales do not support scienter.**

Plaintiffs allege that Kies' June 30, 2020 and July 15, 2020 stock sales, and Kim's July 30, 2020 stock sales support an inference of scienter.  (¶¶ 29, 33, 132.)  As an initial matter, the timing of these stock sales cannot support an inference of scienter as to the first two groups of challenged statements because the sales post-date the purported revelations of the fraud.  (*See* ¶ 144 (fraud allegedly revealed on March 9); ¶ 145 (fraud allegedly revealed on June 3).)   "Selling after delivering news that causes a company's stock price to go down is not suggestive of withholding information" because defendants reap no benefit from the purportedly inflated stock price. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 207 (1st Cir. 1999).  Rather, "[t]he fact that Defendants did not take advantage of the purportedly inflated price to sell their holdings overwhelms the inference that they were knowingly withholding from the public damaging and

material information." *In re Homebanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1359 (N.D. Ga. 2010); *see also Hoey v. Insmed Inc.*, 2018 WL 902266, at *21 (D.N.J., Feb. 15, 2018) (noting courts consistently weigh a lack of stock sales "during the applicable time period . . . against an inference of scienter").

Nor do the stock sales support scienter as to the final statement regarding inclusion in Operation Warp Speed because the sales were made pursuant to 10b5-1 plans.  (¶¶ 29, 33.)  "A Rule 10b5-1 plan prearranges stock transactions and provides an affirmative defense to an allegation of insider trading, provided the plan is adopted in writing prior to becoming aware of material non-public information."  *In re NutriSystem, Inc. Sec. Litig.*, 653 F. Supp. 2d 563, 576 (E.D. Pa. 2009)).  Plaintiffs' allegations, made on "information and belief," that Defendants "had knowledge of, or recklessly disregarded, non-public, material adverse facts concerning the development status of INO-4800 at the time [they] created the trading plan[s]" (¶¶ 29, 33), are pure speculation and fail to satisfy the PSLRA's pleading requirement to "state with particularity all facts on which that belief is formed."  *Aetna*, 617 F.3d at 277.  "It therefore amounts to an unsupported allegation that is impermissible under the PSLRA."  *Kocourek v. Shrader*, 391 F. Supp. 3d 308, 330 (S.D.N.Y. 2019).

Moreover, Kim ***increased*** his holdings during the Class Period, which is "inconsistent with an intent to commit fraud."  *In re MELA Scis., Inc. Sec. Litig.*, 2012 WL 4466604, at *5 (S.D.N.Y. Sept. 19, 2012).  (*Compare* Ex. N at 1 (1,100,707 shares as of January 13, 2020) *with* Ex. O at 1 (1,188,313 post-sale on July 30, 2020).)

### ii.       Inovio's capital raises do not support scienter.

As a last-ditch effort, Plaintiffs allege that Defendants were motivated to artificially inflate the stock price so that they could raise additional capital "to fund clinical development activities and operations supporting clinical development," which factored into their compensation.  (¶ 6;

*see also* ¶¶ 12, 133–37.)  Generic allegations of motive that are common to all corporate executives

"cannot give rise to a strong inference of fraudulent intent."  *Avaya*, 564 F.3d at 278–79; *see also*

*Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) (if general motive allegations

were sufficient, "virtually every company in the United States that experiences a downturn in stock

price could be forced to defend securities fraud actions").  As the Fourth Circuit observed:

> [T]he motivations to raise capital or increase one's own compensation are ***common to every company*** and thus add little to an inference of fraud. All investments carry risk, ***particularly in a field like biopharmaceuticals***. If we inferred scienter from every bullish statement by a pharmaceutical company that was trying to raise funds, we would ***choke off the lifeblood of innovation in medicine*** by fueling frivolous litigation—exactly what Congress sought to avoid by enacting the PSLRA

*Cozzarelli*, 549 F.3d at 627.

Indeed, this is precisely why courts routinely reject such allegations, recognizing that "[i]n

every corporate transaction, the corporation and its officers have a desire to complete the

transaction, and officers will usually reap financial benefits from a successful transaction."  *Avaya*,

564 F.3d at 278–79; *see also Hoey*, 2018 WL 902266, at *22 (finding the motive to raise money

for a clinical trial "applicable to any corporation seeking to commercialize an investigational drug"

and thus "fails to support a strong inference of scienter").  Plaintiffs' generic allegations that

Defendants were motivated to raise additional funds fall far short of establishing scienter.

### 3.    Viewed holistically, Plaintiffs' allegations do not support a cogent and compelling inference of scienter.

"To determine whether the allegations give rise to a 'strong' inference of scienter," the

Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as

inferences favoring the plaintiff."  *GNC Holdings*, 757 F. App'x at 154.  In cases where plaintiffs

are able to satisfy this pleading standard, "the complaint often contains clear allegations of

admissions, internal records or witnessed discussions suggesting that at the time they made the

statements claimed to be misleading, the defendant officers were aware that they were withholding

vital information or were at least warned by others that this was so." *In re Boston Sci. Corp. Sec. Litig.,* 686 F.3d 21, 31 (1st Cir. 2012). No such allegations are present here.

