THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICK MCDERMID, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INOVIO PHARMACEUTICALS, INC., et al.,<br><br>Defendants. | Case No. 2:20-cv-01402-GJP<br><br>CLASS ACTION |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................... 1

II.    RELEVANT BACKGROUND ................................................................................. 3

    A.    Inovio Pharmaceuticals and the Individual Defendants.............................. 3

    B.    Procedural Posture and Plaintiffs' Theories of Fraud................................. 4

        1.    "Design" Versus "Construct." ...................................................... 5

        2.    Inovio's Manufacturing Capabilities ............................................ 7

            a.    Alleged misrepresentations............................................ 7

            b.    Alleged corrective disclosures ...................................... 8

    C.    Plaintiffs and Their Proposed Class........................................................... 10

III.    LEGAL STANDARD............................................................................................. 11

IV.    ARGUMENT......................................................................................................... 11

    A.    The Proposed Class Period Is Overbroad. ................................................. 11

        1.    The Class Period Should Be Broken into Two Separate Class Periods.... 13

        2.    The First Class Period Should End No Later Than March 3, 2020. ......... 13

        3.    The Second Class Period Should End No Later Than June 3, 2020......... 13

    B.    Plaintiffs Cannot Satisfy Rule 23(b)(3)'s Predominance Requirement Because Individual Questions of Reliance Overwhelm Questions Common to the Class. 16

        1.    The Presumption of Reliance Is Rebuttable............................................. 16

            a.    To rebut the presumption, a defendant can show the alleged misstatements had no price impact. .............................................. 16

            b.    Event studies can show the absence of price impact. ................... 17

            c.    In an efficient market, confirmatory information will not cause price impact................................................................................. 18

            d.    If it is more likely than not that an alleged misrepresentation had no price impact, the presumption of reliance is rebutted. ...... 18

        2.    Dr. Kim's Statements that Inovio Was Able to "Construct" a Vaccine in Three Hours Had No Price Impact. ....................................................... 19

            a.    No price impact from the alleged misrepresentation on February 14. ................................................................................. 19

            b.    No price impact from the alleged misrepresentation on March 2. ..................................................................................... 19

            c.    Price impact cannot be inferred from the alleged corrective disclosure on March 9.................................................................. 20

        3.    The Remainder of the Class Period Must Be Shortened to Account for the Lack of Price Impact at the Front- and Back-End of the Period......... 21

            a.    No price impact from alleged misrepresentation on March 24..... 22

            b.    Price impact cannot be inferred from the August 9 and 10 disclosures.................................................................................. 22

TABLE OF CONTENTS
(continued)

Page

i.      No new information regarding allegedly omitted facts. ... 22

ii.     No reiteration of allegedly omitted facts on August 10.... 23

iii.    New information unrelated to alleged misrepresentations.............................................................. 24

C.    Plaintiffs Do Not Satisfy the Typicality and Adequacy Requirements of Rule 23(a). ...................................................................................................... 25

    1.    Mr. Williams Is Atypical Because He Did Not Purchase Inovio Stock During the Only Viable Portion of the Class Period and Is Otherwise Subject to a Unique Truth-on-the-Market Defense. ................................ 25

    2.    Mr. Zenoff Is Atypical Because He Did Not Suffer Any Compensable Loss. .................................................................................................. 27

V.    CONCLUSION.................................................................................................... 29

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
2007 WL 276150 (D.N.J. Jan. 25, 2007)................................................................11, 12

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)................................................................................................16

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006)................................................................................25, 26

*In re Data Access Sys. Sec. Litig.*,
103 F.R.D. 130 (D.N.J. 1984)....................................................................................12

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................28

*Erica P. John Fund, Inc. v. Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015).................................................................................17

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)...................................................................20

*Goldman Sachs Group, Inc. v. Ark. Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021)......................................................................................17, 18, 24

*Greenberg v. Crossroads Sys., Inc.*,
364 F.3d 657 (5th Cir. 2004) ............................................................................18, 20, 23

*In re GSE Bonds Antitrust Litig.*,
377 F. Supp. 3d 437 (S.D.N.Y. 2019)...........................................................................27

*Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*,
573 U.S. 258 (2014)...................................................................................16, 17, 18, 27

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008)......................................................................................11

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)..................................................................15

*Jasin v. Kozlowski*,
2010 WL 4536973 (M.D. Pa. Nov. 3, 2010) ...................................................................28

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) ...............................................................................25

TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Kulicke & Soffa Indus., Inc. Sec. Litig.*,
   1990 WL 1478 (E.D. Pa. Jan. 9, 1990)..............................................................11, 12

*Lerch v. Citizens First Bancorp, Inc.*,
   144 F.R.D. 247 (D.N.J. 1992).........................................................................12, 15

*Malone v. Microdyne Corp.*,
   26 F.3d 471 (4th Cir. 1994) .................................................................................14

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) .........................................................................17

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001)..................................................................................11

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)....................................................24

*In re Organogenesis Sec. Litig.*,
   241 F.R.D. 397 (D. Mass. 2007)...........................................................................27

*In re Safeguard Scis.*,
   216 F.R.D. 577 (E.D. Pa. 2003).............................................................................27

*Sherman v. Am. Eagle Express, Inc.*,
   2012 WL 748400 (E.D. Pa. Mar. 8, 2012).............................................................11

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   325 F.R.D. 280 (D. Minn. 2018).................................................................12, 13, 23

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)...............................................................................................11

*Wallace v. Sys. & Computer Tech. Corp.*,
   1997 WL 602808 (E.D. Pa. Sept. 23, 1997) ........................................................26

**Statutes**

15 U.S.C.
   § 78u-4(a)(3)(B)(iii)(I).........................................................................................27
   § 78u-4(e).............................................................................................................29

Defendants Inovio Pharmaceuticals, Inc. ("Inovio"), J. Joseph Kim, Peter D. Kies, and Robert J. Juba (collectively "Defendants") oppose Plaintiffs' Motion for Class Certification ("Motion").

## I.    INTRODUCTION

Plaintiffs seek certification of a class period running from February 14, 2020 to August 10, 2020, and appointment of Mr. Williams and Mr. Zenoff as class representatives.  Both requests should be denied.  At most, the class period should run from May 11, 2020 to June 3, 2020.  However, because neither Mr. Williams nor Mr. Zenoff is an adequate class representative, the Motion should be denied in its entirety.

**Class Period.**  Plaintiffs' proposed class period has four critical flaws:

***First***, there is no basis to extend the class period beyond June 3, 2020.  That is the last date on which Plaintiffs have actually alleged a corrective disclosure related to any of the surviving alleged misrepresentations.  Although the Complaint identified disclosures on August 9 and 10, 2020, Plaintiffs alleged those disclosures were corrective of Inovio's June 30 press release—which the Court dismissed with prejudice.  With the June 30 statements out of the case, there is no basis to extend the class period to August 10.  Plaintiffs, however, in a transparent attempt to salvage a longer class period and higher damages, are now claiming that the August 9 and 10 disclosures somehow provided "additional information" about "Inovio's inability to meet vaccine production guidance."  This is nonsense.  Plaintiffs identify no such information disclosed on August 9 or 10.  And even if they could, Plaintiffs previously represented to this Court that they are ***not*** challenging any forward-looking aspect of Defendants' alleged misrepresentations, which includes Inovio's ability to meet vaccine production guidance.  Accordingly, any new information about Inovio's ability (or lack thereof) to meet such guidance cannot be corrective.

