# Exhibit A

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICK MCDERMID, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INOVIO PHARMACEUTICALS, INC., et al.,<br><br>Defendants. | Case No. 2:20-cv-01402-GJP<br><br>CLASS ACTION |

**EXPERT REPORT OF RENÉ M. STULZ, PH.D.**

**EVERETT D. REESE CHAIR OF BANKING AND MONETARY ECONOMICS**

**THE OHIO STATE UNIVERSITY, FISHER COLLEGE OF BUSINESS**

**OCTOBER 8, 2021**

# Contents

I.      Qualifications.................................................................................................... 1

II.     Assignment ...................................................................................................... 2

III.    Background....................................................................................................... 3

    A.      Inovio Pharmaceuticals, Inc. ....................................................................3

    B.      The Onset of COVID-19 and Inovio's COVID-19 Vaccine Candidate, INO-4800 .4

    C.      Summary of Allegations...........................................................................6

IV.     Summary of Opinions .................................................................................... 12

V.      Overview of Market Efficiency and Its Implications for Assessing Price Impact ........... 14

VI.     Event Study Analysis..................................................................................... 16

    A.      Overview of Event Study Methodology....................................................16

    B.      Regression Model Specification................................................................18

VII.    Dr. Kim's Statements about Constructing a Vaccine in Three Hours Did Not Impact Inovio's Stock Price and Any Assertion That They Did So Would Be Inconsistent with Professor Feinstein's Market Efficiency Claims ............................................................. 20

    A.      Information That Inovio Designed Its Vaccine within Three Hours Was Available Prior to the Start of the Putative Class Period .........................................21

    B.      The Alleged Misrepresentation on February 14, 2020 Did Not Impact Inovio's Stock Price..................................................................................23

    C.      The Alleged Misrepresentation on March 2, 2020 Did Not Impact Inovio's Stock Price..................................................................................24

    D.      Any Stock Price Decline on March 9, 2020 Cannot Be Used As Economic Evidence of Price Impact for the February 14 and March 2, 2020 Alleged Misrepresentations, In an Efficient Market............................................27

VIII.   The Alleged Misrepresentation on March 24, 2020 Did Not Impact Inovio's Stock Price ....................................................................................................... 31

IX.     The Stock Price Declines on August 10 and 11, 2020 Were Not Due to the Alleged Misrepresentations on March 24, May 11, or May 12, 2020 and Are Therefore Not Evidence of Prior Price Impact from Those Alleged Misrepresentations ....................... 32

    A.      The VGXI Lawsuit Identified the Information Plaintiffs Allege Was Misrepresented Concerning Inovio's Manufacturing Capabilities ........................33

    B.      The August 9, 2020 Article Did Not Provide New, Negative Information Concerning Inovio's Manufacturing Capabilities with VGXI, Ology, and Richter-Helm ......................................................................................39

C.      On Its August 10, 2020 Earnings Conference Call, Inovio Did Not Provide New, Negative Information Concerning Inovio's Manufacturing Capabilities with VGXI, Ology, and Richter-Helm ..................................................................41

D.      The Key New, Negative Information Regarding INO-4800 Disclosed in Inovio's August 10, 2020 Earnings Conference Call Was a Delay in the Expected Start Date of Its Phase 2/3 Trial ..................................................................44

X.    Representative Plaintiff Andrew R. Zenoff Has No Damages According to Professor Feinstein's Proposed Section 10(b) Damages Methodology ............................................ 49

XI.    Conclusion ............................................................................................................. 51

## I.      Qualifications

1.      I hold the Everett D. Reese Chair of Banking and Monetary Economics at The Ohio State University.  I am also Director of the Dice Center for Research in Financial Economics at The Ohio State University and a Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts.  Since receiving my Ph.D. in Economics from the Massachusetts Institute of Technology in 1980, I have taught at the Massachusetts Institute of Technology, the University of Rochester, the University of Chicago, and The Ohio State University.  I was a Bower Fellow at the Harvard Business School from 1996 to 1997.

2.      I am a past president of the American Finance Association; a fellow of the American Finance Association, the Financial Management Association, the European Corporate Governance Institute, and the Wharton Financial Institutions Center; and a past president of the Western Finance Association.  I received a Doctorate Honoris Causa from the University of Neuchâtel in Switzerland and the Risk Manager of the Year award from the Global Association of Risk Professionals.  I have also been recognized by a number of organizations for my contributions to financial economics by awards or by invitations to be a keynote speaker.  I belong to the editorial boards of many academic and practitioner publications.  Further, I am a member of the Asset Pricing and Corporate Finance Programs and the director of the Risk of Financial Institutions Group of the National Bureau of Economic Research.  I was editor of the *Journal of Finance* for 12 years and co-editor of the *Journal of Financial Economics* for five years (these are two of the top three journals in the field of financial economics).  Thomson Reuters includes me in its list of the world's most influential scientific minds, which identifies top researchers based on the number of authored publications that are highly cited by peers.[1]

3.      I have published more than 100 papers in finance and economics journals, including the *Journal of Political Economy*, the *Journal of Financial Economics*, the *Journal of Finance*, and the *Review of Financial Studies*.  I am the author of a textbook titled *Risk Management and Derivatives*, a co-author of *The Squam Lake Report: Fixing the Financial System*, and have edited several books, including the *Handbook of the Economics of Finance* and *International Capital Markets*.

---

[1] *See, e.g.,* "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015, p. 46.

4.       I have taught in executive development programs in North America, Europe, and Asia.  I have consulted for major corporations, law firms, the New York Stock Exchange, the International Monetary Fund, and the World Bank.  I also served as a member of an advisory board of the U.S. Treasury.  I belonged to several corporate boards and was the vice-chairman of the board of trustees of the Global Association of Risk Professionals, where I also chaired the governance committee.

5.       A copy of my curriculum vitae is attached as Appendix A, which includes a list of my publications over the last ten years.  Appendix B contains a list of my testimony over the last four years.

## II.     Assignment

6.       In Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Motion"), Plaintiffs seek to certify a class, subject to certain exclusions, comprising "[a]ll persons who purchased or otherwise acquired the common stock of Inovio Pharmaceuticals, Inc. between February 14, 2020 through August 10, 2020, inclusive" (the "Putative Class Period").[2]  In support of their Motion, Plaintiffs filed the Report on Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, dated July 29, 2021 ("Feinstein Report").

7.       I have been retained by counsel for Inovio Pharmaceuticals, Inc. ("Inovio" or the "Company"), J. Joseph Kim ("Dr. Kim"), Peter D. Kies, and Robert J. Juba, Jr. (collectively, "Defendants") in the above-captioned matter.  I have been asked to (1) review and assess the opinions expressed and analyses conducted in the Feinstein Report; (2) assess whether certain of Plaintiffs' alleged misstatements impacted Inovio's stock price; (3) assess whether any stock price changes following certain of Plaintiffs' alleged corrective disclosures can be used as evidence of price impact of Plaintiffs' alleged misrepresentations; and (4) review and analyze the trading records for Representative Plaintiff Andrew R. Zenoff.  I have not been asked to opine on, and I am not offering any opinion on, market efficiency.  However, assuming Inovio's stock

---

[2] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *Patrick McDermid, et al. v. Inovio Pharmaceuticals, Inc., et al.*, July 29, 2021, p. 1.

traded in an efficient market, as Plaintiffs and Professor Feinstein contend, then Inovio's stock price would "always 'fully reflect' available information."[3]  For purposes of my analysis, I have assumed that Inovio's stock traded in an efficient market.

8.      In undertaking this assignment, I have considered documents and data related to the issues in this matter.  In Appendix C, I have listed the documents I considered for this report.  My work in this matter is ongoing, and I reserve the right to supplement my opinions in the event that additional information or arguments are provided to me or submitted in connection with this matter.

9.      The analyses and opinions expressed in this report are my own. I am being compensated for my time and services at an hourly rate of $1,100.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

## III.    Background

### A.    Inovio Pharmaceuticals, Inc.

10.     Inovio is a biotechnology company focused on developing DNA medicines for treating and preventing infectious diseases, cancer, and diseases associated with human papillomavirus.[4]  As of the start of the Putative Class Period, the Company's DNA medicines pipeline consisted of three types of product candidates:  DNA vaccines, DNA immunotherapies, and DNA encoded monoclonal antibodies.[5]

---

[3] Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, (1970), pp. 383–417 ("Fama (1970)") at p. 383.  I note that Professor Feinstein cites multiple sources that define market efficiency and states that "[a]n efficient market, as defined and discussed by *Cammer, Basic, Amgen, Halliburton II*, Bromberg and Lowenfels, Professor Fama, and other leading scholars, is a market in which available information is incorporated into the price of a security such that the trading price reflects available information with reasonable promptness."  Professor Feinstein further concludes that statistical analysis examining the cause-and-effect relationship between the release of Company information and movement in the Inovio stock price using data at daily frequency demonstrates that "Inovio stock responded to Company-specific information, which is the essence of market efficiency."  Expert Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA, July 29, 2021 ("Feinstein Report"), ¶¶ 18, 37.

[4] Inovio Pharmaceuticals, Inc., 10-K for Fiscal Year Ended December 31, 2019, filed March 12, 2020 ("FY2019 10-K"), p. 2.

[5] FY2019 10-K, p. 2.

11.    Inovio's DNA medicine development platform consists of two main components:  the SynCon® Design Process, a proprietary design and optimization process for DNA plasmids, and the CELLECTRA® Smart Device, a proprietary hand-held delivery device to deliver its DNA medicines.[6]  The delivery device is capable of injecting medicines directly into the cells of the body utilizing electroporation technology, which creates pores in the cell membrane through electric pulses.[7]  Inovio states that the development platform facilitates "rapid design, pre-clinical testing, manufacturing, and clinical development" of its DNA vaccines and other DNA medicines.[8]

12.    According to Inovio's 2019 Form 10-K, filed March 12, 2020, Inovio had 12 product candidates under development and no commercially available products.[9]  VGX-3100, a product candidate for treating human papillomavirus infections, was Inovio's only product candidate in phase 3 clinical trials, which started in June 2017 and was leading all other product candidates.[10]

### B.    The Onset of COVID-19 and Inovio's COVID-19 Vaccine Candidate, INO-4800

13.    The World Health Organization ("WHO") defines "COVID-19" as "an infectious disease caused by the SARS-CoV-2 virus."[11]  According to the Joint WHO-China Study, COVID-19 was "first observed [in late 2019] when cases of unexplained pneumonia were noted in the city of Wuhan, China."[12]  On December 31, 2019, Chinese officials first reported that they detected a "viral pneumonia" in the Hubei Province.[13]  By January 2, 2020, 41 patients in Wuhan, China had been admitted to hospitals and identified as having the COVID-19 infection.[14]  However, it was not until January 9, 2020, that the WHO officially announced that a cluster of pneumonia cases in Wuhan were in fact a new type of coronavirus (COVID-19), a virus in the same family

---

[6] FY2019, 10-K, p. 2.
[7] FY2019, 10-K, pp. 3, 6.
[8] FY2019, 10-K, p. 6.
[9] FY2019, 10-K, p. 8.
[10] FY2019, 10-K, pp. 10–11.
[11] "Coronavirus Disease (COVID-19) Overview," *WHO*, https://www.who.int/health-topics/coronavirus, accessed September 27, 2021.
[12] "WHO-Convened Global Study of Origins of SARS-CoV-2: China Part," Joint WHO-China Study, Joint Report, January 14, 2021–February 10, 2021, p. 9.
[13] "Listings of WHO's Response to COVID-19," *WHO¸* June 29, 2020, https://www.who.int/news/item/29-06-2020-covidtimeline, accessed September 27, 2021.
[14] Chaolin Huang, et al., "Clinical Features of Patients Infected with 2019 Novel Coronavirus in Wuhan, China," *Lancet* 395, 2020, pp. 497–506.

as the ones causing Severe Acute Respiratory Syndrome (SARS) and Middle East Respiratory Syndrome (MERS).[15]  In the statement, the WHO said that "[a]ccording to Chinese authorities, virus in question can cause severe illness in some patients and does not transmit readily between people."[16]  By January 10, 2020, Chinese scientists had obtained and shared the sequence of the coronavirus genome.[17]

14.     The health community around the world reacted rapidly to the pandemic and a number of programs were initiated by research institutions and private companies to develop vaccines against COVID-19.[18]  New technologies to produce vaccines, such as DNA and mRNA based vaccines, make it possible to design vaccines from the virus genome using computer technology, so that the genome availability led to a flurry of rapid vaccine developments.[19]

15.     Inovio was among the earliest U.S. companies in announcing a program to develop a COVID-19 vaccine.  On January 23, 2020, the Coalition for Epidemic Preparedness Innovations ("CEPI"), a global partnership to develop vaccines for epidemics, announced funding for three programs with Inovio, the University of Queensland, and Moderna to develop COVID-19 vaccines.[20]  Inovio announced its funding from CEPI would be used for preclinical through Phase 1 human testing of its vaccine, named INO-4800.[21]  On January 30, 2020, Inovio announced a collaboration with Beijing Advaccine Biotechnology Co. to "run a Phase 1 trial [of INO-4800] in China in parallel with Inovio's clinical development efforts in the U.S."[22]  On March 3, 2020,

---

[15] "WHO Statement Regarding Cluster of Pneumonia Cases in Wuhan, China," *WHO*, January 9, 2020, https://www.who.int/china/news/detail/09-01-2020-who-statement-regarding-cluster-of-pneumonia-cases-in-wuhan-china, accessed September 27, 2021.

[16] "WHO Statement Regarding Cluster of Pneumonia Cases in Wuhan, China," *WHO*, January 9, 2020, https://www.who.int/china/news/detail/09-01-2020-who-statement-regarding-cluster-of-pneumonia-cases-in-wuhan-china, accessed September 27, 2021.

[17] Inovio Pharmaceuticals Press Release, "Inovio Accelerates Timeline for COVID-19 DNA Vaccine INO-4800," March 3, 2020. *See also*, "Whole Genome of Novel Coronavirus, 2019-nCoV, Sequenced," *ScienceDaily*, January 31, 2020, https://www.sciencedaily.com/releases/2020/01/200131114748.htm, accessed September 27, 2021.

[18] "CEPI to Fund Three Programmes to Develop Vaccines Against the Novel Coronavirus, nCoV-2019," *CEPI*, January 23, 2020, https://cepi.net/news_cepi/cepi-to-fund-three-programmes-to-develop-vaccines-against-the-novel-coronavirus-ncov-2019/, accessed on October 2, 2021.

[19] *See, e.g.*, "DNA Vaccines," *WHO*, https://www.who.int/teams/health-product-policy-and-standards/standards-and-specifications/vaccines-quality/dna, accessed October 2, 2021; Jon Gertner, "Unlocking the Covid Code," *The New York Times*, March 25, 2021, https://www.nytimes.com/interactive/2021/03/25/magazine/genome-sequencing-covid-variants.html, accessed on October 2, 2021.

[20] "CEPI to Fund Three Programmes to Develop Vaccines Against the Novel Coronavirus, nCoV-2019," *CEPI*, January 23, 2020, https://cepi.net/news_cepi/cepi-to-fund-three-programmes-to-develop-vaccines-against-the-novel-coronavirus-ncov-2019/, accessed on October 2, 2021.

[21] Inovio Pharmaceuticals Press Release, "Inovio Selected by CEPI to Develop Vaccine Against New Coronavirus," January 23, 2020.

[22] Inovio Pharmaceuticals Press Release, "Inovio Collaborating With Beijing Advaccine To Advance INO-4800 Vaccine Against New Coronavirus In China," January 30, 2020.

Inovio announced an accelerated timeline for INO-4800 development, with human clinical trials in the U.S. expected to start in April 2020.[23]

### C.        Summary of Allegations

16.      Plaintiffs allege claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of all purchasers of common stock of Inovio between February 14 and August 10, 2020 (the Putative Class Period).[24]  I understand that, following the Court's ruling on Defendants' Motion to Dismiss, five alleged misrepresentations remain:  (1) Dr. Kim's February 14, 2020 statement about constructing a vaccine in three hours; (2) Dr. Kim's March 2, 2020 statement about constructing a vaccine in three hours; (3) Inovio's March 24, 2020 press release announcing its partnership with Ology Bioservices Inc. ("Ology"); (4) Dr. Kim's May 11, 2020 earnings conference call statement that Inovio was on the right track to preparing one million vaccine doses by year-end 2020; and (5) Inovio's risk disclosure regarding potential risks from the loss of a collaborator, incorporated by reference into its May 12, 2020 Prospectus on Form 424B5.[25]

17.      Specifically, I understand that Plaintiffs contend the following two statements made by Dr. Kim were false and misleading when made:[26]

| Date | Event/Location | Speaker and Statement |
| --- | --- | --- |
| 2/14/2020 | Fox Business News with Fox's Neal Cavuto | [KIM:] "Well, using our DNA medicine's platform, Inovio doesn't need to see or get ahold of the virus to make a vaccine. Rather we just need the genetic sequence of that, so within three hours of accessing that after the Chinese authorities made it available we |

---

[23] Inovio Pharmaceuticals Press Release, "Inovio Accelerates Timeline for COVID-19 DNA Vaccine INO-4800," March 3, 2020.
[24] First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws, *Patrick McDermid, et al. vs. Inovio Pharmaceuticals, Inc., et al.*, September 21, 2020 ("First Amended Complaint"), ¶ 1.
[25] I understand that Plaintiffs' allegations concerning statements made in Inovio's April 30, 2020 press release regarding its agreement with Richter-Helm and its June 30, 2020 press release about its participation in Operation Warp Speed have been dismissed.  *See* Memorandum Regarding Defendants' Motion to Dismiss, *Patrick McDermid, et al. v. Inovio Pharmaceuticals, Inc., et al.*, February 16, 2021 ("Memorandum Regarding Motion to Dismiss").
[26] *See* Andrew R. Zenoff's Responses and Objections to Defendants' First Set of Interrogatories, July 1, 2020 ("Zenoff Responses to Interrogatories"), p. 4; Manual S. William's Responses and Objections to Defendants' First Set of Interrogatories, July 1, 2020 ("Williams Responses to Interrogatories"), p. 4.  *See also* First Amended Complaint, ¶¶ 97–100; Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *Patrick McDermid, et al. v. Inovio Pharmaceuticals, Inc., et al.*, December 21, 2020, p. 5; Memorandum Regarding Motion to Dismiss, p. 2.

| | | were able to construct our vaccine INO-4800 in about three hours." |
|---|---|---|
| 3/2/2020 | Televised Coronavirus Task Force Meeting | [KIM:] "By getting just the DNA sequence of the virus, we were able to fully construct our vaccine within three hours." |

18.    I understand that Plaintiffs contend that the February 14 and March 2, 2020 statements were "false and misleading" when made because "they failed to disclose that Inovio had merely 'designed' a vaccine construct within three hours of receiving the COVID-19 viral sequence, rather than constructing such a vaccine within three hours."[27]

19.    I understand that Plaintiffs contend that the following Tweet issued by Inovio on March 9, 2020 corrected Dr. Kim's statements:[28]

> Dear shareholders,
>
> A third-party report today demonstrated a lack of understanding of the science behind DNA medicines.  Inovio designed a vaccine construct for its coronavirus vaccine (INO-4800) within three hours after the viral sequence was publicly available; produced the vaccine at small scale and was in preclinical trials in January – preclinical results are available online in Nature Communications.  Inovio expects to move into human trials next month.
>
> Based on extensive prior work creating DNA vaccines using our proprietary DNA medicines platform, we are confident that we have a viable approach to address the COVID-19 outbreak.
>
> We remain committed to sharing our progress as we advance into the clinic in the coming weeks.[29]

---

[27] Zenoff Responses to Interrogatories, pp. 5–6; Williams Responses to Interrogatories, pp. 5–6.  *See e.g.*, First Amended Complaint, ¶ 101.

[28] *See* Zenoff Responses to Interrogatories, p. 7; Williams Responses to Interrogatories, p. 7; First Amended Complaint, ¶¶ 113, 144; Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *Patrick McDermid, et al. vs. Inovio Pharmaceuticals, Inc., et al.*, p. 24 (identifying that the "Complaint alleged that Inovio, not Citron, corrected Kim's statements on March 9, 2020.").

[29] Inovio Pharmaceuticals, Twitter Post by @InovioPharma, March 9, 2020, 1:26 p.m. ET, https://twitter.com/inoviopharma/status/1237067248835182592?lang=en.

20.    I understand that Plaintiffs contend the following statements contained in Inovio's March 24, 2020 press release were false and misleading:[30]

| Date | Event/Location | Speaker and Statement |
|---|---|---|
| 3/24/2020 | Inovio Press Release re Partnership with Ology Bioservices | [INOVIO:] "[T]he [DoD] has awarded Ology Bioservices with a contract valued at $11.9 million to work with Inovio on DNA technology transfer to rapidly manufacture DNA vaccines." |
| 3/24/2020 | Inovio Press Release re Partnership with Ology Bioservices | [KIM:] "'This partnership increases Inovio's manufacturing capabilities for our COVID vaccine and establishes an additional DNA vaccine manufacturing facility to protect the U.S. military against current and future disease outbreaks." |

21.    I understand that Plaintiffs contend that the March 24, 2020 statements were false and misleading when made because they failed to disclose that:  (a) "Inovio did not have VGXI, Inc.'s ('VGXI') permission to transfer VGXI's intellectual property and processes to Ology Bioservices, Inc. ('Ology')"; (b) "[i]n fact, Inovio told VGXI that Ology would use its own technology to produce Inovio's vaccine candidate, even though Inovio intended to transfer VGXI's technology to Ology"; (c) "Inovio transferred part of VGXI's technology to Ology without permission from VGXI"; and (d) "[w]ithout VGXI's technology, Ology did not have the capacity to deliver sufficient doses of Inovio's vaccine candidate."[31]

22.    I understand that Plaintiffs contend the following statement made by Dr. Kim on Inovio's May 11, 2020 earnings conference call was false and misleading:[32]

| Date | Event/Location | Speaker and Statement |
|---|---|---|
| 5/11/2020 | 1Q 2020 Earnings Call | [KIM:] "Yes. Thanks, Greg. Well, just roughly, when we say we're preparing 1 million doses, we're discussing or we're stating both the plasmids and the device and arrays to deliver them. So you can't really have one without the other. So we're on |

---

[30] Zenoff Responses to Interrogatories, p. 4; Williams Responses to Interrogatories, p. 4.  *See also* First Amended Complaint, ¶ 102.
[31] Zenoff Responses to Interrogatories, p. 6; Williams Responses to Interrogatories, p. 6.  *See also* First Amended Complaint, ¶ 103.
[32] Zenoff Responses to Interrogatories, pp. 4–5; Williams Responses to Interrogatories, pp. 4–5.  *See also* First Amended Complaint, ¶ 106.

|  |  | right track to do that. But we're preparing to do beyond that, we're preparing and increasing our scale to be able to provide hundreds of millions of doses starting next year. So these are the preparations that take to – which we're already doing to scale up in that massive scale. Assuming success of INO-4800, we will be in a great position to do so by relying on our current contract manufacturers of plasmids and adding on additional manufacturers that can help us scale." |
|---|---|---|

23.     I understand that Plaintiffs contend that Dr. Kim's May 11, 2020 statement was false and misleading when made because it failed to disclose:  (a) "Inovio knew that VGXI had very limited manufacturing capacity in 2020 and 2021"; (b) "VGXI could not produce one million doses of Inovio's vaccine candidate in 2020, nor could it produce hundreds of millions of doses thereafter"; (c) "VGXI did not have the necessary approvals from the FDA [U.S. Food and Drug Administration] to produce plasmids for publicly distributed vaccines"; (d) "Inovio had concluded that it would be impossible for VGXI to produce the doses required by Inovio"; (e) "[o]n May 7, 2020, VGXI had canceled its supply contract with Inovio"; (f) "[o]ther manufacturers could not make up the difference needed for Inovio to reach its production goals"; (g) "[a] transfer of the necessary technology from VGXI could take years to accomplish;" (h) "Inovio did not have VGXI's permission to transfer VGXI's intellectual property to other manufacturers, a necessary step for producing the vaccine candidate"; (i) "creating a new process from scratch could take years"; and (j) "Richter-Helm BioLogics GmbM and Co. KG ('Richter-Helm'), the only manufacturer other than VGXI that had the technology necessary to produce Inovio's vaccine, would not be able to deliver one million doses in 2020 or hundreds of millions of doses per year thereafter."[33]

24.     I understand that Plaintiffs contend the following statement contained in Inovio's May 12, 2020 Prospectus on Form 424B5 was false and misleading:[34]

_____

[33] Zenoff Responses to Interrogatories, p. 6; Williams Responses to Interrogatories, p. 6.  *See also* First Amended Complaint, ¶ 108.
[34] Zenoff Responses to Interrogatories, p. 5; Williams Responses to Interrogatories, p. 5.  *See also* First Amended Complaint, ¶ 109.

| Date | Event/Location | Speaker and Statement |
|---|---|---|
| 5/12/2020 | Form 424B5 Prospectus (incorporated by reference from Inovio's 2019 Form 10-K, filed March 12, 2020) | [INOVIO:] "If we lose or are unable to secure collaborators or partners, or if our collaborators or partners do not apply adequate resources to their relationships with us, our product development and potential for profitability will suffer.<br><br>*    *    *<br><br>If any of our current or future collaborators breaches or terminates our agreements, or fails to conduct our collaborative activities in a timely manner, our commercialization of products could be diminished or blocked completely." |

25.     I understand that Plaintiffs contend that the risk disclosure language was false and misleading when made because it failed to disclose:  (a) "Inovio knew that VGXI had very limited manufacturing capacity in 2020 and 2021"; (b) "VGXI could not produce one million doses of Inovio's vaccine candidate in 2020, nor could it produce hundreds of millions of doses thereafter"; (c) "VGXI did not have the necessary approvals from the FDA to produce plasmids for publicly distributed vaccines"; (d) "Inovio had concluded that it would be impossible for VGXI to produce the doses required by Inovio"; (e) "[o]n May 7, 2020, VGXI had canceled its supply contract with Inovio;" (f) "[o]ther manufacturers could not make up the difference needed for Inovio to reach its production goals;" (g) "[a] transfer of the necessary technology from VGXI could take years to accomplish"; (h) "Inovio did not have VGXI's permission to transfer VGXI's intellectual property to other manufacturers, a necessary step for producing the vaccine candidate"; (i) "creating a new process from scratch could take years"; (j) "Richter-Helm, the only manufacturer other than VGXI that had the technology necessary to produce Inovio's vaccine, would not be able to deliver one million doses in 2020 or hundreds of millions of doses per year thereafter"; and (k) "[t]hese facts should have raised a reasonable expectation with Defendants Kim and Kies that VGXI's cancellation of Inovio's contract, and the manufacturing

limitations of other manufacturers, would have a materially unfavorable impact on Inovio's future net sales, revenues, and/or income."[35]

26.    I understand that Plaintiffs are only challenging Defendants' statements about its manufacturing capacity, and not any forward-looking statements.[36]  Specifically, the Court identified that the alleged misrepresentations concerned Inovio's manufacturing capacity with respect to whether "VGXI lacked large-scale manufacturing capacity," whether "VGXI had already cancelled its contract," whether Ology could produce "any vaccine doses without VGXI's intellectual property or technology", and that "Richter-Helm could produce only 500,000 doses in 2020."[37]

27.    I understand that Plaintiffs now contend the following disclosures corrected the March 24, 2020, May 11, 2020, and May 12, 2020 alleged misrepresentations:[38]

> On June 3, 2020, after Defendants were required to lift the seal on their complaint against VGXI, and which partially revealed that Defendants' claims regarding the ability to produce certain doses of INO-4800 were misleading, the Company's stock price dropped by $2.46 per share on heavy trading volume.[39]

> On August 9 and 10, as additional information came into the market regarding Inovio's inability to meet vaccine production guidance, the Company's stock price experienced a two-day drop of $5.60 per share on heavy trading volume.[40]

---

[35] Zenoff Responses to Interrogatories, p. 6; Williams Responses to Interrogatories, p. 6.  *See also* First Amended Complaint, ¶ 110.

[36] For example, the Court has stated that "Plaintiffs contend that they are challenging only Defendants' statements about current manufacturing capacity, not any forward-looking statements."  *See* Memorandum Regarding Motion to Dismiss, p. 18.

[37] Memorandum Regarding Motion to Dismiss, pp. 21–22.

[38] Plaintiffs also appear to identify corrective disclosures on August 26, 2020 and September 2, 2020 that post-date the Putative Class Period in the First Amended Complaint, but do not identify these disclosures in their interrogatory responses.  *See* First Amended Complaint, ¶¶ 127–130, 147–148; Zenoff Responses to Interrogatories, pp. 7–8; Williams Responses to Interrogatories, pp. 7–8.

[39] Zenoff Responses to Interrogatories, pp. 7–8; Williams Responses to Interrogatories, pp. 7–8.  *See also* First Amended Complaint, ¶¶ 116, 145 ("On June 3, 2020, Inovio filed its complaint against VGXI, asserting that VGXI was preventing Inovio from producing one million doses of INO-4800 by the end of year for purposes of continuing clinical testing of the vaccine.  In that lawsuit, Inovio contended that unless VGXI transferred its intellectual property and technology for producing INO-4800 to other manufacturers, it would be mathematically impossible to deliver one million doses by the end of 2020 (let alone, hundreds of millions of doses in 2021 and beyond).").

[40] Zenoff Responses to Interrogatories, p. 8; Williams Responses to Interrogatories, p. 8.  *See also* First Amended Complaint, ¶¶ 124–125, 146 ("On August 9, 2020, The New York Times issued an article entitled, 'This Company Boasted to Trump About Its COVID-19 Vaccine.  Experts are Skeptical.'  The article discussed many of allegations relevant to this case, but included new information regarding statements made by Defendants on June 30, 2020. … On the evening of August 10, 2020, Inovio held its second fiscal quarter of 2020 earnings conference call.  Inovio had nothing significant to report to investors other than the INO-

## IV.    Summary of Opinions

28.    My opinions in this matter are summarized as follows:

A.    Based on my analysis, and assuming that Inovio's stock traded in an efficient market, Plaintiffs' alleged February 14 and March 2, 2020 misstatements did not impact the price of Inovio's stock.  (See Section VII.) My conclusion is based on:

(1) my analysis of the information regarding Inovio's vaccine development timeline that was publicly available prior to the start of the Putative Class Period;

(2) the results of my event study showing that Inovio's return on February 14, 2020 was not statistically significant;

(3) my investigation of news concerning Inovio that establishes the absence of negative confounding information potentially affecting the stock return on February 14, 2020;

(4) Plaintiffs' and Professor Feinstein's claim that Inovio's stock traded in an efficient market, in which stock prices react quickly and fully to new, value-relevant information, but do not react to reiterations of old information;

(5) Inovio's press release on March 3, 2020, which clarified that Inovio "designed" its vaccine in three hours; and

(6) intra-day analysis of Inovio's stock price on March 9, 2020, which shows that the entirety of Inovio's stock price decline on March 9, 2020 occurred prior to the alleged corrective disclosure.

B.    Based on my analysis, and assuming that Inovio's stock traded in an efficient market, Inovio's March 24, 2020 alleged misstatements did not impact the price of Inovio's stock.  My conclusion is based on the results of my event study showing that Inovio's return on March 24, 2020 was not statistically significant and my investigation of news concerning Inovio that establishes the absence of negative

---

4800 program milestones experienced further delay. Indeed, Kim summed up his opening remarks regarding INO-4800 by stating the Company had to focus on 'continu[ing] to build out manufacturing . . . to meet Inovio's and the world's need for hundreds of millions of COVID-19 vaccine doses [and] . . . achieving additional external funding for scale-up and manufacturing of vaccine doses.'").

confounding information potentially affecting the stock return on March 24, 2020. (See Section VIII.)

C.  Based on my analysis, and assuming that Inovio's stock price traded in an efficient market, any stock price declines following the August 9 and 10, 2020 disclosures were not due to new information about Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm and are therefore not evidence of prior price impact from the alleged March 24, May 11, and May 12, 2020 misrepresentations. (See Section IX.) My conclusion is based on:

(1) prior to August 9 and 10, 2020, disclosures concerning Inovio's lawsuit against VGXI became public and revealed the information Plaintiffs allege was misrepresented concerning Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm;

(2) the absence of any new, negative information disclosed in the August 9, 2020 article regarding Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm;

(3) the results of my event study showing that Inovio's return on August 10, 2020 was not statistically significant;

(4) the absence of any new, negative information disclosed during the August 10, 2020 earnings conference call regarding Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm; and

(5) the existence of new, negative information regarding INO-4800 disclosed on the August 10, 2020 earnings conference call about the delay in the expected start date of Inovio's Phase 2/3 efficacy trial.

