# EXHIBIT F
# [Filed Under Seal]

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

Civ. Action No. 2:20-cv-01402-GJP

PATRICK McDERMID, Individually and
on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

INOVIO PHARMACEUTICALS, INC.,
et al.,

Defendants.

REPLY EXPERT REPORT

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

December 8, 2021

**TABLE OF CONTENTS**

I.     SCOPE OF PROJECT AND REPORT ........................................................................1

II.    CONCLUSIONS............................................................................................................2

III.   DR. STULZ DOES NOT DISPUTE THE CONCLUSIONS IN THE FEINSTEIN
       REPORT ......................................................................................................................4

IV.   DEFINING AND ASSESSING PRICE IMPACT ...................................................5

V.    CRITIQUE OF STULZ REPORT ...........................................................................7

        A.     Dr. Stulz's Price Impact Arguments Are Misguided Because He Disputes
              Rather than Accepts as an Assumption Plaintiffs' Allegations that
              Defendants Made Misrepresentations and Omissions that Misled the
              Market ..............................................................................................................7

        B.     Dr. Stulz's Purported Analysis of Price Impact on the Misrepresentation
              Dates is Flawed and Misleading ......................................................................9

        C.     Dr. Stulz's Purported Analyses of Price Impact Following the Alleged
              Corrective Disclosures are Flawed, Misleading, and Unreliable............................13

            1.     9-10 March 2020....................................................................................13

            2.     10 August 2020 .....................................................................................16

VI.   LIMITING FACTORS AND OTHER ASSUMPTIONS...................................................23

## I.   SCOPE OF PROJECT AND REPORT

1.   On 29 July 2021, I submitted a report in this matter (the "Feinstein Market Efficiency Report" or the "Feinstein Report").[1] Based on the analyses presented in the Feinstein Report, I concluded that the common stock of Inovio Pharmaceuticals, Inc., ("Inovio" or the "Company") traded in an efficient market during the period from 14 February 2020 through 10 August 2020, inclusive (the "Class Period").[2] I further concluded and explained that Section 10(b) damages in this matter can be computed for all Class members using a common methodology that is consistent with Plaintiffs' theory of liability, and I described that methodology.[3]

2.   In the Feinstein Report, I showed that each of the *Cammer* and *Krogman* factors supports a finding that the market for Inovio stock was efficient over the course of the Class Period.[4] The analyses included a statistical test that compared the price behavior of Inovio stock on a set of high information flow dates to the stock price movements on ordinary non- or lesser-news dates. This test proved that Inovio stock responded to new Company-specific information and thereby demonstrated market efficiency during the Class Period.[5]

3.   Subsequently, I was asked by Robbins Geller Rudman & Dowd LLP, Counsel for the Plaintiffs, to consider and evaluate the arguments and conclusions in the Expert Report of Rene M. Stulz, Ph.D., dated 8 October 2021 (the "Stulz Report"), submitted by Defendants in this matter. I also reviewed a transcript of the Remote Videotaped Deposition of Rene M. Stulz, dated 19 November 2021 (the "Stulz Deposition"). Dr. Stulz's report focuses on price impact and the "trading records for Representative

---

[1] Unless otherwise indicated, capitalized terms used herein have the same definition and meaning ascribed to them in the Feinstein Report.

[2] Feinstein Report, ¶¶17-19.

[3] Feinstein Report, ¶¶157-167.

[4] Feinstein Report, ¶¶50-156.

[5] Feinstein Report, ¶¶98-153.

Plaintiff Andrew R. Zenoff."[6,7] Dr. Stulz does not contest either of the two conclusions presented in the Feinstein Report – that the market for Inovio stock was efficient throughout the Class Period and that Section 10(b) damages can be computed using a common methodology that is consistent with Plaintiffs' theory of liability. In fact, Dr. Stulz "assumed that Inovio's stock traded in an efficient market" for the purposes of his analysis.[8]

4.  This rebuttal report presents my analysis and conclusions relating to the Stulz Report. Documents that I reviewed and relied upon in preparing this report in addition to those already cited in the Feinstein Report are listed in Exhibit-1 of this report. My credentials and compensation are presented in the Feinstein Report, as is a list of testimony I provided during the four years preceding that report. Testimony I have provided since the Feinstein Report is identified in Exhibit-2 of this report.

5.  My work in this matter is ongoing, and I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

## II.  CONCLUSIONS

6.  Dr. Stulz does not dispute my conclusion presented in the Feinstein Report that Inovio stock traded in an efficient market throughout the Class Period. In fact, Dr. Stulz assumes for the purposes of his analysis that the market for Inovio stock was efficient throughout the Class Period.[9] Thus, the efficiency of the market for Inovio stock is undisputed.

7.  Dr. Stulz does not dispute my conclusion in the Feinstein Report that damages can be computed for all Class Members using a common damage methodology that is consistent with Plaintiffs' theory of liability. He does not challenge the existence, applicability, or

---

[6] Stulz Report, ¶7.

[7] I have only been asked to respond to the analyses and conclusions in the Stulz Report that relate to price impact. I understand from counsel that they intend to address the arguments relating to Plaintiff Andrew Zenoff's damages in their brief.

[8] Stulz Report, ¶7.

[9] Stulz Report, ¶7.

feasibility of the out-of-pocket damage methodology for commonly computing damages for all Class Members.

8. As such, the Stulz Report provides no reason to revise any of the conclusions presented in the Feinstein Report.

9. Dr. Stulz's price impact analyses and conclusions are flawed, misleading, and unreliable. His analysis does not prove that the alleged misrepresentations and omissions had no impact on the price of Inovio stock. Several of Dr. Stulz's price impact arguments rely on the assumption that Plaintiffs will not be able to prove their claims. Even notwithstanding his inappropriate assumptions about the merits of Plaintiffs' allegations, Dr. Stulz's price impact arguments are flawed and unreliable for additional reasons.

10. Dr. Stulz does not contest my finding of the statistical significance at the 95% confidence level of the Inovio stock price returns following alleged corrective disclosures on 9 March 2020, 10 March 2020, and 11 August 2020.