Instead, Plaintiffs' allegations—viewed collectively and holistically—"suggest most compellingly that during the putative class period [Defendants] were aware of risks [impacting Inovio's production capabilities] but were optimistic, ***with good justification*** . . . , that [Inovio] would successfully navigate those risks." *See Mentor Graphics*, 2018 WL 4524107, at *22. This is inadequate to plead a strong inference of scienter. *See id.*

C.   **Plaintiffs Fail to Plead Loss Causation for Statements Regarding the Vaccine Construct and Operation Warp Speed.**

A third ground for dismissing the statements regarding the vaccine construct (*i.e.*, February 14 and March 2) and Operation Warp Speed (*i.e.*, June 30) is the failure to plead loss causation. The PSLRA requires that a plaintiff show "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (plaintiff must show "a causal connection between the material misrepresentation and the loss"). Plaintiffs fail to do so.

**Vaccine construct.** Plaintiffs allege that Inovio's March 9 tweet corrected Kim's prior statements by clarifying that Inovio "had not ***constructed*** its vaccine within three hours, but had merely '***designed*** a vaccine construct.'" (¶ 113.) This theory fails for at least two reasons.

First, the March 9 statements did not "reveal any new information related to Defendants' alleged misrepresentations." *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *24 (E.D. Pa. Sept. 3, 2010); *see also Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) ("Corrective disclosures must present facts to the market that are new."). From the start, the market understood that Inovio had "***designed*** the vaccine within 3 hours using its DNA-based vaccine platform." (Ex. P at 1; *see also supra* Section IV.A.1.) Thus, no "correction" was required.

24

Second, Inovio's March 9 tweet was in response to a baseless accusation by notorious short-seller, Citron Research ("Citron"), questioning Inovio's ability to design a vaccine construct within three hours: "SEC should immediately HALT [Inovio] stock and investigate the ludicrous and dangerous claim that they designed a vaccine in 3 hours."  (Ex. B at 1; *see also* ¶ 113.)  To be clear, Citron was not accusing Inovio of misleading investors about "constructing" versus "designing" a vaccine; Citron's own tweet demonstrates that it understood Kim was referring to the design of the vaccine.  And far from correcting Kim's statements, Inovio's March 9 tweet confirmed Kim's statements were accurate—"Inovio designed a vaccine construct . . . within three hours after the viral sequence was publicly available"—and that Citron's accusations to the contrary "demonstrated a lack of understanding behind DNA medicines."  (Ex. C at 1.)

**Operation Warp Speed.**  Plaintiffs allege that an August 9 *New York Times* article revealed that Inovio's June 30 statement about being selected for Operation Warp Speed was false. (¶ 124.)  They are wrong.  The article states only that "Inovio was not given federal funding to produce vaccines" and that "its vaccine candidate had been chosen for inclusion in a preliminary study on rhesus macaque monkeys that had been organized by Warp Speed."  (*Id.*)  But the statement Plaintiffs challenge is silent as to funding.  And the article otherwise confirms that Inovio's vaccine candidate was, in fact, included in a study organized by Operation Warp Speed. In short, the article did not "correct" Inovio's June 30 statement, it confirmed its accuracy.

### D.    Plaintiffs' Section 20(a) Claim Fails.

Because the Complaint does not state a violation of Section 10(b), the "control person" claim under Section 20(a) necessarily fails.  *See Avaya*, 564 F.3d at 252.

## V.    CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Dated: November 5, 2020

Respectfully Submitted,

DUANE MORRIS LLP


By: *s/ Patrick Loftus*
　　 Patrick Loftus (PA60417)
　　 30 South 17th Street
　　 Philadelphia, PA 19103
　　 (215) 979-1367 (phone)
　　 (215) 689-3591 (fax)
　　 loftus@duanemorris.com

　　 COOLEY LLP
　　 Luke Cadigan (*Pro Hac Vice*)
　　 500 Boylston Street
　　 14th Floor
　　 Boston, MA 02116-3736
　　 (617) 937-2300 (phone)
　　 (617) 937-2400 (fax)
　　 lcadigan@cooley.com

　　 Heather Speers (*Pro Hac Vice*)
　　 4401 Eastgate Mall
　　 San Diego, CA 92121-1909
　　 (858) 550-6000 (phone)
　　 (858) 550-6420 (fax)
　　 hspeers@cooley.com

　　 *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on November 5, 2020, I filed this document on the Court's docket using the Court's CM/ECF system.  Based on the Court's records, all counsel of record were served with a copy of the foregoing document by electronic means.

*s/ Patrick Loftus*
DUANE MORRIS LLP
Patrick Loftus (PA60417)
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1367 (phone)
(215) 689-3591 (fax)
loftus@duanemorris.com