1

*Second*, because Plaintiffs' claims are based on two independent theories of fraud that cover two different time periods, there should be two separate class periods. The first period begins on February 14 and ends on March 9, 2020. This timeframe encompasses all of Plaintiffs' allegations related to their first theory of fraud, which is premised on statements about Inovio's ability to "construct" its COVID-19 vaccine in three hours. The second period does not begin until March 24—more than two weeks after the first period ends—and ends on June 3, 2020. This timeframe covers all of Plaintiffs' allegations related to its second theory of fraud, which is premised on statements about Inovio's manufacturing capabilities.

*Third*, the first class period should be eliminated, or at a minimum, shortened by one week. On March 3, 2020, Inovio issued a press release that stated, unequivocally, that it "designed" its COVID-19 vaccine within three hours. This is the same exact information that Inovio reiterated on March 9, which Plaintiffs contend was corrective. Thus, at a minimum, this class period should end on March 3 when the curative information was first disclosed to the market. But even that is too long because neither of the alleged misrepresentations in the first class period had any impact on Inovio's stock price. And without price impact, Plaintiffs have no means of proving class-wide reliance. Accordingly, the class period cannot encompass February 14 to March 9, 2020 without running afoul of Rule 23(b)(3).

*Fourth*, the second class period should not begin earlier than May 11, 2020. The only alleged misrepresentation prior to this date is March 24. However, Defendants' expert has demonstrated this statement had no impact on Inovio's stock price. As such, Plaintiffs face the same obstacle to class-wide reliance with respect to this alleged misrepresentation.

**Class Representatives.**  Plaintiffs have also failed to demonstrate that they are adequate class representatives.

*Mr. Williams.*  Mr. Williams is an inadequate representative for the second class period because he did not make any purchases or sales of Inovio stock during this timeframe.  And to the extent the Court is inclined to keep any portion of the first class period, Mr. Williams is inadequate and atypical because his only purchases of Inovio stock occurred after the alleged "truth" was revealed to the market on March 3.  As such, he is subject to a unique truth-on-the-market defense that, if successful, would eliminate his standing in this case altogether.

*Mr. Zenoff.*  Mr. Zenoff is also inadequate because, according to the damages methodology proposed by Plaintiffs' own expert, the only shares of Inovio stock that Mr. Zenoff held over an alleged corrective disclosure resulted in ***no damages***.  As such, he is subject to a unique standing defense and has no financial incentive to pursue this litigation on behalf of the proposed class.

For these reasons, as discussed more fully below, Plaintiffs' Motion should be denied.

## II.     RELEVANT BACKGROUND

### A.     Inovio Pharmaceuticals and the Individual Defendants.

Inovio creates precisely designed DNA medicines to treat and protect people from infectious diseases, cancer, and diseases associated with human papillomavirus.  Its partners and collaborators are among the largest and most esteemed in the industry, including (among others): AstraZeneca, Richter-Helm BioLogics ("Richter-Helm"), Thermo Fisher Scientific ("Thermo/Patheon"), Coalition for Epidemic Preparedness Innovations ("CEPI"), Defense Advanced Research Projects Agency ("DARPA"), the U.S. Department of Defense ("DoD"), International Vaccine Institute ("IVI"), National Cancer Institute, the Walter Reed Army Institute of Research, and The Bill & Melinda Gates Foundation.  For almost a decade, Inovio has been developing DNA vaccines to prevent the spread of infectious diseases, including (among others)

Middle East Respiratory Syndrome ("MERS"), Zika, and Lassa Fever.

Shortly after a novel coronavirus emerged in December 2019, Inovio (like dozens of other vaccine makers and researchers) began dedicating resources to what would soon become a global pandemic.  Since January 2020, Inovio has been working to develop a DNA vaccine for COVID-19 that is not only safe and effective, but also stable at room temperature—a huge differentiator from vaccines currently on the market.  If successful, Inovio's shelf-stable vaccine will last longer and be particularly advantageous for those living in regions with less access to healthcare.

DNA vaccines, however, are still relatively new and have yet to be approved by the FDA. Inovio (with the support of its many partners and collaborators) hopes to change that. And it is making progress.  It currently has multiple DNA vaccine candidates in its pipeline at various stages of development.  Among those is INO-4800, Inovio's vaccine candidate for COVID-19, which was recently evaluated—and demonstrated positive results—in the Phase 2 segment of an ongoing Phase 2/3 clinical trial.  (Ex. B at 1.)[1]  Inovio announced in August 2021 that it has received approval to begin the Phase 3 segment of its clinical trial in Brazil.  (Ex. C at 1.)

**B.      Procedural Posture and Plaintiffs' Theories of Fraud.**

Plaintiffs' Complaint was originally premised on three theories of fraud: (1) Dr. Kim's February 14 and March 2, 2020 statements about Inovio constructing a vaccine in three hours; (2) Defendants' March 24, April 30, May 11, and May 12 statements about Inovio's manufacturing

---

[1] "Ex." refers to the exhibits attached to the Declaration of Heather Speers in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Speers Decl."). "FAC" and "Complaint" refer to the First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws (ECF 68).  "Mem." refers to Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (ECF 100).  "Feinstein Rpt." refers to the Report on Market Efficiency by Professor Steven F. Feinstein (ECF 101-1).  "Stulz Rpt." refers to the Expert Report of René M. Stulz, attached as Exhibit A to the Speers Decl.  Unless otherwise noted, all emphasis is added and all citations, quotations marks, and internal alterations are omitted.  All pin cites are to the internal document pagination.

capabilities and progress toward producing one million vaccine doses in 2020; and (3) Inovio's June 30, 2020 press release regarding Operation Warp Speed.  (ECF 85 at 11.)  On February 16, 2021, the Court dismissed with prejudice the claims based on Defendants' April 30 and June 30, 2020 statements.  (ECF 86.)   Thus, only the first two theories remain at issue in this case.

### 1.    "Design" Versus "Construct."

The first theory encompasses two alleged misrepresentations made on February 14 and March 2, 2020.  (FAC ¶¶ 97, 99.)  Plaintiffs contend these statements were misleading because Dr. Kim said Inovio was able to "construct" its vaccine in three hours, rather than saying it was able to "design" its vaccine construct in that time.  (Ex. D at 4–6; Ex. E at 4–6.)  Plaintiffs claim the truth was revealed on March 9, when Inovio issued a Tweet stating that it was, in fact, able to design its COVID-19 vaccine in three hours, refuting a baseless accusation by a notorious short-seller that such a feat was impossible.  (FAC ¶ 13; Ex. D at 7; Ex. E at 7.)  In short, "[a]s Plaintiffs tell it, Inovio's March 9 tweet was the first time it claimed to have only designed a vaccine in three hours and its stock price tumbled in response."  (ECF 85 at 17.)

Contrary to the allegations in the Complaint, however, March 9 was ***not*** the first time Inovio claimed to design its vaccine in three hours.  On January 30, 2020, Kate Broderick, Senior Vice President of Research and Development at Inovio, told BBC: "Once China had provided the DNA sequence of this virus, we were able to put it through our lab's computer technology and ***design a vaccine within three hours***."  (Ex. F at 2.)