D.  Representative Plaintiff Andrew R. Zenoff has no damages according to Professor Feinstein's proposed Section 10(b) damage methodology. (See Section X.) My conclusion is based on:

(1) none of Mr. Zenoff's purchases of Inovio stock in his personal E*TRADE account were held at the time of an alleged corrective disclosure, and thus would not result in damages under Professor Feinstein's proposed methodology;

(2) Mr. Zenoff's first (of two) purchase of Inovio stock in his 401(k) E*TRADE account were also not held at the time of an alleged corrective disclosure, and thus would not result in damages under Professor Feinstein's proposed methodology; and

(3) Mr. Zenoff's second (of two) purchase of Inovio stock in his 401(k) E*TRADE account was held until March 4, 2021, and thus would result in no damages under Professor Feinstein's methodology because the 90-day average price following the Putative Class Period of $12.47 exceeds Mr. Zenoff's purchase price of $10.97.

## V.    Overview of Market Efficiency and Its Implications for Assessing Price Impact

29.    I understand that in *Basic*,[41] the Supreme Court affirmed the ability of plaintiffs in a Rule 10b-5 class action to establish reliance under a "fraud on the market" theory if they can establish that the security at issue traded in an efficient market. *Basic* further explains that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[42]

30.    Financial economists define an efficient market as one in which "prices always 'fully reflect' available information."[43,44] Consistent with the above discussion in *Basic*, I understand that a presumption of reliance on the alleged material misrepresentations requires conditions that are analogous to what financial economists refer to as the semi-strong form of market efficiency.

---

[41] *Basic Inc. v. Levinson et al.*, 485 U.S. 224 (1988) ("*Basic*").

[42] *Basic* at 247.

[43] Fama (1970), p. 383. In general, financial economists distinguish between different forms of efficiency based on the type of information that is incorporated in asset prices. Financial economists consider three forms of market efficiency, which differ based on the universe of information that is incorporated in asset prices: weak form, semi-strong form, and strong form. Fama (1970), p. 383 describes the three forms of market efficiency as follows: "First, weak form tests, in which the information set is just historical prices… Then semi-strong form tests, in which the concern is whether prices efficiently adjust to other information that is obviously publicly available (e.g., announcements of annual earnings, stock splits, etc.)… Finally, strong form tests concerned with whether given investors or groups have monopolistic access to any information relevant for price formation…" (emphasis removed).

[44] Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617 ("Fama (1991)") at 1575–1577.

Under the semi-strong form, the market efficiency hypothesis holds that stock prices adjust quickly and completely to new and value-relevant public information.[45]

31.    Tests of semi-strong form efficiency focus on "[h]ow quickly … security prices reflect public information."[46]  Professor Fama, who was awarded the Nobel Prize in Economics and made major contributions to the development of the theory and evidence on market efficiency, states:

> [T]hough transaction costs, information that is not freely available to all investors, and disagreement among investors about the implications of given information are not necessarily sources of market inefficiency, they are potential sources.  And all three exist to some extent in real world markets.  Measuring their effects on the process of price formation is, of course, the major goal of empirical work in this area.[47]

In his 1991 review of the market efficiency literature at the time, Professor Fama further notes that the "typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements."[48]  Market efficiency thus should not be casually presumed, but rather requires rigorous empirical analysis for a given individual security and time period.

32.    In the current matter, Professor Feinstein concludes that "Inovio common stock traded in an efficient market over the course of the Class Period."[49]  Professor Feinstein further concludes that statistical analysis examining the cause-and-effect relationship between the release of Company information and movement in Inovio's stock price demonstrates that "Inovio stock responded to Company-specific information, which is the essence of market efficiency."[50]

33.    I understand that the Supreme Court's ruling in *Halliburton II* reiterated that "[u]nder *Basic*'s fraud-on-the-market theory, market efficiency and the other prerequisites for invoking the presumption constitute an indirect way of showing price impact."[51]  However, it further held

---

[45] Fama (1970), p. 414.  Throughout the remainder of this report, discussion of market efficiency refers to semi-strong form market efficiency.
[46] Fama (1991), p. 1576.
[47] Fama (1970), p. 388.
[48] Fama (1991) p. 1601.
[49] Feinstein Report, ¶ 17.
[50] Feinstein Report, ¶ 18.
[51] *Halliburton II* at 281.

that "an indirect proxy should not preclude direct evidence when such evidence is available" because "'[a]ny showing that severs the link between the alleged misrepresentation and…the price received (or paid) by the plaintiff… will be sufficient to rebut the presumption of reliance' because 'the basis for finding that the fraud had been transmitted through market price would be gone.'"[52]  Below, I evaluate whether any stock price change on the days of certain of the allegedly misleading statements and alleged corrective disclosures can be used as evidence of price impact of alleged misrepresentations, assuming Professor Feinstein is correct in his claim that Inovio's stock traded in an efficient market throughout the Putative Class Period.

## VI.    Event Study Analysis

34.    In this section, I provide an overview of the event study methodology and follow the academic research in applying the event study methodology to analyze the information released on the days on which Plaintiffs identify alleged misrepresentations or alleged corrective disclosures.  Given Plaintiffs' and Professor Feinstein's contention that the market for Inovio's common stock was efficient during the Putative Class Period,[53] Inovio's stock price should react rapidly to reflect all new value-relevant information released to the market.  In other words, an event study is a helpful first step that a financial economist can take to evaluate whether new information impacted the price of Inovio's common stock.[54]

### A.    Overview of Event Study Methodology

35.    I understand that, in *Halliburton II*, the Supreme Court stated that the presumption of reliance in an efficient market "'could be rebutted by appropriate evidence,' including evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock."[55]  Event studies have been widely used for more than 50 years to measure the stock price impact of new information that enters the marketplace, and serve as an important tool

---

[52] *Halliburton II* at 281.

[53] Feinstein Report, ¶ 17.

[54] Note that because the event study is focusing on the price impact of all new information entering the market on a particular day, it may be insufficient to address price impact of a specific piece of information if other important information is released simultaneously.

[55] *Halliburton II* at 279–280.

for assessing the price impact of alleged misrepresentations.[56]  I have employed this technique numerous times in my peer-reviewed research.[57]  Professor Craig MacKinlay summarizes the essence of the event study approach as follows:  "Using financial market data, an event study measures the impact of a specific event on the value of a firm."[58]  Because of their ability to isolate the impact of firm-specific information, event studies are commonly used in securities cases.

36.     Typically, event studies use a regression model to isolate the firm-specific stock price change ("return") after controlling for market-wide and/or industry-wide factors.  The financial economist selects the appropriate market- and/or industry-wide indices and typically assumes there exists a stable linear relationship between the firm's stock return and the returns of the market- and/or industry-wide indices.  Such a relationship between the firm's stock return and these indices can be estimated over an "estimation window."  It is then possible to calculate the firm's expected return on any given day based on that day's market and/or industry index returns and the estimated relationship.  Intuitively, the firm's expected return is the return one would predict on a particular day based on the typical relationship between the stock's return and the market and industry indices.  Because financial economists are interested in the "typical" relationship, they often exclude from the estimation window the events being tested to ensure that the returns on the event dates do not affect the measurement of the typical relationship.[59]

37.     The difference between a stock's actual ("raw" or "observed") return and its expected return estimated from the regression model is called the stock's "abnormal" or "residual" return. The period over which the stock's return is analyzed is called the "event window" (*e.g.*, one day).  Financial economists use statistical measures to determine whether a return is statistically distinguishable from zero, *i.e.*, whether the return is statistically greater than the typical variation

---

[56] For example, I note that the Brief for Financial Economists as Amici Curiae Supporting Respondents in *Goldman*, for which Professor Feinstein was a signatory, states:  "Economic tools are routinely used to analyze the impact of all kinds of statements on market price… the same tools that establish price impact can disprove price impact where the challenged conduct in fact did not affect the market price. … An event study, for example, can still isolate the statement's effect on share price (Torchio, supra, at 163), experts can still conduct content analysis to test whether certain concepts were discussed by market observers (J.A. 605-606, 646-647, 652-659), and so on."  Brief for Financial Economists as Amici Curiae Supporting Respondents, *Goldman Sachs Group, Inc., et al., v. Arkansas Teacher Retirement System, et al*, March 2021, pp. 4–5, 13 (emphasis omitted).

[57] Appendix A lists my publications.  The first event study listed on my CV is Yong Cheol Kim, and René M. Stulz, "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," *Journal of Financial Economics* 22, no. 2, 1998, pp. 189–205.

[58] Craig A. MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1, 1997, pp. 13–39 ("MacKinlay (1997)") at p. 13.

[59] *See, e.g.*, MacKinlay (1997), p. 20.

in the abnormal returns of that stock during the estimation window. Abnormal returns with magnitudes that exceed the threshold are deemed "statistically significant."

38.    The statistical significance is generally evaluated using a t-statistic. A t-statistic is defined as the ratio between the residual return on a particular date of interest and the volatility of that residual return.[60] A residual return is typically deemed to be "statistically significant" using a two-sided test at the 95 percent confidence interval when the absolute value of the t-statistic is greater than 1.96. Thus, when the t-statistic for a particular date is greater than 1.96 (in absolute value), the residual return is considered statistically significant relative to the typical range of residual returns that one would expect to observe on that date, indicating the arrival of new, value-relevant firm-specific information.

39.    In an event study, a statistically significant abnormal return over a given event window reflects the estimated stock price impact of the total mix of information released during that event window. The typical null hypothesis being tested is that there is no abnormal return over a particular event window. In other words, a residual return that is statistically significant indicates the arrival of new, value-relevant information in the market, whereas a residual return that is not statistically significant does not.[61]

## B.    Regression Model Specification

40.    According to the academic literature, a financial economist must set up a properly specified regression model to conduct the event study analysis, which requires (i) defining the estimation window and (ii) selecting appropriate market and/or industry indices to account for market- and/or industry-wide factors.

41.    Regarding the selection of the estimation window, it is important to take into account that the Putative Class Period includes a highly unusual period characterized by extremely high volatility in the markets in March 2020 but lower volatility later. As shown in Exhibit 1, VIX, a

---

[60] Specifically, the volatility of the residual return on a given date is the estimated standard deviation of the residual return for that specific date (also known as the forecast standard error).

[61] Professor Feinstein similarly states: "The portion of a stock price change that cannot be attributed to market or sector factors is called the residual stock price movement or 'residual return.' The event study isolates the residual return and also tests whether or not the residual return can reasonably be explained as merely a random fluctuation. If a security's residual return is statistically significant, it indicates that the stock price movement cannot be attributed to market factors, sector factors, or to random volatility, but rather was caused by new, company-specific information." Feinstein Report, ¶¶ 96–97.

widely used index of expected market volatility, peaked in March 2020.[62]  It is well known that when one fails to account for periods of high volatility, one may wrongly conclude that some abnormal returns are statistically significant when they are not.[63]  To account for the effects of changing volatility during the Putative Class Period, I utilize the period of the Putative Class Period for the estimation window, which includes the period of heightened volatility earlier in the Putative Class Period.  I exclude from the estimation window any stock return corresponding to (i) dates on which Plaintiffs identify an alleged misrepresentation and (ii) dates on which Plaintiffs identify an alleged corrective disclosure.[64]  In performing the event study regression model, I then utilize a generalized method of moments ("GMM") technique that allows me to test for whether the abnormal return volatility differs earlier in the Putative Class Period and to estimate the point at which the abnormal return volatility changes.  I estimate my regression model allowing for the abnormal return volatility to be higher early in the Putative Class Period and lower later during the Putative Class Period.[65]  See Appendix D for additional detail regarding the event study regression model and estimation.

[62] From 1990 to now, the index exceeded 50 twice.  The first time was in November 2008 and the second time was in March 2020.  *See* Chicago Board Options Exchange, "CBOE Volatility Index: VIX (VIXCLS)," retrieved from FRED, *Federal Reserve Bank of St. Louis*, https://fred.stlouisfed.org/series/VIXCLS, accessed September 27, 2021.

[63] Professor Feinstein similarly states:  "[W]hen running an event study on a period during which volatility has suddenly increased substantially, the standard event study methodology can produce unreliable results if no adjustment is made to the significance critical value to reflect the increased volatility. … With the higher volatility in the COVID Period, the usual distributional assumptions for the t-test of significance are inadequate because they produce too many false positives. … Without a proper correction, one may mistake spuriously significant random stock price movements for market reactions to information disclosures."  Feinstein Report, ¶¶ 105–107.  While Professor Feinstein recognizes that the Putative Class Period overlaps with a period of "higher volatility" due to the COVID-19 pandemic, I note that his event study models fail to account for the fact that volatility changed dramatically during the Putative Class Period.  As shown in Exhibit 1, Inovio's 30-day implied volatility also increased in late February 2020 to early March 2020, following a similar trend as the VIX, and then decreased considerably.  Both market efficiency analyses that Professor Feinstein performs (the empirical distribution and the alternative experimental design) require that the distribution of returns has a constant volatility during the period used to assess abnormal returns.  For example, Gelbach et al. (2013)—on whose methodology Professor Feinstein relies "to account for the heightened volatility during the Covid Period"—states:  "We follow common practice and assume that all excess returns for pre-event dates are iid conditional on the full set of regressors and come from the same distribution, which we name *F*. … Given the common assumption that events affect only the level of the daily return, it follows that $a_e$, the part of the event-date excess return that is unrelated to the event, also has distribution *F*."  In other words, the methodology employed by Gelbach et al. (2013) assumes that the event dates come from the same distribution as the estimation window dates, and thus does not account for changing volatility from the estimation window to the event dates.  *See* Feinstein Report, ¶ 109; Jonah Gelbach et al., "Valid Inference in Single-Firm, Single-Event Studies," *American Law and Economics Review* 15, no. 2, 2013, at p. 509.  This condition is not met during the Putative Class Period because it is a period with dramatic changes in the volatility of Inovio's return, as suggested by the implied volatility shown in Exhibit 1.

[64] The dates on which there is an alleged misrepresentation or an alleged corrective disclosure are summarized in Section III.C.  For announcements that occur after the close of trading, the following trading day's return is used.

[65] This technique enables testing whether there is a structural break in residual return volatility in the estimation window, and provides an estimate for the date on which the structural break occurred.  The structural break in residual return volatility during the Putative Class Period is estimated to occur on March 30, 2020.  *See* Exhibit 2A for these results. The structural break date is estimated using structural stability tests well-documented in the literature.  *See, e.g.*, Donald W. K. Andrews, "Tests for Parameter Instability and Structural Change With Unknown Change Point," *Econometrica*, Vol. 61, No. 4 (July 1993), pp. 821–

42.     For robustness, I also considered two alternative event study approaches to potentially account for changes in volatility during the Putative Class Period relative to the period prior to the Putative Class Period.  First, I evaluated a rolling regression approach in which the estimation window for each event date is the 120 trading days immediately preceding the event date, which can potentially account for changes in volatility because the estimation periods include days that are closer to the day of interest.  Second, I evaluated a Generalized Auto-regressive Conditional Heteroscedasticity (GARCH) model, which is a technique in financial economics that can account for rapid and consequential changes in volatility.  The conclusions I reach in this report hold for all three of the event study approaches that I evaluated.

43.     Regarding the selection of the appropriate market and/or industry indices, I use the returns on the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index ("Market Index") to control for market movements and returns on the S&P Biotechnology Select Industry Index ("Industry Index") to control for industry movements.[66]  Exhibit 2A provides a summary of the event study model and Exhibit 2B shows the firm-specific (abnormal) return for Inovio stock on each date during the Putative Class Period.

### VII.     Dr. Kim's Statements about Constructing a Vaccine in Three Hours Did Not Impact Inovio's Stock Price and Any Assertion That They Did So Would Be Inconsistent with Professor Feinstein's Market Efficiency Claims

44.     As summarized in Section III.C above, I understand that Plaintiffs contend that Dr. Kim made misrepresentations on February 14, 2020 and March 2, 2020 by stating that Inovio "constructed" its vaccine candidate in three hours after receiving the DNA sequence, rather than

---

856 ("Andrews (1993)"); Donald W. K. Andrews and Werner Ploberger, "Optimal Tests when a Nuisance Parameter is Present Only Under the Alternative," *Econometrica*, Vol. 62, No. 6 (Nov. 1994), pp. 1383–1414 ("Andrews and Ploberger (1994)"); Margaret M. McConnell and Gabriel Perez-Quiros, "Output Fluctuations in the United States: What Has Changed Since the Early 1980's?," *The American Economic Review*, Vol. 90, No. 5 (Dec, 2000), pp. 1464–1476 ("McConnell and Perez-Quiros (2000)").
[66] In Section VII below, I discuss intraday price movements on select event dates.  Intraday price information is not readily available for the Market Index or Industry Index.  When evaluating intraday movements for these indices, I select exchange traded funds ("ETFs") that seek to track the performance of the Market Index and Industry Index, respectively.  Specifically, for the Market Index, I select the Vanguard Total Stock Market ETF (VTI), which "[s]eeks to track the performance of the CRSP US Total Market Index," and for the Industry Index, I select the SPDR S&P Biotech ETF (XBI), which "seeks to provide investment results that, before fees and expenses, correspond generally to the total return performance of the S&P Biotechnology Select Industry Index."  *See "*Vanguard Total Stock Market ETF (VTI)," Vanguard, 2021, https://investor.vanguard.com/etf/profile/VTI, accessed September 27, 2021; "SPDR® S&P® Biotech ETF," *State Street Global Advisors*, 2021, https://www.ssga.com/us/en/intermediary/etfs/funds/spdr-sp-biotech-etf-xbi, accessed September 27, 2021.

stating that Inovio "designed" a vaccine construct within three hours, and that these alleged misrepresentations were corrected on March 9, 2020 via Inovio's 1:26 p.m. ET Tweet.

45.    Based on my analysis, and assuming that Inovio's stock traded in an efficient market, Plaintiffs' alleged February 14 and March 2, 2020 misstatements did not impact the price of Inovio's stock.  As discussed in detail below, my conclusion is based on:

(1) my analysis of the information regarding Inovio's vaccine development timeline that was publicly available prior to the start of the Putative Class Period;

(2) the results of my event study showing that Inovio's return on February 14, 2020 was not statistically significant;

(3) my investigation of news concerning Inovio that establishes the absence of negative confounding information potentially affecting the stock return on February 14, 2020;

(4) Plaintiffs' and Professor Feinstein's claim that Inovio's stock traded in an efficient market, in which stock prices react quickly and fully to new, value-relevant information, but do not react to reiterations of old information;

(5) Inovio's press release on March 3, 2020, which clarified that Inovio "designed" its vaccine in three hours; and

(6) intra-day analysis of Inovio's stock price on March 9, 2020, which shows that the entirety of Inovio's stock price decline on March 9, 2020 occurred prior to the alleged corrective disclosure.

**A.    Information That Inovio Designed Its Vaccine within Three Hours Was Available Prior to the Start of the Putative Class Period**

46.    An analysis of the public mix of information establishes that the market was informed no later than January 30, 2020 that Inovio "designed" its potential vaccine within three hours.  In an efficient market, as of the start of the Putative Class Period, Inovio's stock price would incorporate all such prior publicly available information.

47.    On January 30, 2020, it was publicly reported that Inovio "designed" a potential vaccine within three hours by putting the available DNA sequence of the virus through its computer technology platform.  Specifically, a *BBC News* article identified that Inovio used "a relatively

new type of DNA technology to develop a potential vaccine" and quotes Inovio's Kate Broderick, senior vice-president of research and development, as stating that "[o]nce China had provided the DNA sequence of this virus, we were able to put it through our lab's computer technology and design a vaccine within three hours."[67]

48.     In addition, on January 30, 2020, Inovio announced a collaboration with Beijing Advaccine Biotechnology Co. "to advance the development in China of INO-4800."[68]  Inovio announced that it "plans to rapidly develop INO-4800 against the new coronavirus and has already started preclinical testing and preparations for clinical product manufacturing."[69] Following this announcement, equity analysts noted that Inovio continued to develop its potential vaccine candidate and remarked on Inovio's track record of rapidly turning vaccine "concepts" into investigative new drug candidates:

> January 30, 2020, Roth:  "We expect INO-4800 to be in the clinic in a few months both in the U.S. and China, which even if the outbreak mostly resolves itself by then, will still demonstrate that INO's technology can rapidly generate vaccines once a pathogen's genetic sequence and organization is known. At present, INO is in preclinical testing and preparing for clinical product manufacturing, and Advaccine's expertise and experience with Chinese regulatory authorities and clinical trial management should help INO-4800 development hit the ground running in China."[70]

> January 30, 2020, Stifel:  "The modularity of INO's DNA vaccine technology and proven ability to rapidly-transition from product profile concept to IND candidate capable of generating robust immunological responses in the clinic has once-again placed them at the center of another viral outbreak with non-dilutive funding (per CEPI) in-hand and, per today's announcement, a newly-announced collaboration designed to navigate China's regulatory landscape and facilitate future clinical development. … **We've seen INO successfully mobilize infectious disease product development candidates before**. Management hopes to expedite the development of INO-4800 by leveraging previous work targeting the successful development of a vaccine candidate against Middle East Respiratory Syndrome (MERS, INO-4700) – a respiratory

---

[67] Tulip Mazumdar, "Coronavirus Vaccine: Scientists Race to Develop Prevention," *BBC News*, January 30, 2020, https://www.bbc.com/news/health-51299735, accessed September 27, 2021.
[68] Inovio Pharmaceuticals Press Release, "Inovio Collaborating With Beijing Advaccine To Advance INO-4800 Vaccine Against New Coronavirus In China," January 30, 2020.
[69] Inovio Pharmaceuticals Press Release, "Inovio Collaborating With Beijing Advaccine To Advance INO-4800 Vaccine Against New Coronavirus In China," January 30, 2020.
[70] "INO: Beijing Advaccine Partnership To Advance New Coronavirus INO-4800 In China," *Roth*, January 30, 2020, p. 1.

disorder caused by a structurally related coronavirus (but via a completely different route of transmission, i.e. animal-to-human). … In addition to INO-4700, INO has been able to rapidly turnaround other vaccine candidates from concept to IND candidate in multiple other infectious disease settings for which potential outbreaks have sparked concern – including GLS-5700 (a Zika virus vaccine currently in P1 development) and INO-4500 (a Lassa virus vaccine currently in P1 development and also supported by a separate CEPI grant)."[71]

January 31, 2020, H.C. Wainwright & Co.:  "Inovio plans to use the CEPI funding to support preclinical and clinical development through Phase 1 human testing of INO-4800 in the U.S. In fact, Inovio has already started preclinical testing and preparations for clinical product manufacturing. The goal of the collaboration with Advaccine is to run a Phase 1 trial in China in parallel with the U.S. study, and leverage Advaccine's expertise and experience with regulatory authorities and clinical trial management in China to achieve accelerated regulatory approval for INO-4800. Inovio and Advaccine also plan to obtain additional grant funding and further collaboration with larger vaccine firms in China to speed up the development of INO-4800."[72]

### B.    The Alleged Misrepresentation on February 14, 2020 Did Not Impact Inovio's Stock Price

49.    As discussed above, Plaintiffs allege that Dr. Kim made a misrepresentation during an interview with Fox Business News by stating that "within three hours of accessing [the DNA sequence] after the Chinese authorities made it available we were able to construct our vaccine INO-4800 in about three hours."[73]  Plaintiffs further allege that "[i]n reaction to this news, Inovio's common stock price closed up 7.5% on February 14, 2020, compared to the prior day's closing price of $3.86 per share."[74]  Contrary to Plaintiffs' allegations, the economic evidence shows that the alleged misrepresentation on February 14, 2020 did not impact Inovio's stock price.

50.    As an initial matter, as discussed in Section VII.A above, an analysis of the public mix of information establishes that the market was informed no later than January 30, 2020 that Inovio

---

[71] "Lots of Volatility, Little (If Any) Visibility – Don't Forget About Fundamentals Here," *Stifel*, January, 30, 2020, p. 1 (emphasis in original).

[72] "Chinese Collaboration Against New Coronavirus Established; Reiterate Buy," *H.C. Wainwright & Co.*, January 31, 2020, p. 1.

[73] First Amended Complaint, ¶ 97.

[74] First Amended Complaint, ¶ 98.

had "design[ed]" its potential vaccine within three hours.  Plaintiffs and Professor Feinstein have claimed that Inovio's stock traded in an efficient market.  In such a market, stock prices react quickly and fully to new, value-relevant information, but do not react to reiterations of old information.  Thus, there is no economic basis to expect Dr. Kim's reiteration of previously-disclosed information to affect Inovio's stock price.

51.     In addition, as shown in Exhibit 2B, Inovio's residual return is not statistically significant on February 14, 2020.  Professor Feinstein's event study results for both his market efficiency analysis (using the empirical distribution) and the alternative experimental design also show that Inovio's residual stock return on February 14, 2020 is not statistically significant.[75]  In other words, after controlling for market and industry factors, Inovio's stock return on February 14, 2020 cannot be reliably distinguished from the normal volatility and random fluctuations in Inovio's stock price on a daily basis.  Moreover, based on a review of analyst reports, SEC filings, and news articles available through *Factiva* and *Bloomberg*, I do not find any new negative, firm-specific information released on February 14, 2020 that could potentially have offset any price increase related to the alleged misrepresentation.  Thus, there is no reliable economic evidence that the alleged misrepresentation on February 14, 2020 impacted Inovio's stock price.  I note that, consistent with this finding, I am aware of no analyst reports published on or around February 14, 2020 that discuss Plaintiffs' alleged misrepresentation.

### C.     The Alleged Misrepresentation on March 2, 2020 Did Not Impact Inovio's Stock Price

52.     As discussed above, Plaintiffs allege that Dr. Kim made a misrepresentation near the close of market hours on March 2, 2020 during a televised meeting in the White House Cabinet Room with President Trump, members of the Coronavirus Task Force, and other pharmaceutical company executives when responding to questioning by President Trump by stating "'[b]y getting just the DNA sequence of the virus, we were able to fully construct our vaccine within three hours.'"[76]  Plaintiffs further allege that "[i]n response to Kim's statements at the White House meeting, on March 3, 2020, Inovio's common stock price closed up 69.7%, on over 121

---

[75] Feinstein Report, Exhibit 8, p. 103 and Exhibit 10c, p. 117.
[76] First Amended Complaint, ¶ 99.

million shares in trading volume, compared to $4.39 per share at the close of March 2, 2020."[77] Contrary to Plaintiffs' allegations, the economic evidence shows that the alleged misrepresentation on March 2, 2020 did not impact Inovio's stock price.

53.    As an initial matter, as discussed in Sections VII.A and VII.B above, an analysis of the public mix of information establishes that the market was informed no later than January 30, 2020 that Inovio had "design[ed]" its potential vaccine within three hours. In addition, even after the February 14, 2020 alleged misrepresentation discussed above, Dr. Kim is again quoted as explaining that Inovio was able to "design" the vaccine within hours of receiving the DNA sequence. Specifically, on February 24, 2020, *The Wall Street Journal* reported that "Inovio's vaccine contains DNA with the genetic code of the virus, and the company was able to design it within hours of learning the genetic sequence in January, said Chief Executive Joseph Kim."[78] Further, the alleged misrepresentation on March 2, 2020 is essentially the same as the alleged misrepresentation on February 14, 2020. Plaintiffs and Professor Feinstein have claimed that Inovio's stock traded in an efficient market during the Putative Class Period. A repetition of existing information should not impact the stock price in such an efficient market.

54.    In addition, as shown in Exhibit 3A, a review of Inovio's intraday stock price changes reveals that the increase in Inovio's stock price on March 3, 2020 begins immediately after Inovio's 8:00 a.m. ET issuance of a press release announcing an accelerated timeline for developing the INO-4800 vaccine.[79] Based on my review, analyst commentary indicates that the central item of new, value-relevant information in Inovio's press release was that it was accelerating its timeline for the COVID-19 DNA vaccine development, including human trials planned for April 2020. For example, analyst commentary following the March 3, 2020 press release noted:

> March 3, 2020, Maxim:  "INO shares are up ~17% on the announcement
> of development timelines for its COVID-19 vaccine (INO-4800) using its
> DNA vaccine platform. … The company plans to initiate a US clinical
> trial (30 healthy subjects) in April with data by Fall 2020, and if positive,

---

[77] First Amended Complaint, ¶ 100.  Plaintiffs also state that "Inovio's common stock price continued to skyrocket through March 6, 2020, closing at $14.09 per share as investors continued to acquire the Company's shares."

[78] Peter Loftus, "J&J, Sanofi, Inovio Hunt for Coronavirus Vaccines," *The Wall Street Journal*, February 24, 2020, 4:22 p.m. ET, https://www.wsj.com/articles/j-j-sanofi-inovio-hunt-for-coronavirus-vaccines-11582579340, accessed October 2, 2021.

[79] Inovio Pharmaceuticals Press Release, "Inovio Accelerates Timeline for COVID-19 DNA Vaccine INO-4800," March 3, 2020, 8:00am.

have 1M doses prepared for emergency use and future trials by the end of 2020."[80]

March 3, 2020, Cantor Fitzgerald:  "Inovio announced (3/3, BMO) its accelerated timeline for development of its COVID-2019 vaccine candidate INO-4800. The company anticipates having 3000 doses manufactured for clinical studies in March and expects to start dosing healthy volunteers in the US in April followed by study starts in China and South Korea. Inovio expects to have data in fall 2020. We view this timeline as feasible in light of the company's experience developing vaccines in an expeditious manner as we opined in a recently published note."[81]

March 4, 2020, H.C. Wainwright:  "Yesterday, Inovio Pharmaceuticals formally announced the accelerated timeline for the development of its DNA vaccine against coronavirus COVID-19, designated INO-4800, following the company's participation in and presentation at the U.S. Coronavirus Task Force meeting at the White House. INO-4800 is now slated to enter human clinical testing in the U.S. in April 2020 and soon thereafter in both China and South Korea. The company plans to deliver 1M doses by the end of 2020 with existing resources and capacity."[82]

March 4, 2020, Stifel:  "We had an opportunity to catch up with Inovio management after yesterday's (March 3) market close – one day removed from management's participation (along with other biotech/pharma executives) in the White House Coronavirus Task Force meeting in Washington D.C. and following the announcement re: the acceleration of development timelines for its COVID-19 DNA vaccine candidate INO-4800 (human trials will begin next month) and newly-issued guidance suggesting 1M doses will be available by YE20. … Management has finalized the design of human clinical trials which will initiate in the U.S. next month (healthy volunteers, n=30) and subsequently expand into China and South Korea shortly thereafter. Preliminary human trial data ae [sic] expected to be presented/published in the fall of FY20. Management has also developed large-scale manufacturing plans, intends to have >3K INO-4800 doses prepared for aforementioned clinical trials, and is now

---

[80] "COVID-19 Vaccine Candidate INO-4800 Timelines Announced, Could Have 1 Million Doses by YE20," *Maxim*, March 3, 2020, p. 1.
[81] "DNA-Based Platform Gaining Traction in COVID-19 Therapeutics Race," *Cantor Fitzgerald*, March 3, 2020, p. 1.
[82] "Coronavirus Vaccine Development Timeline Accelerated; Positive Preclinical Data; Reiterate Buy," *H.C. Wainwright*, March 4, 2020 p. 1.

guiding to the production of ~1M doses for either emergency use authorization or future clinical trials by YE20."[83]

**D.      Any Stock Price Decline on March 9, 2020 Cannot Be Used As Economic Evidence of Price Impact for the February 14 and March 2, 2020 Alleged Misrepresentations, In an Efficient Market**

55.      As discussed in Section III.C above, Plaintiffs identify that on March 9, 2020 at 1:26 p.m. ET, Inovio issued a Tweet that stated, in part:[84]

> A third-party report today demonstrated a lack of understanding of the science behind DNA medicines.  Inovio designed a vaccine construct for its coronavirus vaccine (INO-4800) within three hours after the viral sequence was publicly available; produced the vaccine at small scale and was in preclinical trials in January – preclinical results are available online in Nature Communications.  Inovio expects to move into human trials next month.[85]

However, as discussed below, any price reaction to Inovio's March 9, 2020 Tweet cannot be used as economic evidence of price impact for the February 14, 2020 and March 2, 2020 alleged misrepresentations, in an efficient market.

56.      First, it does not appear that Inovio's Twitter statement provided new, value-relevant information.  Inovio's statement that it "designed a vaccine construct" within three hours is consistent with (a) its pre-Putative Class Period statement on January 30, 2020 that it was "able to put it through our lab's computer technology and design a vaccine within three hours,"[86] discussed in Section VII.A above, and (b) its February 24, 2020 statement in *The Wall Street Journal* that it "was able to design it within hours of learning the genetic sequence in January,"[87] discussed in Section VII.C above.  It is also consistent with Inovio's March 3, 2020 press release statements that:  (a) at the U.S. Coronavirus Task Force meeting at the White House on March 2,

---

[83] "Riding the COVID-19 Headline Wave – Quick Thoughts on Early INO-4800 Progress/Plans & Relevant KOL Feedback," *Stifel*, March 4, 2020, p. 1.