11. While Dr. Stulz does not find the Inovio stock price return on 3 June 2020 to be statistically significant at the 95% level, his analysis shows that the stock price decline that day was the 8th most severe among the 123 days of the Class Period. Moreover, Dr. Stulz's report found that Inovio's residual stock price decline that day was 10.68%, which according to his own analysis corresponds to the 11th most negative $t$-statistic (a normalized measure of statistical significance) during the Class Period.

12. Dr. Stulz's purported price impact analysis of 9-10 March 2020 is flawed and unreliable. Dr. Stulz found no information other than the corrective information that could have been responsible for the stock price declines on 9 March 2020 and 10 March 2020. His purported analysis of the 9 March 2020 statistically significant stock price decline relies on his inappropriate assumption that Plaintiffs will not be able to prove their claims. Dr. Stulz offers no analysis of the 10 March 2020 stock price decline, which was alleged by Plaintiffs to have been caused by the disclosure of allegation-related information. Therefore, Dr. Stulz does not prove that the alleged misrepresentations and omissions, and the alleged corrective disclosure on 9 March 2020, had no impact on the price of Inovio stock. Moreover, Dr. Stulz provides no reliable basis to conclude or even suggest that the stock price declines on 9 March 2020 and 10 March 2020 are not evidence of price impact.

3

13. Dr. Stultz conducts no price impact analysis whatsoever of the 3 June 2020 stock price decline, alleged by Plaintiffs to have been caused by the disclosure of allegation-related information. Dr. Stulz thus provides no basis to conclude that the price decline that day is not evidence of price impact.

14. Dr. Stulz's purported price impact analysis of 11 August 2020 is misleading and incorrect. While his Report appears to attribute all of the stock price decline on 11 August 2020 to a delay in the Phase II/III efficacy trials for INO-4800, Dr. Stultz testified at his deposition that he was not offering an opinion on the cause of the 11 August 2020 statistically significant stock price decline.[10] Dr. Stulz ignores commentary in analyst reports and on the Company's 10 August 2020 conference call about Inovio's manufacturing capacity, which is allegation-related information. Dr. Stulz further ignores that at least one analyst report in which the analysts directly tied their downgrade of Inovio's stock rating to newly disclosed information about the Company's manufacturing.[11] Thus, Dr. Stulz overlooks direct evidence of price impact on 11 August 2020.

### III. DR. STULZ DOES NOT DISPUTE THE CONCLUSIONS IN THE FEINSTEIN REPORT

15. Dr. Stulz does not dispute my conclusion in the Feinstein Report that Inovio stock traded in an efficient market throughout the Class Period. In fact, he assumes the market for Inovio stock was efficient throughout the Class Period.

> "I have not been asked to opine on, and I am not offering any opinion on, market efficiency. However, assuming Inovio's stock traded in an efficient market, as Plaintiffs and Professor Feinstein contend, then Inovio's stock price would 'always 'fully reflect' available information.' For purposes of my analysis, I have assumed that Inovio's stock traded in an efficient market."
> **Stulz Report, ¶7.**

---

[10] Stulz Deposition, 134:11 – 136:12.

[11] "2Q20: Cash and COVID Vaccine Progress but Timeline Visibility More Opaque," by Charles Duncan and Pete Stavropoulos, Cantor Fitzgerald, analyst report, 11 August 2020, p. 1.

16.    Not only does Dr. Stulz not dispute my conclusion that the market for Inovio stock was efficient during the Class Period, but he does not challenge the empirical findings supporting that conclusion. For his regression analysis, Dr. Stulz adopts my choice of Market Index and Sector Index, and his statistical findings are qualitatively consistent with mine.[12]

17.    Dr. Stulz acknowledges in his report that the Inovio stock price returns on 3 March 2020, 9 March 2020, 10 March 2020, and 11 August 2020 are statistically significant at the 95% confidence level.

18.    Finally, Dr. Stulz does not dispute my conclusion in the Feinstein Report that damages can be computed for all Class Members using a common damage methodology that is consistent with Plaintiffs' allegations of liability. He does not challenge the existence, applicability, and feasibility of the out-of-pocket damage methodology for commonly computing damages for all Class Members.

19.    As such, the Stulz Report provides no reason to revise any conclusions presented in the Feinstein Report.

## IV.    DEFINING AND ASSESSING PRICE IMPACT

20.    The Supreme Court in *Halliburton II* held that defendants at the class certification stage may rebut the presumption of reliance "by showing that the alleged misrepresentation did not actually affect the stock price – that is, that it had no 'price impact.'"[13] From an

---

[12] In his report, Dr. Stulz uses a "generalized method of moments ('GMM') technique" which allows "for the abnormal return volatility to be higher early in the Putative Class Period and lower later during the Putative Class Period." See, Stulz Report, ¶41 and FN65. I maintain that using the Pre-Covid Estimation Period to measure the relationship between Inovio stock price movements and movements in the market and sector, as well as using the empirical distribution to assess statistical significance during the Class Period and Examination Period, is appropriate. However, disagreements over regression technique are moot as we agree on the statistical significance at the 95% confidence threshold for all relevant dates addressed in the Stulz Report. Further, under both my and Dr. Stulz's regression specifications, the Inovio stock price decline on 3 June 2020 was among the largest declines during the Class Period. My regression analysis finds that Inovio's residual stock price decline on 3 June 2020 was -12.47% (on a logarithmic basis), while Dr. Stulz finds that Inovio's residual stock price decline was -10.68% (on an arithmetic basis). Using either methodology, 3 June 2020 stands out as an unusually steep decline that was not likely to have been caused by random volatility alone.

[13] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2402 (2014) ("*Halliburton II*").

economic perspective, a statement has price impact if it either (i) causes the stock price to move, or (ii) maintains the stock price at a level other than what it would be but for the statement.