Additionally, on February 11, 2020, CBS News interviewed Inovio's Director of Research and Development, Trevor Smith, and reported: "When Chinese scientists released the genetic sequence on Jan. 9, Inovio researchers got to work immediately and ***within 3 hours they had a vaccine for coronavirus***, or COVID-19 as it is now being referred to.  'We have an algorithm which we designed, and we put the DNA sequence into our algorithm and came up with the vaccine

in that short amount of time,' said Dr. Smith."  (Ex. G at 2.)

And on March 3, 2020, at 8:00 a.m. ET, Inovio issued a press release announcing that it was accelerating its COVID-19 vaccine development timeline, including beginning its human trials in April 2020.  (Ex. H.)  This press release clarified Dr. Kim's statement at the White House explaining that Inovio had ***designed its vaccine in three hours*** and within two weeks began manufacturing and pre-clinical testing:

> Dr. J. Joseph Kim, Inovio's President & CEO, shared this accelerated timeline at the U.S. Coronavirus Task Force meeting at the White House on March 2. Dr. Kim said, "Inovio is the leader in coronavirus vaccine development and the only company with a Phase 2 vaccine for a related coronavirus that causes Middle East Respiratory Syndrome (MERS). Using our modern DNA medicines platform, we designed our DNA vaccine INO-4800 in three hours after the publication of the genetic sequence of the novel coronavirus that causes COVID-19."

## Inovio's COVID-19 DNA Vaccine Development Timeline

| December 31, 2019 | Inovio scientists learn about a novel coronavirus (SARS-CoV-2) which caused an outbreak of respiratory disease in Wuhan, China, now referred to as **COVID-19** |
|---|---|
| January 10, 2020 | Chinese researchers share the genetic sequence of the novel coronavirus<br><br>Inovio designs **DNA vaccine INO-4800 in three hours** after receiving the genetic sequence using its proprietary **DNA medicines platform technology**<br><br>INO-4800 was designed to precisely match the DNA sequence of the virus |
| January 10 to January 23, 2020 | Inovio scientists race to **manufacture INO-4800 and begin preclinical testing** |

(Ex. H at 1–2.)

### 2.    Inovio's Manufacturing Capabilities

#### a.    Alleged misrepresentations

Plaintiffs' second theory encompasses three alleged misrepresentations that relate to Inovio's manufacturing capabilities.

**March 24, 2020**.  On March 24, Inovio issued a press release announcing that the DoD awarded Ology Bioservices ("Ology") a contract to manufacture Inovio's DNA vaccine for the U.S. military.  (FAC ¶ 102.)  According to Plaintiffs, this press release was misleading because "Inovio did not have VGXI's permission to transfer VGXI's intellectual property and processes to Ology," and "[w]ithout VGXI's technology, Ology did not have the capacity to deliver sufficient doses of Inovio's vaccine candidate."  (Ex. D at 8–9; Ex. E at 8–9.)

**May 11, 2020**.  On May 11, Inovio held an earnings call with investors and analysts, during which Dr. Kim stated that Inovio was "on [the] right track" towards its goal of producing one million doses by the end of 2020.  (FAC ¶ 106.)  As the Court previously noted, "[a]lthough portions of [the May 11 statement] were forward-looking, Plaintiffs do not challenge those aspects; they take issue with Defendants withholding material information about Inovio's current relationship with VGXI and its manufacturing capacity under present conditions."  (ECF 85 at 19.) Specifically, Plaintiffs contend this statement was misleading because "VGXI had very limited manufacturing capacity in 2020 and 2021"; VGXI "could not produce one million doses of Inovio's vaccine candidate in 2020, nor could it produce hundreds of millions of doses thereafter"; "VGXI had canceled its supply contract with Inovio"; "Inovio did not have VGXI's permission to transfer VGXI's intellectual property to other manufacturers"; "creating a new process from scratch could take years"; and Richter-Helm, "the only manufacturer other than VGXI that had the technology necessary to produce Inovio's vaccine, would not be able to deliver one million doses in 2020 or hundreds of millions of doses per year thereafter."  (Ex. D at 6, 9–11; Ex. E at 6, 9–11.)

7

To be clear, however, Dr. Kim did not claim that Inovio had already secured commitments from manufacturers to produce one million doses by the end of 2020. (FAC ¶ 106.) Nor did he claim that VGXI would play any role in Inovio's ability to meet its production goals. (*See id.*) Rather, his statement was aspirational: "Assuming success of INO-4800, we will be in a great position to [meet our production goals] by relying on our current contract manufacturers of plasmids and adding on additional manufacturers that can help us scale." (*Id.*)

**May 12, 2020**. On May 12, Inovio issued a prospectus that incorporated by reference risk warnings from Inovio's March 12, 2020, Form 10-K. Plaintiffs contend that Inovio's disclosure about potential manufacturing risks that could result from the loss of a collaborator was misleading for the same reasons as the May 11 statement. (Ex. D at 5–6; Ex. E at 5–6.)

#### b.    Alleged corrective disclosures

Plaintiffs now contend that the March 24, May 11, and May 12 alleged misrepresentations were corrected on three dates: June 3, August 9, and August 10.

**June 3, 2020**. On June 3, Inovio filed a complaint against VGXI in Pennsylvania state court for its refusal to comply with the terms of their Supply Agreement, which required VGXI to transfer its technology to a location of Inovio's choosing—in this case, Ology. (*See* FAC ¶¶ 14, 116.) Plaintiffs allege that this complaint against VGXI revealed that, as of May 11, Inovio was already aware of significant obstacles that could impact its ability to produce one million doses of its vaccine by the end of 2020, including: VGXI's limited capacity to produce Inovio's vaccine, VGXI's purported termination of the Supply Agreement, and VGXI's refusal to transfer its technology to Ology so that Ology could quickly and easily produce Inovio's vaccine. (*See* FAC ¶¶ 14, 62, 93, 108, 116.) Plaintiffs further allege that during the course of the proceedings in that case, additional details about VGXI's manufacturing capabilities were revealed, but do not allege that any of these disclosures were corrective or caused losses to investors. (FAC ¶¶ 14, 63.) On

June 25, the Pennsylvania state court denied Inovio's request for a preliminary injunction compelling VGXI to transfer its technology to Ology. (FAC ¶ 96.) Plaintiffs do not allege that this state court decision was corrective of any of the alleged misrepresentations or caused losses to investors.

**August 9 & 10, 2020**. Plaintiffs originally pled a third theory of fraud based on Inovio's June 30 press release, which Plaintiffs alleged misled "investors to believe that Inovio was, in fact, selected by the U.S. Government for inclusion in Operation Warp Speed and that the federal government would likely fund Inovio's production of the INO-4800 vaccine." (FAC ¶ 112; *see also id.* ¶¶ 111, 15.) Plaintiffs further alleged that the "truth" about Inovio's participation in Operation Warp Speed was partially revealed on August 9, 2020 in a *New York Times* article that noted Inovio was not awarded federal funding to produce its COVID-19 vaccine. (FAC ¶ 112.) And that additional information was revealed on Inovio's August 10, 2020 earnings call, during which Plaintiffs claimed Inovio was "given the opportunity to update investors on whether the Company would receive government funding, [and] Defendants responded vaguely, stating that they were still working on securing outside cash in order to mass produce INO-4800." (FAC ¶ 15; *see also id.* ¶ 125 (alleging "Inovio had nothing significant to report to investors other than the INO-4800 program milestones experienced further delay").)