[84] I note that the Memorandum Regarding Defendants' Motion to Dismiss states:  "As Plaintiffs tell it, Inovio's March 9 tweet was the first time it claimed to have only designed a vaccine in three hours and its stock price tumbled in response." *See* Memorandum Regarding Motion to Dismiss, p. 17.

[85] Inovio Pharmaceuticals, Twitter Post by @InovioPharma, March 9, 2020, 1:26 p.m. ET, https://twitter.com/inoviopharma/status/1237067248835182592?lang=en.

[86] Tulip Mazumdar, "Coronavirus Vaccine: Scientists Race to Develop Prevention," BBC News, January 30, 2020, https://www.bbc.com/news/health-51299735, accessed September 27, 2021.

[87] Peter Loftus, "J&J, Sanofi, Inovio Hunt for Coronavirus Vaccines," *The Wall Street Journal*, February 24, 2020, 4:22 p.m. ET, https://www.wsj.com/articles/j-j-sanofi-inovio-hunt-for-coronavirus-vaccines-11582579340, accessed October 2, 2021.

2020, Dr. Kim said, "[u]sing our modern DNA medicines platform, we designed our DNA vaccine INO-4800 in three hours after the publication of the genetic sequence of the novel coronavirus that causes COVID-19"; (b) on January 10, 2020, "Chinese researchers share the genetic sequence of the novel coronavirus; Inovio designs DNA vaccine INO-4800 in three hours after receiving the genetic sequence using its proprietary DNA medicines platform technology; INO-4800 was designed to precisely match the DNA sequence of the virus"; (c) from January 10 to January 23, 2020, "Inovio scientists race to manufacture INO-4800 and begin preclinical testing"; and (d) from January 23 to February 29, 2020, "Preclinical testing continues, with immune responses generated in animal models; human clinical trial designs developed."[88]

57.    Moreover, as shown in Exhibit 3B, a review of Inovio's intraday stock price movement on March 9, 2020 reveals that Inovio's stock price *increased* from $9.22 at 1:26 p.m. ET, the time of its Tweet, to $9.83 at the close of trading.[89]  Based on a review of analyst reports, SEC filings, and news articles available through *Factiva* and *Bloomberg*, I do not find any new positive, firm-specific information released on March 9, 2020 that may have offset any price decline related to Inovio's Tweet.  Thus, in an efficient market where information is rapidly incorporated into Inovio's stock price, there is no economic evidence that Inovio's Tweet caused a decline in Inovio's stock price.[90]

58.    Based on the earlier disclosures, market participants were aware prior to March 9, 2020 that Inovio "designed" its vaccine within three hours on January 10, 2020 using its proprietary technology and then, in the following weeks, began manufacturing and preclinical testing.  All of

---

[88] Inovio Pharmaceuticals Press Release, "Inovio Accelerates Timeline for COVID-19 DNA Vaccine INO-4800," March 3, 2020, 8:00 a.m. ET (emphasis omitted).

[89] For comparison, the Market Index (using the VTI proxy) decreased by 1.72 percent and the Industry Index (using the XBI proxy) decreased by 1.73 percent.  The prices of Inovio, VTI, and XBI at 1:26 p.m. ET are calculated as the volume-weighted average transaction price within the minute.

[90] I note that Plaintiffs also claim that Inovio's stock price declined on March 10, 2020 "as investors continued to absorb Inovio's concession that Kim's prior statements were not accurate."  *See* First Amended Complaint, ¶ 114.  In an efficient market where information is rapidly incorporated into Inovio's stock price, such information would be incorporated in Inovio's stock price on March 9, 2020.  I find no economic evidence that Inovio's March 9, 2020 Twitter statement impacted Inovio's stock price on March 10, 2020.

the analyst reports I reviewed from on or around March 3, 2020 that mention Inovio's "three hours" disclosure refer to the "design" of the vaccine within three hours:[91]

> March 3, 2020, Maxim:  "The company first received the genetic sequence on 1/10/20, after which it designed the vaccine within 3 hours using its DNA-based vaccine platform and entered preclinical development."[92]

> March 4, 2020, H.C. Wainwright:  "We find it impressive that Inovio first designed INO-4800 on January 10, within three hours of receiving the viral genetic sequence, and managed to complete preclinical studies and manufacture 3,000 human trial doses in roughly three months."[93]

> March 4, 2020, Stifel:  "Management announced today it took just 3 hours after the publication of the viral sequence for the novel coronavirus responsible for COVID-19 to design INO-4800 – which was then immediately the subject of preclinical testing and small-scale manufacturing."[94]

59.    Moreover, I am aware of only one analyst report published on or around March 9, 2020 that discusses Inovio's Tweet.  In its report following Inovio's March 12, 2020 earnings release and conference call, Piper Sandler noted that Inovio "countered" an accusation made by a short-seller, and responded that its previously disclosed timeline was accurate:

> March 13, 2020, Piper Sandler: "While many vaccine-related names have seen meaningful appreciation since COVID-19 began dominating headlines, INO stands out, with the stock up ~188% YTD. As one might predict, this kind of action has attracted some controversy with at least one short report calling into question the validity of management's recent claims around designing a construct directed toward the virus in 3 hours,

---

[91] As noted above, Inovio's March 3, 2020 press release reiterated that Inovio "designed" its potential vaccine in three hours and provided further detail regarding its vaccine development.  I understand that Plaintiffs do not allege that the press release contains any misrepresentations.  *See* First Amended Complaint, ¶ 101.

[92] "COVID-19 Vaccine Candidate INO-4800 Timelines Announced, Could Have 1 Million Doses by YE20," *Maxim*, March 3, 2020, p. 1.

[93] "Coronavirus Vaccine Development Timeline Accelerated; Positive Preclinical Data; Reiterate Buy," *H.C. Wainwright*, March 4, 2020, p. 1.

[94] "Riding the COVID-19 Headline Wave – Quick Thoughts on Early INO-4800 Progress/Plans & Relevant KOL Feedback," *Stifel*, March 4, 2020, p. 1.  Stifel's statement that Inovio "announced today" that it had designed INO-4800 in three hours could be interpreted to suggest that analysts at Stifel may not have been aware of the earlier statements by Inovio that it had designed its vaccine in three hours.  However, an efficient market—as Plaintiffs and Professor Feinstein contend for Inovio's stock—does not require that *all* market participants are aware of *all* publicly-available information.  What is required is that a sufficient number of investors obtain, evaluate, and act on information so that the stock price reflects their trading decisions.  *See* Fama (1970), p. 388 and Fama (1991), p. 1575.  Accordingly, Stifel's statement is not inconsistent with an efficient market.

> and management's retort that it is in fact true. … This saga has not been without controversy with at least one short thesis making the rounds on social media on Monday morning, questioning the validity of management's recent claims that INO-4800 was ***designed within 3 hours*** of the publication of the genetic sequence of SARS-CoV-2. Management countered that this timeline is in fact accurate, but this still drove a sharp stock reaction as described previously."[95]

60.     The decline in Inovio's stock price on March 9, 2020 occurred prior to Inovio's Tweet. As shown in Exhibit 3B, March 9, 2020 was a turbulent day for U.S. equity markets, with trading in U.S. equity markets being halted for 15 minutes after the S&P 500 Index declined 7% by 9:33 a.m. ET, the first such trading halt since December 2008.[96]  Trading in Inovio's stock was halted five additional times between 10:01 a.m. ET and 12:55 p.m. ET.[97]  In addition, Citron Research's Tweet occurred at 10:38 a.m. ET.[98]  By the time of Inovio's Tweet at 1:26 p.m. ET, all of Inovio's stock price decline on March 9, 2020 had occurred and its price increased from 1:26 p.m. ET to the close of trading.

61.     Finally, I note that Citron Research's Tweet—which I understand is not the alleged corrective disclosure on March 9, 2020—did not reveal the specific information that Plaintiffs' claim was corrective on March 9, 2020.  Specifically, I note that Plaintiffs have stated that "Defendants next complain that Citron is a 'notorious' short-seller that used the word 'design' in his March 9, 2020 tweet. Mtn. at 25. The argument is irrelevant. The Complaint alleges that Inovio, not Citron, corrected Dr. Kim's statements on March 9, 2020."[99]  As noted above, Plaintiffs allege that Dr. Kim's statement was a misrepresentation because of the description of

---

[95] "Downgrade to Neutral: Love the Platform But COVID19 Upside Seems Priced In," *Piper Sandler*, March 13, 2020, pp. 1–2 (emphasis added).

[96] *See also*, "Market-wide stock trading halts 15 minutes after S&P 500 falls 7%," *Fortune*, March 9, 2020, 10:01 a.m. ET, available at https://fortune.com/2020/03/09/market-wide-stock-trading-halts-after-sp-500-plunges-7-stock-market-crash/.

[97] "*Inovio Pharmaceuticals Inc. (INO) Paused due to volatility," *Dow Jones Newswires*, March 9, 2020, 10:01 a.m. ET; "*Inovio Pharmaceuticals Inc. (INO) Resumed Trading," *Dow Jones Newswires*, March 9, 2020, 10:06 a.m. ET; "*Inovio Pharmaceuticals Inc. (INO) Paused due to volatility," *Dow Jones Newswires*, March 9, 2020, 11:02 a.m. ET; "*Inovio Pharmaceuticals Inc. (INO) Resumed Trading," *Dow Jones Newswires*, March 9, 2020, 11:07 a.m. ET; "*Inovio Pharmaceuticals Inc. (INO) Paused due to volatility," *Dow Jones Newswires*, March 9, 2020, 11:11 a.m. ET; "*Inovio Pharmaceuticals Inc. (INO) Resumed Trading," *Dow Jones Newswires*, March 9, 2020, 11:16 a.m. ET; "*Inovio Pharmaceuticals Inc. (INO) Paused due to volatility," *Dow Jones Newswires*, March 9, 2020, 11:20 a.m. ET; "*Inovio Pharmaceuticals Inc. (INO) Resumed Trading," *Dow Jones Newswires*, March 9, 2020, 11:25 a.m. ET; "*Inovio Pharmaceuticals Inc. (INO) Paused due to volatility," *Dow Jones Newswires*, March 9, 2020, 12:50 p.m. ET; "*Inovio Pharmaceuticals Inc. (INO) Resumed Trading," *Dow Jones Newswires*, March 9, 2020, 12:55 p.m. ET.

[98] Citron Research, Twitter Post by @CitronResearch, March 9, 2020, 10:38 a.m. ET.

[99] *See* Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws, *Patrick McDermid, et al. v. Inovio Pharmaceuticals, Inc., et al.*, December 21, 2020, p. 24.

"construct[ing]" as opposed to "design[ing]" its vaccine in three hours.[100]  However, Citron Research's Tweet appears to identify Inovio's prior statements that it "designed" its vaccine in three hours, and not its prior statements that used the term "construct."  Citron Research stated that the "SEC should immediately HALT this stock and investigate the ludicrous and dangerous claim that they designed a vaccine in 3 hours."[101]  Therefore, any potential stock price decline related to Citron Research's Tweet cannot be used as economic evidence of price impact for Plaintiffs' alleged February 14, 2020 and March 2, 2020 misrepresentations, in an efficient market.

## VIII.    The Alleged Misrepresentation on March 24, 2020 Did Not Impact Inovio's Stock Price

62.    As discussed in Section III.C above, Plaintiffs allege that Inovio's March 24, 2020 press release announcing its partnership with Ology contained misrepresentations in stating that "the [DoD] has awarded Ology Bioservices with a contract valued at $11.9 million to work with Inovio on DNA technology transfer to rapidly manufacture DNA vaccines" and that "[t]his partnership increases Inovio's manufacturing capabilities for our COVID vaccine and establishes an additional DNA vaccine manufacturing facility to protect the U.S. military against current and future disease outbreaks."[102]  Contrary to Plaintiffs' allegations, the alleged misrepresentations on March 24, 2020 did not impact Inovio's stock price.

63.    If the alleged March 24, 2020 misrepresentation about Inovio's partnership with Ology contained new, value-relevant information, then such statements should have impacted Inovio's stock price in an efficient market, as Plaintiffs and Professor Feinstein have claimed.  However, as shown in Exhibit 2B, Inovio's residual return is not statistically significant on March 24, 2020.  Professor Feinstein's event study results for both his market efficiency analysis (using the empirical distribution) and alternative experimental design also show that Inovio's residual stock return on March 24, 2020 is not statistically significant.[103]  In addition, based on a review of

---

[100] First Amended Complaint, ¶ 101.

[101] Citron Research, Twitter Post by @CitronResearch, March 9, 2020, 10:38 a.m. ET.

[102] Zenoff Responses to Interrogatories, p. 4; Williams Responses to Interrogatories, p. 4; First Amended Complaint, ¶ 102.  *See also*, Inovio Pharmaceuticals Press Release, "Ology Bioservices, Inovio Partner to Manufacture COVID-19 DNA Vaccine with $11.9 Million Department of Defense Grant," March 24, 2020.

[103] Feinstein Report, Exhibit 8, p. 104 and Exhibit 10c, p. 118.

analyst reports, SEC filings, and news articles available through *Factiva* and *Bloomberg*, I do not find any new negative, firm-specific information released on March 24, 2020 that may have offset any potential price impact from the alleged misrepresentation.  In other words, after controlling for market and industry factors, Inovio's stock return on March 24, 2020 cannot be reliably distinguished from the normal volatility and random fluctuations in Inovio's stock price on a daily basis.  Thus, there is no reliable economic evidence that the alleged misrepresentation on March 24, 2020 impacted Inovio's stock price by causing an increase in that price on March 24, 2020.[104]

64.    Consistent with the lack of a statistically significant stock price return on March 24, 2020, I note that I am aware of only two analysts who published reports on March 24 and 25, 2020 discussing the announced partnership with Ology:  Cantor Fitzgerald and H.C. Wainwright. Neither Cantor Fitzgerald nor H.C. Wainwright reported a change in their rating, price target estimates, or valuation conclusions for Inovio's common stock.[105]

## IX.    The Stock Price Declines on August 10 and 11, 2020 Were Not Due to the Alleged Misrepresentations on March 24, May 11, or May 12, 2020 and Are Therefore Not Evidence of Prior Price Impact from Those Alleged Misrepresentations

65.    On Sunday, August 9, 2020, *The New York Times* issued an article entitled, "This Company Boasted to Trump About Its COVID-19 Vaccine. Experts are Skeptical."[106]  After market hours on August 10, 2020, Inovio released its Q2 2020 earnings results (below market consensus)[107] and held its earnings conference call.[108]  However, as discussed below, any stock price declines following the August 9 and 10, 2020 disclosures cannot be used as economic

---

[104] Based on a review of analyst reports, SEC filings, and news articles available through *Factiva* and *Bloomberg*, I do not find any new negative, firm-specific information released on March 24, 2020.

[105] *See* "COVID-19 Candidate Progress Reflects All Hands On Deck," *Cantor Fitzgerald*, March 24, 2020; "Department of Defense Grant to Rapidly Produce COVID-19 Vaccine; Reiterate Buy," *H.C. Wainwright*, March 25, 2020.  *See also*, "4Q19 – Emboldened Cash and P3 Data in '20 to REVEAL Broadening Pipeline Potential," *Cantor Fitzgerald*, March 12, 2020; "4Q and full-Year 2019 Financial Results Reported; Reiterate Buy," *H.C. Wainwright*, March 13, 2020.

[106] David Gelles and Heather Murphy, "This Company Boasted to Trump About Its Covid-19 Vaccine. Experts Are Skeptical.," The New York Times, August 9, 2020, 7:00 am ET, https://www.nytimes.com/2020/08/09/business/coronavirus-vaccine-inovio.html, access October 2, 2021.

[107] *See* "2Q20 Recap: Still Many Unanswered Questions Governing Fate of INO-4800 – Reducing Target Price to $16," *Stifel*, August 11, 2020, p. 1, ("GAAP net loss of $128.7M, or $(0.83)/share, was greater than our/Consensus $(0.16)/$(0.17) estimates.").

[108] Inovio Pharmaceuticals Press Release, "INOVIO Reports Second Quarter 2020 Financial Results; Provides DNA Medicines Clinical Program Mid-Year Update," August 10, 2020, 4:05 PM; Q2 2020 Inovio Pharmaceuticals Inc. Earnings Call – Edited Transcript, *Refinitiv*, August 10, 2020.

evidence of price impact for the March 24, May 11, or May 12, 2020 alleged misrepresentations, in an efficient market.

66.     Based on my analysis, and assuming that Inovio's stock price traded in an efficient market, any stock price declines following the August 9 and 10, 2020 disclosures were not due to new information about Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm and are therefore not evidence of prior price impact from the alleged March 24, May 11, and May 12, 2020 misrepresentations.  As discussed in detail below, my conclusion is based on:

(1) prior to August 9 and 10, 2020, disclosures concerning Inovio's lawsuit against VGXI became public and revealed the information Plaintiffs allege was misrepresented concerning Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm;

(2) the absence of any new, negative information disclosed in the August 9, 2020 article regarding Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm;

(3) the results of my event study showing that Inovio's return on August 10, 2020 was not statistically significant;

(4) the absence of any new, negative information disclosed during the August 10, 2020 earnings conference call regarding Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm; and

(5) the existence of new, negative information regarding INO-4800 disclosed on the August 10, 2020 earnings conference call about the delay in the expected start date of Inovio's Phase 2/3 efficacy trial.

### A.    The VGXI Lawsuit Identified the Information Plaintiffs Allege Was Misrepresented Concerning Inovio's Manufacturing Capabilities

67.     On June 3, 2020, Inovio filed a lawsuit in Pennsylvania against VGXI for refusing the technology transfer to Ology and Richter-Helm to manufacture the INO-4800 vaccine. The complaint appears to provide the information regarding Inovio's manufacturing capabilities with

VGXI, Ology, and Richter-Helm that Plaintiffs allege was misrepresented or failed to have been disclosed on March 24, May 11, and May 12, 2020:[109]

> The Company has a goal of producing one million doses of INO-4800 by the end of 2020, with its existing capacity and contract resources, for further clinical trials or emergency use… VGXI informed the Company that it did not have the capacity to manufacture the Company's full order of DNA plasmids on the requested timeline, nor would it be able to manufacture plasmids for the commercial sale of INO-4800, if it were to be approved for sale… In May 2020, following further discussions between the parties, VGXI notified the Company of its refusal to undertake the Company's request, leading the Company to initiate legal proceedings as an emergency action to compel the technology transfer required of VGXI by the Supply Agreement for the planned large-scale manufacture of the Company's COVID-19 vaccine candidate.[110]

> It soon became obvious that, as a matter of basic mathematics, VGXI would not be able to manufacture anywhere close to 1 million doses of the Vaccine by the end of 2020, and that Inovio would have to, as permitted by the Agreement, find additional manufacturers to meet that need. … Richter-Helm agreed it would be able to allocate five large-scale manufacturing slots which could potentially deliver 500,000 doses of the Vaccine by the end of 2020. … VGXI is one of only a limited number of DNA plasmid manufacturers in the world. However, without a technology transfer of VGXI's manufacturing process to one of this small group of DNA manufacturers, as required under the Agreement, Inovio would be severely delayed, and thereby irreparably damaged, in its ability to provide the requisite number of Vaccine doses for the public benefit. … That leaves only one company, Richter-Helm, with knowledge of the existing manufacturing process (which it learned through a 2015 Technology Transfer). Richter-Helm does not have the capacity or availability to manufacture the volume of DNA plasmids Inovio needs to develop, test, and potentially produce one million doses in 2020, over 100 million doses in 2021, and hundreds of millions of doses thereafter. Accordingly, VGXI's breaches of the Agreement will likely deprive the world of millions of Vaccine doses.[111]

---

[109] First Amended Complaint, ¶¶ 103, 108, 110. *See also*, Memorandum Regarding Motion to Dismiss, pp. 21–22.
[110] Inovio Pharmaceuticals, Inc., Form 8-K, June 3, 2020.
[111] Complaint in Equity, *Inovio Pharmaceuticals, Inc. v. VGXI Inc. and GeneOne Life Science, Inc.*, June 3, 2020, ¶¶ 52, 65, 80–81.

68.      Analyst commentary following the VGXI lawsuit disclosure identified the VGXI lawsuit as a setback and that it increased the risk that Inovio would not meet its manufacturing goals. For example (see also, Exhibit 4):

> June 4, 2020, Roth:  "VGXI indicated that it does not have the capacity to manufacture the full order of INO-4800 nor would it be able to achieve commercial scale if approved. Further, VGXI declined to provide the necessary technology transfer materials that would help another manufacturer assist in the shortfall, causing INO to initiate legal proceedings. We reiterate our Neutral rating. … **This failure on VGXI's part will prevent INO from producing the one million doses of INO-4800 it claimed it would have by YE20, unless INO can rectify this problem**. INO is now talking to other manufacturers, in addition to having already engaged Ology Bioservices Inc. (private) and Richter-Helm BioLogics GmbH & Co. KG (private) to support largescale manufacturing of INO-4800. …
>
> INO must deal with its manufacturing snag in order to potentially be a viable player in the COVID-19 [vaccine] race, but consistent with our unfavorable view of INO-4800's ability to compete, we note that the Trump Administration did not include INO-4800 among the five vaccine candidates selected for their likelihood of ultimately being viable. Vaccine development speed is crucial in fighting this pandemic, and we emphasize that although such swiftness has been a hallmark of INO vaccines versus its peers, the current difference of opinion with VGXI is not helping to speed anything along. We reiterate our view that INO's valuation has appreciated disproportionately to the added value of INO-4800."[112]
>
> June 4, 2020, Stifel:  "INO has since initiated legal proceedings as an 'emergency action' to compel VGXI to cooperate with this transfer. No timelines re: a potential resolution were provided. While we're inclined to believe the terms of the existing VGXI supply agreement, coupled with the epidemiological urgency associated with the development of a safe/viable COVID-19 vaccine, would inherently favor INO with respect to reaching an expeditious outcome, we also believe this does present an additional/potential risk factor to securing external funding to support INO-4800 development/manufacturing – although we're also inclined to believe any government-issued mandate under this Operation Warp Speed

---

[112] "INO: INO-4800 - Manufacturing Snag with VGXI; Trump Admin Excludes from List," *Roth*, June 4, 2020, p. 1 (emphasis added).

project (assuming inclusion as a 'finalist' company) would seemingly be capable of fast-tracking this legal process."[113]

69.    An analysis of the public mix of information establishes that, as discussed above, the June 3, 2020 disclosure regarding the VGXI lawsuit appears to contain all of the information Plaintiffs allege was misrepresented or failed to have been disclosed regarding Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm in its March 24, May 11, and May 12, 2020 alleged misrepresentations (taking Plaintiffs' allegations as true).[114]  In addition, subsequent disclosures and commentary provided additional context.[115]

70.    Specifically, on June 25, 2020 at 1:37 pm, the Court denied Inovio's mandatory preliminary injunction against VGXI, and equity analysts described the order as a major setback for Inovio:[116]

> June 25, 2020, Piper Sandler:  "Remain Neutral rated on INO shares and would be particularly cautious after today's court decision denying the company's request for emergency injunction against supply partner VGXI. While we acknowledge significant funding from DOD ($71M for device development/ manufacture) is nothing to sneeze at, today's decision denying INO's request for injunctive relief from VGXI is a major setback to the scale-up required for the CoV-19 vaccine (INO-4800) development program. Coupling this with CEPI's recent commentary regarding a current lack of DNA vaccine manufacturing capacity, we worry that investors hoping for a viable, scaled vaccine option from INO in the near-term will be disappointed. Given this, in combination with the stock's

---

[113] "More Media Speculation, More Volatility (This Time Favoring Inovio)," *Stifel*, June 4, 2020, p. 1.

[114] First Amended Complaint, ¶¶ 103, 108, 110.  *See also*, Memorandum Regarding Motion to Dismiss, pp. 21–22.

[115] I note that, according to the timestamp of the VGXI complaint, it appears to have been publicly available by 2:09 p.m. ET on June 3, 2020.  However, Inovio announced the lawsuit against VGXI in a Form 8-K filed after market hours on June 3, 2020 (at 4:01 p.m.).  *See* Complaint in Equity, *Inovio Pharmaceuticals, Inc. v. VGXI Inc. and GeneOne Life Science, Inc.*, June 3, 2020, docketed at 2:09 p.m. ET; Inovio Pharmaceuticals, Inc., Form 8-K, June 3, 2020, 4:01 p.m. ET.  However, as shown in Exhibit 2B, Inovio's residual return is not statistically significant on either June 3 or June 4, 2020.  Professor Feinstein's event study results for both his market efficiency analysis (using the empirical distribution) and alternative experimental design also show that Inovio's residual stock returns on June 3 and June 4, 2020 are not statistically significant.  Feinstein Report, Exhibit 8, p. 106 and Exhibit 10c, p. 120.  In other words, after controlling for market and industry factors, Inovio's stock returns on June 3 and June 4, 2020 cannot be reliably distinguished from the normal volatility and random fluctuations in Inovio's stock price on a daily basis.

[116] The cover page of the Memorandum and Order, *Inovio Pharmaceuticals, Inc., v. Geneone Life Science Inc and VGXI, Inc.*, June 25, 2020 indicates it was docketed at 1:37 p.m. ET.  I note that, as shown in Exhibit 2B, Inovio's residual return is *positive* and statistically significant on June 25, 2020.  Professor Feinstein's event study results for both his market efficiency analysis (using the empirical distribution) and alternative experimental design (using the empirical distribution) show that Inovio's residual stock return on June 25, 2020 is not statistically significant, and his event study result for his alternative experimental design using the theoretical t-distribution shows that Inovio's residual stock return on June 25, 2020 is *positive* and statistically significant.  Feinstein Report, Exhibit 8, p. 107 and Exhibit 10c, p. 120.  In other words, after controlling for market and industry factors, there is no economic evidence that Inovio's stock price declined on June 25, 2020 as a result of the total mix of information disclosed on June 25, 2020.

recent run up on other CoV-19 headlines, we remain safely on the sidelines with this name.

… Without injunctive relief compelling tech transfer, this would (in INO's own words) create the possibility that "Inovio cannot manufacture the product promptly, safety, or perhaps at all" and at the least "substantially delay the successful manufacture" of INO-4800.

**Denial of INO's request for injunction is no bueno**. In a decision this afternoon, Judge Saltz determined that the factual basis for INO's claim were too speculative to support a mandatory preliminary injunction. Specifically, he cited INO's own testimony that there are other DNA plasmid manufacturers, the >100 other vaccine candidates in development (meaning the public interest doesn't require "immediate large-scale production of *Inovio's* vaccine"), the possible harm to VGXI caused by tech transfer, and difficulty determining what would be required of VGXI if an injunction were granted. We assume INO will appeal the decision, so legal back-and-forth may continue for some time, but this appears to hinder INO's ability to scale-up INO-4800 any time soon.

**Regardless of clinical data, you still need to make the product.**
Thinking about the viability of various CoV-19 vaccine approaches for the current pandemic, manufacturing scale-up is just as (if not more) important than clinical data, meaning the upcoming topline for INO-4800 (clinical data this month) should take a backseat until we have clarity on manufacturing. To that point, VGXI's written response to INO's suit raised key questions about global manufacturing capacity to meet INO's goal of 50M-100M doses by YE21. This is supported by commentary from CEPI's [sic] regarding limited capacity for high-volume production of DNA-based vaccines (like INO-4800), and seems to dovetail with media reports that INO-4800 isn't a Warp Speed finalist."[117]

June 25, 2020, RBC:  "**Court's Injunction Denial Injects Uncertainty in Scale-up For Now; New Data Could Be Key to Cause** … We see the court decision as posing another hurdle for INO to fulfill its aim for manufacturing scale-up for delivery of over 100M doses starting in 2021, and believe in the likelihood that the lack of manufacturing capability could preclude additional funding until this issue is resolved – which could require the company to restart preclinical and clinical development with plasmids manufactured by another contractor under a new protocol – all of which we believe could distort the timeline or introduce some inefficiency around development. Nonetheless, we acknowledge the view

---

[117] "Rubber Seems to Have Met the Road Regarding CoV-19 Vaccine Scale Up," *Piper Sandler*, June 25, 2020, p. 1 (emphasis in original).

that INO's upcoming HV data, if favorable, could be an important
dimension to INO's case, potentially helping to make their vaccine effort
less speculative before the eyes of the court. … we look to ongoing clarity
from mgmt on their strategy to scale up the manufacturing capabilities and
their next clinical steps for continued INO-4800 development following
the key top line."[118]

June 26, 2020, Stifel:  "**Risk/Reward Seems Less-Palatable Here –
Downgrading to Hold, Increasing Target Price to $24** … we believe the
now >$6B fully-diluted valuation more-appropriately reflects a balanced
risk/reward profile ahead of multiple pending/approaching events (P1
safety/immunogenicity data, VGXI/GeneOne injunction appeal, timely
procurement of additional development/manufacturing funding) for which
some level of collective uncertainty still exists – particularly given the
challenge of elucidating a clear path to longer-term INO-4800
monetization. While acknowledging peer COVID-19 vaccine company
valuations would suggest we're potentially leaving significant upside on
the table should promising immunogenicity data (i.e. robust neutralizing
antibody responses) and a large government-written check subsequently
materialize, we also believe any potential downside risk in the absence of
the aforementioned events occurring is equally-significant. …

**Source of Uncertainty #2 – Resolving the VGXI/GeneOne situation.**
After today's (June 25) market close, INO announced the preliminary
injunction it had legally sought against VGXI/GeneOne – the primary
manufacturer of INO-4800 under an existing supply agreement – in an
effort to compel VGXI/GeneOne to transfer the technology required to
manufacture INO-4800 (a transfer which INO has claimed is covered
under the existing agreement) to other third-party contract manufacturers
to facilitate the scale-up of INO-4800 was denied in a Pennsylvania court.
INO management is currently exploring its legal options (likely to include
an immediate appeal of the Court's decision) and has previously intimated
contingency plans would be put into place in the event of an adverse
ruling such as this. This development is in no way a primary driver of our
downgrade here and we're inclined to believe some near-term resolution
can be reached here given the urgency of the situation. However,
management's guidance regarding the scale-up of hundreds of millions of
INO-4800 doses being made available in FY21 (management's 1M dose
guidance by YE20 is not impacted by any delay here) is dependent upon
some timely resolution being reached here and we don't think current
valuation can accommodate any underlying risk to the company's ability
to scale INO-4800 manufacturing – the latter of which could be
interpreted as a rate-limiting step in the company's ability to procure

---

[118] "Court's Injunction Denial Injects Uncertainty in Scale-up For Now; New Data Could Be Key to Cause," *RBC*, June 25, 2020,
p. 1 (emphasis in original).

more-substantial funding required to fund P2/3 clinical development and manufacturing (see below).

**Source of Uncertainty #3 – Securing additional funding.** We've remained positive on the prospects of the company procuring governmental/collaborative funding to support the clinical development and manufacturing scale-up of INO-4800 – particularly given the significant amount of money (>$10B) rumored to be earmarked for dissemination by a number of different agencies/entities from which numerous INO infectious disease vaccine candidates have previously received funding. We also believe the recent $71M DoD grant intended to support the development/manufacturing of the CELLECTRA 3PSP device (and single-use arrays) required to support INO-4800 intradermal administration in the clinical/commercial settings generates positive read-through on this front (i.e. why scale-up a device in the absence of not expecting to have a product to run through it?), and we believe recent price action in INO shares following this announcement (>2x) reflects some of the inherent investor skepticism on this front. However, with INO's valuation now having surpassed NVAX – the recipient of a ~$400M CEPI grant in the absence of any clinical data for its COVID-19 vaccine candidate – we believe that once-significant valuation delta has been meaningfully narrowed and believe the continued absence of additional funding (particularly in light of potentially perceived-to-be-disappointing immunogenicity data) represents a source of significant headline risk. Management has indicated a potential willingness to "go it alone" with P2/3 INO-4800 clinical development – but we view this as the least-favorable of all outcomes."[119]

## B.    The August 9, 2020 Article Did Not Provide New, Negative Information Concerning Inovio's Manufacturing Capabilities with VGXI, Ology, and Richter-Helm

71.    The August 9, 2020 article in *The New York Times* did not provide new, negative information about Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm. Instead, to the extent the article discussed Inovio's manufacturing capabilities, it summarized previously-available information, as discussed in Section IX.A above.  Specifically, the article stated:

---

[119] "Risk/Reward Seems Less-Palatable Here – Downgrading to Hold, Increasing Target Price to $24," *Stifel*, June 26, 2020, pp. 1–2 (emphasis in original).

> While the company does manufacture its Cellectra, it has relied on another company, VGX International, to manufacture its vaccine candidate.
>
> Now, Inovio and VGX are in a legal fight. In June, Inovio sued, claiming that VGX was refusing to share technology needed to produce the Inovio vaccine with other companies and was endangering public health. The case, along with a countersuit by VGX, is pending in state court in Pennsylvania.
>
> In court filings, VGX accused Inovio of stealing trade secrets and challenged its claim that there is a public interest in Inovio's work.
>
> "Although the Covid-19 pandemic is horrible, Inovio is unlikely to win the race for the vaccine," VGX lawyers wrote. Despite Inovio's years of work, "it has never developed an F.D.A.-approved product."[120]

Plaintiffs and Professor Feinstein have claimed that Inovio's stock traded in an efficient market. In such a market, stock prices react quickly and fully to new, value-relevant information, but do not react to reiterations of old information. Thus, there is no economic basis to expect *The New York Times's* reiteration of previously-disclosed information to affect Inovio's stock price.