21.    Price impact and price movement are not the same thing. Information that prevents a stock price decline has price impact even though there may be no movement in the stock price. Therefore, while a statistically significant positive price reaction in response to misrepresentations may demonstrate price impact, a nonsignificant reaction, or even no price movement at all, does not prove there was no price impact. False statements that are consistent with market expectations or that omit material negative information would generally not be expected to cause a contemporaneous, statistically significant price increase. Such statements would have price impact by preventing a stock price decline that would otherwise have occurred had the truth been disclosed.

22.    The Feinstein Report noted that misrepresentations and omissions can have price impact not only by measurably increasing the stock price, but also by maintaining the stock price where it was, or even supporting the stock price so that it fell less than it otherwise would have but for the false and misleading statements.[14] This principle is also discussed in the professional literature:

> "Misrepresentations that falsely confirm market expectations will not lead to an *observable change in price*. But this does not mean they have no *price impact*. As the Second Circuit explained in *Vivendi*, 'a statement may cause inflation not simply by *adding* it to a stock, but by maintaining it.' The relevant price impact is simply counterfactual: the price would have fallen had there not been fraud."
> **"The Logic and Limits of Event Studies in Securities Fraud Litigation," by Jill E. Fisch et al., *Texas Law Review*, vol. 96, 2018, pp. 564-565 (emphasis in original).**

---

[14] Feinstein Report, ¶¶125-126.

## V.    CRITIQUE OF STULZ REPORT

### A.    Dr. Stulz's Price Impact Arguments Are Misguided Because He Disputes Rather than Accepts as an Assumption Plaintiffs' Allegations that Defendants Made Misrepresentations and Omissions that Misled the Market

23.    Rather than accepting as assumptions Plaintiffs' factual allegations, as is appropriate for a forensic finance expert assessing the price impact of alleged misrepresentations and omissions, Dr. Stulz disputes Plaintiffs' allegation that Defendants had made misrepresentations and omissions that misled the market. Specifically, Dr. Stulz assumes that the alleged misrepresentations about and related to Inovio having constructed a vaccine were truthful, fully informative, and not misleading. Thus, Dr. Stulz adopts the Defendants' legal arguments as true and his opinion regarding full disclosure prior to 9 March 2020 presumes Plaintiffs' allegations to be meritless.[15] Weighing in on the case merits in this manner is outside the proper role of a forensic finance expert.

24.    It is undisputed that on 2 March 2020 Company CEO Dr. Joseph Kim said:

> "When the new outbreak occurred, we applied our very innovative twenty-first century platform called DNA Medicines platform to Covid-19. By getting the, just the DNA sequence of the virus, we are able to fully construct a vaccine within three hours and we have been working on pre-clinical and preparation work … With existing resources and capacity, by end of this year, Inovio could deliver about one million doses …"
> **Transcription, https://www.c-span.org/video/?c4858361/user-clip-inovio-ceo-joseph-kim-adressing-trump-ompaniescoronavirus-plan (emphasis added).**

25.    Plaintiffs' allege that the Company's statements were false and misleading because, among other things, the Company **had only** "designed" the INO-4800 vaccine within three hours and **had not** "constructed" the vaccine. Plaintiffs allege that this distinction was first disclosed to the market on 9 March 2020, precipitating the statistically significant stock price declines on 9 March 2020 and 10 March 2020.

---

[15] *See*, Defendants' Opposition to Plaintiffs' Motion for Class Certification, dated 8 October 2021; and Stulz Report, pp. 21-23.

7

26.    Dr. Stulz contends that the 2 March 2020 statements were not misleading because prior to 2 March 2020, the Company had stated that it had "designed" the INO-4800 vaccine, and that these prior statements were true and constituted full disclosure of the truth. The foundation of Dr. Stulz's assumption, outside his area of expertise, is that "design" and "construct" are interchangeable terms. Dr. Stulz presumes that to "construct" means no more than to "design." Without any reliable corroborative evidence, Dr. Stulz assumes that all analysts and investors similarly equated "construct" with "design". Dr. Stulz makes all of these presumptions and assumptions despite acknowledging in his deposition that he is not "an expert on the difference between design and construct for vaccines."[16]

27.    I understand that the Court addressed this issue at the motion to dismiss stage and identified the distinction between "designed" and "constructed" as one of the "questions of fact" in this case.

> "Defendants move to dismiss Plaintiffs' claims regarding Kim's statements about constructing a vaccine in three hours because they fail to adequately plead falsity. In Defendants' estimation, Kim's statements were neither false nor misleading because 'construct' and 'design' are synonymous. As evidence of the terms' interchangeability, Defendants cite several instances of investors and analysts noting that Kim had claimed that Inovio 'designed' a vaccine in three hours after he said it had 'constructed' a vaccine in that time. Plaintiffs respond with dictionary definitions they believe show that the terms are not synonymous. As this disagreement shows, whether 'construct' and 'design' are synonyms in this context and how investors and analysts interpreted Kim's statements are questions of fact inappropriate for resolution at the motion to dismiss stage of the litigation."
> **MTD Memorandum, p. 11-12 (internal citations omitted).**

28.    As Dr. Stulz's price impact analysis of the "designed" and "constructed" INO-4800 vaccine statements does not address Plaintiffs' actual allegations that the Company's statements were false and misleading, his price impact analysis is misguided and misleading.

---

[16] Stulz Deposition, 165:14-15.

**B.     Dr. Stulz's Purported Analysis of Price Impact on the Misrepresentation Dates is Flawed and Misleading**

29.     Dr. Stulz acknowledges that the Inovio stock price increased 69.70% on 3 March 2020 and that this increase was statistically significant at the 95% confidence level.[17] The Inovio stock price increase on 3 March 2020 was the largest stock price increase during the Class Period. Nonetheless, Dr. Stulz maintains that "the alleged misrepresentation on March 2, 2020 did not impact Inovio's stock price."[18] Dr. Stulz contends that the Company's alleged misleading announcement on 2 March 2020 that it was "able to fully construct our vaccine within three hours" while adding that "'[w]ith existing resources and capacity, by end of this year, Inovio could deliver about one million doses ... by end of this year'"[19] had no positive impact on the stock price whatsoever.