On February 16, 2021, the Court dismissed with prejudice Plaintiffs' claim based on Inovio's June 30, 2020 press release. (ECF 86.) Since the Court's dismissal of the June 30 statements, Plaintiffs have pivoted their theory regarding the August 9 and 10 disclosures. They now contend, without providing any specifics, that on August 9 and 10, "additional information came into the market regarding Inovio's inability to meet vaccine production guidance." (Ex. D at 8; Ex. E at 8.) This new theory is not pled in the Complaint. Nor does it comport with Plaintiffs'

9

prior representation to this Court that they are not challenging any forward-looking aspect of Inovio's vaccine production guidance. (ECF 80 at 9–10; *see also* ECF 85 at 19.)

  **C. Plaintiffs and Their Proposed Class.**

  Plaintiffs seek to certify a class, subject to certain exclusions not relevant here, of "[a]ll persons who purchased or otherwise acquired the common stock of Inovio Pharmaceuticals, Inc., between February 14, 2020 through August 10, 2020, inclusive." (Mem. at 1.)

  Plaintiffs were each Inovio stockholders for different portions of their proposed class period. Mr. Williams purchased Inovio stock on March 3 and March 4, 2020, and sold his entire position on March 6, 2020. (Ex. I at 36:17–39:18.) Later that day, he purchased additional shares of Inovio stock, which he sold on March 10, 2020. (*Id.* at 40:13–45:12.) Mr. Williams did not purchase any shares of Inovio stock for the remainder of the proposed class period. (*Id.* at 46:2–4.)

  Mr. Zenoff joined this litigation as a self-proclaimed "Representative Plaintiff" in September 2020. He did not move for lead plaintiff under the PSLRA-mandated lead plaintiff process because his "losses weren't as big as [he] thought they should be to be the lead." (Ex. J at 70:16-17, 70:24-71:4.) Mr. Zenoff's first purchase of Inovio stock was on April 23, 2020, which he held for only a few days before selling on April 27, 2020. (Stulz Rpt., Ex. 5.) He then engaged in a series of short sales between April 28 and May 1, 2020. (*Id.*) Throughout the remainder of the proposed class period, Mr. Zenoff engaged in a series of short-term trades, often opening and closing out his position in Inovio the same day. (*Id.*) With the exception of 550 shares of Inovio stock held in Mr. Zenoff's 401(k) E*TRADE account—which are not listed in either his PSLRA certification or declaration in support of the Motion for Class Certification—Mr. Zenoff did not own any shares in Inovio over any of the alleged corrective disclosure dates. (*Id.*) Mr. Zenoff sold those 550 shares on March 4, 2021. (*Id.*)

### III.    LEGAL STANDARD

Plaintiffs seeking class certification must prove each of the four requirements of Rule 23(a), as well as one of the three provisions of Rule 23(b) by a preponderance of the evidence. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 181 (3d Cir. 2001). Although the Court has broad discretion in deciding whether to certify a class, it "should not suppress doubt as to whether a Rule 23 requirement is met," "relax its certification analysis," or "presume a requirement for class certification is met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321–22 (3d Cir. 2008). "Proper analysis under Rule 23 requires ***rigorous consideration*** of all the evidence and arguments offered by the parties." *Id.* at 321. "[T]he court must resolve all factual or legal disputes relevant to class certification, ***even if they overlap with the merits***." *Id.* at 307. The Court's obligation to consider all relevant evidence includes taking into account expert opinions. *Id.*

### IV.    ARGUMENT

Plaintiffs' Motion should be denied because: (1) the proposed class period is overbroad because it extends past the date when the alleged misrepresentations were corrected; (2) Plaintiffs can only prove class-wide reliance for May 11 to June 3, 2020, and thus fail to satisfy Rule 23(b)(3)'s predominance requirement as to the remainder of their proposed class period; and (3) Plaintiffs cannot satisfy Rule 23(a)'s typicality and adequacy requirements.

####      A.      The Proposed Class Period Is Overbroad.

"Courts possess the authority to limit or modify class definitions in order to provide the precision needed for class certification." *Sherman v. Am. Eagle Express, Inc.*, 2012 WL 748400, at *6 (E.D. Pa. Mar. 8, 2012). Among other things, "the class period should not extend past the date upon which curative information becomes available." *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2007 WL 276150, at *3 (D.N.J. Jan. 25, 2007); *see also In re Kulicke & Soffa*

11

*Indus., Inc. Sec. Litig.*, 1990 WL 1478, at *5 (E.D. Pa. Jan. 9, 1990) ("Liability under the securities acts is terminated when curative information is publicly announced or otherwise effectively disseminated."). That is because "[c]urative information retracts or dispels the alleged misinformation, or puts the investor on inquiry notice of the alleged fraud, making further reliance on the original statements by investors unreasonable." *Alaska Elec.*, 2007 WL 276150, at *3.

This analysis is distinct from loss causation, which "requires plaintiffs to show that defendant's misrepresentation or omission caused the plaintiffs subsequent loss. In contrast, the date of a corrective disclosure concerns when this misrepresentation or omission was publicly revealed; it does not concern actual causation." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 292 (D. Minn. 2018). This "test is a preliminary merits determination [of] whether the facts which underlie the gravamen of the plaintiffs' complaint continue to represent a reasonable basis on which the individual purchaser or the market would rely." *In re Kulicke*, 1990 WL 1478, at *5.

Courts have long recognized that they "must evaluate some aspects of the merits of plaintiffs' proposed class period to determine the appropriate endpoints." *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143 (D.N.J. 1984); *see also Medtronic*, 325 F.R.D. at 294 ("*Amgen* and *Halliburton I* do not change courts' longtime practice of considering the date of corrective disclosure at the class-certification stage for purposes of determining the end of the class period," and "*Halliburton II* affirms the Court's conclusion that the Court may modify the class period during the class-certification stage."). "This test strikes a balance between avoiding a decision on the merits of plaintiff's claim and providing a reasonable ending date for claims of fraud against the defendants." *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 253 (D.N.J. 1992).

Here, the proposed class is overbroad in three respects.

### 1.   The Class Period Should Be Broken into Two Separate Class Periods.

Taking all of Plaintiffs' allegations as true, the proposed class period should be broken into two separate class periods to account for the two-week gap during which there is no alleged fraud. Plaintiffs claim that the February 14 and March 2, 2020 alleged misrepresentations were corrected on March 9, 2020, when "the Company was forced to correct Defendants' claims."  (FAC ¶ 13; *see also id.* ¶ 113.)  The next allegedly misleading statement—which is based on an entirely distinct theory of fraud—was not made until March 24, 2020.  (FAC ¶¶ 102–103.)  Thus, at a minimum, the Court should split Plaintiffs' proposed class period into two separate class periods: the first spanning February 14 to March 9, 2020, and the second spanning March 24 to August 10, 2020. But, as explained below, there is no basis for this overlong class period; rather, the facts support a much shorter period.