72.     Consistent with the above, Plaintiffs do not identify any new information in the August 9, 2020 article about Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm. Instead, Plaintiffs claim that the article "included new information regarding statements made by Defendants on June 30, 2020."[121]  I understand that the alleged misstatement on June 30, 2020 has been dismissed.[122]

73.     In addition, as shown in Exhibit 2B, Inovio's residual return is not statistically significant on August 10, 2020, the first trading day after the Sunday, August 9, 2020 article.  Professor Feinstein's event study results for both his market efficiency analysis (using the empirical distribution) and the alternative experimental design also show that Inovio's residual stock return on August 10, 2020 is not statistically significant.[123]  In other words, after controlling for market and industry factors, Inovio's stock return on August 10, 2020 cannot be reliably distinguished

---

[120] David Gelles and Heather Murphy, "This Company Boasted to Trump About Its Covid-19 Vaccine. Experts Are Skeptical.," *The New York Times*, August 9, 2020, 7:00 am ET, https://www.nytimes.com/2020/08/09/business/coronavirus-vaccine-inovio.html, accessed October 2, 2021.
[121] First Amended Complaint, ¶ 124.
[122] Memorandum Regarding Motion to Dismiss, p. 26.
[123] Feinstein Report, Exhibit 8, p. 108 and Exhibit 10c, p. 122.

from the normal volatility and random fluctuations in Inovio's stock price on a daily basis. Moreover, based on a review of analyst reports, SEC filings, and news articles available through *Factiva* and *Bloomberg*, I do not find any new positive, firm-specific information released on August 10, 2020 that could potentially have offset any price decrease related to the alleged corrective disclosure. Thus, any stock price decline on August 10, 2020 cannot be used as evidence of price impact for the March 24, May 11, or May 12, 2020 alleged misrepresentations.

>      **C.    On Its August 10, 2020 Earnings Conference Call, Inovio Did Not Provide New, Negative Information Concerning Inovio's Manufacturing Capabilities with VGXI, Ology, and Richter-Helm**

74.    On its August 10, 2020 earnings conference call, Inovio did not provide any new, negative information about its manufacturing capabilities with VGXI, Ology, and Richter-Helm. Inovio instead (1) expressed optimism about reaching its forward-looking manufacturing goals through additional partnerships;[124] and (2) stated that it cannot discuss specifics of the VGXI lawsuit, but that it was confident that the VGXI dispute did not affect its forward-looking scale-up, development, and manufacturing plans.[125]  Specifically, Inovio's executives stated:

> I want to thank our partners and growing global manufacturing coalition, which includes Richter-Helm BioLogics in Germany, other large-scale European manufacturers and Ology Bioservices and other large-scale

[124] I note that, consistent with Inovio's August 10, 2020 conference call statements that "over the next couple of months we'll be announcing further manufacturing partnerships," Inovio announced new manufacturing partnerships and funding subsequent to the Putative Class Period.  Specifically, on September 8, 2020, Inovio "announced that Thermo Fisher Scientific, the world leader in serving science, has signed a letter of intent to manufacture INOVIO's DNA COVID-19 vaccine candidate INO-4800."  On November 16, 2020, Inovio announced the initiation of its Phase 2 segment of its Phase 2/3 clinical trial for INO-4800, and that the DoD would fund the trial.  On December 3, 2020, Inovio "announced the execution of an agreement with Kaneka Eurogentec S.A., an affiliate of Kaneka Corporation, for Eurogentec to manufacture INOVIO's COVID-19 vaccine candidate INO-4800 at their industry-leading GMP plasmid production scales."  *See* Inovio Pharmaceuticals Press Release, "INOVIO Adds Thermo Fisher Scientific To Global Manufacturing Consortium," September 8, 2020; Inovio Pharmaceuticals Press Release, "INOVIO Announces Initiation of Phase 2 Segment of its Phase 2/3 Clinical Trial for its COVID-19 DNA Vaccine Candidate, INO-4800; Trial Will Be Funded by the U.S. Department of Defense," November 16, 2020; Inovio Pharmaceuticals Press Release, "INOVIO Expands Global Manufacturing Consortium For Its COVID-19 Vaccine Candidate INO-4800 With Addition of Kaneka Eurogentec S.A.," December 03, 2020.

[125] I note that Inovio's statements regarding the need to continue to develop manufacturing partnerships to reach its forward-looking manufacturing goals appears consistent with Inovio's repeated statements throughout the Putative Class Period. *See, e.g.*, Inovio Pharmaceuticals Press Release, "Inovio Accelerates Timeline for COVID-19 DNA Vaccine INO-4800," March 3, 2020; Inovio Pharmaceuticals Press Release, "IVI, INOVIO, and KNIH to Partner with CEPI in Phase 1/2 Clinical Trial of INOVIO's COVID-19 DNA Vaccine in South Korea," April 16, 2020, pp. 1–3; Inovio Pharmaceuticals Press Release, "INOVIO Completes Enrollment in the Phase 1 U.S. Trial of INO-4800 for COVID-19 DNA Vaccine; Interim Results Expected in June," April 28, 2020; Inovio Pharmaceuticals Press Release, "INOVIO Expands Manufacturing of COVID-19 DNA Vaccine INO-4800 With New Funding from CEPI," April 30, 2020; Inovio Pharmaceuticals Press Release, "INOVIO Reports First Quarter 2020 Financial Results; Provides Business Update," May 11, 2020, pp. 1–8.

manufacturers here in the U.S. I also want to thank our current funders, including the U.S. Department of Defense, CEPI and The Bill & Melinda Gates Foundation. With this support, we look forward to advancing INO-4800 into a Phase II/III trial in September and meeting our target to provide at least 1 million doses of our DNA vaccine this year and 100 million doses in 2021.[126]

We are also in the process of finalizing additional manufacturing partnerships in the U.S. and in Europe to fulfill our vaccine candidate production goals of 1 million doses this year, 100 million next and plan to make announcements about the expanded consortium over the next few months.[127]

[Stephen Wiley, Stifel] Okay. And then just I guess on the VGX ongoing, I guess litigation or arbitration or whatever you want to call it does this impact at all the likelihood of starting a Phase II/III in September? And I guess what are the projected time lines to a resolution here if this does indeed need to be litigated?  [J. Joseph Kim]  So I Don't want to go too – we don't want to go too deeply into the actual discussion of the litigation because that's an ongoing process, but I can absolutely say that this or any other litigation has any impact on our INO-4800 development plan including Phase II/III efficacy trials or even the scale-up in 2021 of our goal of reaching 100 million doses. So we feel – as I mentioned before, we have all the doses and device and race manufacturer to support our trials and our focus is squarely on scaling up for 100 million doses that we feel are needed in 2021.[128]

[Charles Duncan, Cantor Fitzgerald] … And then with regard to capacity the other capacity and that is manufacturing some folks have wondered about logistics and manufacturing capacity that you may or may not have and I'm wondering how you solve for that problem and fund it.  [J. Joseph] … So, -- and as far as manufacturing, we've made huge progress in the past quarter really setting up a manufacturing consortium globally. But let me turn to Dr. Shea for addressing this in detail.  [Jackie Shea] Thank, you Joseph. So, to break up your question into a couple of parts. So, first of all, we already have the doses manufactured that we need for our ongoing clinical studies including the phase – the upcoming Phase 2/3. And in terms of longer-term supply and being able to build to the hundreds of millions of doses that we would need, we recognized that very early on.  As early as January, we recognized that we would have to

[126] Inovio Pharmaceuticals, Inc., Q2 2020 Inovio Pharmaceuticals Inc. Earnings Call – Edited Transcript, *Refinitiv*, August 10, 2020, p. 3.

[127] Inovio Pharmaceuticals, Inc., Q2 2020 Inovio Pharmaceuticals Inc. Earnings Call – Edited Transcript, *Refinitiv*, August 10, 2020, pp. 5–6.

[128] Inovio Pharmaceuticals, Inc., Q2 2020 Inovio Pharmaceuticals Inc. Earnings Call – Edited Transcript, *Refinitiv*, August 10, 2020, pp. 8–9.

approach manufacturing in a very novel and very different way. And the same way that other companies have reached out and established manufacturing consortium for their vaccines, we've also taken the same approach with INO-4800. So, some of those manufacturing partnerships we've talked about so Richter Helm and Ology. And over the next couple of months we'll be announcing further manufacturing partnerships and these are partnership based in the U.S. and Europe and we're also now exploring partnerships beyond the U.S. and Europe.[129]

75.     As Plaintiffs note, "Inovio had nothing significant to report to investors other than the INO-4800 program milestones experienced further delay."[130]  Similarly, Professor Feinstein does not identify any new, negative information about the alleged misrepresentations on March 24, May 11, or May 12, 2020.  Professor Feinstein summarized the "new information" contained in Inovio's earnings release and conference call transcript as follows:

> In its press release, Inovio provided updates on 'the first two cohorts in its Phase 1 clinical trial' for INO-4800, disclosed that it had 'received significant funding from government and private sources in 1H 2020 to support vaccine development and manufacturing scale-up,' and provided updates for three additional drug development programs. Management discussed these developments in detail on the conference call, including a discussion of the results of the nonhuman primate study data and details on the Phase 1 extension studies for INO-4800.[131]

76.     Consistent with the above, analysts did not identify new information disclosed on August 10, 2020 regarding Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm.  Instead, to the extent some analysts discussed risks related to Inovio's ability to meet its forward-looking manufacturing goals—particularly its goal of manufacturing 100 million doses in 2021—such risk discussions were consistent with those analysts' previously reported views. Specifically, I identified eight equity analysts that published reports between August 10, 2020 and August 19, 2020 following the August 10, 2020 disclosure.  Exhibit 4 summarizes the analysts' statements related to manufacturing capabilities prior to and after the August 10, 2020

---

[129] Inovio Pharmaceuticals, Inc., Q2 2020 Inovio Pharmaceuticals Inc. Earnings Call – Edited Transcript, *Refinitiv*, August 10, 2020, p. 11.
[130] First Amended Complaint, ¶ 125.
[131] Feinstein Report, ¶ 121.

disclosure. None of the analysts identified new information or risks regarding Inovio's manufacturing capabilities that were not already identified prior to August 10, 2020.

77.    For example, Piper Sandler noted there was "[n]o change to Neutral outlook on INO following Q220 results" and raised the question "how can INO manufacture 100M doses next year if partner VGXI will not facilitate tech transfer?"[132]  However, they had raised the same concern in an earlier report published on June 25, 2020 after the Court denied Inovio's mandatory preliminary injunction against VGXI:  "[w]ithout injunctive relief compelling tech transfer, this would (in INO's own words) create the possibility that 'Inovio cannot manufacture the product promptly, safety, or perhaps at all' and at the least 'substantially delay the successful manufacture' of INO-4800."[133]  Piper Sandler also identifies that they "***still wonder*** how 100M doses can be manufactured next year when partner VGXI refuses to facilitate tech transfer," and cite to their June 25, 2020 report discussing the issue.[134]

### D.    The Key New, Negative Information Regarding INO-4800 Disclosed in Inovio's August 10, 2020 Earnings Conference Call Was a Delay in the Expected Start Date of Its Phase 2/3 Trial

78.    As discussed above, Plaintiffs acknowledge that "Inovio had nothing significant to report to investors other than the INO-4800 program milestones experienced further delay."[135]  Specifically, Inovio announced that it was "look[ing] forward to beginning [its] planned Phase II/III trials in September upon FDA concurrence."[136]  Analysts identified this as a delayed expectation for the start of Inovio's Phase 2/3 efficacy trial for INO-4800.  For example, the first question and answer on the August 10, 2020 earnings call was:

> [RBC] Congratulations on the progress. Joseph, I just wanted to start with your commentary around the plans for the Phase II/III trial for 4100 (sic) [4800]. I'm just curious if you could perhaps comment on the current gating factors for getting that going. It sounds like you're targeting a September start, maybe just slightly a delay from maybe previous commentary. So I just want to understand maybe what the pushes and pulls are there. And then, secondarily, just related to some of the resources

---

[132] "Q220 Update; More Questions Than Answers," *Piper Sandler*, August 10, 2020, p. 1.
[133] "Rubber Seems to Have Met the Road Regarding CoV-19 Vaccine Scale Up," *Piper Sandler*, June 25, 2020, p. 1.
[134] "Q220 Update; More Questions Than Answers," *Piper Sandler*, August 10, 2020, p. 1 (emphasis added).
[135] First Amended Complaint, ¶ 125.
[136] Inovio Pharmaceuticals, Inc., Q2 2020 Inovio Pharmaceuticals Inc. Earnings Call – Edited Transcript, *Refinitiv*, August 10, 2020, p. 4.

or monies that would perhaps be involved to support that and help to execute on that.

[Dr. Kim] Yes. Thank you, Greg. So we've been working urgently to get our Phase II/III events. We are in very active discussions with the FDA on the design and we feel that we are very close to this process. So in terms of drug doses, we have everything available to execute. In terms of the devices, we have everything -- we have very encouraging and positive Phase I data, which is undergoing peer review. So we feel like we are executing on this. Obviously, we are concurrently working on getting an external funding to support this large trial. So please stay tuned because we will be able to, certainly by September, announce the Phase II/III start with external funding in this regard.[137]

79.    Prior to August 10, 2020, analysts expressed that, consistent with management guidance, Inovio would initiate its Phase 2/3 efficacy study in summer 2020:

June 23, 2020, Stifel:  "[Inovio's] guidance re: the initiation of a P2/3 efficacy study 'this summer' remains unchanged."[138]

June 30, 2020, Benchmark:  "Absent of any significant red flags not reported in the INO's press release, there is a high chance the FDA may approve the Ph2/3 study design within several weeks, in our opinion. We also think that once Ph2/3 study design is cleared by the FDA, the external non-dilutive financing may follow."[139]

July 1, 2020, Maxim:  "Although the clinical design has yet to be finalized, Inovio envisions a potentially large (N=2000, depending on the state of the pandemic) pivotal P2/3 randomized study evaluating INO-4800 as the basis for regulatory submission for emergency use authorization approval initially. The study would target frontline healthcare workers and begin in July/August, upon regulatory approval of the IND."[140]

July 31, 2020, Benchmark:  "We remain optimistic about initiation of Ph2/3 trial in August, as the evidence of INO-4800 efficacy along with

---

[137] Inovio Pharmaceuticals, Inc., Q2 2020 Inovio Pharmaceuticals Inc. Earnings Call – Edited Transcript, *Refinitiv*, August 10, 2020, p. 7.

[138] "Now We Just Need More Funding to Support the Development of a Vaccine Candidate to Administer Via These Pre-Funded Devices," *Stifel*, June 23, 2020, p. 1.

[139] "Defining Efficacy in Ph1 Safety Trials (Corrected)," *Benchmark*, June 30, 2020, p. 1.

[140] "Reports Positive P1 Data for INO-4800, but COVID Opportunity Seems Priced in – Downgrading Shares to Hold, from Buy," *Maxim*, July 1, 2020, p. 2.

long-standing safety of Inovio vaccine candidates may prompt FDA to
greenlight large Ph2/3 trial."[141]

80.    A delay in the development timeline for INO-4800 was important given the highly
competitive race to produce a viable vaccine.  For example, analyst commentary throughout the
Putative Class Period recognized that vaccine development speed was critical and that Inovio
was competing with a large number of better-resourced companies:

> April 7, 2020, Maxim:  "At least 52 vaccines are currently in development
> (LINK). In the US, reaching the clinic first was Moderna's (MRNA - NR)
> mRNA vaccine (mRNA-1273), followed now by Inovio (INO - Buy) with
> INO-4800, a DNA-based vaccine. Also in the DNA vaccine race, albeit at
> earlier stages, are Applied DNA Sciences (APDN - Buy), and as of 4/6,
> OncoSec (ONCS - Buy)."[142]

> May 12, 2020, Maxim:  "What about COVID and INO-4800? The COVID
> DNA vaccine is essentially neck and neck in the race with Moderna
> (MRNA - NR) and BioNTech's (BNTX - NR) mRNA vaccines. All three
> are nucleic acid-based approaches which lends themselves to speed in
> synthesis, optimization, clinical trials and most important in a global
> pandemic, scalability. Inovio and its deep pipeline of DNA vaccines for
> infectious diseases, including other coronaviruses, has demonstrated safety
> and induced robust immune responses, more than any in the space, in our
> view. Yet, from a valuation perspective INO (Mkt Cap: $1.7B) lags its
> nucleic-acid vaccine peers MRNA (Mkt Cap: $24.8B) and BNTX (Mkt
> Cap: $11.4B)."[143]

> May 12, 2020, Roth:  "We do not doubt that INO can deliver on its
> guidance of initially manufacturing one million INO-4800 doses by YE20,
> but what we question most is how the program will fare against the
> COVID-19 vaccine competition. We note the recent awarding of up to
> $483M to Moderna (MRNA-Buy) from BARDA and up to $388M from
> CEPI grants to Novavax (NVAX-NC) for their COVID-19 vaccines, by
> contrast to the $17.2M in CEPI grants to INO, the $11.9M DoD grant to
> INO's contract manufacturer Ology Bioservices (private) for INO-4800
> production, and the $5M grant from the Gates Foundation to INO, for a
> total of $34.1M. The world's foundations are collectively focused more on

---

[141] "Ph2/3 INO-4800 Study Even More Likely," *Benchmark*, July 31, 2020, p. 1.

[142] "The DNA/RNA Vaccines are Leading the COVID-19 Race – Maxim Group to Host Virtual Infectious Disease Conference on May 5," *Maxim*, April 7, 2020, p. 1.

[143] "Factoring in COVID Vaccine, but Don't Forget Inovio's Pipeline and Strong Balance Sheet; Raising PT to $18," *Maxim*, May 12, 2020, p. 1.

the SARS-CoV-2 virus than any other infectious agent in the last century, and if INO-4800 is all that it is cracked up to be, we are understandably perplexed by the imbalance in external funding received by these companies."[144]

June 4, 2020, Cantor Fitzgerald:  "Currently there are ~159 COVID-19 vaccine candidates in development, which will be greatly reduced in the coming year, in our view. Of the candidates that may progress to P3 studies, we believe there is a non-zero probability that several will get approval eventually and that no one candidate will be the 'sole winner,' especially with improving clinical profile and distribution advantages. … That said, we note that two of our covered companies, Inovio and Novavax (both OW), were not present on the short list of candidates that the US will support in 'Operation Warp Speed.'"[145]

June 4, 2020, Roth:  "INO must deal with its manufacturing snag in order to potentially be a viable player in the COVID-19 vaccine race, but consistent with our unfavorable view of INO-4800's ability to compete, we note that the Trump Administration did not include INO-4800 among the five vaccine candidates selected for their likelihood of ultimately being viable. Vaccine development speed is crucial in fighting this pandemic, and we emphasize that although such swiftness has been a hallmark of INO vaccines versus its peers, the current difference of opinion with VGXI is not helping to speed anything along."[146]

81.    Notably, Inovio had recently fallen behind its mRNA-based vaccine competitors in its trial development timeline.  Specifically, on July 27, 2020, both Moderna and Pfizer/BioNTech announced the commencement of their Phase 3 and Phase 2/3 trials, respectively.[147]  On July 30, 2020, analysts at Stifel noted that need for Inovio to catch-up to more advanced competitive vaccine programs that were already in Phase 3 development:

We don't see INO shares materially appreciating from current levels in the continued absence of either P1 immunogenicity data (supposedly available "within weeks" per management's recent commentary) and/or some meaningful slug of third-party funding, which would cover registrational development costs (P3 development is not something we want to see INO

---

[144] "INO 1Q20: Transformative 2020 Catalysts Coming, Lowering PT to $11 From $13," *Roth*, May 12, 2020, p. 1.

[145] "WARP Speed Finalists May Not be Final; Show Me the Data," *Cantor Fitzgerald*, June 4, 2020, p. 1.

[146] "INO: INO-4800 - Manufacturing Snag with VGXI; Trump Admin Excludes from List," *Roth*, June 4, 2020, p. 1.

[147] *See*, *e.g.*, National Institutes of Health Press Release, "Phase 3 Clinical Trial of Investigational Vaccine for COVID-19 Begins," July 27, 2020;  BioNTech Press Release, "Pfizer and BioNTech Choose Lead mRNA Vaccine Candidate Against COVID-19 and Commence Pivotal Phase 2/3 Global Study," July 27, 2020.

pursuing independently in the absence of funding) and provide the company an opportunity to potentially catch-up to some of the other, now more-advanced competitive programs in P3 development – most of which (with the exception of PFE/BNTX) are benefiting via inclusion within the NIH master trial protocol.[148]

82.    Following the August 10, 2020 earnings call, analyst commentary identified the delayed expected start date for the Phase 2/3 efficacy trial of INO-4800 to be new, negative information:

> August 10, 2020, Piper Sandler:  "**INO-4800 – lots of questions, answers hopefully forthcoming.** New today, after guiding to P2/3 initiation in July/Aug., timelines have shifted to Sept as INO awaits FDA 'concurrence'. While FDA delays are not unheard of, the urgency of a COV-19 vaccine would seem to be at odds with any foot-dragging on the part of the Agency."[149]

> August 10, 2020, RBC:  "A finer point yet slight delay on the ph.II/III start of INO-4800 - now guided for September - with incremental updates to the ph.I interim data though no significant change to the shape of INO's COVID-19 vaccine candidate profile. … INO expects to initiate the ph.II/III trial of INO-4800 in September - slightly later than the previously guided July/ August timeline."[150]

> August 11, 2020, Cantor Fitzgerald:  "We reiterate our Overweight rating and are reducing our PT to $31 from $45 on INO shares. Our price target reduction results from our reduced visibility on clinical trial execution, and only a cautious optimism in manufacturing capacity, given management commentary on the 2Q20 call. Although we are encouraged by Inovio's planned P3 in 'at-risk' volunteers with an assumed higher 'case rate' and therefore potentially more capital-efficient plan, we believe there may be greater execution risk and mounting competition for clinical trial resources and in-market demand, given recent progress by other vaccine innovators."[151]

> August 11, 2020, Stifel:  "We believe the company's 2Q20 EPS print/call left us (again) with more questions than answers on numerous fronts – including 1) disclosure/publication timelines and the continued high-level characterization of marginally-incremental INO-4800 P1 immunogenicity/

---

[148] "Delayed Challenge NHP Data Is Interesting – But Absence of Granular P1 Immunogenicity Data Is Still a Lingering Overhang," *Stifel*, July 30, 2020, p. 1.

[149] "Q220 Update; More Questions Than Answers," *Piper Sandler*, August 10, 2020, p. 1 (emphasis in original).

[150] "2Q20: Thinking Fast and Slow – INO-4800 Advances Alongside An Accelerating Vaccine Field," *RBC*, August 10, 2020, p. 1.

[151] "2Q20: Cash and COVID Vaccine Progress but Timeline Visibility More Opaque," *Cantor Fitzgerald*, August 11, 2020, p. 1.

safety data; 2) the likelihood of external funding required to support both the September initiation of INO-4800 P2/3 development and the scale-up of third-party/ex-VGXI manufacturing necessary to meet management's FY21 100M dose guidance (and the regulatory uncertainty associated with each); and 3) projected enrollment completion timelines in the P3 REVEAL-2 trial (required to support VGX-3100 registration, which remains core to our base-business estimates). … **INO-4800 P2/3 initiation now planned for September (funding and FDA-dependent).** Management continues to work towards reaching an agreement with FDA regarding a proposed P2/3 trial design. However, management indicated the initiation of any such trial remains dependent on the securitization of third-party funding. … While management noted the ongoing litigation with VGXI will not impact this manufacturing guidance or the ability to conduct registrational development, it is our understanding (per our conversation with management) the proposed P2/3 trial design would be conducted using clinical supply generated from both the legacy VGXI process and recently-scaled capacity from third-party CMOs (i.e. Richter-Helm) – which presumably comprises a non-proprietary version of the VGXI manufacturing process (technology which VGXI has been unwilling to transfer to third-party CMOs). While the P2/3 trial could arguably serve as its own bridging study (i.e. comparing data generated via Richter-Helm manufactured product with VGXI-manufactured product), we believe this may represent another layer of regulatory complexity."[152]

## X.    Representative Plaintiff Andrew R. Zenoff Has No Damages According to Professor Feinstein's Proposed Section 10(b) Damages Methodology

83.     Professor Feinstein proposes the "out-of-pocket damages methodology," which he claims "can be applied commonly for all Class members" and that "[o]ut-of-pocket damages are measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale or, if held, at the end of the Class Period, taking into account formulaic prescriptions in relevant case law and statutes."[153]   I understand that per-share damages under Section 10(b) and Rule 10b-5 are the lesser of the following:  (1) out-of-pocket damages, which is inflation at purchase minus inflation at sale, where inflation is defined as the difference between the actual share price and the but-for or "true value" the security would have had absent the alleged misrepresentations; (2) the actual losses caused by the revelation of the

---

[152] "2Q20 Recap: Still Many Unanswered Questions Governing Fate of INO-4800 – Reducing Target Price to $16," *Stifel*, August 11, 2020, p. 1 (emphasis in original).
[153] Feinstein Report, ¶ 160.

truth regarding the alleged misrepresentations as opposed to price declines caused by other non-fraud-related factors; and (3) the Private Securities Litigation Reform Act ("PSLRA") 90-day bounce-back provision.[154]  As shown below, Representative Plaintiff Andrew R. Zenoff has no damages according to Professor Feinstein's proposed Section 10(b) damage methodology.

84.    Notably, I understand that there are no damages under the out-of-pocket methodology for shares that were not held over any alleged corrective disclosure, as such shares would not have suffered any losses caused by the alleged revelation of the truth.  Consistent with this understanding, Professor Feinstein contends that "per share damages can be measured" using valuation tools that would establish "if corrective disclosures caused the inflation to dissipate, in turn causing investor losses."[155]  As shown in Exhibit 5, Representative Plaintiff Andrew R. Zenoff primarily traded Inovio stock during the Putative Class Period in his personal E*TRADE account.  According to Mr. Zenoff's transaction records, Mr. Zenoff did not hold any Inovio shares in his personal E*TRADE account at the time of any of the alleged corrective disclosures identified in Section III.C above.  Specifically, as shown in Exhibit 5, Mr. Zenoff made various purchases in April and May 2020, but had sold all of his Inovio shares by May 18, 2020 (usually within the same day or next day after purchase).  Mr. Zenoff again made purchases on June 25, 2020, June 30, 2020, July 13, 2020, and July 14, 2020, but had sold all of his Inovio shares by August 3, 2020.  Accordingly, none of Mr. Zenoff's purchases in his personal E*TRADE account were held at the time of an alleged corrective disclosure, and thus would not result in damages under Professor Feinstein's proposed methodology.

85.    In addition, as shown in Exhibit 5, Mr. Zenoff made two purchases of Inovio stock in his 401(k) E*TRADE account.  Mr. Zenoff's first purchase occurred on April 23, 2020 and those shares were sold on May 1, 2020.  As with his personal E*TRADE account transactions, there were no alleged corrective disclosures between the time of this purchase and sale, and thus no damages under Professor Feinstein's proposed methodology.

86.    Mr. Zenoff's second purchase in his 401(k) E*TRADE account occurred on May 4, 2020 at $10.97 per share, and those shares were sold on March 4, 2021 at $9.33 per share, as shown in

---

[154] 15 U.S.C. § 78u-4 at (e)(1) ("Except as provided in paragraph (2), in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.").

[155] Feinstein Report, ¶ 165.

Exhibit 5.  While those shares were held over three alleged corrective disclosures (June 3, 2020, August 9, 2020, and August 10, 2020), Mr. Zenoff suffered no damages on this transaction according to Professor Feinstein's proposed methodology.  As Professor Feinstein identifies, "[p]er share damages are limited, however, to be no greater than the decline in the share price over the investor's holding period, which is the investment loss actually sustained," and that "for purposes of computing the investment loss limitation on damages, …[f]or any shares held 90 days or more beyond the final corrective disclosure, the investment loss is computed as if the shares were sold for the average price over the 90 days following the final corrective disclosure."[156]  Since Mr. Zenoff's shares were sold more than 90 days following the final alleged corrective disclosure, his investment loss limitation would be calculated using the average price over the 90 days following the final alleged corrective disclosure, which I compute to be $12.47.[157]  Since the 90-day average price of $12.47 exceeds Mr. Zenoff's purchase price of $10.97, this transaction would result in no damages under Professor Feinstein's methodology.

## XI.    Conclusion

87.    In sum, based on my analysis, and assuming that Inovio's stock traded in an efficient market, Plaintiffs' alleged February 14, March 2, 2020, and March 24, 2020 misstatements did not impact the price of Inovio's stock.  In addition, based on my analysis, and assuming that Inovio's stock price traded in an efficient market, any stock price declines following the August 9 and 10, 2020 disclosures were not due to new information about Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm and are therefore not evidence of prior price impact from the alleged March 24, May 11, and May 12, 2020 misrepresentations. Finally, Representative Plaintiff Andrew R. Zenoff has no damages according to Professor Feinstein's proposed Section 10(b) damage methodology.

---

[156] Feinstein Report, ¶ 165.
[157] Inovio's 90-day average price of $12.47 is computed over the period 8/11/20–11/8/20.  I note that 11/8/20 is a Sunday, when U.S. equity markets are closed.  If the period were extended to 8/11/20–11/9/20, the 90-day average price would be $12.41.

Executed this 8th of October, 2021

_____

René M. Stulz, Ph.D.

Appendix A

**René M. Stulz**

Fisher College of Business
806 Fisher Hall
2100 Neil Avenue
Columbus, OH 43210-1144
Phone:  (614) 292-1970
Fax:     (614) 292-2359
E-mail: stulz.1@osu.edu
Homepage
Google Scholar

Home Address:
3419 River Seine Street
Columbus, OH 43221
Phone: (614) 771-1110
Cell:   (614) 206-0265

## UNDERGRADUATE STUDIES

University of Neuchâtel, Switzerland, Licence es Sciences Économiques, 1975.

## GRADUATE STUDIES

London School of Economics, 1975-1976, Visiting Graduate Student.

Massachusetts Institute of Technology (MIT), 1976-1980, Ph.D. in Economics.

## ACADEMIC APPOINTMENTS

Ohio State University, Everett D. Reese Chair of Banking and Monetary Economics, 1996 to present.

University of Southern California, Visiting Professor, 2007.

University of Chicago, Visiting Professor, Stigler Center, 2003-2004.

Northwestern University, Visiting Scholar, Kellogg School of Management, 2003-2004.

Harvard University, Business School, August 1996 to July 1997, Bower Fellow.

Ohio State University, Director of the Dice Center for Research in Financial Economics, 1995 to present.

Ohio State University, Ralph Kurtz Chair in Finance, 1993-1996.

Ohio State University, Riklis Chair in Business and its Environments, 1988-1993.

Ohio State University, Professor of Finance, 1985 to present.

Appendix A

University of Chicago, Visiting Professor of Finance, 1986-1987.

Massachusetts Institute of Technology, Visiting Associate Professor of Finance, Fall 1985.

Ohio State University, Associate Professor of Finance, 1983-1985.

University of Rochester, Assistant Professor of Finance and Economics, 1980-1983.


**OTHER POSITIONS**

Research Associate, National Bureau of Economic Research (Asset Pricing Group and Corporate Finance Group).

Director, NBER Group on the Risks of Financial Institutions, 2005 to present.

Chairman, Scientific Council, Swiss Finance Institute, 2006 to 2019.

Finance Research Advisory Committee, Office of Financial Research, U.S. Treasury, 2016 to 2019.

Board of Directors, American Finance Association, 1988 to 2000, 2002 to 2006.

Consultant to the World Bank, the IMF, the NYSE, Federal Reserve Bank of New York, corporations, and law firms.

Expert testimony in federal courts, state courts, and domestic and international arbitrations.

Taught executives in Europe, Asia and North America (open enrollment as well as for corporations, courses on risk management, banking, derivatives, corporate valuation, investments).

Advisory Committee, Morningstar, 2000-2002.

Director, Banque Bonhôte, 2002 to present.

Director, Wegelin Fund Management, 1999 to 2010.

President, Gamma Foundation, 2002 to 2013.

Director, Community First Financial Group, Inc., 2001 to 2010.

Director, Peninsula Banking Group, Inc., 2001 to 2010.

Trustee, Global Association of Risk Professionals, 2002-2020; executive committee, 2004-2011; chair of governance committee, 2011-2020 to present; vice-chair, 2017-2019.