30.     Dr. Stulz bases his opinion of no price impact on two erroneous arguments: (i) that the alleged misrepresentation made on 2 March 2020 was a reiteration of statements made by the Company previously;[20] and (ii) what made the stock price rise on 3 March 2020 was exclusively the Company's announcement that "it was accelerating its timeline for the COVID-19 DNA vaccine development, including human trials planned for April 2020."[21]

31.     Dr. Stulz is wrong to assert that "the alleged misrepresentation on March 2, 2020 is essentially the same as the alleged misrepresentation on February 14, 2020"[22] and that the 2 March 2020 alleged misstatements therefore could not have further impacted the price of Inovio stock. First, Dr. Stulz ignores the context in which the 2 March 2020 statements were made. Not only were the statements made to an international audience from the White House Situation Room, but between 14 February 2020 and 2 March 2020,

---

[17] Stulz Report, Exhibit 2B (percent change is on an arithmetic basis).

[18] Stulz Report, §VII.C.

[19]https://www.c-span.org/video/?c4858361/user-clip-inovio-ceo-joseph-kim-adressing-trump-ompaniescoronavirus-plan. See, Complaint, ¶99.

[20] Stulz Report, ¶53.

[21] Stulz Report, ¶54.

[22] Stulz Report, ¶53.

Covid-19 was spreading rapidly around the world and the Center for Disease Control had warned Americans to brace for the eventual community spread of Covid-19 and that the "disruption to everyday life may be severe."[23] While Dr. Stulz acknowledged in his deposition testimony that "[t]here are cases where the circumstances can make a difference"[24] he simply ignores the substantial change in circumstances involving Covid between the 14 February 2020 and 2 March 2020 statements. Second, Dr. Stulz disregards the fact that while the initial 14 February 2020 misrepresentation misinformed the market that the Company had "constructed" the vaccine, the 2 March 2020 alleged misrepresentations, elaborated and provided broader information about the Company's vaccine "construct," the Company's ability to bring this constructed vaccine to market, and the Company's ability to "deliver about one million doses … by the end of this year."[25]

> "When the new outbreak occurred, we applied our very innovative twenty-first century platform called DNA Medicines platform to Covid-19. By getting the, just the DNA sequence of the virus, we are able to fully construct a vaccine within three hours and we have been working on pre-clinical and preparation work. With the help of the FDA acceleration and really working very well together, our plan is to start the U.S. based clinical trials for Covid-19 vaccine in the April of this year, followed by shortly thereafter, trials in China, in South Korea."
> **Transcription, https://www.c-span.org/video/?c4858361/user-clip-inovio-ceo-joseph-kim-adressing-trump-companiescoronavirus-plan.**

> "With existing resources and capacity, by end of this year, Inovio could deliver about one million doses, but to scale by end of this year. To scale beyond that, we need your help Mr. President. We need to work with you and your agencies BARDA and others to help us scale our vaccine. To

---

[23] *See*, CDC Covid-19 timeline at https://www.cdc.gov/museum/timeline/covid19.html

[24] Stulz Deposition, 194:18-195:21.

[25] https://www.c-span.org/video/?c4858361/user-clip-inovio-ceo-joseph-kim-adressing-trump-companiescoronavirus-plan. See, e.g., Complaint, ¶99.

manufacturer in America, to protect American public. Also, to lead the world in vaccine development from America."
**Transcription,  https://www.c-span.org/video/?c4858361/user-clip-inovio-ceo-joseph-kim-adressing-trump-companiescoronavirus-plan.**

32.    Given the additional alleged misinformation provided on 2 March 2020, Dr. Stulz cannot reasonably conclude that no portion of the statistically significant stock price increase on 3 March 2020 was caused by the alleged misrepresentations and omissions.

33.    Based on an examination of premarket and intraday stock prices on 3 March 2020, Dr. Stulz suggests that the Inovio stock price movement that day was affected by information in Inovio's 8:00 AM press release, "announcing an accelerated timeline for developing the INO-4800 vaccine."[26] During his deposition, however, Dr. Stulz testified ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████[27] If Dr. Stulz is offering the opinion that the 3 March 2020 stock price movement was *fully* caused by the press release that day, and not by statements made by Defendants on 2 March 2020, his opinion is incorrect and inconsistent with his own analytic methodology. Specifically, the accelerated timeline information was not announced for the first time in the 8:00 AM press release, but rather was announced the previous day at the White House event. The press release specifically stated that Company management had "shared this accelerated timeline at the U.S. Coronavirus Task Force meeting at the White House on March 2."[28] Thus, Dr. Stulz's opinion that it was the 3 March 2020 press release and not the 2 March 2020 White House statements that impacted Inovio's stock price is inconsistent with his opinion that the "repetition of existing information should not impact the stock price."[29]

---

[26] Stulz Report, ¶54.

[27] Stulz Deposition, 192:5 – 193:6.

[28] "Inovio Accelerates Timeline for COVID-19 DNA Vaccine INO-4800," *PR Newswire*, Company press release, 3 March 2020, 8:00 AM.

[29] Stulz Report, ¶53.

11

34. Dr. Stulz's suggested attribution of the 3 March 2020 stock price increase only to disclosures about the "accelerated timeline" for INO-4800 is further flawed because analyst reports following the 2 March 2020 White House statements reveal that analysts highlighted the allegation-related information, and did not just comment on the "accelerate timeline" information. For example:

> "The new COVID-19 vaccine, INO-4800 was developed in just 3 hours once the COVID-19 sequence was deposited in data banks for public access. This is demonstration of the versatility and speed with which Inovio can respond to an 'emergency' situation. … The human trials are set to begin in April. The US study will be in N=30 healthy volunteers, and initiation should be followed shortly by the studies in China and South Korea. Data from these trials are expected to be reported in Fall 2020. By the end of 2020, Inovio plans to have 1M doses prepared for emergency use and further trials."
> **"COVID-19 Vaccine Candidate INO-4800 Timelines Announced, Could Have 1 Million Doses by YE20," by Jason McCarthy, Maxim Group, analyst report, 3 March 2020, p. 1.**