### 2.   The First Class Period Should End No Later Than March 3, 2020.

The first class period should be further modified to end no later than March 3 because that morning before the market opened, Inovio issued a press release clarifying that it had ***designed*** its vaccine construct in three hours.  (Ex. H.)  Any investor who purchased Inovio securities on or after March 3 did so after "curative" information was already in the market.  Thus, they could not have relied on Dr. Kim's use of the term "construct" because they already knew that he meant "design."   The March 9 statement that Plaintiffs allege is corrective merely repeated the information disclosed on March 3; it did not contain any new information.  *See Medtronic*, 325 F.R.D. at 294–95 (shortening class period after reviewing alleged corrective disclosures and determining they contained no new information).

### 3.   The Second Class Period Should End No Later Than June 3, 2020.

The second class period should be further modified to end on June 3 because that is the only corrective disclosure alleged in the Complaint that relates to the March 24, May 11, and May

12 statements.  To the extent Plaintiffs contend that additional corrective information was revealed on August 9 and 10, that argument should be rejected for three reasons.

*First*, the Complaint links the August 9 and 10 disclosures to the alleged misstatements on June 30, 2020 regarding Operation Warp Speed.  (FAC ¶¶ 15, 112; *see also id.* ¶ 124 (alleging the "new information" disclosed on August 9 was "regarding statements made by Defendants on June 30, 2020").)  Because the Court dismissed with prejudice all claims premised on Inovio's June 30 press release (ECF 86), the corresponding disclosures on August 9 and 10 are no longer the proper end point for the class period.  *See Malone v. Microdyne Corp.*, 26 F.3d 471, 479–80 (4th Cir. 1994) (remanding case to district court to narrow and recertify the plaintiff class following dismissal of one of the alleged misstatements).

*Second*, Plaintiffs previously represented to this Court that they were not challenging any forward-looking aspect of Defendants' alleged misrepresentations.  (ECF 80 at 9–10.)  Yet the only "additional information" Plaintiffs contend was disclosed on August 9 and 10 relates to "Inovio's inability to meet vaccine production guidance."  (Ex. D at 8; Ex. E at 8.)  This plainly falls outside the scope of the alleged misrepresentations, which Plaintiffs allege were misleading because they omitted details about Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm.

*Third*, Plaintiffs cannot seriously dispute that all of the information they allege was misleadingly omitted from the March 24, May 11, and May 12 statements was disclosed to the market prior to August 9 and 10.  (*See* Ex. K (chart identifying when each allegedly omitted fact was disclosed).)  For example, on June 3, the market learned that VGXI had limited capacity in 2020; that VGXI could not manufacture INO-4800 on a large scale; that VGXI purported to terminate its Supply Agreement with Inovio; that VGXI refused to transfer its technology to

14

Ology; that Ology may be unable to manufacture INO-4800 without VGXI's technology; that Richter-Helm could only deliver 500,000 doses of INO-4800 by the end of 2020; and that VGXI's refusal to transfer its technology would potentially impact Inovio's manufacturing goals.  (Ex. L at ¶¶ 12, 52, 54, 58, 61, 63, 65, 67; Ex. M at ¶ 17.)  During the public hearing on Inovio's preliminary injunction, the parties presented testimony that by the end of 2019, VGXI informed Inovio that it had very limited manufacturing slots in 2020 and 2021; that it was "mathematically impossible" for VGXI to manufacture a million doses in 2020 or a hundred million doses in 2021; and that it could take years to transfer the VGXI technology to another company.  (Ex. N at 153:21–154:4; 207:5–11; 49:3–22.)  And on June 25, the market learned that the court overseeing the litigation between Inovio and VGXI denied Inovio's request to compel VGXI to transfer its technology to Ology.  (FAC ¶ 96.)  In fact, Plaintiffs concede in their Complaint that prior to August 9 and 10, all of the "key facts" had been disclosed.  (FAC ¶ 63; *see also id.* ¶¶ 68, 70–77, 79, 81–83, 85–92, 95–96.)  As such, August 9 and 10 cannot qualify as corrective disclosures for the March 24, May 11, or May 12 statements.  *See Lerch*, 144 F.R.D. at 255 (finding no corrective disclosure where no information of a "qualitatively different nature" than what was already in the market was revealed and shortening the class period accordingly).

There is nothing to support Plaintiffs' new theory that anything in the August 9 article or the August 10 earnings call was corrective of the alleged March 24, May 11, or May 12 misstatements, and the Court should reject Plaintiffs' attempt to recharacterize the allegations as such.  *See In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *16 (N.D. Cal. Dec. 22, 2016) (rejecting plaintiffs attempt to recharacterize corrective disclosures related to alleged misrepresentations that were previously dismissed).

**B.    Plaintiffs Cannot Satisfy Rule 23(b)(3)'s Predominance Requirement Because Individual Questions of Reliance Overwhelm Questions Common to the Class.**

In addition to the reasons discussed above, the class period is also overbroad under Rule 23(b)(3). Plaintiffs rely on the fraud-on-the-market theory to invoke a presumption of class-wide reliance on the alleged misrepresentations. That presumption, however, can only apply to the period May 11, 2020 to June 3, 2020.

### 1.    The Presumption of Reliance Is Rebuttable.

"The reliance element [of a 10b-5 action] ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 267 (2014). In *Basic Inc. v. Levinson*, the Supreme Court "held that investors could satisfy this reliance requirement by invoking a presumption that the price of stock traded in an efficient market reflects all public, material information." *Halliburton II*, 573 U.S. at 263.

#### a.    To rebut the presumption, a defendant can show the alleged misstatements had no price impact.

If "reliance is to be shown through the *Basic* presumption," the "misrepresentation [must be] reflected in the market price at the time of the transaction." *Id.* at 283. The *Basic* presumption is thus rebuttable at class certification: "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). That is because "the basis for finding that the fraud had been transmitted through market price would be gone." *Id.* In other words, a defendant can defeat the *Basic* presumption by showing the absence of "price impact"—*i.e.*, that the alleged misstatement did not affect the price of the security. ***"Price impact is thus an essential precondition for any Rule 10b-5 class action."*** *Halliburton II*, 573 U.S. at 282.

16

The Supreme Court recently clarified in *Goldman* that price impact, for purposes of rebutting *Basic*'s presumption, is "front-end price inflation"—that is, an effect on the stock price at the time alleged misrepresentations are made.  *Goldman Sachs Group, Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021).  This inflation may be inferred from a decline in the stock price after the alleged misrepresentation was disclosed ("back-end price impact"), but only if the decline was the market's reaction to the actual alleged misrepresentations.  *Cf. Halliburton II*, 573 U.S. at 281 (certifying a class "is inconsistent with *Basic*'s own logic" if "the evidence shows no price impact with respect to the ***specific misrepresentation*** challenged in the suit").  For that reason, the Supreme Court held in *Goldman* "that final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."  141 S. Ct. at 1961.

In assessing price impact, the Supreme Court has stressed that the court's inquiry should be flexible and holistic.  "[C]ourts should be open to ***all*** probative evidence on that question— qualitative as well as quantitative—aided by a good dose of common sense."  *Id.* at 1960.  The Supreme Court has further counseled that courts "must take into account ***all*** record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue," and "may not use the overlap to refuse to consider the evidence."  *Id.* at 1961 & n.2.