Appendix A

Vice-Chairman, Board of Trustees, Global Association of Risk Professionals, 2019-2020. to present.

Chairman, Financial Risk Management Examination Certification Committee, Global Association of Risk Professionals, 2002 to 2020.

Chairman, New York Federal Reserve Bank/GARP Global Risk Forum (2011, 2013, 2016, 2019), Bank of England/GARP Global Risk Forum (2012, 2014, 2017, 2020), Hong Kong Monetary Authority/GARP Global Risk Forum (2013, 2015).

International Advisory Committee, NCCR, 2002 to 2011.

External Reviewer, London Business School Finance Department, 2005.

Financial Advisory Roundtable (FAR), Federal Reserve Bank of New York, 2006 to 2010.

Guest Contributor, Harvard Law School Corporate Governance Blog.

Squam Lake Group, member, 2008 to present.

Senior Academic Fellow, Asia Bureau of Finance and Economic Research, 2012 to present.

Fellow, Wharton Center for Financial Institutions, 2013 to present.

Nominating Committee, American Finance Association, 2016, 2018.


**HONORS, SCHOLARSHIPS AND FELLOWSHIPS**

Advanced Researcher Fellowship, Swiss National Science Foundation, 1978-1980.

Dean's Research Professorship, Ohio State University, Spring 1984.

Pacesetter Research Award, Ohio State University, April 1986.

President-Elect (1993) and President (1994), International Economics and Finance Society.

Docteur Honoris Causa, University of Neuchâtel, Switzerland, 1998.

Eastern Finance Association Scholar Award, 1998.

Selected keynote speeches: ABFER, Asia-Pacific Finance Association, Bank of the Netherlands Governance Conference, Bocconi Derivatives Annual Conference, Drexel Corporate Governance Conference, Eastern Finance Association, European Corporate Finance Institute, European Finance Association, Financial Management Association, European Financial Management Association, Financial Management Association European Conference, FDIC Annual

3

Appendix A

Conference, Rising Stars Conference, Fourth Annual Conference on Asia-Pacific Financial Markets of the Korean Securities Association, French Finance Association, German Finance Association, Infiniti Conference, Notre Dame/SEC Conference, Northern Finance Association, Swiss Banking Association 100th Anniversary Conference, Western Finance Association, World Finance Conference, China International Conference in Finance, South Carolina Conference on Banking and Fixed Income, Asian Finance Association Conference, Seoul Asian Financial Forum, Oklahoma University Energy and Commodities Finance Research Conference, ECGI Roundtable Riga, Institutional Investor Private Markets Summit, 7th HEC Paris Workshop.

Assurant Lecture, Georgia Tech University, 2004.

Fellow, Financial Management Association, 2000.

Fellow, American Finance Association, 2005.

Fellow, European Corporate Governance Institute, 2005.

Vice-President (2002), Program Chair, (2003), President (2004), Western Finance Association.

Vice-President (2002), President-elect (2003), President (2004), American Finance Association.

Who's Who in Banking and Finance; Who's Who in Economics.

Jensen Prize for best article in Corporate Finance in the Journal of Financial Economics, 2000, 2008, 2017; runner-up, 2011.

William F. Sharpe Award for the best paper published in the Journal of Financial and Quantitative Analysis during the year 2003.

Selected by the magazine Treasury and Risk Management as one of the 100 most influential people in finance (June 2004).

René M. Stulz Scholar Development Fund, created in 2005 by former Ph.D. students.

Fama/DFA Prize for best article in Capital Markets and Asset Pricing in the Journal of Financial Economics, 2005.

Nominated for a Brattle Prize for best paper in Corporate Finance in the Journal of Finance in 2005.

Risk Who's Who, Charter Member, 2006.

Best paper, First Asian-Pacific Capital Markets Conference, Seoul, 2006.

Outstanding Academic Contribution to Corporate Governance Award, Drexel University, 2009.

4

Appendix A

Risk Manager of the year award, Global Association of Risk Professionals, 2009.

Swiss Finance Institute/Banque Privée Espirito Santo Prize 2010.

Trailblazer in Finance Award, 2014.

Reuters, Highly-Cited Researchers, first time in 2014.

Ohio State University, Distinguished Scholar Award, 2016.


**CONGRESSIONAL TESTIMONY**

"Over-the-Counter Derivatives Markets Act of 2009," testimony to the House of Representatives Committee on Financial Services, 2009.

"Oversight of the Mutual Fund Industry: Ensuring Market Stability and Investor Confidence," Subcommittee on Capital Markets and Government Sponsored Enterprises, House of Representatives Committee on Financial Services, 2011.


**BOOKS**

Risk Management and Derivatives, Southwestern College Publishing, 2003.

Handbook of the Economics of Finance, volume 1, edited with George Constantinides and Milton Harris, North-Holland, 2003.

Handbook of the Economics of Finance, volume 2, edited with George Constantinides and Milton Harris, Elsevier, 2013.

International Capital Markets, 3 volumes, edited with Andrew Karolyi, Edward Elgar, 2003.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2004.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2005.

The Risks of Financial Institutions, edited with Mark Carey, University of Chicago Press, 2006.

The Squam Lake Report: Fixing the Financial System, co-authored with the Squam Lake Group, Princeton University Press, 2010.

Appendix A

**PUBLISHED PAPERS**

"On the Effects of Barriers to International Investment," Journal of Finance, 1981, v36(4), 923-934; reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 1-36.

"A Model of International Asset Pricing," Journal of Financial Economics, 1981, v9(4), 383-406.

"The Forward Exchange Rate and Macroeconomics," Journal of International Economics, 1982, v12(3/4), 285-299.

"Options on the Minimum or the Maximum of Two Risky Assets: Analysis and Applications," Journal of Financial Economics, 1982, v10(2), 161-185, reprinted in Options Markets, vol. 2, George Constantinides and A. G. Malliaris, eds., Edward Elgar Publishing, 2001.

"On the Determinants of Net Foreign Investment," Journal of Finance, 1983, v38(2), 459-468.

"The Demand for Foreign Bonds," Journal of International Economics, 1983, v15(3/4), 225-238.

"Optimal Hedging Policies," Journal of Financial and Quantitative Analysis, 1984, v19(2), 127-140.

"Currency Preferences, Purchasing Power Risks and the Determination of Exchange Rates in an Optimizing Model," Journal of Money, Credit and Banking, 1984, v16(3), 302-316; reprinted in Monetary Policy and Uncertainty, Manfred J. M. Neumann, ed., Nomos, 1986.

"Pricing Capital Assets in an International Setting: An Introduction," Journal of International Business Studies (Winter 1984), 55-73; reprinted in International Financial Management: Theory and Applications, Donald R. Lessard, ed., John Wiley & Sons, 1985.

"Macroeconomic Time-Series, Business Cycles and Macroeconomic Policies," with Walter Wasserfallen, Carnegie-Rochester Conference Series on Public Policy (Spring 1985), 9-55.

"An Analysis of Secured Debt," with Herb Johnson, Journal of Financial Economics, 1985, v14(4), 501-522, reprinted in The Debt Market, vol. 3, Steve A. Ross, editor, Edward Elgar, 2000.

"The Determinants of Firm's Hedging Policies," with Clifford W. Smith, Journal of Financial and Quantitative Analysis, 1985, v20(4), 391-406; reprinted in Studies in Financial Institutions: Commercial Banks, C. James and C.W. Smith, eds., McGraw Hill, 1993, and in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L. Culp and Merton H. Miller, eds., Risk Publications, London, 1999.

"Asset Pricing and Expected Inflation," Journal of Finance, 1986, v41(1), 209-224.

Appendix A

"Risk Bearing, Labor Contracts and Capital Markets," with Patricia B. Reagan, Research in Finance, 1986, v6, 217-232.

"Interest Rates and Monetary Policy Uncertainty," Journal of Monetary Economics, 1986, v17(3), 331-348.

"Time-Varying Risk Premia, Imperfect Information and the Forward Exchange Rate," International Journal of Forecasting, 1987, v3(1), 171-178.

"The Pricing of Options with Default Risk," with Herb Johnson, Journal of Finance, 1987, v42(2), 267-280.

"An Equilibrium Model of Exchange Rate Determination and Asset Pricing with Non-Traded Goods and Imperfect Information," Journal of Political Economy, 1987, v95(5), 1024-1040.

"Managerial Control of Voting Rights: Financing Policies and the Market for Corporate Control," Journal of Financial Economics, 1988, v20(1/2), 25-54, reprinted in M.C. Jensen and C.W. Smith, eds., The Modern Theory of Corporate Finance, McGraw-Hill, 1989 (second edition).

"Risk and the Economy: A Finance Perspective," with K.C. Chan, Risk and the Economy, in C.C. Stone, ed., Financial Risk: Theory, Evidence and Implications, Proceedings of the Eleventh Annual Economic Conference of the Federal Reserve Bank of St. Louis, Kluwer Academic Publishers, 1988.

"Capital Mobility and the Current Account," Journal of International Finance and Money, 1988, v7(2), 167-180.

"The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," with Yong Cheol Kim, Journal of Financial Economics, 1988, v22(2), 189-205.

"Contracts, Delivery Lags, and Currency Risks," with Patricia Reagan, Journal of International Money and Finance, 1989, v8(1), 89-104.

"The Pricing of Stock Index Options in General Equilibrium," with Warren Bailey, Journal of Financial and Quantitative Analysis, 1989, v24(1), 1-12.

"Managerial Performance, Tobin's q, and the Gains from Successful Tender Offers," with Larry Lang and Ralph Walkling, Journal of Financial Economics, 1989, v24(1), 137-154.

"Real Exchange Rate Dynamics and the Financial Theory of the Trading Firm," in Recent Developments in International Banking and Finance, S. Khoury and A. Ghosh, eds., Probus Publishing Company,1989, v3, 247-262.

Appendix A

"Properties of Daily Stock Returns from the Pacific Rim Stock Markets: Evidence and Implications," with Warren Bailey and Edward Ng, in S.G. Rhee and R. Chang, eds., Pacific-Basin Capital Markets Research, North Holland, 1990, 155-171.

"The Pricing of Currency Options: A Review," in R. E. Schwartz and C. W. Smith, eds., Handbook of Currency and Interest Rate Risk Management, Simon & Schuster, 1990, 5/1-5/20.

"Stock Index Futures in Switzerland: Pricing and Hedging Performance," with Walter Wasserfallen and Thomas Stucki, Review of Futures Markets, 1990, v9(3), 576-592.

"The Distribution of Target Ownership and the Division of Gains in Successful Takeovers," with Ralph A. Walkling and Moon H. Song, Journal of Finance, 1990, v45(3), 817-834.

"Managerial Discretion and Optimal Financing Policies," Journal of Financial Economics, 1990, v26(1), 3-26, reprinted in The Theory of Corporate Finance, M.J. Brennan, ed., Edward Elgar, 1995.

"Benefits of International Diversification: The Case of Pacific Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management, 1990, v16(4), 57-61.

"A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," with Ralph A.Walkling and Larry H. Lang, Journal of Financial Economics, 1991, v29(2), 315-335.

"Is There a Global Market for Convertible Bonds?" with Yong-Cheol Kim, Journal of Business, 1992, v65(1), 75-92.

"Industry Contagion Effects of Bankruptcy and Firm Size," with Larry Lang, in Ed Altman, ed., Bankruptcy and Distressed Restructurings, Business One Irwin, 1992, 215-221.

"Contagion and Competitive Intra-Industry Effects of Bankruptcy Announcements," with Larry Lang, Journal of Financial Economics, 1992, v32(1), 45-60.

"Global Financial Markets and the Risk Premium on U.S. Equity," with K.C. Chan and Andrew Karolyi, Journal of Financial Economics, 1992, v32(2), 137-168.

"Portfolio Management and Exchange Rate Risks: New Theoretical and Empirical Perspectives," with Warren Bailey and Edward Ng, S. Khoury and A. Ghosh, eds., Recent Developments in International Banking and Finance, 1992, v6, 230-248.

"Optimal Hedging of Stock Portfolios Against Foreign Exchange Risks: The Case of the Nikkei 225," with Warren Bailey and Edward Ng, Global Finance Journal, 1992, v3(2), 97-114.

"Contracting Costs, Inflation and Relative Price Volatility," with Patricia Reagan, Journal of Money, Credit and Banking, 1993, v25(3), Part 2, 585-601.

8

Appendix A

"Tobin's q, Diversification, and Firm Performance," with Larry Lang, Journal of Political Economy, 1994, v102(6), 1248-1280, reprinted in Empirical Corporate Finance, vol. IV, Michael Brennan, ed., Edward Elgar, 2001.

"International Asset Pricing: An Integrative Survey," Handbook of Modern Finance, R. Jarrow, M. Maksimovic and W. Ziemba, eds., North Holland-Elsevier, 1995, 201-223.

"Asset Sales, Firm Performance and the Agency Costs of Managerial Discretion," with Larry Lang and Annette Poulsen, Journal of Financial Economics, 1994, v37(1), 3-37, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"The Cost of Capital in Internationally Integrated Markets," European Financial Management, European Financial Management, 1995, 11-22.

"An Analysis of the Wealth Effects of Japanese Offshore Dollar-Denominated Convertible and Warrant Bond Issues," with Jun-Koo Kang, Yong-Cheol Kim and Kyung-Joo Park, Journal of Financial and Quantitative Analysis, 1995, v30(2), 257-270.

"Globalization of Capital Markets and the Cost of Capital: The Case of Nestlé," Journal of Applied Corporate Finance, 1995, v8(3,Fall), 30-38.

"Foreign Equity Investment Restrictions, Capital Flight, and Shareholder Wealth Maximization," with Walter Wasserfallen, Review of Financial Studies, 1995, v8(4), 1019-1057.

"Leverage, Investment and Firm Growth," with Larry Lang and Eli Ofek, Journal of Financial Economics, 1996, v40(1), 3-29.

"How Different is Japanese Corporate Finance?", with Jun-Koo Kang, Review of Financial Studies, 1996, v9(1), 109-139.

"Information, Trading and Stock Returns: Lessons from Dually-Listed Securities," with K.C. Chan, Wai-Ming Fong, and Bong-Chan Kho, Journal of Banking and Finance,1996, v20(7), 1161-1187.

"Timing, Investment Opportunities, Managerial Discretion, and the Security Issue Decision," with Kooyul Jung and Yong-Cheol Kim, Journal of Financial Economics, 1996, v42(2), 159-185,reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"Why Do Markets Move Together? An Investigation of U.S.-Japan Stock Return Comovements," with G. Andrew Karolyi, Journal of Finance, 1996, v51(3), 951-986.

"Rethinking Risk Management," Journal of Applied Corporate Finance, 1996 (Fall), 8-24. Reprinted in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L Culp and Merton H. Miller, eds., Risk Publications, London, 1999, and in

Appendix A

Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999.

"Why Is There a Home Bias? An Analysis of Foreign Portfolio Equity Ownership in Japan," with Jun-Koo Kang, Journal of Financial Economics, 1997, v46(1), 3-28.

"Are Internal Capital Market Efficient?" with Hyun-Han Shin, Quarterly Journal of Economics, 1998, v113(2), 531-552.

"The Determinants and Implications of Corporate Cash Holdings," with Tim Opler, Lee Pinkowitz, and Rohan Williamson, Journal of Financial Economics, 1999, v52(1), 3-46. A shortened version of this paper appeared as "Corporate Cash Holdings," Journal of Applied Corporate Finance, 2001 v14(1), 55-79.

"Do Foreign Investors Destabilize Stock Markets? The Korean Experience in 1997," with Hyuk Choe and Bong-Chan Kho, Journal of Financial Economics, 1999, v54(2), 227-264.

"The Underreaction Hypothesis and the New Issue Puzzle: Evidence from Japan," with Yong-Cheol Kim and Jun-Koo Kang, Review of Financial Studies, 1999, v12(3), 519-534.

"International Portfolio Flows and Security Markets," in International Capital Flows, edited by Martin Feldstein, University Chicago Press, 1999, 257-293, reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 387-423.

"Globalization, Corporate Finance and the Cost of Capital," Journal of Applied Corporate Finance, 1999, v12(3), 8-25.

"Do Banking Shocks Affect Firm Performance? An Analysis of the Japanese Experience," with Jun-Koo Kang, Journal of Business, 2000, v73(1), 1-23.

"Banks, the IMF, and the Asian crisis," with Bong-Chan Kho, Pacific Basin Finance Journal, 2000, v8(2), 177-216.

"U.S. Banks, Crises, and Bailouts: From Mexico to LTCM," with Bong-Chan Kho and Dong Lee, American Economic Review, 2000, v90(2), 28-31.

"Financial Structure, Corporate Finance and Economic Growth," International Review of Finance, 2000, v1(1), 11-38.

"Merton Miller and Modern Finance," Financial Management, 2000, v29(4), 119-131. Reprinted in the Journal of Applied Corporate Finance, 2001(Winter), 8-20.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis of Stock Returns," with John Griffin, Review of Financial Studies, 2001, v14(1), 215-241.

Appendix A

"Divestitures and the Liquidity of the Market for Corporate Assets," with Frederick Schlingemann and Ralph A. Walkling, Journal of Financial Economics, 2002, v64(1), 117-144, reprinted in Corporate Restructuring, vol. 2, John Campbell and David J. Denis, ed., Edward Elgar Publishing, 2005.

"Should we Fear Capital Flows?" in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer (Editor), University of Chicago Press, 2003, Chicago, Ill.

"Corporate Governance, Investor Protection, and the Home Bias," with Magnus Dahlquist, Lee Pinkowitz, and Rohan Williamson, Journal of Financial and Quantitative Analysis, 2003, v38(1), 87-110.

"Equity Market Liberalizations as Country IPOs," with Rodolfo Martell, American Economic Review, Papers and Proceedings, 2003, v93(2), 97-101.

"Culture, Openness, and Finance," with Rohan Williamson, Journal of Financial Economics, 2003, v70(3), 313-349.

"A New Approach to Measuring Financial Contagion," with Kee-Hong Bae and Andrew Karolyi, Review of Financial Studies, 2003, v16, 717-763. Pre-publication Working Paper

"Are Assets Priced Locally or Globally?" with Andrew Karolyi, in Constantinides, George, Milton Harris and René Stulz (eds.), The Handbook of the Economics of Finance, North Holland, 2003.

"Why are Foreign Firms that List in the U.S. Worth More?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2004, v71(2), 205-238.

"Daily Cross-Border Flows: Pushed or Pulled?" with Federico Nardari and John Griffin, Review of Economics and Statistics, 2004, v86(3), 641-657.

"Firm Size and the Gains from Acquisitions," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Financial Economics, 2004, v73, 201-228.

"Should we Fear Derivatives?" Journal of Economic Perspectives, 2004, v18(3), 173-192; reprinted in The ICFAI Journal of Derivatives Markets, 2005, v2(1), 42-53.

"Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Finance, 2005, v60(2), 757-782 (Reprinted in Mergers and Acquisitions, J. Harold Mulherin, ed., Edward Elgar Publishing, 2012).

"Do Domestic Investors have an Edge? The Trading Experience of Foreign Investors in Korea," with Hyuk Choe and Bong-Chan Kho, Review of Financial Studies, 2005, v18(3),795-829.

Appendix A

"The Limits of Financial Globalization," Journal of Finance, 2005, v60(4), 1595-1638; reprinted in Journal of Applied Corporate Finance, 2007, v19(1), 8-15.

"Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A Cross-Country Analysis," with Lee Pinkowitz and Rohan Williamson, Journal of Finance, 2006, v61(6) 2725-2751; reprinted in Journal of Applied Corporate Finance, 2007, v19(1), 81-87.

"Dividend Policy and the Earned/Contributed Capital Mix: A Test of the Life-cycle Theory," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2006, v81(2), 227-254.

"Enterprise Risk Management: Theory and Practice," with Brian W. Nocco, Journal of Applied Corporate Finance, Fall 2006, v18(8), 8-20.

"Do Investors Trade more when Stocks have Performed Well? Evidence from 46 Countries," with John M. Griffin and Federico Nardari, Review of Financial Studies, 2007, v20(3), 905-951.

"Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership," with Jean Helwege and Christo Pirinsky, Journal of Finance, 2007, 62 (3), 995-1028.

"Hedge Funds: Past, Present, and Future," Journal of Economic Perspectives, 2007, v21(2), 175-194.

"The Economics of Conflicts of Interests in Financial Institutions," with Hamid Mehran, Journal of Financial Economics, 2007, v85(2), 267-296.

"Why Do Countries Matter so much for Corporate Governance?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2007, v86, 1-39.

"How do Diversity of Opinion and Information Asymmetry Affect Acquirer Returns?" with Sara B. Moeller and Frederik P. Schlingemann, Review of Financial Studies, 2007, v20(6), 2047-2078.

"Do Local Analysts know more? A Cross-Country Study of Performance of Local Analysts and Foreign Analysts," with Kee-Hong Bae and Hongping Tan, Journal of Financial Economics, 2008 v88(3), 581-606.

"Why Do Private Acquirer Pay so Little Compared to Public Acquirers?" with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, Journal of Financial Economics, 2008, v89(3), 375-390

"Risk Management Failures: What Are They and When Do They Happen?" Journal of Applied Corporate Finance, 2008, v20, No. 4, 39-48.

12

Appendix A

"Private Benefits of Control, Ownership, and the Cross-Listing Decision," with Craig Doidge, G. Andrew Karolyi, Karl V. Lins, and Darius P. Miller, Journal of Finance, 2009, v64(1), 425-466.

"Has New York Become Less Competitive than London in Global Markets?  Evaluating Foreign Listing Choices Over Time," with Craig Doidge, and G. Andrew Karolyi, Journal of Financial Economics, 2009, v91(3), 253-277.

"Differences in Governance Practices between U.S. and Foreign Firms: Measurement, Causes, and Consequences," with Reena Aggarwal, Isil Erel, and Rohan Williamson, Review of Financial Studies, 2009, v22(8), 3171-3209.

"Managerial Ownership Dynamics and Firm Value," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2009, v92(3), 342-361.

"How Much Do Banks Use Credit Derivatives to Hedge Loans?" with Bernadette Minton and Rohan Williamson, Journal of Financial Services Research, 2009, v35(1), 1-31.

"Securities Laws, Disclosure, and National Capital Markets in the Age of Financial Globalization," Journal of Accounting Research, 2009, v47(2), 349-390.

"Why Do U.S. Firms Hold so Much More Cash than they Used to?" with Thomas W. Bates, and Kathleen M. Kahle, Journal of Finance, 2009, v64(5), 1985-2021.

"Financial Globalization, Governance, and the Evolution of the Home Bias," with Bong-Chan Kho and Francis E. Warnock, Journal of Accounting Research, 2009, v47(2), 597-635.

"Seasoned Equity Offerings, Market Timing and the Corporate Lifecycle," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2010, v95(3), 275-295.

"Why do Firms Appoint CEOs as Outside Directors?" with Rüdiger Fahlenbrach and Angie Low, Journal of Financial Economics, 2010, v97(1), 12-32.

"Credit Default Swaps and the Credit Crisis," Journal of Economic Perspectives, 2010, v24(1), 73-92.

"Why Do Foreign Firms Leave U.S. Equity Markets?" with Craig Doidge and G. Andrew Karolyi, Journal of Finance, 2010, v.65(4), 1507-1553.

"Hedge Fund Contagion and Liquidity Shocks," with Nicole M. Boyson and Christof W. Stahel, Journal of Finance, 2010, v65(5), 1789-1816.

"Bank CEO Incentives and the Credit Crisis," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2011, v99, 11-26 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

13

Appendix A

"When Are Analyst Recommendation Changes Influential?" with Roger K. Loh, Review of Financial Studies, 2011, v24(2), 593-627.

"The Credit Crisis Around the Globe: Why Did Some Banks Perform Better?" with Andrea Beltratti, Journal of Financial Economics, 2012, v105(1), 1-17 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Why Are U.S. Stocks More Volatile?" with Söhnke M. Bartram and Gregory Brown, Journal of Finance, 2012, v67(4), 1329-1370.

"Market Institutions, Financial Market Risks, and The Financial Crisis," with Mark Carey, Anil K. Kashyap, and Raghuram Rajan, Journal of Financial Economics, 2012, v104(3),421-424.

"This Time Is the Same: Using Bank Performance in 1998 to Explain Bank Performance during the Recent Financial Crisis," with Rüdiger Fahlenbrach and Robert Prilmeier, Journal of Finance, 2012, v67(6), 2139-2185 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Access to Capital, Investment, and the Financial Crisis," with Kathleen Kahle, Journal of Financial Economics, 2013, v110(2), 280-299.

"The U.S. Left Behind? Financial Globalization and the Rise of IPOs Outside the U.S.," with Craig Doidge and G. Andrew Karolyi, Journal of Financial Economics, 2013, v110(3), 546-573.

"Why Did Holdings of Highly-Rated Securitization Tranches Differ So Much Across Banks?" with Isil Erel and Taylor Nadauld, The Review of Financial Studies, 2014, v27(2), 404-453.

"Liquid-Claim Production, Risk Management, and Bank Capital Structure: Why High Leverage is Optimal for Banks," with Harry DeAngelo, Journal of Financial Economics, 2015, v116, 219-236.

"Corporate Acquisitions, Diversification, and the Firm's Lifecycle" with Asli M. Arikan, Journal of Finance, 2016, v71(1), 139-194.

"Do U.S. Firms Hold More Cash than Foreign Firms?" with Lee Pinkowitz and Rohan Williamson, The Review of Financial Studies, 2016, v29(2), 309-348.

"Why Don't All Banks Practice Regulatory Arbitrage? Evidence from the Usage of Trust Preferred Securities," with Nicole Boyson and Rüdiger Fahlenbrach, The Review of Financial Studies, 2016, v29(7), 1821-1859.

"Risk Management, Governance, Culture and Risk-Taking in Banks," Economic Policy Review, Federal Reserve Bank of New York, 2016, v22(1), 43-59 (A shorter version was published as "Risk-Taking and Risk Management by Banks," Journal of Applied Corporate Finance, 2015, v.27(1), 8-18).

14

Appendix A

"Firm Rigidities and the Decline of Growth Opportunities," with Claudio Loderer and Urs Wälchli, 2016, Management Science 63(9), 3000-3020.

"Portable Country Governance and Cross-Border Acquisitions," with Jesse A. Ellis, Sara B. Moeller, and Frederik P. Schlingemann, Journal of International Business Studies, 2017, 48(2), 148-173.

"The U.S. Listing Gap," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2017, 123, 464-487.

"Is the US Public Corporation in Trouble?" with Kathleen Kahle, Journal of Economic Perspectives, 2017, 31(3), 67-88.

"Do Independent Director Departures Predict Future Bad Events?" with Rüdiger Fahlenbrach and Angie Low, 2017, The Review of Financial Studies, 30(7), 2131-2358.

"What Is the Shareholder Wealth Impact of Target CEO Retention in Private Equity Deals?" with Leonce Bargeron, Fred Schlingemann, and Chad Zutter, Journal of Corporate Finance, 2017, v46, 186-206.

"Why Does Fast Loan Growth Predict Poor Performance for Banks?" with Rüdiger Fahlenbrach and Robert Prilmeier, 2017, The Review of Financial Studies, 31(3), 1014-1063.

"Corporate Deleveraging and Financial Flexibility," with Harry DeAngelo and Andrei Gonçalves, 2018, The Review of Financial Studies, 31(8), 3122-3174.

"Eclipse of the Public Corporation or Eclipse of the Public Markets?" with Craig Doidge, Kathleen Kahle, and Andrew Karolyi, 2018, Journal of Applied Corporate Finance, 30(1), 8-16.

"Is Sell-Side Research More Valuable in Bad Times?" with Roger K. Loh, 2018, Journal of Finance, 73(3), 959-1013.

"Do Firms Issue More Liquidity When Markets Become More Liquid?" with Rogier M. Hanselaar and Mathijs A. van Dijk, 2019, Journal of Financial Economics, 133(1), 64-82.

"Are the Largest Banks Valued More Highly?" with Bernadette Minton and Alvaro Taboada, 2019, Review of Financial Studies, 32(12), 4604-4652.

"FinTech, BigTech, and the Future of Banks," 2019, Journal of Applied Corporate Finance, 31(4), 86-97.

"Does the Stock Market Make Firms More Productive?" with Ben Bennett and Zexi Wang, Journal of Financial Economics, 2020, 136(2), 281-306.

15

Appendix A

 "Risk Management, Firm Reputation, and the Impact of Successful Cyberattacks on Target Firms," with Shinichi Kamiya, Jun-Koo Kang, Jungmin Kim, and Andreas Milidonis, 2020, Journal of Financial Economics, forthcoming.

"Public Versus Private Equity," 2020, Oxford Economic Policy Review, 36(2), 275-290.

"Why Is Contagion Asymmetric During the European Sovereign Crisis?" Journal of International Money and Finance, forthcoming.

"Why Does Equity Capital Flow Out of High Tobin's q Industries," with Dong Lee and Han Shin, Review of Financial Studies, forthcoming.

"Why Are Firms with More Managerial Ownership Worth Less?" with Kornelia Fabisik, Rüdiger Fahlenbrach, and Jérôme Taillard, Journal of Financial Economics, forthcoming.

"How Valuable is Financial Flexibility when Revenue Stops? Evidence from the COVID-19 Crisis" with Rüdiger Fahlenbrach and Kevin Rageth, Review of Financial Studies, forthcoming.

"Why Are Payouts So High in the 2000s?" with Kathleen Kahle, Journal of Financial Economics, forthcoming.

"Where there Fire Sales in the RMBS Market?" with Craig B. Merrill, Taylor D. Nadauld, and Shane M. Sherlund, Journal of Monetary Economics, forthcoming.


**PROFESSIONAL JOURNAL ARTICLES, BOOK REVIEWS, NOTES AND COMMENTS**

Review of "Managing Foreign Exchange Risk," Richard J. Herring, ed., Journal of Money, Credit and Banking (February 1985), 124-125.

"On Capital Mobility in the World Economy," Carnegie-Rochester Conference Series on Public Policy (Spring, 1986), 105-114.

"Portfolio Management in International Capital Markets," Financial Markets and Portfolio Management (1, 1986), 18-23.

"Portfolio Insurance, Program Trading and the Crash of 1987," Financial Markets and Portfolio Management (1, 1988), 11-22.

"SMI Futures," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (4, 1989), 288-300.

"Benefits of International Diversification with Daily Data: The Case of Pacific-Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management (4, 1990), 57-61.

16

Appendix A

"Portfolio Insurance with Options and Futures on the SMI," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (2, 1990), 99-115.

"Securities Transaction Taxes: Lessons from the International Experience," in The Globalization of Equity Markets, Jeffrey Frankel, ed., University of Chicago Press, 1994.

"Identifying and Quantifying Exposures," with Rohan Williamson, in Financial Risk and the Corporate Treasury: New Developments in Strategy and Control, Robert Jameson, ed., Risk Publications, London, 1997, 33-51 (Reprinted in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999). Pre-publication Working Paper

"What's Wrong with Modern Capital Budgeting?" Financial Practice and Education, Fall/Winter 1999, p.5-9.

"Diminishing the Threats to Shareholder Wealth," Financial Times, Mastering Risk Series, April 25, 2000.

"Why Risk Management is not Rocket Science," Financial Times, Mastering Risk Series, June 27, 2000.

"An Emotional High for Stocks?" a review of "Irrational Exuberance" by Robert J. Shiller, Science (June 30, 2000), 2323.

"Demystifying Financial Derivatives," The Milken Institute Review, Third Quarter 2005, 20-31.

"Merton Miller," New Palgrave Dictionary, 2006.

"Financial Derivatives: Lessons from the Subprime Crisis," The Milken Institute Review, First Quarter 2009, 59-70.

"Six Ways Companies Mismanage Risk," Harvard Business Review, February 2009, v87(3), 86-94.

"In Defense of Derivatives and How to Regulate Them," Wall Street Journal, April 7, 2009.


**SELECTED RESEARCH IN PROGRESS AND WORKING PAPERS**

"Has the Bond Market Really Become Less Liquid?" with Mike Anderson.

"Why Has there Been a Secular Decline in Idiosyncratic Risk since 2000?" with Söhnke Bartram and Greg Brown.

"Are Analyst Trade Ideas Valuable?" with Justin Birru, Sinan Gokkaya, and Xi Liu.

17

Appendix A

"Who Benefits from Analyst 'Top Picks?'" with Justin Birru, Sinan Gokkayaa, and Xi Liu.

"Has the Stock Market Become Less Representative of the Economy," with Fred Schlingemann.

"Is Financial Globalization in Reverse After the 2008 Global Financial Crisis? Evidence from Corporate Valuations," with Craig Doidge and Andrew Karolyi.

"Does Joining the S&P 500 Index Hurt Firms?" with Benjamin Bennett and Zexi Wang.


**EDITORIAL AND REFEREEING ACTIVITIES**

Advisory Board, Journal of Risk and Financial Management, 2018 to present.

Editorial Board, Journal of Financial Intermediation, 2013 to present.