> "Data anticipated in fall 2020; Over 1M doses of '4800 to be manufactured by YE20."
> **"DNA-Based Platform Gaining Traction in COVID-19 Therapeutics Race," by Charles Duncan and Pete Stavropoulos, Cantor Fitzgerald, analyst report, 3 March 2020, p. 1.**

> "The company plans to deliver 1M doses by the end of 2020 with existing resources and capacity."
> **"Coronavirus Vaccine Development Timeline Accelerated; Positive Preclinical Data; Reiterate Buy," by Raghuram Selvaraju and Yi Chen, H.C. Wainwright, analyst report, 4 March 2020, p. 1.**

35. Dr. Stulz has failed to establish that the 3 March 2020 stock price movement was wholly caused by the disclosure of information unrelated to the alleged misrepresentations. He has not proved that the alleged misrepresentations and omissions had no impact on Inovio's stock price on 3 March 2020. Nor has he even provided any reasonable basis to conclude that the 3 March 2020 stock price movement is not evidence that Defendants' alleged misrepresentations impacted Inovio's stock price.

**C.    Dr. Stulz's Purported Analyses of Price Impact Following the Alleged Corrective Disclosures are Flawed, Misleading, and Unreliable**

**1.    9-10 March 2020**

36.    In addition to his flawed analysis of the 3 March 2020 stock price increase discussed above, Dr. Stulz seeks to support his opinion regarding the 14 February 2020 and 2 March 2020 misstatements by challenging that information partially correcting these misstatements impacted the price of Inovio stock on 9 March 2020, the date of the first corrective disclosure. This section responds to Dr. Stulz's arguments relating to the 9 March 2020 corrective disclosure.

37.    As an initial matter, Dr. Stulz's analysis of the 9 March 2020 price response is incomplete and insufficient to prove that the 14 February 2020 and 2 March 2020 misstatements had no price impact. Plaintiffs allege that the disclosure impacted the price of Inovio stock on *both* 9 March 2020 and 10 March 2020. While Dr. Stulz concedes that the Inovio stock price returns on *both* 9 March 2020 and 10 March 2020 are statistically significant, he failed to assess or even consider the price impact on 10 March 2020. Moreover, Dr. Stulz did not identify any Company-specific, non-allegation related information that could have caused the statistically significant decline in Inovio's stock price on 10 March 2020.

38.    Dr. Stulz's remaining arguments about price impact on 9 March 2020 are flawed and unreliable. He argues that: "first, it does not appear that Inovio's Twitter statement provided new, value-relevant information"[30]; and second "a review of Inovio's intraday stock price movement on March 9, 2020 reveals that Inovio's stock price increased from $9.22 at 1:26 p.m. ET, the time of its Tweet, to $9.83 at the close of trading."[31]

39.    Dr. Stulz's contention that Inovio's Twitter statement provided no new, valuation-relevant information relies on his deliberate and inappropriate mischaracterization of Plaintiffs' allegations. He seeks to support his view that there was no new information disclosed in Inovio's Twitter statement by citing previous examples of media sources reiterating that Inovio had "designed" its vaccine within three hours. However, that Inovio had "designed"

---

[30] Stulz Report, ¶56.

[31] Stulz Report, ¶57.

its vaccine within three hours is not what Plaintiffs allege would have constituted full disclosure. Rather, Plaintiffs allege that the Company concealed that it **had only** "designed" and **had not** "constructed" the vaccine within three hours. While Dr. Stulz is able to cite to examples of his mischaracterized but-for disclosures, he is unable to identify a single example in news or analyst reports prior to 9 March 2020 in which Plaintiffs' actual but-for information was revealed to the market. Thus, Dr. Stulz has no basis to conclude that the Inovio Twitter statement, and the broader disclosure on 9 March 2020, conveyed no new, valuation-relevant information to the market.

40.   Dr. Stulz's second argument in support of his 9 March 2020 price impact analysis is unreliable for similar reasons. He again mischaracterizes or misinterprets Plaintiffs' allegations. He wrongly assumes that the 9 March 2020 Citron Research Tweet is unrelated to Plaintiffs' allegations.[32] Plaintiffs' allegations, as set out in the Complaint, under the header "Disclosure of Defendants' Scheme to Defraud", state that both the Citron Research Tweet and the Inovio reply are alleged to have revealed fraud-related information that day.[33]

> "On March 9, 2020, at or about 10:38 a.m. ET, Citron Research issued a Tweet condemning Kim's claims that the Company had constructed a vaccine within three hours, noting Kim's assertions were 'ludicrous and dangerous' and that '[i]nvestors have been warned.' At or about 1:26 p.m. ET on the morning of March 9, 2020, Inovio responded to Citron Research with a Tweet of its own, conceding that it had not constructed its vaccine within three hours, but had merely 'designed a vaccine construct.' In response to this exchange, the Company's stock price dropped from its March 9, 2020 opening price of $18.72 per share to close at $9.83, on over 138 million shares in volume. On March 10, 2020, as investors continued to absorb Inovio's concession that Kim's prior statements were not accurate, the Company's stock price dropped from its March 9, 2020 closing price of $9.83 per share to close at $5.70 per share, on over 75 million shares

[32] See, Stulz Report, FN84: "I note that the Memorandum Regarding Defendants' Motion to Dismiss states: 'As Plaintiffs tell it, Inovio's March 9 tweet was the first time it claimed to have only designed a vaccine in three hours and its stock price tumbled in response.' *See* Memorandum Regarding Motion to Dismiss, p. 17."

[33] Complaint, ¶113.

14

in volume. The March 9-10 share price drop reflected a market capitalization loss of over $600 million, or a 59.5% decline from Inovio's closing price on March 6, 2020."
**Complaint, ¶¶113-114.**

41. The Company's 9 March 2020 statement that it had not "constructed" the vaccine within three hours fully corrected the prior misstatements regarding the vaccine "construct" versus "design." Citron Research's Twitter statement and the Company's response are further evidence that the market had been misled, contrary to Dr. Stulz's contention that the market had not been. Dr. Stulz's own analysis shows that the price decline between the time of the release of the Citron Research Twitter statement and the close of trading on 9 March 2020, was a substantial $6.49 per share.