### b.      Event studies can show the absence of price impact.

Event studies are one piece of quantitative evidence that a defendant may use "to prove that a misrepresentation did not cause a statistically significant change in price."  *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 492 (S.D.N.Y. 2011).  Event studies test for non-random stock price movements by controlling for market and industry movements during a particular time period allowing for the isolation of company-specific price movements.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 263 (N.D. Tex. 2015) ("Event studies are used by academics to

determine whether and how stock prices respond to new information, and they typically measure movement in a stock price after an event, adjusting for movement in the overall market and/or industry."). By doing so, event studies can determine whether an alleged misrepresentation or corrective disclosure caused an increase or decrease in the company's stock, and in turn, whether there was price impact.

### c.     In an efficient market, confirmatory information will not cause price impact.

Qualitative evidence is equally important. For example, in an efficient market, disclosure of confirmatory information—*i.e.*, information already known by the market—will not cause a change in the stock price because the market has already digested that information and incorporated it into the price. *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665–66 (5th Cir. 2004) ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price."). Thus, one important piece of qualitative evidence is when information was first available to the market.

### d.     If it is more likely than not that an alleged misrepresentation had no price impact, the presumption of reliance is rebutted.

Although defendants "bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence," the Supreme Court has emphasized that "the burden of persuasion should rarely be outcome determinative." *Goldman*, 141 S. Ct. at 1958. "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 1963. If not, "*Basic*'s fraud-on-the-market theory and presumption of reliance collapse" and class certification must be denied. *Halliburton II*, 573 U.S. at 278, 281–83.

18

### 2. Dr. Kim's Statements that Inovio Was Able to "Construct" a Vaccine in Three Hours Had No Price Impact.

Plaintiffs allege that Dr. Kim's statements on February 14 and March 2, 2020—about Inovio's ability to "construct" its COVID-19 vaccine in three hours—caused Inovio's stock price to increase, resulting in artificial inflation. (FAC ¶¶ 97–100; Ex. D at 4; Ex. E at 4.) Plaintiffs further allege that on March 9, 2020—following Inovio's Tweet that it had designed its vaccine in three hours—Inovio's stock price declined, as the prior inflation came out of the price. (FAC ¶¶ 13, 142; Ex. D at 7–8; Ex. E at 7–8.)

Both the quantitative and qualitative evidence show that the alleged misrepresentations on February 14 and March 2 did not impact Inovio's stock price. This is demonstrated through the absence of front-end price impact (*i.e.*, no increase in the stock price on February 14 or March 3 that can be attributed to the alleged misrepresentations) ***and*** the absence of back-end price impact (*i.e.*, no decrease on March 9 that can be attributed to the alleged corrective disclosure).

### a. No price impact from the alleged misrepresentation on February 14.

Plaintiffs allege that Inovio's stock price increased on February 14, 2020 in response to the alleged misrepresentation that day. (FAC ¶ 98.) The evidence proves otherwise. The event studies conducted by Defendants' expert (René Stulz) and Plaintiffs' expert (Steven Feinstein) show that the increase in Inovio's stock price on February 14 cannot be distinguished from normal volatility and random fluctuations in the stock market. (Stulz Rpt. ¶ 51, Ex. 2B; Feinstein Rpt., Exs. 8, 10c.) In other words, the increase cannot be attributed to the alleged misrepresentation.

### b. No price impact from the alleged misrepresentation on March 2.

Plaintiffs also allege that Inovio's stock price increased on March 3 in response to Dr. Kim's statement on March 2, 2020 (which was made near close of market). (FAC ¶ 100.) Once again, however, the evidence proves otherwise. As an initial matter, the alleged misrepresentation

19

on March 2 is essentially the same as the alleged misrepresentation on February 14.  (Stulz Rpt. ¶ 53.)  Thus, if Inovio's stock traded in an efficient market, as Plaintiffs and their expert contend, this repetition of existing information would not impact Inovio's stock price.  (*Id.*)  *See Greenberg*, 364 F.3d at 665–66 ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.").

Additionally, before the stock market opened on March 3, Inovio issued its press release announcing that it was accelerating its COVID-19 vaccine development timeline, including beginning its human trials in April 2020.  (Stulz Rpt. ¶ 54.)  This intervening event severs the link between the alleged misrepresentation on March 2 and the increase in Inovio's stock price the following day.  *See In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *8 (N.D. Cal. Dec. 5, 2017) (finding the issuance of "new information" after the alleged misstatement "severs the link" between the alleged misstatement and the increase in stock price).  Indeed, analyst commentary indicates that the price increase on March 3 was in response to Inovio's accelerated development timelines—which Plaintiffs do not allege were false or misleading.  (Stulz Rpt. ¶ 54.)  To the extent analysts commented on the "three hour" statements, they uniformly reported that Inovio was able to *design* its vaccine in three hours.  (*Id.*, ¶ 58.)

> **c.     Price impact cannot be inferred from the alleged corrective disclosure on March 9.**

The evidence also shows that there is no basis to infer artificial inflation from the alleged misrepresentations based on Inovio's March 9, 2020 stock price decline.

As discussed above*,* the market was already aware prior to March 9 that Inovio had *designed* its vaccine in three hours.  Inovio disclosed this in its March 3 press release (as well as back in January), and analysts covering Inovio reported the same.  (Stulz Rpt. ¶ 58.)  Accordingly, based on the same logic described above, if Inovio's stock traded in an efficient market, this

repetition of existing information would not impact Inovio's stock price on March 9.

No additional evidence is needed to show lack of price impact. Here, however, there *is* more: the intraday analysis of Inovio's stock price on March 9. This analysis shows that Inovio's stock price began to decline immediately after a short-seller, Citron Research, issued a Tweet accusing Inovio of lying about the time it took to *design* its vaccine. (Stulz Rpt., Ex. 3B.) Plaintiffs do not allege there was any merit to this accusation, nor do they contend that Citron's Tweet was a corrective disclosure. (ECF 80 at 24.) Rather, they argue that Inovio's Tweet in response to Citron was the corrective disclosure. (*Id.*) However, the intraday analysis of Inovio's stock price shows that immediately after Inovio issued its March 9 Tweet, Inovio's share price stopped declining and actually *increased*. (Stulz Rpt. ¶ 57, Ex. 3B.)

### 3.    The Remainder of the Class Period Must Be Shortened to Account for the Lack of Price Impact at the Front- and Back-End of the Period.

The remainder of the surviving alleged misrepresentations concern various aspects of Inovio's manufacturing capabilities. These include Defendants' March 24 statements concerning its partnership with Ology, May 11 statement about its current trajectory vis-à-vis its goal of producing one million doses by the end of 2020, and May 12 statement regarding potential manufacturing risks that could arise from the loss of a collaborator. (FAC ¶¶ 102, 106, 109; Ex. D at 4–5; Ex. E at 4–5.) Plaintiffs now contend that the "truth" about Inovio's manufacturing capabilities was revealed on June 3, August 9, and August 10.

The evidence, however, shows (1) there was no price impact from the March 24 alleged misrepresentation, and (2) there is no basis to infer price impact on May 11 or May 12 from the August 9 and 10 disclosures. Accordingly, the class period should be shortened to run from May 11 to June 3, 2020.