Advisory Editor, Journal of Investment Management, 2003 to present.

Advisory Editor, Journal of Financial Economics, 2000 to present.

Advisory Editor, Journal of Financial Services, 1999 to present.

Editor, Journal of Finance, 1988 to 2000.

Editor, Corporate Finance Abstracts, Social Science Research Network, 1998 to present.

Editor, Journal of Financial Economics, 1982 to 1987.

Board of Editors, Journal of Banking and Finance, 2008.

Co-Editor, Banking and Financial Institutions Abstracts, Social Science Research Network, 1998 to present.

Co-Editor, Financial Markets and Portfolio Management, 1999 to present.

Associate Editor, Journal of Risk, 2006 to present.

Board of Editors, Japan and the World Economy, 2006 to present.

Advisory Editor, The Review of Finance, 2003 to 2009.

Advisory Editor, Journal of Economic Perspectives, 2006 to 2008.

Associate Editor, Journal of Economic Perspectives, 2003 to 2005.

18

Appendix A

Associate Editor, Journal of Financial Abstracts, 1994 to 1998.

Associate Editor, Journal of Financial Economics, 1988 to 1999.

Associate Editor, Journal of International Finance and Accounting, 1988 to present.

Associate Editor, Global Finance Journal, 1988 to 2015.

Associate Editor, Journal of International Financial Markets, Institutions and Money, 1989 to present.

Associate Editor, Journal of Fixed Income, 1991 to present.

Associate Editor, Journal of International Trade and Finance, 1992 to present.

Associate Editor, Journal of Financial and Quantitative Analysis, 1983-1985.

Acted as an ad hoc referee for AER, JIE, JAE, JFE, JME, JMCB, JFQA, QJE, JF, JB, JPE, Canadian Journal of Economics, Management Science, Marketing Science, Journal of International Money and Finance, Journal of International Business Studies, the Canadian NSF and the NSF.

19

# Appendix B

# Deposition and Trial Testimony of René M. Stulz During the Past Four Years

**Case Name:**      In Re Eletrobras Securities Litigation
**Case No.:**         No. 1:15-cv-05754-JGK, United States District Court, Southern
                              District of New York
**Date of Testimony:**  November 2017 (Deposition)


**Case Name:**      Australian Securities and Investment Commission v. Westpac
                              Banking Corporation
**Case No.:**         No. VID282/2016, Federal Court of Australian Proceedings
**Date of Testimony:**  December 2017 (Trial)


**Case Name:**      William Sponn et al. v. Emergent Biosolutions, Inc. et al.
**Case No.:**         No. 8:16-cv-02625-RWT, United States District Court, Southern
                              District of Maryland
**Date of Testimony:**  February 2018 (Deposition)


**Case Name:**      In Re BHP Billiton Limited Securities Litigation
**Case No.:**         No. 1:16-cv-01445-NRB, United States District Court, Southern
                              District of New York
**Date of Testimony:**  June 2018 (Deposition)


**Case Name:**      Loreley Financing (Jersey) No. 28, Ltd. v. Merrill Lynch, Pierce,
                              Fenner & Smith Inc. et al.
**Case No.:**         No. 652732/2011, Supreme Court of the State of New York
**Date of Testimony:**  November 2018 (Deposition)


**Case Name:**      In Re Flowers Foods, Inc. Securities Litigation
**Case No.:**         No. 7:16-CV-00222-WLS, United States District Court, Middle
                              District of Georgia
**Date of Testimony:**  November 2018 (Deposition)


**Case Name:**      SSA Bonds
**Case No.:**         A.T.40346, European Commission
**Date of Testimony:**  July 2019 (Oral Hearing)

# Appendix B

**Case Name:**      In Re Equifax, Inc. Securities Litigation
**Case No.:**        No. 17-CV-3463-TWT, United States District Court, Northern District of Georgia
**Date of Testimony:**  September 2019 (Deposition)


**Case Name:**      Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corporation et al.
**Case No.:**        No. 16-112-MN, United States District Court, District of Delaware
**Date of Testimony:**  December 2019 (Deposition), June 2021 (Deposition)


**Case Name:**      Joseph Prause v. TechnipFMC PLC et al.
**Case No.:**        No. 4:17-cv-02368, United States District Court, Southern District of Texas
**Date of Testimony:**  February 2020 (Depositions)


**Case Name:**      In Re Volkswagen "Clean Diesel" Marketing Sales Practices, and Products Liability Litigation; BRS v. Volkswagen AG, et al., Case No. 16-cv-3435 ("Bondholders Securities Action")
**Case No.:**        MDL No. 2672-CRB (JSC), United States District Court, Northern District of California
**Date of Testimony:**  February 2020 (Deposition)


**Case Name:**      Mayagüez S.A. v. Citigroup, Inc., Citibank, N.A.
**Case No.:**        No. 1:16-cv-06788-PGG-JLC, United States District Court, Southern District of New York
**Date of Testimony:**  May 2020 (Deposition)


**Case Name:**      In re WeWork Litigation
**Case No.:**        No. 2020-0258-AGB, Court of Chancery, Delaware
**Date of Testimony:**  February 2021 (Deposition)


**Case Name:**      In re Envision Healthcare Corporation Securities Litigation
**Case No.:**        No. 3:17-cv-01112, United States District Court, Middle District of Tennessee, Nashville Division
**Date of Testimony:**  May 2021 (Deposition)


**Case Name:**      In Re Navient Corporation Securities Litigation
**Case No.:**        No. 17-cv-08373-RBK-AMD, United States District Court, District of New Jersey
**Date of Testimony:**  June 2021 (Deposition)

# Appendix B

**Case Name:**     Evanston Police Pension Fund v. McKesson Corporation et al
**Case No.:**     No. 3:18-cv-06525-CRB, United States District Court, Northern
                 District of California
**Date of Testimony:**  July 2021 (Deposition)


**Case Name:**     In re Allergan PLC Securities Litigation
**Case No.:**     No. 18-cv-12089, United States District Court, Southern
                 District of New York
**Date of Testimony:**  September 2021 (Deposition)

# Appendix C

# Documents Considered by René M. Stulz

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Case Pleadings** | |
| First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws | September 21, 2020 |
| Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Law | November 5, 2020 |
| Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws | December 21, 2020 |
| Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws | January 20, 2021 |
| Memorandum Regarding Defendants' Motion to Dismiss | February 16, 2021 |
| Andrew R. Zenoff's Responses and Objections to Defendants' First Set of Interrogatories | July 1, 2021 |
| Manual S. Williams's Responses and Objections to Defendants' First Set of Interrogatories | July 1, 2021 |
| Memorandum of Law in Support of Plaintiffs' Motion for Class Certification | July 29, 2021 |
| | |
| **Expert Reports** | |
| Report on Market Efficiency, Professor Steven P. Feinstein, PhD., CFA, including Exhibits 1 through 10 and provided production materials, Feinstein_0000001–6936 (production materials include data, statistical analyses, analyst reports, and public press) | July 29, 2021 |
| | |
| **Other Legal Pleadings and Opinions** | |
| *Basic, Inc. v. Levinson*, 485 U.S. 224, Justia Supreme Court Center | 1988 |
| Opinion of the Court, *Halliburton Co., et al., Petitioners v. Erica P. John Fund, Inc., fka Archdiocese of Milwaukee Supporting Fund, Inc.* | June 23, 2014 |
| Brief for Financial Economists as Amici Curiae Supporting Respondents, *Goldman Sachs Group, Inc., et al. v. Arkansas Teacher Retirement System, et al.* | March 2021 |
| Complaint in Equity, *Inovio Pharmaceuticals, Inc., v. VGXI Inc. and Geneone Life Science, Inc.* | June 3, 2020 |
| Defendants VGXI Inc. and GeneOne Life Science, Inc.'s Memorandum of Law in Opposition to Plaintiff Inovio Pharmaceuticals Inc.'s Petition for a Preliminary Injunction, *Inovio Pharmaceuticals, Inc., v. VGXI Inc. and Geneone Life Science, Inc.* | June 12, 2021 |
| Opinion Of The Court, *Goldman Sachs Group, Inc., et al., Petitioners v. Arkansas Teacher Retirement System, et al.* | June 21, 2021 |
| Memorandum and Order, *Inovio Pharmaceuticals, Inc., v. VGXI Inc. and Geneone Life Science, Inc.* | June 25, 2021 |
| Defendants VGXI Inc. and GeneOne Life Science, Inc.'s Answer to Plaintiff Inovio Pharmaceuticals Inc.'s Complaint, with New Matter and Counterclaims, *Inovio Pharmaceuticals, Inc., v. VGXI Inc. and Geneone Life Science, Inc.* | July 7, 2021 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Defendants/Counterclaimants VGXI Inc. and GeneOne Life Science, Inc.'s Third-Party Complaint Against Ology Bioservices, Inc., *VGXI Inc. and GeneOne Life Science, Inc. v. Ology Bioservices, Inc.* | July 7, 2021 |

**Depositions**

| | |
|---|---|
| Deposition of Andrew R. Zenoff | August 25, 2021 |

**Produced Documents**

| | |
|---|---|
| Andrew R. Zenoff Transaction Confirmation Emails, Zenoff_0000001–192 | |

**SEC Filings**

| | |
|---|---|
| Inovio Pharmaceuticals, Inc., Form 424B5 | February 7, 2020 |
| Inovio Pharmaceuticals, Inc., Form 8-K | February 7, 2020 |
| Inovio Pharmaceuticals, Inc., Form 8-K | March 9, 2020 |
| Inovio Pharmaceuticals, Inc., Form 424B5 | March 9, 2020 |
| Inovio Pharmaceuticals, Inc., Form 10-K, Fiscal Year Ended December 31, 2019 | March 12, 2020 |
| Inovio Pharmaceuticals, Inc., Schedule 14A | March 27, 2020 |
| Inovio Pharmaceuticals, Inc., Form 424B5 | April 3, 2020 |
| Inovio Pharmaceuticals, Inc., Form 8-K | April 3, 2020 |
| Inovio Pharmaceuticals, Inc., Form 8-K | April 6, 2020 |
| Inovio Pharmaceuticals, Inc., Schedule 14A | April 15, 2020 |
| Inovio Pharmaceuticals, Inc., Form 10-Q, Quarterly Period Ended March 31, 2020 | May 11, 2020 |
| Inovio Pharmaceuticals, Inc., Form 424B5 | May 12, 2020 |
| Inovio Pharmaceuticals, Inc., Form 8-K | May 12, 2020 |
| Inovio Pharmaceuticals, Inc., Form 8-K | May 18, 2020 |
| Inovio Pharmaceuticals, Inc., Form 8-K | June 3, 2020 |
| Inovio Pharmaceuticals, Inc., Form 8-K | June 25, 2020 |
| Inovio Pharmaceuticals, Inc., Form 10-Q, Quarterly Period Ended June 30, 2020 | August 10, 2020 |

**Inovio Press Releases and Conference Call Transcripts**

| | |
|---|---|
| "Inovio Selected by CEPI to Develop Vaccine Against New Coronavirus," *Inovio Pharmaceuticals Inc.* | January 23, 2020 |
| "Inovio Receives Authorization from the U.S. FDA to begin Phase 1/2 Clinical Trial for INO-3107, a DNA Medicine to Treat a Rare Disease – Recurrent Respiratory Papillomatosis (RRP)," *Inovio Pharmaceuticals Inc.* | February 10, 2020 |
| "Inovio Pharmaceuticals to Report Fourth Quarter and Full Year 2019 Financial Results on March 12, 2020," *Inovio Pharmaceuticals Inc.* | March 2, 2020 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| "Inovio Accelerates Timeline for COVID-19 DNA Vaccine INO-4800," *Inovio Pharmaceuticals Inc.* | March 3, 2020 |
| "INOVIO Pharmaceuticals Reports 2019 Fourth Quarter and Year-End Financial Results," *Inovio Pharmaceuticals Inc.* | March 12, 2020 |
| "INOVIO Receives New $5 Million Grant to Accelerate Scale Up of Smart Delivery Device for Its COVID-19 Vaccine," *Inovio Pharmaceuticals Inc.* | March 12, 2020 |
| "Q4 2019 Inovio Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters* | March 12, 2020 |
| "Ology Bioservices, Inovio Partner to Manufacture COVID-19 DNA Vaccine with $11.9 Million Department of Defense Grant," *Inovio Pharmaceuticals Inc.* | March 24, 2020 |
| "INOVIO Reports Positive Interim Phase 2 VGX-3100 Results in Patients with HPV-associated Anal Dysplasia," *Inovio Pharmaceuticals Inc.* | March 26, 2020 |
| "INOVIO Interim Results of an Open-Label Phase 2 Trial of VGX-3100 Show Efficacy Against HPV-associated Vulvar Dysplasia," *Inovio Pharmaceuticals Inc.* | March 30, 2020 |
| "INOVIO Initiates Phase 1 Clinical Trial Of Its COVID-19 Vaccine and Plans First Dose Today," *Inovio Pharmaceuticals Inc.* | April 6, 2020 |
| "INOVIO to Host its Annual Meeting of Stockholders in Virtual Format and at a New Time," *Inovio Pharmaceuticals Inc.* | April 15, 2020 |
| "IVI, INOVIO, and KNIH to Partner with CEPI in Phase 1/2 Clinical Trial of INOVIO's COVID-19 DNA Vaccine in South Korea," *Inovio Pharmaceuticals Inc.* | April 16, 2020 |
| "INOVIO to Report First Quarter 2020 Financial Results on May 11, 2020," *Inovio Pharmaceuticals Inc.* | April 27, 2020 |
| "INOVIO and GeneOne Life Science Report Positive Phase 1/2a Clinical Data With DNA Vaccine INO-4700 for MERS Coronavirus at the American Society of Gene & Cell Therapy (ASGCT) Conference," *Inovio Pharmaceuticals Inc.* | April 28, 2020 |
| "INOVIO Completes Enrollment in the Phase 1 U.S. Trial of INO-4800 for COVID-19 DNA Vaccine; Interim Results Expected in June," *Inovio Pharmaceuticals Inc.* | April 28, 2020 |
| "INOVIO Expands Manufacturing of COVID-19 DNA Vaccine INO-4800 With New Funding from CEPI," *Inovio Pharmaceuticals Inc.* | April 30, 2020 |
| "INOVIO Reports First Quarter 2020 Financial Results; Provides Business Update," *Inovio Pharmaceuticals, Inc.* | May 11, 2020 |
| "Q1 2020 Inovio Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters* | May 11, 2020 |
| "INOVIO to Present at RBC Capital Markets Virtual Global Healthcare Conference," *Inovio Pharmaceuticals Inc.* | May 12, 2020 |
| "INOVIO's INO-5401 in Combination with PD-1 Inhibitor Libtayo® (cemiplimab) Demonstrates 85% of Newly Diagnosed Glioblastoma Patients are Alive 12 Months Following Treatment," *Inovio Pharmaceuticals Inc.* | May 14, 2020 |
| "INOVIO's COVID-19 DNA Vaccine INO-4800 Demonstrates Robust Neutralizing Antibody and T Cell Immune Responses in Preclinical Models," *Inovio Pharmaceuticals Inc.* | May 20, 2020 |
| "INOVIO to Host Webinar "DNA Medicines: From COVID-19 to Cancer," *Inovio Pharmaceuticals Inc.* | May 26, 2020 |
| "INOVIO and IVI Partner with Seoul National University Hospital to Start Phase 1/2 Clinical Trial of INOVIO's COVID-19 DNA Vaccine (INO-4800) in South Korea," *Inovio Pharmaceuticals Inc.* | June 4, 2020 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| "INOVIO Receives $71 Million Contract From U.S. Department of Defense To Scale Up Manufacture of CELLECTRA® 3PSP Smart Device and Procurement of CELLECTRA® 2000 for COVID-19 DNA Vaccine," *Inovio Pharmaceuticals Inc.* | June 23, 2020 |
| "INOVIO Expands Senior Management Team," *Inovio Pharmaceuticals Inc.* | June 25, 2020 |
| "INOVIO Announces Positive Interim Phase 1 Data for INO-4800 Vaccine for COVID-19," *Inovio Pharmaceuticals Inc.* | June 30, 2020 |
| "INOVIO to Report Second Quarter 2020 Financial Results on August 10, 2020," *Inovio Pharmaceuticals Inc.* | July 27, 2020 |
| "INOVIO Receives Orphan Drug Designation From U.S. FDA for DNA Medicine INO-3107 To Treat Rare Disease Recurrent Respiratory Papillomatosis (RRP)" *Inovio Pharmaceuticals Inc.* | July 29, 2020 |
| "INOVIO's COVID-19 DNA Vaccine INO-4800 Provides Protection with Memory Immune Responses in Non-Human Primates Challenged with SARS-CoV-2 Virus," *Inovio Pharmaceuticals Inc.* | July 30, 2020 |
| "Q2 2020 Inovio Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Refinitiv* | August 10, 2020 |
| "INOVIO Reports Second Quarter 2020 Financial Results; Provides DNA Medicines Clinical Program Mid-Year Update," *Inovio Pharmaceuticals Inc.* | August 10, 2020 |
| "INOVIO to Present at Upcoming Investor Conferences in September," *Inovio Pharmaceuticals Inc.* | September 1, 2020 |

**Analyst Reports**

See Appendix C.1

**Academic Literature**

| | |
|---|---|
| A. Craig MacKinlay, "Events Studies in Economics and Finance," *Journal of Economic Literature*, 25, no. 1, pp. 13 – 39 | March 1997 |
| Bruce E. Hansen, "Approximate Asymptotic P Values for Structural-Change Tests," *Journal of Business & Economic Statistics*, 15, no. 1, pp. 60 – 67 | January 1997 |
| Chaolin Huang, et al., "Clinical Features of Patients Infected with 2019 Novel Coronavirus in Wuhan, China," Lancet 395, pp. 497–506 | 2020 |
| Donald W. K. Andrews and Werner Ploberger, "Optimal Tests when a Nuisance Parameter is Present Only Under the Alternative," *Econometrica*, 62, no.6, pp. 1383 – 1414 | November 1994 |
| Donald W. K. Andrews, "Tests for Parameter Instability and Structural Change with Unknown Change Point," *Econometrica*, 61, no. 4, pp. 821 – 856 | July 1993 |
| Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, pp. 383 – 417 | 1970 |
| Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, pp. 1575 – 1617 | December 1991 |
| Jonah B. Gelbach, Eric Helland, and Jonathan Klick, "Valid Inference in Single-Firm, Single-Events Studies," *American Law and Economics Review* 15, no. 2, pp. 496 – 541 | 2013 |

| Document Title, Bates Numbers | Document Date |
| --- | --- |
| Margaret M. McConnell and Gabriel Perez-Quiros, "output Fluctuations in the United States: What has Changed since the early 1980?" *The American Economic Review*, 90, no.5, pp. 1464 – 1476 | December 2000 |
| Yong Cheol Kim and René M. Stulz, "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis*," *Journal of Financial Economics* 22, pp. 189 – 205 | 1988 |

**Public Press**

| | |
| --- | --- |
| Tulip Mazumdar, "Coronavirus vaccine: Scientist race to develop prevention," *BBC News* | January 30, 2020 |
| "Whole genome of novel coronavirus, 2019-nCov, sequenced," *Science Daily* | January 31, 2020 |
| "Market-wide stock trading halts 15 minutes after S&P 500 falls 7%," *Fortune* | March 9, 2020 |
| Jon Gertner, "Unlocking the Covid Code," *The New York Times* | March 25, 2021 |

*Public Press articles available from Factiva, downloaded using the following search parameters: All Sources; All Authors; Company: Inovio Pharmaceuticals, Inc; All Subjects; All Industries; All Regions that were published between July 1, 2019 and July 1, 2021 (Feinstein_0003687–6808).*

*Public press articles available from Factiva All and Bloomberg that contain the search term "Inovio*" or are tagged as related to ticker INO that were published on the following dates: February 13, 2020 – February 18, 2020; February 28, 2020 – March 4, 2020; March 6, 2020 – March 10, 2020; March 23, 2020 – March 25, 2020; May 8, 2020 – May 14, 2020; June 2, 2020 – June 5, 2020; August 7, 2020 – August 12, 2020.*

**Miscellaneous**

| | |
| --- | --- |
| "The World's Most Influential Scientific Minds," *Thomson Reuters* | December 2015 |
| "WHO Statement regarding cluster of pneumonia cases in Wuhan, China," *World Health Organization* | January 9, 2020 |
| "CEPI to Fund Three Programmes to Develop Vaccines Against the Novel Coronavirus, nCoV-2019", Coalition for Epidemic Preparedness Innovations Press Release | January 23, 2020 |
| Inovio Pharmaceuticals, Tweet at 9:33 a.m. | March 3, 2020 |
| Citron Research, Tweet at 10:38 a.m. | March 9, 2020 |
| Inovio Pharmaceuticals, Tweet at 13:26 a.m. | March 9, 2020 |
| "Listings of WHO's response to COVID-19," *World Health Organization* | June 29, 2020 |
| "Phase 3 Clinical Trial of Investigational Vaccine for COVID-19 Begins," *National Institutes of Health Press Release* | July 27, 2020 |
| "Pfizer and BioNTech Choose Lead mRNA Vaccine Candidate Against COVID-19 and Commence Pivotal Phase 2/3 Global Study," *BioNTech Press Release* | July 27, 2020 |
| "WHO-convened global study of origins of SARS-CoV-2: China Part," *Joint World Health Organization-China Study Team Report* | January 14 – February 10, 2021 |
| "Coronavirus Disease (Covid-19) Overview," *World Health Organization* | |
| "DNA Vaccines," *World Health Organization* | |
| Vanguard Total Stock Market EFT (VTI), *Investor Vanguard* | |

**Document Title, Bates Numbers**                                                      **Document Date**

S&P Biotechnology Select Industry Index, *State Street SPDR Global Advisors*

White Paper Cboe Volatility Index, *Chicago Board Options Exchange*

15 U.S.C. § 78u-4 at (e)(1)


**Data Sources**

Center for Research in Security Prices (CRSP)

Federal Reserve Economic Data (FRED)

iVolatility

Refinitiv Eikon

Tick


**Note: In addition to the documents on this list, I considered all documents cited in my report to form my opinions.**

# Appendix C.1
## Analyst Reports Considered by René M. Stulz

| Date | Headline | Contributor |
|---|---|---|
| 1/2/2020 | Execution Story Still a Work in Progress; VGX-3100 BLA Now Meaningfully Delayed | Piper Sandler Companies |
| 1/3/2020 | Follow-on Bond Offering Completed; REVEAL 1 Data on Track; BLA Filing in 2022; Reiterate Buy | H.C. Wainwright & Co. |
| 1/3/2020 | Acceleration of REVEAL-1 Data Timelines Doesn't Offset Delayed BLA Submission Guidance | Stifel |
| 1/5/2020 | Put Away the Binoculars - Pipeline Visibility Could be Enhanced by YE20 | Cantor Fitzgerald & Co. |
| 1/7/2020 | 2020 Catalysts Highlighted; Reiterate Buy | H.C. Wainwright & Co. |
| 1/8/2020 | 4Q19/2020 Earnings Preview on Select Biotechs | RBC Capital Markets |
| 1/10/2020 | Lots of Ways to Win in 2020; Incrementally Positive After Management Travel | Piper Sandler Companies |
| 1/21/2020 | Post Annual SF Due Diligence "Gauntlet" 2020 Preview Re-Think | Cantor Fitzgerald & Co. |
| 1/21/2020 | Inovio Pharmaceuticals, Inc. (INO) Zacks Company Report | Zacks Investment Research Inc. |
| 1/23/2020 | New Coronavirus; Who Do You Call? Inovio | Maxim Group |
| 1/23/2020 | A Little Perspective on CEPI Funding for Wuhan Coronavirus Development Work | Piper Sandler Companies |
| 1/23/2020 | INO: Incremental Epidemic Preparedness Grant Formalizes INO's Entry Into Coronavirus Virus Solution Mix | RBC Capital Markets |
| 1/24/2020 | Development of Vaccine Against New Coronavirus Funded; Reiterate Buy | H.C. Wainwright & Co. |
| 1/24/2020 | INO: New Coronavirus Leads CEPI to Grant INO Up to $9M for Vaccine Development | Roth Capital Partners, LLC |
| 1/24/2020 | Maxim Morning Minutes - New Coronavirus; Who Do You Call? Inovio | Maxim Group |
| 1/24/2020 | Inovio Pharmaceuticals, Inc. (INO) Zacks Company Report | Zacks Investment Research Inc. |
| 1/27/2020 | Inovio Pharma Awarded $9M Development Grant for Coronavirus Vaccine | Streetwise Reports |
| 1/28/2020 | INO: Expert Call - Potential Threats from the New Chinese Coronavirus | Roth Capital Partners, LLC |
| 1/29/2020 | No Chicken-Little, Emerging Infectious Disease Threats on the Rise – Who Will Wear the Crown? | Cantor Fitzgerald & Co. |
| 1/29/2020 | Inovio Pharmaceuticals, Inc.(INO) Zacks Company Report | Zacks Investment Research Inc. |
| 1/30/2020 | INO: Beijing Advaccine Partnership To Advance New Coronavirus INO-4800 In China | Roth Capital Partners, LLC |
| 1/30/2020 | Lots of Volatility, Little (If Any) Visibility – Don't Forget About Fundamentals Here | Stifel |
| 1/31/2020 | Chinese Collaboration Against New Coronavirus Established; Reiterate Buy | H.C. Wainwright & Co. |
| 2/4/2020 | Recurrent Respiratory Papillomatosis Pilot Data Published; Reiterate Buy | H.C. Wainwright & Co. |
| 2/4/2020 | INO: Conclusions from Our Coronavirus Call with Expert Dr. David Weiner, Ph.D. | Roth Capital Partners, LLC |
| 2/6/2020 | With or Without Coronavirus, 2020 Could Prove Transformational with Later Stage Clinical Readouts | Cantor Fitzgerald & Co. |
| 2/10/2020 | Green Flag Flies for RRP Clinical Trial Start – Potential for Rare Disease Indication | Cantor Fitzgerald & Co. |
| 2/10/2020 | RRP Program Advancing; As We Have Said, Don't Sleep on This Opportunity | Piper Sandler Companies |
| 2/10/2020 | Clarity emerging for INO-3107 and RRP opportunity with new trial details | RBC Capital Markets |
| 2/11/2020 | FDA Authorizes New INO-3107 Clinical Study; Reiterate Buy | H.C. Wainwright & Co. |
| 2/14/2020 | Inovio Pharmaceuticals, Inc. Company Evaluation | Jefferson Research & Management |
| 2/17/2020 | Inovio Pharmaceuticals Inc Investment Status Report | PriceTarget Research |
| 2/25/2020 | Escalating Coronavirus Outbreaks Necessitate Fast-to-Market Vaccines; Reiterate Buy | H.C. Wainwright & Co. |
| 3/2/2020 | Coronavirus Crisis Update: Infections Moving West | H.C. Wainwright & Co. |
| 3/2/2020 | Inovio Pharmaceuticals, Inc. Company Report March 2020 | BioPharm Insight |
| 3/2/2020 | Inovio Pharmaceuticals, Inc.(INO) Zacks Company Report | Zacks Investment Research Inc. |
| 3/3/2020 | DNA-Based Platform Gaining Traction in COVID-19 Therapeutics Race | Cantor Fitzgerald & Co. |
| 3/3/2020 | Coronavirus Vaccine to Enter Clinical Testing Next Month; Reiterate Buy | H.C. Wainwright & Co. |
| 3/3/2020 | COVID-19 Vaccine Candidate INO-4800 Timelines Announced, Could Have 1 Million Doses by YE20 | Maxim Group |
| 3/4/2020 | Coronavirus Vaccine Development Timeline Accelerated; Positive Preclinical Data; Reiterate Buy | H.C. Wainwright & Co. |
| 3/4/2020 | Riding the COVID-19 Headline Wave – Quick Thoughts on EarlyINO-4800 Progress/Plans & Relevant KOL Feedback | Stifel |
| 3/4/2020 | Maxim Moring Minutes - COVID-19 Vaccine Candidate INO-4800 Timelines Announced, Could Have 1 Million Doses by YE20 | Maxim Group |
| 3/4/2020 | Inovio Pharmaceuticals, Inc.(INO) Zacks Company Report | Zacks Investment Research Inc. |
| 3/6/2020 | Inovio Pharmaceuticals, Inc.(INO) Zacks Company Report | Zacks Investment Research Inc. |
| 3/12/2020 | 4Q19 – Emboldened Cash and P3 Data in '20 to REVEAL Broadening Pipeline Potential | Cantor Fitzgerald & Co. |
| 3/13/2020 | 4Q and full-Year 2019 Financial Results Reported; Reiterate Buy | H.C. Wainwright & Co. |
| 3/13/2020 | A COVID-19 Play? Maybe, but the Real Upside is Still VGX-3100; Raising PT to $12 | Maxim Group |
| 3/13/2020 | Downgrade to Neutral: Love the Platform But COVID19 Upside Seems Priced In | Piper Sandler Companies |

# Appendix C.1
## Analyst Reports Considered by René M. Stulz

| Date | Headline | Contributor |
|---|---|---|
| 3/13/2020 | 4Q19: Too Early to Count in COVID-19 Vaccine Opportunity; Late-Stage Assets Remain in Focus - Downgrade to Sector Perform | RBC Capital Markets |
| 3/13/2020 | INO: Clinical Trials Progress, Ample Grant Funding for COVID-19 - Reports 4Q19 | Roth Capital Partners, LLC |
| 3/13/2020 | 4Q19 Recap: SARS-CoV-2 Will Continue to Drive Near-Term Narrative, But Don't Forget About Other FY20 Pipeline Catalysts | Stifel |
| 3/13/2020 | Maxim Morning Minutes - A COVID-19 Play? Maybe, but the Real Upside is Still VGX-3100; Raising PT to $12 | Maxim Group |
| 3/16/2020 | Renza's Takeaways from RBC's Virtual NY Doctor Day– APRE, APTO, INO, ITRM | RBC Capital Markets |
| 3/3/2020 | COVID-19 Vaccine Candidate INO-4800 Timelines Announced, Could Have 1 Million Doses by YE20 | Maxim Group |
| 3/24/2020 | COVID-19 Candidate Progress Reflects All Hands On Deck | Cantor Fitzgerald & Co. |
| 3/25/2020 | Department of Defense Grant to Rapidly Produce COVID-19 Vaccine; Reiterate Buy | H.C. Wainwright & Co. |
| 3/26/2020 | HPV Update - P2 Data in AIN, May Have Predictive Value for '3100 in CIN | Cantor Fitzgerald & Co. |
| 3/26/2020 | Take a Break for a Moment from COVID-19 and Let's Get Back to a Key INO Driver: VGX-3100 | Maxim Group |
| 3/26/2020 | VGX-3100 Looks Active in AIN; Commercial Competitiveness Still an Open Issue | Piper Sandler Companies |
| 3/26/2020 | New VGX-3100 Proof of Concept AIN Data Shift Focus to Lead Asset Amid COVID-19 Action | RBC Capital Markets |
| 3/26/2020 | INO: Positive Interim Phase 2 Results in HSIL - VGX-3100 Shows Consistency | Roth Capital Partners, LLC |
| 3/26/2020 | Top-Line VGX-3100 Data in Anal HSIL Suggestive of Benefit – Next Week's ASCCP Presentation Should Provide More Clarity | Stifel |
| 3/27/2020 | Positive HPV-Associated Anal Dysplasia Phase 2 Interim Data; Reiterate Buy | H.C. Wainwright & Co. |
| 3/27/2020 | Maxim Morning Minutes - Take a Break for a Moment from COVID-19 and Let's Get Back to a Key INO Driver: VGX-3100 | Maxim Group |
| 3/27/2020 | Inovio Pharmaceuticals, Inc. Profile | Corporate Watchdog Reports |
| 3/30/2020 | VIN Interim Follow-up on AIN, May be Revealing for REVEAL 1 & 2 | Cantor Fitzgerald & Co. |
| 3/30/2020 | Inovio Reports Positive P2 Vulvar Dysplasia Data | Maxim Group |
| 3/30/2020 | Provides More Clarity on VGX-3100 Opportunity beyond HPV+ Cervical HSIL | Stifel |
| 3/31/2020 | Positive Phase 2 Data in HPV-Associated Vulvar Dysplasia; Reiterate Buy | H.C. Wainwright & Co. |
| 3/31/2020 | Maxim Morning Minutes - Inovio Reports Positive P2 Vulvar Dysplasia Data | Maxim Group |
| 4/2/2020 | Detailed AIN/VIN Interim Data at ASCCP Add More Context to VGX-3100's Profile | RBC Capital Markets |
| 4/2/2020 | Renza's Takeaways from RBC's Third Virtual Doctor Day - ACAD, XNCR, APTO, INO, COVID-19 | RBC Capital Markets |
| 4/3/2020 | INO: Presentations at ASCCP Annual Meeting in HSIL Underscore VGX-3100 Efficacy | Roth Capital Partners, LLC |
| 4/6/2020 | Green Flag Flies for COVID-19 Vaccine HV Study | Cantor Fitzgerald & Co. |
| 4/6/2020 | Initiates First-in-Human P1 Trial of INO-4800 & Becomes Second to Clinic with a SARS-CoV-2 Vaccine Candidate | Stifel |
| 4/6/2020 | Inovio Pharmaceuticals (INO): IND acceptance marks key but expected step for COVID-19 vaccine program; INO-4800 now set for clinical entry | RBC Capital Markets |
| 4/7/2020 | COVID-19 Vaccine Advances Into Phase 1 Testing; Reiterate Buy | H.C. Wainwright & Co. |
| 4/7/2020 | The DNA/RNA Vaccines are Leading the COVID-19 Race – Maxim Group to Host Virtual Infectious Disease Conference on May 5 | Maxim Group |
| 4/7/2020 | Fireside Chat with Inovio Pharmaceuticals Inc. | Cantor Fitzgerald & Co. |
| 4/12/2020 | Fireside Chat with Inovio Pharmaceuticals Inc. | Cantor Fitzgerald & Co. |
| 4/13/2020 | Fireside Chat with Inovio Pharmaceuticals Inc. (INO) Management Today at 1pm ET | Cantor Fitzgerald & Co. |
| 4/14/2020 | Inovio Pharmaceuticals Inc Investment Status Report | PriceTarget Research |
| 4/15/2020 | COVID-19 is Not the Only Source of Potential 2020 Value Creation; Increasing PT to $13 | Cantor Fitzgerald & Co. |
| 4/16/2020 | INO: IVI, KNIH, CEPI & INO to Conduct COVID-19 Vaccine Trial in South Korea | Roth Capital Partners, LLC |
| 4/17/2020 | COVID-19 Vaccine Funded for Clinical Trial in South Korea; Reiterate Buy | H.C. Wainwright & Co. |
| 4/28/2020 | Don't Bet Against Progress – Step One for COVID-19 Vaccine, Now Looking for Data Yet in 2Q20 | Cantor Fitzgerald & Co. |
| 4/28/2020 | Immunogenicity Data Demo's Corona Activity that May Bode Well for COVID-19 Vaccine; Increasing PT to $17 | Cantor Fitzgerald & Co. |
| 4/28/2020 | Pilot Data in Recurrent Respiratory Papillomatosis Presented; Reiterate Buy | H.C. Wainwright & Co. |
| 4/29/2020 | Event Path to P1 INO-4800 Data Disclosure Looks Increasingly Favorable – Increasing Target Price to $19 | Stifel |
| 4/29/2020 | INO-4800 COVID-19 Trial Enrollment Completion; INO-4700 MERS Vaccine Positive Data; Raising PT to $17 | H.C. Wainwright & Co. |
| 4/30/2020 | INO: MERS Vaccine INO-4700 Shows Promise - Downgrading to Neutral on Valuation | Roth Capital Partners, LLC |
| 5/1/2020 | COVID-19 Vaccine Manufacturing Expansion Funding; Reiterate Buy | H.C. Wainwright & Co. |