42. Further, even if one were to accept Dr. Stulz's mischaracterization of Plaintiffs' allegations, Dr. Stulz fails to address that Inovio's stock price declined 42.01% (on an arithmetic basis), or $4.13 per share, on 10 March 2020.[34] This decline occurred after the Inovio Twitter statement, and neither I nor Dr. Stulz identified any new Company-specific information that transpired on 10 March 2020 that could explain this decline aside from the corrective disclosures on 9 March 2020. Dr. Stulz's contention that the entirety of the Inovio stock price decline occurred before the Company's Twitter statement is inaccurate.

43. Dr. Stulz further ignores that Piper Sandler analysts directly attributed the Inovio stock price decline to the corrective disclosure.

> "This saga has not been without controversy with at least one short thesis making the rounds on social media on Monday morning, questioning the validity of management's recent claims that INO-4800 was designed within 3 hours of the publication of the genetic sequence of SARS-CoV-2. Management countered that this timeline is in fact accurate, but this still drove a sharp stock reaction as described previously."
> **"Downgrade to Neutral: Love the Platform but COVID19 Upside Seems Priced In,"**
> **by Christopher J. Raymond et al., Piper Sandler, analyst report, 13 March 2020, p. 2.**

---

[34] Stulz Report, Exhibit 2B (percent change is on an arithmetic basis).

44.   In sum, Dr. Stulz has no basis to conclude that the alleged misrepresentations and omissions did not impact the price of Inovio stock on 9 March 2020 and 10 March 2020. Given that he has failed to establish that the disclosure of information correcting the 14 February 2020 and 2 March 2020 misstatements had no price impact, he similarly cannot reliably conclude that the 14 February 2020 and 2 March 2020 statements themselves did not impact the price of Inovio stock.

### 2.    10 August 2020

45.   Dr. Stulz concludes in his report that "any stock price declines following the August 9 and 10, 2020 disclosures were not due to new information about Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm and are therefore not evidence of prior price impact from the alleged March 24, May 11, and May 12, 2020 misrepresentations."[35] His price impact analysis for these dates is flawed, misleading, and incorrect.

46.   Dr. Stulz bases his conclusion on the following arguments: (i) the 10 August 2020 Inovio stock price return was not statistically significant (Dr. Stulz agrees that the 11 August 2020 was statistically significant); (ii) the 9 August 2020 *New York Times* article did not discuss Inovio's manufacturing capacity specifically related to VGXI, Ology, and Richter-Helm; and (iii) the 10 August 2020 earnings release and conference call did not discuss Inovio's manufacturing capacity specifically related to VGXI, Ology, and Richter-Helm. In his Report, Dr. Stulz also appears to conclude that the entirety of the statistically significant Inovio stock price decline on 11 August 2020 was driven by "the delay in the expected start date of Inovio's Phase 2/3 efficacy trial."[36] However, during his deposition, Dr. Stulz

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ [37]

---

[35] Stulz Report, ¶28.C.

[36] Stulz Report, ¶28.C.5.

[37] Stulz Deposition, 137:5 – 139:24.

47.  I understand from Plaintiffs counsel that based on the dismissed 30 June 2020 misrepresentation, the 9 August 2020 *New York Times* article, which allegedly impacted the Inovio stock price on 10 August 2020, is no longer at issue in this case. Thus, Dr. Stulz's arguments relating only to the price movement on 10 August 2020 are not relevant to the analysis of the price impact of the case's misrepresentations and omissions.

48.  Below, I address Dr. Stulz's arguments related to the corrective disclosure that occurred after the close of trading on 10 August 2020 disclosure event, which is alleged to have impacted the price of Inovio stock on 11 August 2020.

49.  Dr. Stulz's arguments again rely on a mischaracterization and inappropriately narrow interpretation of Plaintiffs' allegations. Dr. Stulz erroneously assumes for the purposes of his analysis that information about the Company's manufacturing capacity is only corrective if it explicitly mentions VGXI, Ology, or Richter-Helm.[38] Plaintiffs allege that the Company "made false and misleading statements regarding the development of the INO-4800 vaccine and the Company's ability to produce one million doses of the vaccine by the close of 2020, and hundreds of millions of doses each year thereafter."[39] Thus, Plaintiffs' allegations are not limited to the specific quantities of doses that each of the manufacturers – VGXI, Ology, and Richter-Helm – would produce, as Dr. Stulz implies, but rather address whether or not the Company could "produce one million doses of the vaccine by the close of 2020, and hundreds of millions of doses each year thereafter."[40] Information that told the market that the Company could not produce the represented aggregate volume of doses partially corrects the alleged misrepresentations and omissions, regardless of whether the disclosures identify specific manufacturing partners.

50.  Dr. Stulz overlooks that the 10 August 2020 Company conference call disclosed additional, negative information about the Company's manufacturing capacity for INO-4800. Specifically, for the first time since the VGXI lawsuit had been disclosed, Defendants

---

[38] See, e.g., Stulz Report, ¶66.(1): "disclosures concerning Inovio's lawsuit against VGXI became public and revealed the information Plaintiffs allege was misrepresented concerning Inovio's manufacturing capabilities with VGXI, Ology, and Richter-Helm."

[39] Complaint, ¶7.