21

### a.    No price impact from alleged misrepresentation on March 24.

On March 24, Inovio announced that "the [DoD] has awarded Ology Bioservices with a contract valued at $11.9 million to work with Inovio on DNA technology transfer to rapidly manufacture DNA vaccines" and that "[t]his partnership increases Inovio's manufacturing capabilities for our COVID vaccine and establishes an additional DNA vaccine manufacturing facility to protect the U.S. military against current and future disease outbreaks."  (FAC ¶ 102.) Plaintiffs allege these statements were materially false and misleading because Inovio did not have permission from VGXI to transfer the technology to Ology that would allow for rapid manufacture of Inovio's COVID-19 vaccine.  (FAC ¶ 103.)

Based on these allegations, one would expect an increase in Inovio's stock price following the March 24 announcement if it contained new, value-relevant information.  (*See* Stulz Rpt. ¶ 63.) However, the event studies conducted by both Plaintiffs' expert and Defendants' expert demonstrate it did not.  Instead, the event studies show that the increase in Inovio's stock price on March 24 cannot be distinguished from normal volatility and random fluctuations in the stock market.  (Feinstein Rpt., Exs. 8, 10c; Stulz Rpt. ¶ 63, Ex. 2B.)  In other words, the nominal stock price increase on March 24 cannot be attributed to the alleged misrepresentations.

### b.    Price impact cannot be inferred from the August 9 and 10 disclosures.

The evidence also shows that there is no basis to infer artificial inflation from the alleged misrepresentations based on Inovio's stock price following the alleged August 9 and 10 corrective disclosures.

### i.    *No new information regarding allegedly omitted facts.*

All of the information Plaintiffs contend was misleadingly omitted from the March 24, May 11, and May 12 statements was disclosed to the market prior to August 9 and 10.  (*See* Section

22

IV.A.3; *see also* Ex. K (chart identifying when each allegedly omitted fact was disclosed); Stulz Rpt. ¶ 67-70.) Thus, in an efficient market, the reiteration of any such facts on August 9 or 10 would not cause a change in the stock price. *See, e.g.*, *Greenberg*, 364 F.3d at 665–66.

### ii.    *No reiteration of allegedly omitted facts on August 10.*

To be clear, however, none of the facts that were allegedly omitted from the March 24, May 11, and May 12 statements were reiterated on August 10. Instead, Defendants expressed optimism about meeting Inovio's forward-looking production goals for 2020 and beyond:

- "[W]e look forward to advancing INO-4800 into a Phase II/III trial in September and meeting our target to provide at least 1 million doses our DNA vaccine this year and 100 million doses in 2021." (Ex. O at 5.)

- "[W]e have an established plan in place for manufacturing at least 1 million 1 mg doses of INO-4800 this year and the target of 100 million doses by 2021." (*Id.* at 7.)

- "We are also in the process of finalizing additional manufacturing partnerships in the U.S. and in Europe to fulfill our vaccine candidate production goals of 1 million doses this year, 100 million next and plan to make announcements about the expanded consortium over the next few months." (*Id.* at 7–8.)

- "I'm really excited to tell the Street that we're making great progress, and we should be able to fulfill our goal for 2021 and beyond." (*Id.* at 16.)

Stated differently, Inovio's August 10 earnings "did not reveal any new hidden information to the public; it only reveals [Inovio's] prospective intent" to meet its vaccine production goals. *Medtronic*, 325 F.R.D. at 295.

23

      ***iii.***   ***New information unrelated to alleged misrepresentations.***

That is not to say that there was no new, negative information reported on August 9 and 10. Merely that the new, negative information was wholly unrelated to the allegedly omitted facts regarding Inovio's manufacturing capabilities with VGXI, Ology and Richter-Helm. Plaintiffs' expert cannot state otherwise; in his expert report, Professor Feinstein purports to identify "new information" on August 10, none of which relates to the allegedly omitted information. (Feinstein Rpt. ¶ 121.)

Following Inovio's August 10 earnings call, analysts focused on the delay of Inovio's Phase 2/3 clinical trials for INO-4800. (Stulz Rpt. ¶ 78.) Inovio had previously announced that it expected to begin its Phase 2/3 trials in the July/August timeframe. (Ex P at 6.) However, on August 10, Inovio reported that it was now expecting to begin its Phase 2/3 trials in September. (Stulz Rpt. ¶ 78.) Plaintiffs, however, do not allege this information is corrective. Nor would such an allegation make any sense given that Plaintiffs have never alleged that Defendants misled investors about the expected timing of Inovio's clinical trials.

As such, neither the August 9 nor August 10 disclosures demonstrate the alleged misrepresentations had any price impact. *See also Goldman*, 141 S. Ct. at 1961 (noting that the inference of front-end price inflation from a later stock price decline "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure"); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *18 (N.D. Ohio Aug. 14, 2018) (finding defendants "rebut[ted] the presumption of reliance" because there "was no evidence to suggest that the Company's [alleged corrective] disclosures were . . . linked to the alleged misrepresentations and omissions in the Third Amended Complaint").

*  *  *

Because Plaintiffs' class claims depend on the presumption of reliance from *Basic*, the

24

class period must be tailored to exclude disclosures that had no price impact.  Accordingly, to the extent any class period is certified, it should be limited to May 11 to June 3, 2020.

### C.    Plaintiffs Do Not Satisfy the Typicality and Adequacy Requirements of Rule 23(a).

"A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation."  *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006); *see also id.* at 296 (noting that "the typicality and adequacy inquiries often tend to merge because both look to potential conflicts and to whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence").  The question at class certification is not whether a unique defense would be successful, but whether the proposed class representative "might devote time and effort to the defense at the expense of issues that are common and controlling for the class."  *Id.* at 297.

"[A]dequacy is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy."  *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 146 (N.D. Tex. 2014).  Additionally, "plaintiffs seeking certification must produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are themselves—not the lawyers—actually directing the litigation."  *Id.* at 145.  Here, Messrs. Williams and Zenoff are both atypical and inadequate class representatives.

### 1.    Mr. Williams Is Atypical Because He Did Not Purchase Inovio Stock During the Only Viable Portion of the Class Period and Is Otherwise Subject to a Unique Truth-on-the-Market Defense.

Mr. Williams' only purchases and sales of Inovio stock during the proposed class period occurred between March 3 and March 10.  (Ex. I at 36:17–46:4.)  Accordingly, to the extent the

25

Court excludes these dates from the class period (as Defendants argue above), Mr. Williams is inadequate because he made no purchases or sales of Inovio stock during the class period.

But even if the Court adopts Plaintiffs' entire proposed class period, Mr. Williams remains inadequate and atypical because he is subject to a unique truth-on-the-market defense. Plaintiffs rely on the fraud-on-the-market theory in bringing this action. "An essential corollary to this theory is a 'truth on the market' defense recognizing that a statement is materially misleading only if the allegedly undisclosed facts have not already entered the market." *Wallace v. Sys. & Computer Tech. Corp.*, 1997 WL 602808, at *10 (E.D. Pa. Sept. 23, 1997). The Court need not decide at class certification whether a unique defense would be successful, but rather must analyze whether the proposed class representative "might devote time and effort to the defense at the expense of issues that are common and controlling for the class." *Beck*, 457 F.3d at 297. And although this defense may be relevant to other putative class members, it is unique to Mr. Williams because of the limited window in which all of his Inovio stock purchases were made.