# Appendix C.1
# Analyst Reports Considered by René M. Stulz

| Date | Headline | Contributor |
|---|---|---|
| 5/7/2020 | Persistent Progress On INO-4800 Vaccine Is A Plus; In Check On Risk/Reward Balance | RBC Capital Markets |
| 5/8/2020 | Vaccine Program Acceleration Efforts Evident; Reiterate Buy | H.C. Wainwright & Co. |
| 5/11/2020 | GBM Update Imminent; CoV-19 Vaccine Volatility Keeps Us Sidelined | Piper Sandler Companies |
| 5/11/2020 | 1Q20: COVID-19 Providing Opportunities and Threats to INO's Pipeline | RBC Capital Markets |
| 5/11/2020 | 1Q20 Recap: Management Remains Upbeat Re: INO-4800 Data Disclosure and Funding Prospects – Don't Forget about ASGCT and ASCO | Stifel |
| 5/12/2020 | 1Q20 Financial Results Reported; Glioblastoma Data Imminent; Reiterate Buy | H.C. Wainwright & Co. |
| 5/12/2020 | Factoring in COVID Vaccine, but Don't Forget Inovio's Pipeline and Strong Balance Sheet; Raising PT to $18 | Maxim Group |
| 5/12/2020 | INO 1Q20: Transformative 2020 Catalysts Coming, Lowering PT to $11 From $13 | Roth Capital Partners, LLC |
| 5/13/2020 | Maxim Morning Minutes - Factoring in COVID Vaccine, but Don't Forget Inovio's Pipeline and Strong Balance Sheet; Raising PT to $18 | Maxim Group |
| 5/13/2020 | Acceleration of COVID-19 Vaccine Programs Could Benefit U.S. Biotech | Streetwise Reports |
| 5/14/2020 | ASCO'20 Preview - Encouraging '5401 OS12 in GBM, Look for OS18 to Illuminate Path | Cantor Fitzgerald & Co. |
| 5/14/2020 | COVID-19 Exhaustion? Here Come's ASCO, GBM OS-12; Data Looks Good | Maxim Group |
| 5/14/2020 | ASCO 2020 Virtual Annual Meeting Abstracts Review | Piper Sandler Companies |
| 5/14/2020 | Our Quick Takes on Select ASCO Abstracts | Stifel |
| 5/14/2020 | Maxim Morning Minutes - COVID-19 Exhaustion? Here Come's ASCO, GBM OS-12; Data Looks Good | Maxim Group |
| 5/14/2020 | ONCY and INO: ASCO 2020 Abstracts Relevant to Our Coverage Universe | Roth Capital Partners, LLC |
| 5/14/2020 | INO-5401 Shows Glioblastoma Survival Advantage at 12 Months; Reiterate Buy | H.C. Wainwright & Co. |
| 5/18/2020 | Encouraging Early COVID-19 Vaccine Data Validate Nucleic Acid-Based Mechanism | RBC Capital Markets |
| 5/18/2020 | Moderna Paving the Road for Nucleic Acid-Based Vaccines – Watching Companies in the COVID-19 Space | Maxim Group |
| 5/19/2020 | Inovio Pharmaceuticals, Inc. (NASDAQ: INO) - Highlights from the RBC Global Healthcare Virtual Conference | RBC Capital Markets |
| 5/20/2020 | No Negative Nellie on 1st Mover COVID-19 Vaccine Innovator, but We Still Like Certain Players in a Broadening Field | Cantor Fitzgerald & Co. |
| 5/20/2020 | Before We Get Too Far Over the Handlebars on INO-4800, A Little Perspective | Piper Sandler Companies |
| 5/20/2020 | INO: Most of These COVID-19 Vaccine Results Are Over Two Months Old | Roth Capital Partners, LLC |
| 5/21/2020 | Diversifying COVID-19 Vaccine Bets? Initiate at Buy | The Benchmark Company |
| 5/21/2020 | Positive COVID-19 DNA Vaccine Preclinical Data Published; Reiterate Buy | H.C. Wainwright & Co. |
| 5/29/2020 | ASCO 2020 Generally Incremental for Our Covered Names | Piper Sandler Companies |
| 6/1/2020 | A Little Context Goes A Long Way; ASCO Discussant Tempers INO-5401 GBM Data | Piper Sandler Companies |
| 6/1/2020 | KOL Day Highlights Vaccine and GBM Programs; ASCO Data Encouraging but Too Early to Tell | RBC Capital Markets |
| 6/2/2020 | Inovio Pharmaceuticals, Inc. Profile | Corporate Watchdog Reports |
| 6/3/2020 | The "Final Five" – Quick Thoughts on INO-4800's Reported Exclusion | Stifel |
| 6/3/2020 | Inovio Pharmaceuticals, Inc. Company Report June 2020 | BioPharm Insight |
| 6/3/2020 | INO: Early reports has INO left out of the White House's Operation Warp Speed vaccine funding plans | RBC Capital Markets |
| 6/4/2020 | WARP Speed Finalists May Not be Final; Show Me the Data | Cantor Fitzgerald & Co. |
| 6/4/2020 | INO: INO-4800 - Manufacturing Snag with VGXI; Trump Admin Excludes from List | Roth Capital Partners, LLC |
| 6/4/2020 | More Media Speculation, More Volatility (This Time Favoring Inovio) | Stifel |
| 6/4/2020 | INO: INO-4800 trial in South Korea slated for a June start though manufacturing partner dispute casts new uncertainty | RBC Capital Markets |
| 6/5/2020 | INO: Incremental INO-4800 Developments Under Watch - Eyes on Funding Prospects, Study Progress, and Interim Data Later this Month | RBC Capital Markets |
| 6/5/2020 | Korean COVID-19 DNA Vaccine Trial Start Imminent; Reiterate Buy | H.C. Wainwright & Co. |
| 6/13/2020 | INOVIO PHARMS.INCO. sees a downgrade to slightly negative on account of less fundamental stars | The Screener |
| 6/23/2020 | The Ph1 Data Coming; DoD has Doubled Down on its Bet | The Benchmark Company |
| 6/23/2020 | Perhaps Inovio Should Have Been a Finalist in Operation Warp Speed; $71M Contract from DoD Awarded – Raising PT to $24 | Maxim Group |
| 6/23/2020 | $71M DoD Contract Bolsters INO's Device Effort, A Key Step to COVID-19 Vaccine Scale-Up | RBC Capital Markets |
| 6/23/2020 | Now We Just Need More Funding to Support the Development of a Vaccine Candidate to Administer Via These Pre-Funded Devices | Stifel |
| 6/24/2020 | Maxim Morning Minutes - Perhaps Inovio Should Have Been a Finalist in Operation Warp Speed; $71M Contract from DoD Awarded - Raising PT to $24 | Maxim Group |

# Appendix C.1
## Analyst Reports Considered by René M. Stulz

| Date | Headline | Contributor |
|---|---|---|
| 6/25/2020 | Rubber Seems to Have Met the Road Regarding CoV-19 Vaccine Scale Up | Piper Sandler Companies |
| 6/25/2020 | Court's Injunction Denial Injects Uncertainty in Scale-up For Now; New Data Could Be Key to Cause | RBC Capital Markets |
| 6/25/2020 | INO-4800 Vaccine is a Function of a Second Wave | The Benchmark Company |
| 6/26/2020 | Risk/Reward Seems Less-Palatable Here – Downgrading to Hold, Increasing Target Price to $24 | Stifel |
| 6/26/2020 | Big Move, but Near-Term Data from COVID Vaccine and Broader Pipeline Bode Well for Platform Validation in NTM | Cantor Fitzgerald & Co. |
| 6/29/2020 | Recent Run Leaves Uncertain Upside; Downgrade to Neutral Without PT | H.C. Wainwright & Co. |
| 6/30/2020 | Defining Efficacy in Ph1 Safety Trials (Corrected) | The Benchmark Company |
| 6/30/2020 | Clear Message – Differentiated Efficacy, Safety, & Logistics in P1 Bode Well for Moving Forward with COVID Vaccine Candidate in P2/3 | Cantor Fitzgerald & Co. |
| 6/30/2020 | So Far So Good on INO-4800 Clinical Data, But Can They Manufacture It? | Piper Sandler Companies |
| 6/30/2020 | Positive Phase I Interim, Preclinical Warp Speed Inclusion Keeping INO-4800 Vaccine In the Mix | RBC Capital Markets |
| 6/30/2020 | Minimal Data Disclosure Limits Interpretation of Immunogenicity, But OWS Inclusion Should Offset Some of Those Concerns | Stifel |
| 7/1/2020 | INO-4800 Phase 1 Data; Operation Warp Speed Selection; Reiterate Neutral | H.C. Wainwright & Co. |
| 7/1/2020 | Reports Positive P1 Data for INO-4800, but COVID Opportunity Seems Priced in – Downgrading Shares to Hold, from Buy | Maxim Group |
| 7/1/2020 | Maxim Morning Minutes - Reports Positive P1 Data for INO-4800, but COVID Opportunity Seems Priced in — Downgrading Shares to Hold, from Buy | Maxim Group |
| 7/1/2020 | Adjacent developments exert more pressure on INO-4800's limited topline: PFE/BNTX, FDA Guide | RBC Capital Markets |
| 7/1/2020 | INO: Downgrading to Sell - Still Unimpressed with INO-4800's Ability to Compete | Roth Capital Partners, LLC |
| 7/1/2020 | Morning Summary - INO: Downgrading to Sell - Still Unimpressed with INO-4800's Ability to Compete - Aschoff, Ph.D. - Inovio Pharmaceuticals, Sell, $11.00 PT, Recommendation Change, $4,260.70 Mkt. Cap.(mil) | Roth Capital Partners, LLC |
| 7/2/2020 | Inovio Pharmaceuticals, Inc. Company Report July 2020 | BioPharm Insight |
| 7/3/2020 | Inovio Pharmaceuticals Inc | Smart Insider |
| 7/7/2020 | Benchmark's Best Ideas for 2H20: List Includes Companies in Focus Areas of Technology, Media, Telecom, Industrial and Healthcare | The Benchmark Company |
| 7/15/2020 | Health Serv & Equipment Intelligence Monitor | PriceTarget Research |
| 7/15/2020 | Fuller Competitive Ph.I MRNA Data Add Clarity to Global Vaccine Effort; INO Read-throughs | RBC Capital Markets |
| 7/16/2020 | Inovio Pharmaceuticals Inc Investment Status Report | PriceTarget Research |
| 7/20/2020 | Clinical Data Continues to Emerge from Lead Vaccine Players; the ABCs of INO Read-throughs | RBC Capital Markets |
| 7/20/2020 | First Patient Dosed in South Korean COVID-19 Vaccine Trial; Reiterate Neutral | H.C. Wainwright & Co. |
| 7/21/2020 | Safety and T-cell Responses May Differentiate INO-4800 | The Benchmark Company |
| 7/21/2020 | RBC Coronavirus Treatment and Vaccine Tracker - 07/21/20 Update: COVID dynamics tidbits, steroids, inhaled interferon, heparin derivatives, vaccine data, and more | RBC Capital Markets |
| 7/30/2020 | Remembering the Importance of Memory - Not Monkeying Around with New NHP Data | Cantor Fitzgerald & Co. |
| 7/30/2020 | NHP Data Builds on Differentiating INO-4800 Ahead of Clinical Expansion | RBC Capital Markets |
| 7/30/2020 | Delayed Challenge NHP Data Is Interesting – But Absence of Granular P1 Immunogenicity Data Is Still a Lingering Overhang | Stifel |
| 7/30/2020 | Orphan Drug Designation Granted to INO-3107; Reiterate Neutral | H.C. Wainwright & Co. |
| 7/31/2020 | Ph2/3 INO-4800 Study Even More Likely | The Benchmark Company |
| 7/31/2020 | INO-4800 Protects Primates in COVID-19 Challenge Study; Reiterate Neutral | H.C. Wainwright & Co. |
| 8/10/2020 | Q220 Update; More Questions Than Answers | Piper Sandler Companies |
| 8/10/2020 | 2Q20: Thinking Fast and Slow – INO-4800 Advances Alongside An Accelerating Vaccine Field | RBC Capital Markets |
| 8/11/2020 | INO in Talks with FDA About Ph2/3 Design | The Benchmark Company |
| 8/11/2020 | 2Q20: Cash and COVID Vaccine Progress but Timeline Visibility More Opaque | Cantor Fitzgerald & Co. |
| 8/11/2020 | 2Q20 Financial Results Reported; Reiterate Neutral | H.C. Wainwright & Co. |
| 8/11/2020 | Reports the Quarter; Watching the COVID Vaccine Space – Maintain Hold on Valuation | Maxim Group |
| 8/11/2020 | INO 2Q20: Years of Cash, Not Expecting INO-4800 to Pan Out Against Competition | Roth Capital Partners, LLC |
| 8/11/2020 | 2Q20 Recap: Still Many Unanswered Questions Governing Fate of INO-4800 – Reducing Target Price to $16 | Stifel |
| 8/12/2020 | Maxim Morning Minutes - Reports the Quarter; Watching the COVID Vaccine Space – Maintain Hold on Valuation | Maxim Group |
| 8/14/2020 | Is Inovio Pharmaceuticals Inc Worth a Higher Bid? | SADIF Investment Analytics |
| 8/18/2020 | Takeaways from the Road: INO's Path to a Vaccine Set to Converge on Several Key Upcoming Events | RBC Capital Markets |

# Appendix C.1
## Analyst Reports Considered by René M. Stulz

| Date | Headline | Contributor |
|------|----------|-------------|
| 8/19/2020 | 100M Doses May Already be on a Pre-sale at $30 Per Dose | The Benchmark Company |
| 8/19/2020 | Inovio Pharmaceuticals, Inc. Profile | Corporate Watchdog Reports |
| 8/28/2020 | OWS Bets on Syringes | The Benchmark Company |
| 9/3/2020 | Inovio Pharmaceuticals, Inc.- Company Report September 2020 | BioPharm Insight |
| 9/8/2020 | Inovio Pharmaceuticals, Inc. - Biotech: COVID-19 TreatmentNaccine Tracker Real-Time Update - Thoughts On Transverse Myelitis Seen With AZN's COVID-19 Vaccine | RBC Capital Markets |
| 9/9/2020 | Manufacturing Capacity Seems Secured | The Benchmark Company |
| 9/9/2020 | Vaccine Manufacturing Capacity Strengthened; Reiterate Neutral | H.C. Wainwright & Co. |
| 9/17/2020 | INO: Simply Not the Horse to Bet On | Roth Capital Partners, LLC |
| 9/23/2020 | T-cells over Antibodies for Long-term Protection; Ph2/3 Start Looks Imminent | The Benchmark Company |
| 9/28/2020 | Monday Morning Madness - COVID Vaccine Delay Headscratcher Moves Us to the Sidelines | Cantor Fitzgerald & Co. |
| 9/28/2020 | Speed Bump for INO-4800 in COVID, but Core Drivers Intact; Shares Oversold, Upgrading to Buy with $20 PT | Maxim Group |
| 9/28/2020 | INO-4800 Clinical Hold Just One More Question Added to a Long List of Questions | Piper Sandler Companies |
| 9/28/2020 | Oh, No-vio: Partial Clinical Hold on Planned INO-4800 Trial Puts Near-term Start At-risk | RBC Capital Markets |
| 9/28/2020 | INO: Phase 2/3 Clinical Hold Costs Precious Time Given Competition - PT to $8 | Roth Capital Partners, LLC |
| 9/29/2020 | Delay is Disappointing, but Understandable; PT to $25 | The Benchmark Company |
| 9/29/2020 | Maxim Morning Minutes - Speed Bump for INO-4800 in COVID, but Core Drivers Intact; Shares Oversold, Upgrading to Buy with $20 PT | Maxim Group |
| 9/29/2020 | Partial Hold Imposed on Planned COVID-19 Vaccine Trial; Reiterate Neutral | H.C. Wainwright & Co. |

Note:  I also considered analyst reports produced by Professor Feinstein for the periods 9/3/19 to 12/31/19 and 10/1/20 to 4/6/21.

# Appendix D

## Generalized Method of Moments ("GMM") Model Estimation

1.     To analyze Inovio's stock price changes throughout the Putative Class Period, I estimated a model of Inovio's daily stock return in relation to the market and industry returns allowing for a structural break in residual volatility within the estimation window at an unknown break date.[1] As noted in Section VI.B, I use the Putative Class Period of February 14, 2020 to August 10, 2020 as the estimation window, excluding from the estimation any dates on which Plaintiffs identify an alleged misrepresentation or corrective disclosure, which are 2/14/20, 3/2/20, 3/3/20, 3/9/20, 3/24/20, 5/12/20, 5/13/20, 6/3/20, 6/4/20, and 8/10/20.  I use the returns on the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index ("Market Index") to control for market movements and returns on the S&P Biotechnology Select Industry Index ("Industry Index") to control for industry movements.

2.     The model comprises two equations.  The first equation describes the relationship between Inovio's daily stock return and the returns on the Market Index and Industry Index. This equation is similar to the one in Professor Feinstein's event study for market efficiency analysis and event study for alternative experimental designs.[2]  The second equation describes the difference in volatility of Inovio's residual returns in the two periods separated by the structural break.

3.     Specifically, the two equations are as follows:

<u>First equation:</u>

$$INO_t = \beta_0 + \beta_1 \times Market\ Index_t + \beta_2 \times Industry\ Index_t + residual_{t_t}$$

<u>Second equation:</u>

$$\sqrt{\frac{\pi}{2}} \left| \widehat{residual_t} \right| = \alpha_1 \times D_{1,t} + \alpha_2 \times D_{2,t} + \mu_t$$

where $\widehat{residual_t}$ is the estimated residual return (i.e., the portion of Inovio's stock return that is not explained by changes in market and industry indices) on a given day.[3]  $D_{1,t}$ is a binary variable equal to 1 if the day is prior to the structural break day, and 0 otherwise, whereas $D_{2,t}$ is

---

[1] The model follows from McConnell and Perez-Quiros (2000). *See also* Andrews (1993) and Andrews and Ploberger (1994) for a general characterization of the model.

[2] Feinstein Report, Exhibits 6 and 10a.

[3] According to McConnell and Perez-Quiros (2000), "the absolute value specification is more robust to departures from conditional normality [as pointed out in M. Davidian and R. J. Carroll (1987)] than the estimator of the variance, $\hat{\epsilon}_t^2$."

a binary variable equal to 1 if the day is after the structural break day, and 0 otherwise. The second equation implies that the volatility of Inovio's residual returns is $\alpha_1$ prior to the structural break date, and $\alpha_2$ afterwards. Since $\alpha_1$ and $\alpha_2$ can differ, the model allows for a different estimate of the volatility of residual returns before and after the structural break date, in contrast to the assumption in Professor Feinstein's event study models that the volatility is constant throughout the estimation window.

4.      I used GMM to estimate the two equations jointly to obtain estimates for the factor coefficients in the first equation, and estimates for volatility of Inovio's residual returns before and after the structural break day in the second equation.[4]

5.      To test whether there was a structural break in volatility of Inovio's residual returns, and estimate the date on which the structural break occurred, I utilized the method developed in Andrews (1993) and Andrews and Ploberger (1994). The method comprised two steps. First, for each possible structural break day within the estimation window, I estimated the two equations described above with GMM. I constructed the Wald statistic for testing whether $\alpha_1 = \alpha_2$, namely, whether volatility of Inovio's residual returns is the same before and after the structural break day.[5] Second, I calculated the Supremum Wald statistic proposed in Andrews (1993), and Average Wald and Exponential Average Wald statistic proposed in Andrews and Ploberger (1994). These statistics are then compared with the critical values at the 5% level to assess if the null hypothesis of no structural break can be rejected.

6.      I present the test statistics and their statistical significance, the estimated structural break date, as well as the coefficient estimates in Exhibit 2A. All three test statistics: Supremum Wald, Average Wald, and Exponential Average Wald, are above the critical values at the 5% level to reject the null hypothesis of no structural change.[6] Hence, the model provides evidence of a structural change in the volatility of Inovio's residual returns over the estimation window with an estimated structural break date of March 30, 2020. Accordingly, I use different estimates of

---

[4] I estimate the model with GMM using Stata, a widely used statistical package.

[5] I trimmed 15% of days on both ends of the estimation window to obtain the set of possible structural break days, as suggested in Andrews (1993) and McConnel and Perez-Quiros (2000).

[6] The critical value for the Supremum Wald statistic at 5% is 8.85. See Table I of Andrews (1993). The critical value for the Average Wald statistic and Exponential Average Wald statistic at 5% is 2.06. See Table I of Andrews and Ploberger (1994).

typical volatility of Inovio's residual returns for the purposes of testing statistical significance before and after this date.

## Exhibit 1
## Inovio Pharmaceuticals, Inc.
## VIX Index[1] and Inovio's Implied Volatility Based on 30-Day At-The-Money Options
1/2/20 – 12/31/20



Source: *Refinitiv*; *iVolatility*; First Amended Complaint dated 9/21/20; White Paper Cboe Volatility Index

Note:
[1]  The VIX Index measures 30-day expected volatility of the S&P 500 Index.  *See* White Paper Cboe Volatility Index, 2019.

# Exhibit 2A
# Inovio Pharmaceuticals, Inc.
# Summary Event Study Regression Results[1]
## Estimation Window: 2/14/20 – 8/10/20

| Variable | Estimates |
|---|---|
| Market Index Coefficient[2] | -1.725 * |
| Robust Standard Error | (0.730) |
| Industry Index Coefficient[3] | 1.181 |
| Robust Standard Error | (0.621) |
| Constant | 0.017 |
| Robust Standard Error | (0.011) |
| | |
| Root Mean Squared Error 2/14/20 – 3/27/20[4] | 0.170 |
| Root Mean Squared Error 3/30/20 – 8/10/20[4] | 0.078 |
| Number of Observations | 113 |
| Adjusted $R^2$ | 0.031 |

Source:  CRSP; Refinitiv; Expert Report of Professor Steven Feinstein dated 7/29/21; Andrews (1993); Andrews and Ploberger (1994); McConnel and Perez-Quiros (2000)

Note:
* denotes significance at the 5% level.
[1]  See Appendix D for details of the model and estimation.
[2]  CRSP NYSE/AMEX/NASDAQ/ARCA Market Index is used as the Market Index.
[3]  S&P Biotechnology Select Industry Index is used as the Industry Index.
[4]  The structural break in residual return volatility during the Putative Class Period is estimated to occur on March 30, 2020.  The supremum Wald test statistic is estimated to be 10.205, which is statistically significant at the 5% level.  The test statistic is constructed according to Andrews (1993) and the critical values are obtained from Table I of Andrews (1993).  For robustness, the average Wald test statistic is estimated to be 4.656 and the exponential average Wald test statistic is estimated to be 3.347, both of which are statistically significant at the 5% level.  The average and exponential average test statistics are constructed according to Andrews and Ploberger (1994) and critical values are obtained from Table I of Andrews and Ploberger (1994).

# Exhibit 2B
# Inovio Pharmaceuticals, Inc.
# Summary of Residual Returns[1]
Estimation Window: 2/14/20 – 8/10/20

| Date | INO Closing Price | INO Return | Market Index Return[2] | Industry Index Return[3] | INO Predicted Return | INO Residual Return | t-statistic |
|---|---|---|---|---|---|---|---|
| 2/14/20 | $4.15 | 7.51% | 0.19% | 0.10% | 1.50% | 6.02% | 0.3523 |
| 2/18/20 | $4.22 | 1.69% | -0.23% | 0.58% | 2.78% | -1.10% | -0.0643 |
| 2/19/20 | $3.81 | -9.72% | 0.50% | 0.76% | 1.73% | -11.44% | -0.6701 |
| 2/20/20 | $3.64 | -4.46% | -0.28% | -0.54% | 1.55% | -6.01% | -0.3517 |
| 2/21/20 | $3.75 | 2.88% | -1.05% | -0.58% | 2.82% | 0.06% | 0.0036 |
| 2/24/20 | $3.96 | 5.74% | -3.28% | -3.50% | 3.23% | 2.52% | 0.1462 |
| 2/25/20 | $3.74 | -5.68% | -3.08% | -2.92% | 3.55% | -9.23% | -0.5374 |
| 2/26/20 | $3.99 | 6.83% | -0.55% | 0.50% | 3.23% | 3.59% | 0.2104 |
| 2/27/20 | $4.36 | 9.27% | -4.30% | -4.31% | 4.03% | 5.24% | 0.3034 |
| 2/28/20 | $4.28 | -1.83% | -0.87% | 1.91% | 5.44% | -7.28% | -0.4252 |
| 3/2/20 | $4.39 | 2.57% | 4.33% | 3.87% | -1.21% | 3.78% | 0.2194 |
| 3/3/20 | $7.45 | 69.70% | -2.69% | -2.84% | 2.97% | 66.73% | 3.8875 * |
| 3/4/20 | $8.03 | 7.72% | 4.04% | 4.74% | 0.31% | 7.40% | 0.4301 |
| 3/5/20 | $9.80 | 22.12% | -3.34% | -1.79% | 5.35% | 16.77% | 0.9761 |
| 3/6/20 | $14.09 | 43.78% | -1.78% | -2.66% | 1.63% | 42.14% | 2.4577 * |
| 3/9/20 | $9.83 | -30.23% | -7.85% | -8.21% | 5.55% | -35.78% | -2.0198 * |
| 3/10/20 | $5.70 | -42.01% | 4.72% | 2.86% | -3.07% | -38.94% | -2.2536 * |
| 3/11/20 | $8.37 | 46.84% | -5.09% | -6.86% | 2.36% | 44.48% | 2.5481 * |
| 3/12/20 | $9.50 | 13.50% | -9.63% | -10.76% | 5.60% | 7.90% | 0.4371 |
| 3/13/20 | $7.20 | -24.21% | 8.95% | 6.97% | -5.52% | -18.70% | -1.0532 |
| 3/16/20 | $6.13 | -14.86% | -12.30% | -14.08% | 6.29% | -21.15% | -1.1324 |
| 3/17/20 | $7.34 | 19.74% | 5.79% | 5.61% | -1.67% | 21.41% | 1.2334 |
| 3/18/20 | $7.44 | 1.36% | -5.86% | -3.61% | 7.54% | -6.18% | -0.3555 |
| 3/19/20 | $6.49 | -12.77% | 1.23% | 6.36% | 7.08% | -19.85% | -1.1449 |
| 3/20/20 | $7.22 | 11.25% | -4.17% | -1.71% | 6.86% | 4.39% | 0.2545 |
| 3/23/20 | $6.62 | -8.31% | -2.77% | -0.78% | 5.55% | -13.86% | -0.8083 |
| 3/24/20 | $7.09 | 7.10% | 9.46% | 8.16% | -4.98% | 12.08% | 0.6778 |
| 3/25/20 | $6.68 | -5.78% | 1.37% | 1.22% | 0.77% | -6.56% | -0.3836 |

# Exhibit 2B
# Inovio Pharmaceuticals, Inc.
# Summary of Residual Returns[1]
Estimation Window: 2/14/20 – 8/10/20

| Date | INO Closing Price | INO Return | Market Index Return[2] | Industry Index Return[3] | INO Predicted Return | INO Residual Return | t-statistic |
|---|---|---|---|---|---|---|---|
| 3/26/20 | $7.15 | 7.04% | 6.20% | 4.24% | -3.99% | 11.03% | 0.6334 |
| 3/27/20 | $8.32 | 16.36% | -3.34% | -3.18% | 3.71% | 12.66% | 0.7361 |
| 3/30/20 | $8.02 | -3.61% | 3.16% | 3.04% | -0.17% | -3.44% | -0.4286 |
| 3/31/20 | $7.44 | -7.23% | -1.52% | -0.81% | 3.35% | -10.58% | -1.3395 |
| 4/1/20 | $7.70 | 3.49% | -4.65% | -5.45% | 3.29% | 0.21% | 0.0247 |
| 4/2/20 | $7.52 | -2.34% | 2.08% | 3.80% | 2.60% | -4.94% | -0.6195 |
| 4/3/20 | $7.74 | 2.93% | -1.67% | -1.52% | 2.78% | 0.15% | 0.0188 |
| 4/6/20 | $8.44 | 9.04% | 7.17% | 7.38% | -1.96% | 11.00% | 1.2537 |
| 4/7/20 | $8.27 | -2.01% | -0.05% | -1.86% | -0.42% | -1.59% | -0.1993 |
| 4/8/20 | $8.32 | 0.60% | 3.61% | 3.64% | -0.23% | 0.84% | 0.1038 |
| 4/9/20 | $8.12 | -2.40% | 1.78% | 1.92% | 0.90% | -3.30% | -0.4179 |
| 4/13/20 | $7.76 | -4.43% | -1.16% | -0.14% | 3.54% | -7.97% | -1.0118 |
| 4/14/20 | $7.44 | -4.12% | 2.99% | 3.99% | 1.24% | -5.37% | -0.6690 |
| 4/15/20 | $7.14 | -4.03% | -2.33% | -2.42% | 2.86% | -6.89% | -0.8611 |
| 4/16/20 | $7.89 | 10.50% | 0.49% | 2.63% | 3.96% | 6.55% | 0.8277 |
| 4/17/20 | $8.26 | 4.69% | 2.86% | 5.50% | 3.25% | 1.44% | 0.1764 |
| 4/20/20 | $9.05 | 9.56% | -1.70% | 3.71% | 9.01% | 0.55% | 0.0664 |
| 4/21/20 | $9.90 | 9.39% | -3.06% | -3.00% | 3.43% | 5.97% | 0.7384 |
| 4/22/20 | $11.71 | 18.28% | 2.24% | 1.50% | -0.40% | 18.68% | 2.3503 * |
| 4/23/20 | $12.03 | 2.73% | 0.07% | 0.30% | 1.92% | 0.81% | 0.1035 |
| 4/24/20 | $14.59 | 21.28% | 1.41% | 3.50% | 3.40% | 17.88% | 2.2499 * |
| 4/27/20 | $13.70 | -6.10% | 1.80% | 1.23% | 0.04% | -6.14% | -0.7760 |
| 4/28/20 | $13.75 | 0.37% | -0.37% | -2.99% | -1.19% | 1.55% | 0.1912 |
| 4/29/20 | $13.74 | -0.07% | 2.90% | 0.63% | -2.57% | 2.50% | 0.3083 |
| 4/30/20 | $12.03 | -12.45% | -1.20% | -2.56% | 0.75% | -13.19% | -1.6479 |
| 5/1/20 | $10.28 | -14.55% | -2.92% | -2.80% | 3.42% | -17.97% | -2.2297 * |
| 5/4/20 | $11.23 | 9.24% | 0.47% | 5.06% | 6.87% | 2.37% | 0.2877 |
| 5/5/20 | $10.64 | -5.25% | 0.94% | 2.26% | 2.74% | -7.99% | -1.0150 |