[40] Complaint, ¶7.

stopped downplaying the impact of the VGXI litigation and disclosed that Inovio was now "squarely" focused on "scaling up for the 100 million doses that we feel are needed in, 2021."[41] When compared to CEO Kim's 11 May 2020 statement, that Inovio was "on right track" to hit its production guidance, the 10 August 2020 conference call revealed that after losing over two months' time in the race to develop a vaccine that could potentially earn Inovio hundreds of millions of dollars in external funding, the Company still needed to engage additional manufacturing partners. That certainly was additional negative news as pharmaceutical companies that were seeking funding from the federal government to develop a Covid-19 vaccine were required to demonstrate "the industrial process scalability, yields, and consistency necessary to reliably produce more than 100 million doses by mid-2021."[42] After participating in Inovio's 10 August 2020 conference call, a Roth Capital securities analyst concluded that "we do not believe management's production forecasts."[43] Further, it was not until September 2020 that Inovio announced that it had merely entered into a "letter of intent" with Thermo-Fisher for the production of 100 million doses in 2021.[44]

51.    Dr. Stulz's analysis of the 11 August 2020 stock price decline and his conclusion that it could not have been caused in any part by disclosures regarding Inovio's manufacturing capacity also disregards analyst commentary during and after the 10 August 2020 conference call, which took place after the close of trading that day. On the conference call, analysts expressed their increased skepticism about the Company's ability to produce one million doses in 2020 and hundreds of millions per year in 2021 and beyond.

> [Charles Duncan – Cantor Fitzgerald analyst]: Joe, your answer just addressed many of the other questions that I had. I just had 2 more, and I'll throw them into one so you can address those, and that is really related to

---

[41] "Q2 2020 Inovio Pharmaceuticals Inc Earnings Call," Thomson Reuters, conference call, 10 August 2020, p. 9.

[42] *Operation Warp Speed Accelerated COVID-19 Vaccine Development Status and Efforts to Address Manufacturing Challenges*, Report to Congressional Addressees, United States Government Accountability Office, February 2021.

[43] "INO 2Q20: Years of Cash, Not Expecting INO-4800 to Pan Out Against Competition," by Jonathan Aschoff, Roth Capital Partners, analyst report, 11 August 2020, p. 1.

[44] See, "INOVIO Adds Thermo Fisher Scientific To Global Manufacturing Consortium," Company press release, *PR Newswire*, 8 September 2020, 8:00 AM.

capacity and its capacity not only to conduct a Phase II/III. And I think you're probably still talking about a 20,000-, 30,000-patient study on the upper end, but I'm wondering if you could provide some color on that. And then with regard to capacity -- the other capacity, and that is manufacturing, some folks have wondered about logistics and manufacturing capacity that you may or may not have, and I'm wondering how you solve for that problem and fund it. …

[J. Joseph Kim – Inovio CEO]: [I]n terms of longer-term supply and being able to build to the hundreds of millions of doses that we would need, we recognize that very early on. As early as January, we recognized that we would have to approach manufacturing in a very novel and very different way. And the same way that other companies have reached out and established manufacturing consortia for their vaccines, we've also taken the same approach with INO-4800. So some of those manufacturing partnerships we've talked about, so Richter-Helm and Ology. And over the next couple of months, we'll be announcing further manufacturing partnerships. And these are partnerships based in the U.S. and Europe and we're also now exploring partnerships beyond the U.S. and Europe.
**"Q2 2020 Inovio Pharmaceuticals Inc Earnings Call," *Thomson Reuters*, conference call, 10 August 2020, p. 11.**

52.    Concern and doubts about the Company's manufacturing capacity and its ability to produce one million doses in 2020 and hundreds of millions beginning in 2021 were echoed in analyst reports. Following the lack of clarification from management on the Q2 2020 conference call, analysts at Roth Capital wrote "we do not believe management's production forecasts."[45] Cantor Fitzgerald analysts reduced their price target for Inovio stock to $31 from $45, citing the trial delays and "only a cautious optimism in manufacturing capacity, given management commentary on the 2Q20 call."[46]

"INO-4800. INO intends to begin its Phase 2/3 INO-4800 trial by the end of 3Q20 with external funding, and the company intends to ramp manufacture of plasmids and CELLECTRA 3PSP electroporation devices, maintaining its goal of 1 million doses by YE20 and 100 million doses, as well as INO-4800 emergency use approval, by YE21. ***Given the position of its manufacturing partners that this level of manufacturing cannot be***

---

[45] "INO 2Q20: Years of Cash, Not Expecting INO-4800 to Pan Out Against Competition," by Jonathan Aschoff, Roth Capital Partners, analyst report, 11 August 2020, p. 1.

[46] "2Q20: Cash and COVID Vaccine Progress but Timeline Visibility More Opaque," by Charles Duncan and Pete Stavropoulos, Cantor Fitzgerald, analyst report, 11 August 2020, p. 1.

19

*attained, and their reluctance to give their technology to other manufacturing companies to assist, we do not believe management's production forecasts*."
**"INO 2Q20: Years of Cash, Not Expecting INO-4800 to Pan Out Against Competition," by Jonathan Aschoff, Roth Capital Partners, analyst report, 11 August 2020, p. 1 (emphasis added).**

"We reiterate our Overweight rating and are *reducing our PT to $31 from $45 on INO shares*. Our price target reduction results from our reduced visibility on clinical trial execution, and *only a cautious optimism in manufacturing capacity, given management commentary on the 2Q20 call*."
**"2Q20: Cash and COVID Vaccine Progress but Timeline Visibility More Opaque," by Charles Duncan and Pete Stavropoulos, Cantor Fitzgerald, analyst report, 11 August 2020, p. 1 (emphasis added).**

"No change to Neutral outlook on INO following Q220 results. Specifically, while COV-19 vaccine INO-4800 (which we do not model) has called significant attention to this stock, we find ourselves – even after this evening's call – still asking a number of important questions, including why has FDA still not provided concurrence on starting the P2/3?; how did P1 results showing 34/36 immunological response become 38/38 (when three were initially deemed COV-19 positive) without adding more patients?; *and maybe most important of all, how can INO manufacture 100M doses next year if partner VGXI will not facilitate tech transfer*? … we still wonder how 100M doses can be manufactured next year when partner VGXI refuses to facilitate tech transfer – a step INO themselves claimed was critical in their own court pleadings from earlier this summer. Long story short – we continue to leave INO-4800 out of our model."
**"Q220 Update; More Questions Than Answers," by Christopher Raymond et al., Piper Sandler, analyst report, 10 August 2020, p. 1 (emphasis added).**