Here, Mr. Williams' first purchase of Inovio stock was on March 3 at 9:34 am ET. (*Id.* at 36:17–37:8.) As discussed above, an hour and half *prior* to this purchase, Inovio issued a press release clarifying that it had "designed" its vaccine construct in three hours. (Ex. H.) This is the precise information that Plaintiffs contend was misleadingly omitted from Dr. Kim's February 14 and March 2 statements. (Ex. D at 4–5; Ex. E at 4–5.) And it is the same information Plaintiffs allege was provided in the "corrective" disclosure. (*See* FAC ¶ 101.)

Thus, unlike other putative class members whose compensable losses may be reduced as a result of a successful truth on the market defense, Mr. Williams will lose standing to pursue his claim altogether because *all* of his purchases were made *after* the "truth" regarding the "design" of the vaccine was disclosed. This timing is fatal to Plaintiffs' theory because "if the plaintiff did

not buy or sell the stock after the misrepresentation was made but before the truth was revealed, then he could not be said to have acted in reliance on a fraud-tainted price." *Halliburton II*, 573 U.S. at 278.  Thus, he is atypical of members of the proposed class.  *See In re Safeguard Scis.*, 216 F.R.D. 577, 583 (E.D. Pa. 2003) (denying class certification motion in part because named plaintiffs failed to meet typicality requirement due to unique defenses concerning reliance); *In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 404–05 (D. Mass. 2007) (finding plaintiff failed to meet the typicality requirement where he lacked standing to proceed against one of the named defendants based on the timing of his purchases).

### 2.  Mr. Zenoff Is Atypical Because He Did Not Suffer Any Compensable Loss.

This case presents a unique situation based on the manner in which Mr. Zenoff joined this litigation.  Unlike a typical lead plaintiff, who is appointed by the court at the outset of the case pursuant to the congressionally-mandated lead plaintiff process, Mr. Zenoff was added after-the-fact as a self-proclaimed "Representative Plaintiff."  Because of this, the Court did not have a prior opportunity to assess Mr. Zenoff's financial interest in the relief sought.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *see also In re GSE Bonds Antitrust Litig.*, 377 F. Supp. 3d 437, 438 (S.D.N.Y. 2019) ("Congress's judgment was that financial interest in such cases is a useful proxy for determining which plaintiff would be most engaged and likely to produce client-driven representation.").

The Court has that opportunity now.  And based on the timing of Mr. Zenoff's purchases and sales, he has no compensable damages.  As a preliminary matter, Mr. Zenoff purchased and sold Inovio stock in two separate E*TRADE accounts during the proposed class period—a personal account and a 401(k) account.  (Ex. J at 26:21–27:4.)  Mr. Zenoff's PSLRA certifications only identified trades made in his personal account.  (*Id.* at 81:3–82:13, 88:1–12.)  Through the

27

discovery process, Defendants were informed that Mr. Zenoff also made purchases and sales of Inovio stock through his 401(k) account, which were not reflected on either his PSLRA certification or his declaration filed in support of class certification. (Ex. Q at 9; *see also* ECF 101-3, ¶ 4 (representing that Mr. Zenoff "acquired 82,296 shares of Inovio stock, not including shares purchased to cover short positions," which only accounts for purchases made in his personal account).) A review of his Inovio trading records for each account shows that Mr. Zenoff did not suffer any damages in either account under Plaintiffs' proposed class-wide damages methodology. (Stulz Rpt. ¶¶ 83–86.)

**Personal Account**. Although Mr. Zenoff purchased Inovio stock in his personal account on multiple days when the price was allegedly inflated, "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Accordingly, if "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Id.* That is precisely what occurred here. Mr. Zenoff did not hold any Inovio stock in his personal account over an alleged corrective disclosure date. (Stulz Rpt., Ex. 5.) Accordingly, he has no compensable losses from his Inovio purchases and sales in his personal account under Plaintiffs' proposed class-wide damages methodology. (*Id.*, ¶ 84.)

**401(k) Account**. Mr. Zenoff also purchased 623 shares of Inovio stock in his 401(k) account on April 23, 2020 which he sold on May 1, 2020. (Stulz Rpt. ¶ 85, Ex. 5.) Again, because he did not hold these shares over an alleged corrective disclosure, he has no compensable losses from these transactions. (*Id.* ¶ 85.) *See Dura*, 544 U.S. at 342; *Jasin v. Kozlowski*, 2010 WL 4536973, at *8 (M.D. Pa. Nov. 3, 2010) (granting summary judgment to defendants with respect

28

to plaintiff's purchase of shares that he sold prior to the disclosure dates). Mr. Zenoff also purchased 550 shares of Inovio stock in his 401(k) account on May 4, 2020 for $10.97. (Stulz Rpt. ¶ 86, Ex. 5.) He later sold these shares on March 4, 2021. (*Id.*, ¶ 86, Ex. 5.) Because these shares were held for more than 90 days beyond the last alleged corrective disclosure, damages are limited by operation of law under the PSLRA. *See* 15 U.S.C. § 78u-4(e). Plaintiffs' expert, Professor Feinstein, acknowledges this in his proposed damages methodology: "For any shares held 90 days or more beyond the final corrective disclosure, the investment loss is computed as if the shares were sold for the average price over the 90 days following the final corrective disclosure." (Feinstein Rpt. ¶ 165(v).) The average price of Inovio stock during the 90 days following the last alleged corrective disclosure was $12.47—*i.e.*, $1.50 **higher** than Mr. Zenoff's purchase price. (Stulz Rpt. ¶ 86.)

Mr. Zenoff has no compensable damages arising from purchases or sales made during any portion of the proposed class period. Because he has no damages, he is subject to a unique standing defense and he has no financial incentive to pursue this litigation on behalf of the proposed class.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion. If the Court is inclined to certify any class period, it should run from May 11, 2020 to June 3, 2020. Additionally, prior to certifying any class, new class representatives who have the financial incentive necessary to adequately oversee counsel and direct this litigation should be identified by Class Counsel and approved by the Court.

Dated: October 8, 2021

Respectfully Submitted,

DUANE MORRIS LLP

By: *s/ Patrick Loftus*

Patrick Loftus (PA60417)
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1367 (phone)
(215) 689-3591 (fax)
loftus@duanemorris.com

COOLEY LLP
Luke Cadigan (*Pro Hac Vice*)
500 Boylston Street
14th Floor
Boston, MA 02116-3736
(617) 937-2300 (phone)
(617) 937-2400 (fax)
lcadigan@cooley.com

Koji F. Fukumura (PA73831)
Heather Speers (*Pro Hac Vice*)
4401 Eastgate Mall
San Diego, CA 92121-1909
(858) 550-6000 (phone)
(858) 550-6420 (fax)
hspeers@cooley.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on October 8, 2021, I filed this document on the Court's docket using the Court's CM/ECF system.  Based on the Court's records, all counsel of record were served with a copy of the foregoing document by electronic means.

*s/ Patrick Loftus*
DUANE MORRIS LLP
Patrick Loftus (PA60417)
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1367 (phone)
(215) 689-3591 (fax)
loftus@duanemorris.com

31