# Exhibit 2B
# Inovio Pharmaceuticals, Inc.
# Summary of Residual Returns[1]
Estimation Window: 2/14/20 – 8/10/20

| Date | INO Closing Price | INO Return | Market Index Return[2] | Industry Index Return[3] | INO Predicted Return | INO Residual Return | t-statistic |
|---|---|---|---|---|---|---|---|
| 5/6/20 | $10.47 | -1.60% | -0.63% | 0.44% | 3.31% | -4.91% | -0.6247 |
| 5/7/20 | $10.70 | 2.20% | 1.33% | 0.16% | -0.41% | 2.61% | 0.3292 |
| 5/8/20 | $10.86 | 1.45% | 1.90% | 1.38% | 0.04% | 1.40% | 0.1774 |
| 5/11/20 | $11.90 | 9.63% | -0.03% | 4.84% | 7.46% | 2.17% | 0.2627 |
| 5/12/20 | $12.90 | 8.40% | -2.17% | -2.23% | 2.82% | 5.59% | 0.7000 |
| 5/13/20 | $13.37 | 3.64% | -1.95% | -1.94% | 2.77% | 0.87% | 0.1092 |
| 5/14/20 | $13.65 | 2.09% | 1.14% | -0.81% | -1.23% | 3.32% | 0.4154 |
| 5/15/20 | $13.43 | -1.61% | 0.51% | 3.31% | 4.72% | -6.34% | -0.7949 |
| 5/18/20 | $14.17 | 5.51% | 3.41% | 3.08% | -0.54% | 6.05% | 0.7519 |
| 5/19/20 | $14.56 | 2.75% | -1.05% | -2.89% | 0.10% | 2.65% | 0.3291 |
| 5/20/20 | $15.79 | 8.45% | 1.79% | 2.96% | 2.11% | 6.33% | 0.8001 |
| 5/21/20 | $14.24 | -9.82% | -0.65% | -0.89% | 1.77% | -11.59% | -1.4698 |
| 5/22/20 | $14.08 | -1.12% | 0.31% | 1.41% | 2.83% | -3.95% | -0.5032 |
| 5/26/20 | $14.46 | 2.70% | 1.39% | -2.54% | -3.69% | 6.39% | 0.7688 |
| 5/27/20 | $13.19 | -8.78% | 1.59% | 0.04% | -0.99% | -7.80% | -0.9785 |
| 5/28/20 | $13.35 | 1.21% | -0.37% | -0.92% | 1.25% | -0.03% | -0.0042 |
| 5/29/20 | $14.75 | 10.49% | 0.49% | 1.08% | 2.12% | 8.36% | 1.0660 |
| 6/1/20 | $14.86 | 0.75% | 0.53% | 0.45% | 1.31% | -0.57% | -0.0721 |
| 6/2/20 | $14.34 | -3.50% | 0.84% | 1.37% | 1.87% | -5.37% | -0.6841 |
| 6/3/20 | $12.43 | -13.32% | 1.51% | -1.46% | -2.64% | -10.68% | -1.3122 |
| 6/4/20 | $11.88 | -4.42% | -0.32% | -1.89% | 0.02% | -4.44% | -0.5566 |
| 6/5/20 | $11.93 | 0.42% | 2.64% | 0.90% | -1.79% | 2.21% | 0.2749 |
| 6/8/20 | $12.03 | 0.84% | 1.36% | 1.83% | 1.50% | -0.67% | -0.0847 |
| 6/9/20 | $12.76 | 6.07% | -0.95% | -0.28% | 3.01% | 3.06% | 0.3889 |
| 6/10/20 | $13.39 | 4.94% | -0.69% | 0.19% | 3.12% | 1.82% | 0.2319 |
| 6/11/20 | $12.18 | -9.04% | -6.01% | -5.57% | 5.48% | -14.51% | -1.6878 |
| 6/12/20 | $13.02 | 6.90% | 1.42% | 1.33% | 0.81% | 6.09% | 0.7724 |
| 6/15/20 | $14.15 | 8.68% | 1.03% | 2.78% | 3.20% | 5.48% | 0.6938 |

# Exhibit 2B
# Inovio Pharmaceuticals, Inc.
# Summary of Residual Returns[1]
## Estimation Window: 2/14/20 – 8/10/20

| Date | INO Closing Price | INO Return | Market Index Return[2] | Industry Index Return[3] | INO Predicted Return | INO Residual Return | t-statistic |
|------|------|------|------|------|------|------|------|
| 6/16/20 | $13.90 | -1.77% | 1.91% | 1.65% | 0.35% | -2.12% | -0.2679 |
| 6/17/20 | $13.82 | -0.58% | -0.44% | 0.05% | 2.52% | -3.10% | -0.3947 |
| 6/18/20 | $14.34 | 3.76% | 0.09% | 1.12% | 2.87% | 0.89% | 0.1134 |
| 6/19/20 | $14.27 | -0.49% | -0.52% | 2.87% | 5.98% | -6.47% | -0.8072 |
| 6/22/20 | $15.30 | 7.22% | 0.66% | 2.90% | 3.98% | 3.23% | 0.4082 |
| 6/23/20 | $21.57 | 40.98% | 0.39% | 1.55% | 2.85% | 38.13% | 4.8554 * |
| 6/24/20 | $23.87 | 10.66% | -2.68% | -2.46% | 3.41% | 7.25% | 0.9037 |
| 6/25/20 | $31.25 | 30.92% | 1.18% | 2.91% | 3.09% | 27.83% | 3.5190 * |
| 6/26/20 | $29.98 | -4.06% | -2.39% | -3.23% | 2.01% | -6.07% | -0.7524 |
| 6/29/20 | $31.69 | 5.70% | 1.54% | -0.22% | -1.22% | 6.92% | 0.8666 |
| 6/30/20 | $26.95 | -14.96% | 1.57% | 1.53% | 0.79% | -15.75% | -1.9973 * |
| 7/1/20 | $19.73 | -26.79% | 0.46% | 0.38% | 1.36% | -28.15% | -3.5839 * |
| 7/2/20 | $21.45 | 8.72% | 0.47% | 0.47% | 1.44% | 7.28% | 0.9271 |
| 7/6/20 | $20.93 | -2.42% | 1.56% | -0.05% | -1.05% | -1.37% | -0.1719 |
| 7/7/20 | $24.09 | 15.10% | -1.11% | 1.87% | 5.81% | 9.28% | 1.1640 |
| 7/8/20 | $23.46 | -2.62% | 0.85% | 1.51% | 2.02% | -4.63% | -0.5896 |
| 7/9/20 | $23.27 | -0.81% | -0.60% | -0.64% | 1.98% | -2.79% | -0.3539 |
| 7/10/20 | $23.38 | 0.47% | 1.09% | -1.05% | -1.41% | 1.89% | 0.2353 |
| 7/13/20 | $25.62 | 9.58% | -1.14% | -2.63% | 0.56% | 9.02% | 1.1253 |
| 7/14/20 | $26.21 | 2.30% | 1.37% | 2.75% | 2.58% | -0.28% | -0.0353 |
| 7/15/20 | $24.51 | -6.49% | 1.18% | 2.05% | 2.08% | -8.57% | -1.0888 |
| 7/16/20 | $24.57 | 0.24% | -0.39% | -0.96% | 1.24% | -0.99% | -0.1259 |
| 7/17/20 | $26.97 | 9.77% | 0.35% | 2.22% | 3.71% | 6.05% | 0.7678 |
| 7/20/20 | $25.37 | -5.93% | 0.86% | 1.40% | 1.87% | -7.80% | -0.9934 |
| 7/21/20 | $27.05 | 6.62% | 0.19% | -2.22% | -1.25% | 7.87% | 0.9761 |
| 7/22/20 | $26.19 | -3.18% | 0.56% | -0.35% | 0.31% | -3.49% | -0.4418 |
| 7/23/20 | $24.58 | -6.15% | -1.14% | -2.08% | 1.22% | -7.36% | -0.9252 |
| 7/24/20 | $21.91 | -10.86% | -0.74% | -2.44% | 0.10% | -10.96% | -1.3675 |

## Exhibit 2B
## Inovio Pharmaceuticals, Inc.
## Summary of Residual Returns[1]
Estimation Window: 2/14/20 – 8/10/20

| Date | INO Closing Price | INO Return | Market Index Return[2] | Industry Index Return[3] | INO Predicted Return | INO Residual Return | t-statistic |
|---|---|---|---|---|---|---|---|
| 7/27/20 | $21.08 | -3.79% | 0.85% | 2.85% | 3.59% | -7.38% | -0.9328 |
| 7/28/20 | $20.79 | -1.38% | -0.71% | -2.70% | -0.28% | -1.10% | -0.1363 |
| 7/29/20 | $19.48 | -6.30% | 1.38% | -1.65% | -2.64% | -3.66% | -0.4494 |
| 7/30/20 | $20.73 | 6.42% | -0.32% | 1.57% | 4.10% | 2.31% | 0.2934 |
| 7/31/20 | $19.44 | -6.22% | 0.55% | -2.58% | -2.31% | -3.91% | -0.4787 |
| 8/3/20 | $20.69 | 6.43% | 0.87% | 4.36% | 5.33% | 1.10% | 0.1358 |
| 8/4/20 | $20.32 | -1.81% | 0.37% | -0.44% | 0.54% | -2.36% | -0.2984 |
| 8/5/20 | $21.79 | 7.26% | 0.75% | 0.98% | 1.55% | 5.71% | 0.7270 |
| 8/6/20 | $20.33 | -6.70% | 0.50% | -0.69% | 0.02% | -6.72% | -0.8485 |
| 8/7/20 | $20.22 | -0.54% | 0.10% | 0.26% | 1.84% | -2.38% | -0.3028 |
| 8/10/20 | $18.99 | -6.08% | 0.22% | -0.15% | 1.13% | -7.22% | -0.9173 |
| 8/11/20 | $14.62 | -23.01% | -0.80% | -3.99% | -1.63% | -21.38% | -2.5910 * |

Source:  *CRSP*; *Refinitiv*; Expert Report of Professor Steven Feinstein dated 7/29/21; Andrews (1993); Andrews and Ploberger (1994); McConnel and Perez-Quiros (2000)

Note:
* denotes significance at the 5% level.
[1] *See* Appendix D for details of the model and estimation.
[2] CRSP NYSE/AMEX/NASDAQ/ARCA Market Index is used as the Market Index.
[3] S&P Biotechnology Select Industry Index is used as the Industry Index.

# Exhibit 3A
# Inovio Pharmaceuticals, Inc.
# Intraday Stock Price[1][2]
## 3/3/20



Source: *Tick; Refinitiv*

Note:
[1] All available timestamps during market hours are shown in U.S. Eastern Time.  Market hours are from 9:30 AM to 4:00 PM.
[2] Opening and Closing prices are taken from *Refinitiv*.  Prices plotted are volume-weighted average prices at the second-level from *Tick*.  Prices labeled are volume-weighted average prices at the minute-level from *Tick*.

# Exhibit 3B
# Inovio Pharmaceuticals, Inc.
# Intraday Stock Price[1][2]
## 3/9/20



Source: *Tick; Refinitiv*

Note:
[1] All available timestamps during market hours are shown in U.S. Eastern Time. Market hours are from 9:30 AM to 4:00 PM. U.S. equity market was halted from trading during 9:33 AM to 9:49 AM. Inovio stock was halted from trading during the following periods: 10:01 AM to 10:06 AM, 11:02 AM to 11:07 AM, 11:11 AM to 11:16 AM, 11:20 AM to 11:25 AM, and 12:50 PM to 12:55 PM.
[2] Opening and Closing prices are taken from *Refinitiv*. Prices plotted are volume-weighted average prices at the second-level from *Tick*. Prices labeled are volume-weighted average prices at the minute-level from *Tick*.

**Exhibit 4**
**Inovio Pharmaceuticals, Inc.**
**Analyst Commentary Regarding Inovio's Manufacturing Capabilities and Manufacturing Partners**

| Contributor | 6/3/20[1] – 8/9/20 | 8/10/20[2] – 8/19/20 |
|---|---|---|
| Benchmark | **7/7 Report**: "The company plans to manufacture one million doses by the end of the year, and hundred million doses in 2021." | **8/19 Report**: "Also, we suspect that the 100M doses that INO planned to manufacture in 2021 are already on a pre-sale for various government structures across the globe." |
| Cantor Fitzgerald | **6/26 Report**: "There are three distinct gating factors for bringing INO-4800 forward and into the market. ... The second factor is commercial scale manufacturing of INO-4800. We do not believe there are any real concerns as it is a much simpler biologic to manufacture than other candidates such as viral vaccine candidates, and scaling up should not face significant hurdles." | **8/11 Report**: "Our price target reduction results from our reduced visibility on clinical trial execution, and only a cautious optimism in manufacturing capacity, given management commentary on the 2Q20 call." |
| H.C. Wainwright[3] | | **8/11 Report**: "Inovio has expanded the INO-4800 DNA manufacturing agreement with Richter-Helm and the Coalition for Epidemic Preparedness Innovations (CEPI) to support large-scale production. The company is currently expanding manufacturing consortium and on track to meet goal of producing at least 100M INO-4800 doses in 2021 via growing global coalition of partners and funders in America, Europe and Asia." |
| Maxim Group[4] | **7/1 Report**: "**Support for INO-4800.**  In late January, when the virus had not yet been coined "COVID-19", Inovio was already digging in its heels in the race for a vaccine, resulting in initial support from CEPI (Coalition for Epidemic Preparedness Innovation) of $1.3M to fund ongoing preclinical and initial clinical development of INO-4800. CEPI expanded that grant to $17.2M in funding in late April to further support large-scale manufacturing of INO-4800 by German manufacturing partner Richter-Helm Biologics (which also manufactures Inovio's lead asset VGX-3100). In addition to CEPI, additional funding has also come in part from the Bill & Melinda Gates Foundation ($5M) to support the scale-up and testing of the delivery device, as well as the U.S. Department of Defense (DOD, from support by the Office of the Assistant Secretary of Defense for Health Affairs) for $11.9M, to Ology Bioservices (private), Inovio's partner for manufacturing additional doses of INO-4800. On 6/23/20, Inovio secured additional funding of $71M from the DoD to support large-scale manufacturing capacity of the CELLECTRA 3PSP devices and procurement of CELLECTRA 2000 devices (used to deliver INO-4800 directly into the skin). The plan is to have one million doses of the vaccine available by YE20 for additional trials and emergency use." | |

**Exhibit 4**
**Inovio Pharmaceuticals, Inc.**
**Analyst Commentary Regarding Inovio's Manufacturing Capabilities and Manufacturing Partners**

| Contributor | 6/3/20[1] – 8/9/20 | 8/10/20[2] – 8/19/20 |
|---|---|---|
| Piper Sandler | **6/25 Report**: "**Remain Neutral rated on INO shares** and would be particularly cautious after today's court decision denying the company's request for emergency injunction against supply partner VGXI. While we acknowledge significant funding from DOD ($71M for device development/manufacture) is nothing to sneeze at, today's decision denying INO's request for injunctive relief from VGXI is a major setback to the scale-up required for the CoV-19 vaccine (INO-4800) development program. Coupling this with CEPI's recent commentary regarding a current lack of DNA vaccine manufacturing capacity, we worry that investors hoping for a viable, scaled vaccine option from INO in the near-term will be disappointed. ...<br><br>• **VGXI/INO legal dispute jeopardizes INO-4800 scale-up**. Recall earlier this month, INO filed a complaint requesting injunctive relief from long-time supply partner VGXI to facilitate tech transfer to allow for large-scale manufacturing of INO's SARS-CoV-2 vaccine candidate INO-4800 by other manufacturers. Without injunctive relief compelling tech transfer, this would (in INO's own words) create the possibility that "Inovio cannot manufacture the product promptly, safety, or perhaps at all" and at the least "substantially delay the successful manufacture" of INO-4800.<br><br>• **Denial of INO's request for injunction is no bueno**. In a decision this afternoon, Judge Saltz determined that the factual basis for INO's claim were too speculative to support a mandatory preliminary injunction. Specifically, he cited INO's own testimony that there are other DNA plasmid manufacturers, the >100 other vaccine candidates in development (meaning the public interest doesn't require "immediate large-scale production of Inovio's vaccine"), the possible harm to VGXI caused by tech transfer, and difficulty determining what would be required of VGXI if an injunction were granted. We assume INO will appeal the decision, so legal back-and-forth may continue for some time, but this appears to hinder INO's ability to scale-up INO-4800 any time soon.<br><br>• **Regardless of clinical data, you still need to make the product**. Thinking about the viability of various CoV-19 vaccine approaches for the current pandemic, manufacturing scale-up is just as (if not more) important than clinical data, meaning the upcoming topline for INO-4800 (clinical data this month) should take a backseat until we have clarity on manufacturing. To that point, VGXI's written response to INO's suit raised key questions about global manufacturing capacity to meet INO's goal of 50M-100M doses by YE21. This is supported by commentary from CEPI's regarding limited capacity for high-volume production of DNA-based vaccines (like INO-4800), and seems to dovetail with media reports that INO-4800 isn't a Warp Speed finalist."<br><br>**6/30 Report**: "**But can they make it?** ... [A]n equally important consideration is scalability, and on that front we remain concerned that last week's court ruling seriously jeopardizes INO-4800 manufacturing scale-up. INO filed notice of appeal on Friday (6/26), and it will likely take some time to for the dispute with longtime manufacturing partner VGXI to be resolved. Without clarity on this critical manufacturing question, we think it's prudent not to assign credit to the INO-4800 program. Remain on the sidelines." | **8/10 Report**: "**No change to Neutral outlook on INO following Q220 results.** ... maybe most important of all, how can INO manufacture 100M doses next year if partner VGXI will not facilitate tech transfer? ... New today, after guiding to P2/3 initiation in July/Aug., timelines have shifted to Sept as INO awaits FDA "concurrence". While FDA delays are not unheard of, the urgency of a COV-19 vaccine would seem to be at odds with any foot-dragging on the part of the Agency. ... Even before these issues, we still wonder how 100M doses can be manufactured next year when partner VGXI refuses to facilitate tech transfer – a step INO themselves claimed was critical in their own court pleadings from earlier this summer. Long story short – we continue to leave INO-4800 out of our model." |

**Exhibit 4**
**Inovio Pharmaceuticals, Inc.**
**Analyst Commentary Regarding Inovio's Manufacturing Capabilities and Manufacturing Partners**

| Contributor | 6/3/20[1] – 8/9/20 | 8/10/20[2] – 8/19/20 |
|---|---|---|
| RBC Capital Markets | **6/4 Report**: "[I]n our view, the recently reported complaint filed in the state of Pennsylvania against INO's manufacturing contractor VGXI due to their refusal of transferring the method of manufacturing INO-4800 despite having difficulty in manufacturing capacity could add another layer of uncertainty to the timeline of further clinical development and potential commercial delivery. That said, INO's seeking of an injunction could signal their high appetite to propel the program forward and pursue the alignment of greater resources."<br><br>**6/23 Report**: "With multi-day virtual testimony already transpiring (having started on 6/18), we also continue to monitor the progress of the complaint INO filed in the state of Pennsylvania against INO's manufacturing contractor VGXI for clarity on capabilities of scaled-up manufacturing of INO-4800 – which, per INO, is expected to require up to 10 manufactures to produce the ultimately desired quantities (100M doses). We note the judge is expecting a quick rule and outcome rule given the urgent need for a vaccine in the current pandemic."<br><br>**6/25 Report**: "This afternoon (6/25), the complaint filed by INO against its manufacturer, VGXI, obligating them to transfer their COVID-19 vaccine plasmid IP, was denied – adds some complexity to INO-4800's path, in the near- and, potentially long-term ... We see the court decision as posing another hurdle for INO to fulfill its aim for manufacturing scale-up for delivery of over 100M doses starting in 2021, and believe in the likelihood that the lack of manufacturing capability could preclude additional funding until this issue is resolved – which could require the company to restart preclinical and clinical development with plasmids manufactured by another contractor under a new protocol – all of which we believe could distort the timeline or introduce some inefficiency around development."<br><br>**7/1 Report**: "More granularity on INO's trial design such as dose levels and age groups, their IND submission and regulatory interactions, and, perhaps separate from clinical progress, any news on funding or manufacturing including the lawsuit with VGXI, remain in focus as INO-4800 enters the new quarter on arguably riskier footing than the market anticipated."<br><br>**7/15 Report**: "We believe comparable clinical data, as well as additional funding and manufacturing capability (pending results from the lawsuit with VGXI) could be required for INO to stay in the mix of vaccine players and maintain their participation in the first mover advantage – within a space that is advancing at an unprecedented pace."<br><br>**7/20 Report**: "As more competitive clinical data is emerging from early vaccine players, we believe INO could continue to be under pressure from the competition given limited clinical data so far, as well as uncertainty around funding and manufacturing capabilities."<br><br>**7/30 Report**: "We continue to look to additional data from the second NHP study - recall that INO was selected by Operation Warp Speed for a NHP study, clarity on the expected initiation of the ph.II/III trial (now guided for summer 2020), progress of the legal dispute with manufacturer VGXI, as well as possibility of additional external funding following the disclosed NHP data." | **8/10 Report**: "We still await the fuller ph.I dataset, more precision on the next study, and even an announcement on additional external funding to support clinical development - though we continue to view the current uncertainties around the legal dispute, scale, and a clean path forward as offsetting and gating to unlocking further valuation potential. ... The company believes they are on-track for EMA approval in 2021, as well as delivery of 1M doses by YE2020 and 100M doses starting in 2021 - though we continue to monitor the development of the ongoing litigation with manufacturer VGXI to scale up manufacturing capability to verify any understandable impact."<br><br>**8/18 Report**: "We hosted INO's management team for a day of virtual meetings, following last week's 2Q EPS company updates, where we gained additional insights into their COVID-19 vaccine program, including the differentiation, late-stage clinical plan, funding expectations, as well as the ongoing work around the manufacturing scale-up. We are encouraged by management's high confidence in ongoing clinical execution and external funding prospects to accelerate INO-4800 development, though we believe several unanswered but natural questions continue to mount on the program - efficacy, manufacturing scale capability, as well as ultimate revenue and market realization. ... **INO sees key work around the VGXI dispute for plasmid manufacturing scale-up; more manufacturing agreements in-store over the upcoming weeks.** INO is currently working with potential partners, domestically and ex-U.S., to develop the manufacturing processes of INO-4800 without the need of tech transfer from VGXI. ... We view any clarity from the anticipated VGXI standstill, or increasing confidence in INO's work around strategy as key to gaining more comfort around scalability - a topic which, not surprisingly, has been a sore spot on overall program execution lately." |

**Exhibit 4**
**Inovio Pharmaceuticals, Inc.**
**Analyst Commentary Regarding Inovio's Manufacturing Capabilities and Manufacturing Partners**

| Contributor | 6/3/20[1] – 8/9/20 | 8/10/20[2] – 8/19/20 |
|---|---|---|
| Roth Capital Partners | **6/4 Report**: "VGXI informed INO that it does not have the capacity to manufacture INO's full order of INO-4800 DNA plasmids on the requested timeline, nor would it be able to achieve commercial scale manufacturing if INO-4800 was approved for sale. ... This failure on VGXI's part will prevent INO from producing the one million doses of INO-4800 it claimed it would have by YE20, unless INO can rectify this problem. ... INO must deal with its manufacturing snag in order to potentially be a viable player in the COVID-19 vaccince race, but consistent with our unfavorable view of INO-4800's ability to compete, we note that the Trump Administration did not include INO-4800 among the five vaccine candidates selected for their likelihood of ultimately being viable. ... We reiterate our view that INO's valuation has appreciated disproportionately to the added value of INO-4800."<br><br>**7/1 Report**: "Regarding DNA plasmids, we note that a Pennsylvania state judge recently rejected INO's request for a preliminary injunction to force supplier VGXI, Inc. (private) and GeneOne Life Science, Inc. (011000-NC) to share its technology with potentially 10 rivals in order to mass-produce INO-4800, claiming that INO's claims are "too speculative" to justify compromising the supplier's proprietary manufacturing process, and that INO has not shown that other companies cannot make INO-4800 without VGXI's technology. Therefore, we question INO's ability to meet the production that will certainly be demanded of a vaccine for SARS-CoV-2." | **8/11 Report**: "INO intends to begin its Phase 2/3 INO-4800 trial by the end of 3Q20 with external funding, and the company intends to ramp manufacture of plasmids and CELLECTRA 3PSP electroporation devices, maintaining its goal of 1 million doses by YE20 and 100 million doses, as well as INO-4800 emergency use approval, by YE21. Given the position of its manufacturing partners that this level of manufacturing cannot be attained, and their reluctance to give their technology to other manufacturing companies to assist, we do not believe management's production forecasts. ... In our view, there are simply too many competitors in this arena, with better trusted technology, and far greater capital resources and manufacturing capacity[.] We view INO share price as being overdependent upon INO-4800, and we view the differential in outside funding to INO versus its closest competition as a harbinger of things to come." |
| Stifel | **6/4 Report**: "In an 8K filing issued late yesterday, INO announced its "most favored supplier" for DNA plasmids (VGXI/GeneOne) has informed the company of its inability to meet the manufacturing capacity demands for INO-4800 (INO has previously-guided to 1M doses available by YE20). INO has subsequently engaged two third-party manufacturers (Ology Bioservices and Richter-Helm BioLogics – the latter of which already has DNA plasmid manufacturing experience via VGX-3100) to support the large-scale manufacturing of INO-4800. ... No timelines re: a potential resolution were provided. While we're inclined to believe the terms of the existing VGXI supply agreement, coupled with the epidemiological urgency associated with the development of a safe/viable COVID-19 vaccine, would inherently favor INO with respect to reaching an expeditious outcome, we also believe this does present an additional/potential risk factor to securing external funding to support INO-4800 development/manufacturing – although we're also inclined to believe any government-issued mandate under this Operation Warp Speed project (assuming inclusion as a "finalist" company) would seemingly be capable of fast-tracking this legal process."<br><br>**6/26 Report**: "**Source of Uncertainty #2 – Resolving the VGXI/GeneOne situation.** After today's (June 25) market close, INO announced the preliminary injunction it had legally sought against VGXI/GeneOne ... was denied in a Pennsylvania court. INO management is currently exploring its legal options (likely to include an immediate appeal of the Court's decision) and has previously intimated contingency plans would be put into place in the event of an adverse ruling such as this. This development is in no way a primary driver of our downgrade here and we're inclined to believe some near-term resolution can be reached here given the urgency of the situation. However, management's guidance regarding the scale-up of hundreds of millions of INO-4800 doses being made available in FY21 (management's 1M dose guidance by YE20 is not impacted by any delay here) is dependent upon some timely resolution being reached here and we don't think current valuation can accommodate any underlying risk to the company's ability to scale INO-4800 manufacturing – the latter of which could be interpreted as a rate-limiting step in the company's ability to procure more-substantial funding required to fund P2/3 clinical development and manufacturing (see below)." | **8/11 Report**: "We believe the company's 2Q20 EPS print/call left us (again) with more questions than answers on numerous fronts – including … 2) the likelihood of external funding required to support both the September initiation of INO-4800 P2/3 development and the scale-up of third-party/ex-VGXI manufacturing necessary to meet management's FY21 100M dose guidance (and the regulatory uncertainty associated with each)[.] ... Additionally, management announced the expansion of manufacturing capabilities (with Richter-Helm and CEPI) for INO-4800, and emphasized plans are in place to further expand the global manufacturing consortium in an effort to meet the goal of producing 1M doses of INO-4800 by YE20 and 100M doses in FY21 (the latter of which is also third-party funding-dependent). While management noted the ongoing litigation with VGXI will not impact this manufacturing guidance or the ability to conduct registrational development, it is our understanding (per our conversation with management) the proposed P2/3 trial design would be conducted using clinical supply generated from both the legacy VGXI process and recently-scaled capacity from third-party CMOs (i.e. Richter-Helm) – which presumably comprises a non-proprietary version of the VGXI manufacturing process (technology which VGXI has been unwilling to transfer to third-party CMOs). While the P2/3 trial could arguably serve as its own bridging study (i.e. comparing data generated via Richter-Helm manufactured product with VGXI-manufactured product), we believe this may represent another layer of regulatory complexity." |

Source:  Various Analyst Reports

Notes:
[1]  Inovio announced its lawsuit against VGXI on 6/3/20.
[2]  Inovio held Q2 2020 earnings call after market on 8/10/20.
[3]  Although H.C. Wainwright issues reports on 6/5/20, 6/29/20, 7/1/20, 7/20/20, 7/30/20, and 7/31/20, H.C. Wainwright does not discuss Inovio's manufacturing capabilities or manufacturing partners in these reports.
[4]  Although Maxim issues reports on 8/11/20 and 8/12/20, Maxim does not discuss Inovio's manufacturing capabilities or manufacturing partners in these reports.

# Exhibit 5
## Analysis of Representative Plaintiff Andrew R. Zenoff Trades in Inovio Stock
4/23/20 – 3/4/21

| Date | Purchases/ Buys to Cover | Weighted Average Purchase Price | Sales/ Short Sales | Weighted Average Sell Price | End of Day Holdings | Held Through Alleged Corrective Disclosure[1] |
|---|---|---|---|---|---|---|
| *Purchase and Sale Transactions Through Personal E\*TRADE Account* | | | | | | |
| 4/23/20 | 12,000 | $12.71 | 7,000 | $13.07 | 5,000 | No |
| 4/27/20 | – | – | 5,000 | $14.72 | – | No |
| 4/28/20[§] | 3,000 | $13.72 | 5,000 | $13.17 | -2,000 | No |
| 4/30/20[§] | 2,000 | $11.85 | – | – | – | No |
| 5/1/20[§] | 6,000 | $10.22 | 6,000 | $10.49 | – | No |
| 5/4/20 | 14,500 | $10.97 | – | – | 14,500 | No |
| 5/5/20 | – | – | 14,500 | $10.85 | – | No |
| 5/12/20 | 21,000 | $12.76 | 21,000 | $12.99 | – | No |
| 5/13/20 | 20,000 | $13.65 | 20,000 | $13.29 | – | No |
| 5/15/20 | 4,000 | $13.42 | 4,000 | $13.45 | – | No |
| 5/18/20 | 5,796 | $13.69 | 5,796 | $13.91 | – | No |
| 6/25/20 | 1,000 | $25.99 | – | – | 1,000 | No |
| 6/26/20 | – | – | 1,000 | $31.86 | – | No |
| 6/30/20 | 1,000 | $24.97 | – | – | 1,000 | No |
| 7/13/20 | 1,000 | $25.36 | – | – | 2,000 | No |
| 7/14/20 | 2,000 | $27.17 | – | – | 4,000 | No |
| 8/3/20 | – | – | 4,000 | $18.91 | – | No |
| *Purchase and Sale Transactions Through 401(k) E\*TRADE Account*[2] | | | | | | |
| 4/23/20 | 623 | $12.89 | – | – | 623 | No |
| 5/1/20 | – | – | 623 | $10.05 | – | No |
| 5/4/20 | 550 | $10.97 | – | – | 550 | Yes[3] |
| 3/4/21 | – | – | 550 | $9.33 | – | Yes[3] |

Source:  First Amended Complaint dated 9/21/20; Deposition of Andrew R. Zenoff dated 8/25/21; Expert Report of Professor Steven Feinstein filed 7/29/21; Zenoff Transaction Confirmations (Zenoff_0000001–192)

Note:
§ indicates that transactions were either short sales or buys to cover.
[1]  The alleged corrective disclosures occured on 3/9/20, 6/3/20, and 8/10/20.
[2]  Reflects transactions that that were not disclosed in Schedule A to the First Amended Complaint.  *See* Deposition of Andrew R. Zenoff, 8/25/21, pp. 85:11–88:20; Zenoff_0000015, -051, -083, -131.
[3]  Mr. Zenoff's shares purchased on 5/4/20 were sold more than 90 days after the end of the Putative Class Period.  The average of Inovio's stock over the 90 days following the final alleged corrective disclosure was $12.47, which exceeds the 5/4/20 purchase price of $10.97.