"A finer point yet slight delay on the ph.II/III start of INO-4800 - now guided for September - with incremental updates to the ph.I interim data though no significant change to the shape of INO's COVID-19 vaccine candidate profile. We still await the fuller ph.I dataset, more precision on the next study, and even an announcement on additional external funding to support clinical development - though *we continue to view the current uncertainties around the legal dispute, scale, and a clean path forward as offsetting and gating to unlocking further valuation potential*. That said, other pipeline programs remain mostly on track - setting up for a catalyst stream over 2H2020 worth watching."
**"2Q20: Thinking Fast and Slow – INO-4800 Advances Alongside an Accelerating Vaccine Field," by Gregory Renza and Yinglu Zhang, RBC, analyst report, 10 August 2020, p. 1 (emphasis added).**

20

53.    Importantly, in his deposition, Dr. Stulz professed that if ███████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████ [47]



54.    As shown in the analyst quotes above, analysts expressed concern over the lack of additional information on the Company's manufacturing capacity progress. Based on the ████████ statement that Defendants issued immediately after the 3 June 2020 disclosure, analysts would have been expecting updated and positive information regarding Inovio's ability to manufacture INO-4800 from the Company.[48] Dr. Stulz disregarded the ████████

---

[47] Stulz Deposition, 143:11 – 145:11.

[48] See, e.g., "Inovio expects the contractual matter dispute with VGXI to be resolved shortly, and that the technology transfer will begin as planned, Richard[s]on said." ("Inovio files lawsuit against one of its Covid-19 vaccine development partners," by John George, Philadelphia Business Journal, 4 June 2020.) ████████

███████████████████████████████████████████████████████████████████

statements concerning the VGXI litigation, as well as analyst discussion relating to management's lack of clarification on the 10 August 2020 conference call about Inovio's INO-4800 manufacturing capacity. His failure to consider these facts further undercuts Dr. Stulz's opinion that allegation-related manufacturing information had no impact on the price of Inovio stock on 11 August 2020.

55. As noted above, in his deposition testimony Dr. Stulz took the position that he was not offering any opinion about what caused the undisputed decline in Inovio's stock price on 11 August 2020. During his deposition testimony, Dr. Stulz stated ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ [49] This failure to identify what, other than the allegation-related disclosures during the 10 August 2020 conference call, caused the Inovio stock price to decline on 11 August 2020 further renders Dr. Stulz's opinion infirm. To the extent Dr. Stulz takes the position that the Inovio stock price decline on 11 August 2020 was driven entirely by "the delay in the expected start date of Inovio's Phase 2/3 efficacy trial,"[50] as he appears to do in his Report but backpedals from in his deposition, that opinion is contradicted by Defendants' statements and analyst commentary about Inovio's INO-4800 manufacturing capacity.

56. Given the statistical significance of the 11 August 2020 Inovio stock price decline, the disclosures and analyst commentary regarding Inovio's manufacturing capacity that Dr. Stulz failed to consider, and Dr. Stulz's failure to identify any information unrelated to the allegations that could fully account for the 11 August 2020 stock price decline, he has failed to demonstrate that the disclosure of allegation-related information had no impact on the price on Inovio stock on 11 August 2020.

---

████████████████████████████████████████████████████████

████████████████████████████████████████████████

[49] Stulz Deposition, 140:5-13.

[50] Stulz Report,¶66(5).

## VI.    LIMITING FACTORS AND OTHER ASSUMPTIONS

57.    This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

Steven P. Feinstein, Ph.D., CFA

23

**Exhibit-1**

**Documents and Other Information Considered
In Addition to Those Cited in the Feinstein Report**

**EXPERT REPORTS**

- Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA, dated 29 July 2021.
- Expert Report of Professor Rene M. Stulz, Ph.D., dated 8 October 2021.

**DEPOSITIONS**

- Remote Video Deposition of Rene Stulz, dated 19 November 2021.

**LEGAL DOCUMENTS**

- Defendants' Opposition to Plaintiffs' Motion for Class Certification, dated 8 October 2021.

**INTERNAL COMPANY DOCUMENTS**

- INO_EDPA_00017015
- INO_EDPA_00017029
- INO_EDPA_00017153
- INO_EDPA_00021880
- INO_EDPA_00093204
- INO_EDPA_00093205
- INO_EDPA_00096409
- INO_EDPA_00096410
- INO_EDPA_00100584
- INO_EDPA_00100585
- INO_EDPA_00100586
- INO_EDPA_00100587
- INO_EDPA_00101305
- INO_EDPA_00101638
- INO_EDPA_00144053
- INO_EDPA_00154576
- INO_EDPA_00156002
- INO_EDPA_00184276
- INO_EDPA_00184277

**Exhibit-1**

**Documents and Other Information Considered
In Addition to Those Cited in the Feinstein Report**

- INO_EDPA_00186488
- INO_EDPA_00186489
- INO_EDPA_00186560
- INO_EDPA_00186561
- INO_EDPA_00186879
- INO_EDPA_00186880

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Fisch, Jill E. et al., "The Logic and Limits of Event Studies in Securities Fraud Litigation," *Texas Law Review*, vol. 96, 2018.

**OTHER**

- https://www.cdc.gov/museum/timeline/covid19.html.
- Operation Warp Speed Accelerated COVID-19 Vaccine Development Status and Efforts to Address Manufacturing Challenges, Report to Congressional Addressees, United States Government Accountability Office, February 2021.
- Any other documents cited in the report.

**Exhibit-2**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided Since the Feinstein Report**

In Re Endo International PLC Securities Litigation
Master File No. 2:17-cv-05114-MMB
United States District Court
Eastern District of Pennsylvania
Deposition Testimony
July 2021

In Re McKesson Corporation Securities Litigation
Master File No. 3:18-cv-06525-CRB
United States District Court
Northern District of California
Deposition Testimony
August 2021

In Re Perrigo Company PLC Securities Litigation
Master File No. 2:18-cv-02074
United States District Court
District of New Jersey
Deposition Testimony
October 2021

In Re Wells Fargo & Company Securities Litigation
Master File No. 3:18-cv-03948-JD
United States District Court
Northern District of California
Deposition Testimony
November 2021