THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICK MCDERMID, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INOVIO PHARMACEUTICALS, INC., et al.,<br><br>Defendants. | Case No. 2:20-cv-01402-GJP<br><br>CLASS ACTION |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................. 1

II. STATEMENT OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS ........ 2

    A. Inovio Designs a COVID-19 Vaccine and Begins Preclinical Testing. ................. 2

    B. Inovio Begins a Phase 1 Clinical Trial and Continues Preclinical Testing. ........... 3

    C. Inovio Seeks FDA Approval to Skip Phase 2 and Proceed Directly to a Phase 3 Clinical Trial. ...................................................................................................... 4

    D. Inovio Announces Plans to Begin a Phase 2/3 Trial Upon FDA Concurrence. ..... 5

    E. Inovio Announces Results from Its Non-Human Primate Study, Which Demonstrated No Antibody-Dependent Enhanced Disease Events. ...................... 6

    F. Inovio Updates Investors on Plans to Begin Phase 2/3 Trials in September 2020 Upon FDA Concurrence. ....................................................................................... 6

    G. Inovio Announces Receipt of Notice from FDA that Inovio's Proposed Phase 2/3 Clinical Trial Protocol Has Been Placed on Clinical Hold. .................................... 7

    H. Inovio Resolves the Hold Comments and Is Cleared to Proceed with the Phase 2 Segment of Its Planned Phase 2/3 Clinical Trial. .................................................. 8

    I. Plaintiffs' Amendments to the Second Amended Complaint. ................................ 8

III. LEGAL STANDARD .......................................................................................... 9

IV. ARGUMENT ...................................................................................................... 11

    A. The Newly Challenged Statements Are Not Materially False or Misleading. ..... 11

        1. Defendants' June 30 statements regarding Inovio's Phase 1 clinical trial were not false or misleading. ............................................................... 11

        2. Defendants' June 30 and August 10 statements about plans to begin a Phase 2/3 clinical trial were not false or misleading. ............................... 14

            a. Defendants had no duty to disclose the partial clinical hold on the proposed Phase 3 clinical trial protocol. ................................ 14

            b. Inovio disclosed that it could not begin a Phase 2/3 clinical trial until it received FDA concurrence. ............................................... 15

            c. The statements about Inovio's plans to conduct a Phase 2/3 clinical trial are protected by the PSLRA safe harbor. ................. 16

                i. The statements were identified as forward-looking and accompanied by meaningful cautionary language. ........... 17

                ii. Plaintiffs do not allege that any Defendant actually knew that Inovio would not meet its projected timeline... 19

    B. Plaintiffs' New Allegations Fail to Plead Loss Causation. ................................... 22

        1. Dr. Kim's August 10 update on Inovio's 2021 production goals does not correct his May 11 statement about Inovio's 2020 production goals. .................................................................................................. 22

        2. The August 10 disclosures do not correct the June 30 alleged misrepresentation. .................................................................................. 24

Page

3. The September 28 disclosure does not correct the June 30 or August 10 alleged misrepresentations. ................................................................. 24

C. Robert Juba Should Be Dismissed. ........................................................ 25

V. CONCLUSION ................................................................................................ 25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010)........................................................................10, 18

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
2017 WL 5635422 (C.D. Cal. Sept. 20, 2017) ........................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................10

*In re Campbell Soup Co. Sec. Litig.*,
2020 WL 7022655 (D.N.J. Nov. 30, 2020) ............................................20

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)..........................................9, 12, 15, 16

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................25

*In re DVI, Inc. Sec. Litig.*,
2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ..........................................24

*In re Empyrean Bioscience, Inc. Sec. Litig.*,
255 F. Supp. 2d 751 (N.D. Ohio 2003)..................................................20

*Fan v. StoneMor Partners LP*,
927 F.3d 710 (3d Cir. 2019)..................................................................15

*Ganem v. InVivo Therapeutics Holdings Corp.*,
845 F.3d 447 (1st Cir. 2017)..........................................................19, 21

*In re Gold Res. Corp. Sec. Litig.*,
957 F. Supp. 2d 1284 (D. Colo. 2013)..................................................20

*Hackel v. AVEO Pharms., Inc.*,
474 F. Supp. 3d 468 (D. Mass. 2020) ..............................................16, 18

*Hoey v. Insmed Inc.*,
2018 WL 902266 (D.N.J. Feb. 15, 2018) ....................................13, 14, 15, 19

*In re Initial Pub. Offering Sec. Litig.*,
399 F. Supp. 2d 261 (S.D.N.Y. 2005)....................................................24

TABLE OF AUTHORITIES
(continued)

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...........................................................10-11, 16, 20, 21

*KBZ Commc'ns Inc. v. CBE Techs. LLC*,
    634 F. App'x 908 (3d Cir. 2015) .............................................................10

*Kleinman v. Elan Corp., plc*,
    706 F.3d 145 (2d Cir. 2013)..................................................................12

*Kuhne v. Gossamer Bio, Inc.*,
    2021 WL 1529934 (S.D. Cal. Apr. 19, 2021)................................... 18-19

*In re MedImmune, Inc. Sec. Litig.*,
    873 F. Supp. 953 (D. Md. 1995)............................................................13

*In re NutriSystem, Inc. Derivative Litig.*,
    666 F. Supp. 2d 501 (E.D. Pa. 2009) ....................................................22

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016)............................................................17, 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..............................................................................15

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)...............................................12, 15

*Smith v. Antares Pharma, Inc.*,
    2020 WL 2041752 (D.N.J. Apr. 28, 2020) ..........................................12

*In re Synchronoss Techs., Inc. Sec. Litig.*,
    2020 WL 2786936 (D.N.J. May 29, 2020)............................................22

*In re Tech. Chems. Sec. Litig.*,
    2001 WL 543769 (S.D. Fla. Mar. 20, 2001)..................................... 16-17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..............................................................................21

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)..................................................................14

*Vallabhaneni v. Endocyte, Inc.*,
    2016 WL 51260 (S.D. Ind. Jan. 4, 2016)..............................................15

*Wang Yan v. ReWalk Robotics Ltd.*,
    330 F. Supp. 3d 555 (D. Mass. 2018) ..............................................................16, 17

*In re Xerox Corp. Sec. Litig.*,
    935 F. Supp. 2d 448 (D. Conn. 2013 ..................................................................24

**Statutes**

15 U.S.C.
    § 78u–4(b)(1) ..................................................................................................10
    § 78u–4(b)(2) ..................................................................................................10
    § 78u–5(i)(1)(B) ..............................................................................................16
    § 78u–5(c)(1) ..................................................................................................17

**Other Authorities**

17 C.F.R. § 240.10b5-1 ............................................................................................15

21 C.F.R.
    § 312.21 ............................................................................................................4
    § 312.21(c) .......................................................................................................4

Fed. R. Civ. P. 9(b) ..................................................................................................10

## I. INTRODUCTION

On February 17, 2022, Plaintiffs filed their Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("SAC"). The SAC challenges new statements made on June 30 and August 10, 2020, alleges new corrective disclosures on August 10 and September 28, 2020, and dismisses Robert Juba, Jr. as a defendant from Count 1. Defendants move to dismiss only the newly challenged statements, newly alleged corrective disclosures, and Mr. Juba as a defendant from Count 2.

The new allegations encompass two new theories of liability. Both fail as a matter of law.

***Theory #1: Manufacturing Goals.*** Plaintiffs' first new theory fails to plead loss causation. This theory—which Plaintiffs first introduced in their reply brief for class certification—is that Inovio's August 10 statement about "scaling up for 100 million doses that we feel are needed in 2021" somehow corrected the May 11 statement that Inovio was "on [the] right track" to produce 1 million doses of its COVID-19 vaccine by the end of 2020. Plaintiffs, however, are conflating statements about two different goals: (1) the production target in 2020 versus (2) the production target in 2021. The August 10 statement cannot be "corrective" of the May 11 statement because they are about entirely different goals. Additionally, this theory is inconsistent with Plaintiffs' own allegations that all of the omitted information that allegedly rendered the May 11 statement misleading (*i.e.*, problems with an existing manufacturer) was disclosed prior to August 10. In short, it is simply not plausible that August 10 can support loss causation for May 11.

***Theory #2: Anticipated Phase 2/3 Clinical Trials.*** Plaintiffs' second new theory fails to plead falsity, scienter, and loss causation. This theory focuses on Inovio's disclosures on June 30 and August 10 regarding its plans to begin a Phase ***2/3*** clinical trial upon FDA approval. Plaintiffs allege these disclosures were misleading because Inovio did not also disclose that the FDA did not approve Inovio's ***earlier*** proposal to completely skip a Phase 2 clinical trial and proceed directly

1

to a Phase 3 clinical trial. Plaintiffs also seize on the "hold" language and imply that the FDA ordered Inovio to halt an ongoing clinical trial, which is demonstrably false and unsupported by the very documents upon which Plaintiffs rely. Additionally, none of the new challenged statements say anything about beginning a Phase 3 clinical trial. Rather, they discuss Inovio's plans to begin a Phase 2/3 clinical trial and expressly state that the Phase 2/3 trial will not begin until Inovio receives clearance from the FDA to proceed. In other words, there is nothing misleading about the statements Plaintiffs challenge and, even if there were, the statements are protected by the Safe Harbor for Forward Looking Statements.

Plaintiffs know that this new theory has no merit. If it did, the SAC would contain at least *some* new scienter allegations based on the extensive document discovery in this matter, including internal Inovio documents concerning the FDA's partial clinical hold on Inovio's proposed Phase 3 clinical trial protocol that are in Plaintiffs' possession. Tellingly, it does not. There is not a single new scienter allegation in the SAC to support this new theory of fraud. Not a single email, meeting, or internal document that would support any inference that Defendants believed this partial clinical hold needed to be disclosed on June 30 or August 10 to avoid misleading investors.

Accordingly, and as discussed more fully below, Plaintiffs' new theories—including the newly challenged statements and newly alleged corrective disclosures—should be dismissed with prejudice. Additionally, because the SAC no longer challenges any statements made by Mr. Juba, and contains no allegations demonstrating that he is a control person within the meaning of Section 20(a), he should be dismissed as a defendant from this case.

## II. STATEMENT OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS

### A. Inovio Designs a COVID-19 Vaccine and Begins Preclinical Testing.

In December 2019, the world learned about SARS-CoV-2, the virus that causes the disease known as COVID-19. On January 10, 2020, Chinese researchers shared the genetic sequence of

the virus. (¶ 51.)[1]  By leveraging its DNA medicines platform and proprietary algorithm—which drew on years of research and development—Inovio was able to design a vaccine construct in a matter of hours. (Ex. A at 1–2; ¶¶ 51, 115.)  Before January was over, Inovio had already started preclinical testing and preparations for clinical product manufacturing of INO-4800—Inovio's vaccine candidate designed to prevent COVID-19. (Ex. A at 2; ¶ 51.)

**B.      Inovio Begins a Phase 1 Clinical Trial and Continues Preclinical Testing.**

On April 6, Inovio announced that the U.S. Food and Drug Administration ("FDA") had accepted Inovio's Investigational New Drug ("IND") application for INO-4800, "paving the way for Phase 1 clinical testing of INO-4800 in healthy volunteers," with the first dosing planned that day. (Ex. B at 1; ¶ 56.)  On April 28, Inovio announced that the Phase 1 trial was "fully enrolled with all 40 healthy volunteers receiving their first dose, with interim immune responses and safety results expected in late June." (Ex. C at 1.)

In the meantime, Inovio continued conducting preclinical studies for INO-4800.  On May 20, Inovio announced that its preclinical study data on mice and guinea pigs had been published in a peer-reviewed journal. (Ex. D at 1; ¶ 59.)  The data demonstrated "robust binding and neutralizing antibod[ies,] as well as T cell responses." (Ex. D at 2; ¶ 59.)  The press release also stated that "[p]reliminary safety and immune responses data from Phase 1 clinical trial expected in June" and a "Phase 2/3 efficacy trial planned to start in July/August pending regulatory approval." (Ex. D at 1; ¶ 59.)  Inovio explained it was "planning to utilize these positive preclinical results along with our upcoming animal challenge data and safety and immune responses data from

---

[1] Citations using the "¶" symbol refer to the SAC (ECF 129).  "Ex." refers to the exhibits attached to the Declaration of Heather Speers in Support of Defendants' Motion to Dismiss the Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Speers Decl.").  Unless otherwise noted, all emphasis is added and internal citations, quotations marks, and alterations are omitted.

our Phase 1 studies to support rapidly advancing this summer to a large, randomized ***Phase 2/3*** clinical trial." (Ex. D at 2.)

### C. Inovio Seeks FDA Approval to Skip Phase 2 and Proceed Directly to a Phase 3 Clinical Trial.

Prior to receipt of the full Phase 1 clinical trial dataset from the initial cohorts (which was not available until the end of June 2020), Inovio submitted a protocol amendment to its IND seeking FDA concurrence to skip a Phase 2 clinical trial and proceed directly to a Phase 3 clinical trial. (*See* ¶¶ 110, 112, 114 (referring to the IND amendment).) This was a deviation from the traditional path of proceeding sequentially from Phase 1 to Phase 2 to Phase 3. *See* 21 C.F.R. § 312.21 ("Although in general the phases are conducted sequentially, they may overlap."). Inovio was aware that its proposal was ambitious given that Phase 3 clinical trials "are performed after preliminary evidence suggesting effectiveness of the drug has been obtained," typically in a Phase 2 clinical trial. 21 C.F.R. § 312.21(c). Accordingly, ***Inovio did not publicly announce this submission. Nor did it publicize any expectation about advancing directly to Phase 3.***

On June 23, the FDA informed Inovio that its proposed Phase 3 trial protocol "has been placed on clinical hold resulting in a partial clinical hold on [its] IND." (Ex. S at 1; ¶¶ 110, 112, 114.) The FDA explained that the decision "to issue a 'hold' on the initiation of the [Phase 3] study was deemed to be a ***more expeditious*** way of delineating and resolving any pending issues than a series of asynchronous, real-time, informal request." (Ex. S at 2.) The FDA also explained that "under the provisions of this partial clinical hold, subjects may not be given the investigational drug as part of the COVID19-311 ***Phase 3 clinical trial***, however, ***<u>there is no impact on ongoing COVID19-001 Phase 1 clinical trial which may continue as planned</u>***." (*Id.* at 1.) On June 26, Inovio received the partial clinical hold letter. (¶¶ 110, 112, 114.)

**D.**     **Inovio Announces Plans to Begin a Phase 2/3 Trial Upon FDA Concurrence.**

On June 30, Inovio announced "positive interim clinical data of INO-4800 from the first two Phase 1 clinical trial cohorts." (Ex. E at 1; ¶¶ 60, 109.) Inovio shared that "INO-4800 was generally safe and well-tolerated in all participants in both cohorts through week 8; all ten reported adverse events (AEs) which were grade 1 in severity, and most were local injection site redness. There were no reported serious adverse events (SAEs)." (Ex. E at 2; *see also* ¶ 53 (noting Phase 1 clinical trials primarily focus on safety).) Inovio also shared that "[a]nalyses to date have shown that 94% (34 out of 36 total trial participants) demonstrated overall immunological response rates based on preliminary data assessing humoral (binding and neutralizing) and T cell immune responses." (Ex. E at 2; *see also* ¶¶ 54–55 (addressing the role of binding and neutralizing antibodies and T cells).)

In the same press release, Inovio reiterated its "plans to initiate a ***Phase 2/3*** efficacy trial this summer ***upon regulatory concurrence***." (Ex. E at 1; ¶ 109.) Inovio did not disclose that its proposed ***Phase 3*** clinical trial protocol was on clinical hold; however, Plaintiffs do not allege that, as of June 30, any Defendant, Inovio executive, or other Inovio subject-matter expert believed that the partial clinical hold would prevent Inovio from beginning the Phase 2 portion of a ***Phase 2/3*** clinical trial by the end of summer 2020. Nonetheless, the press release appropriately identified "plans to develop DNA medicines" as forward-looking statements, noting actual results may differ based on a number of factors, including those outlined in Inovio's Annual Report on Form 10-K for the year ended December 31, 2019 ("2019 10-K") and Quarterly Report on Form 10-Q for the quarter ended March 31, 2020 ("Q1'20 10-Q"). (Ex. E at 5–6.) The 2019 10-K and Q1'20 10-Q cautioned, among other things, that "***[w]e do not know whether planned clinical trials will begin on time or be completed on schedule, if at all. . . . The commencement and completion of clinical trials can be delayed for a number of reasons, including delays related to: obtaining regulatory***

*approval to commence a clinical trial*." (Ex. K at 50; Ex. L at 40.)

### E. Inovio Announces Results from Its Non-Human Primate Study, Which Demonstrated No Antibody-Dependent Enhanced Disease Events.

On July 30, Inovio announced results from its non-human primate study. (Ex. F.) Among other things, Inovio reported that "INO-4800-treated animals demonstrated seroconversion after a single vaccination, with protective neutralizing antibodies and T cells lasting in their blood more than four months after the initial dose," and that "[g]iven the importance of protective antibody and T cell responses, this study gives us more confidence as we continue to advance INO-4800 in the clinic." (Ex. F at 2.) Inovio also reported that "[n]o antibody-dependent enhanced disease events were reported" and that Inovio still "anticipate[d] initiating [] Phase 2/3 efficacy trials this summer." (*Id.* at 1–2.)

### F. Inovio Updates Investors on Plans to Begin Phase 2/3 Trials in September 2020 Upon FDA Concurrence.

On August 10, Inovio announced that it would host "a live conference call and webcast [that afternoon] to discuss financial results and provide a general business update, including near-term expectations for its COVID-19 DNA vaccine development program." (Ex. G at 1; ¶ 113.) Dr. Kim stated that Inovio "look[ed] forward to . . . starting our Phase 2/3 COVID-19 clinical study in the U.S. in September." (Ex. G at 2; ¶ 113.) As in previous press releases, Inovio again cautioned investors that its "plans to develop DNA medicines," including "the planned initiation and conduct of preclinical studies and clinical trials" are forward-looking statements and actual results may differ based on factors identified in Inovio's 2019 10-K and Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 ("Q2'20 10-Q"). (Ex. G at 12.) Like the 2019 10-K, the Q2'20 10-Q also cautioned that "[w]e do not know whether planned clinical trials will begin on time or be completed on schedule, if at all. . . . The commencement and completion of clinical trials can be delayed for a number of reasons, including delays related to: obtaining regulatory

approval to commence a clinical trial." (Ex. K at 50; Ex. M at 46.) The August 10 conference call also began with a disclaimer that certain statements, including "plans to develop Inovio's integrated platform of DNA medicines, which include clinical and regulatory developments" are forward-looking and actual results may "differ materially" based on factors set forth in Inovio's 2019 10-K and Q2'20 10-Q. (Ex. J at 4.)

During the August 10 conference call, Kate Broderick, Inovio's Senior Vice President of Research and Development, stated: "we look forward to beginning our planned Phase II/III trials in September upon FDA concurrence." (*Id.* at 6.) In the Q&A portion, an analyst from RBC congratulated Dr. Kim on Inovio's progress and asked about the planned Phase 2/3 clinical trials: "I'm just curious if you could perhaps comment on the current gating factors for getting that going. It sounds like you're targeting a September start, maybe just slightly a delay from maybe previous commentary. So I just want to understand maybe what the pushes and pulls are there." (*Id.*) Dr. Kim explained that Inovio is "in very active discussions with the FDA on the design, and we feel that we are very close to this process." (*Id.*) Another analyst noted that Inovio "characterized the initiation of the II/III as kind of being dependent upon receiving FDA concurrence," and asked for information on "what that FDA concurrence looks like?" (*Id.* at 11–12.) Dr. Kim responded that "FDA concurrence" is the "term for FDA approval of any process in process steps." (*Id.* at 12.)

### G.      Inovio Announces Receipt of Notice from FDA that Inovio's Proposed Phase 2/3 Clinical Trial Protocol Has Been Placed on Clinical Hold.

On September 28, Inovio disclosed that the FDA "has additional questions about the company's planned *Phase 2/3* trial of its COVID-19 vaccine candidate INO-4800" and that "[u]ntil the FDA's questions have been satisfactorily addressed . . . the *Phase 2/3* trial is on partial clinical hold." (Ex. H at 1; ¶ 125.) Inovio explained that it "is actively working to address the FDA's questions and plans to respond in October, after which the FDA will have up to 30 days to notify

INOVIO of its decision as to whether the trial may proceed." (Ex. H at 1.) Despite having access to the communications between Inovio and the FDA, Plaintiffs chose not to include in the SAC the date on which Inovio submitted the protocol amendment to modify the proposed Phase 3 clinical trial protocol to a Phase 2/3 clinical trial protocol. Plaintiffs also chose not to identify any of the communications between Inovio and the FDA regarding this protocol amendment, including the date that the FDA first notified Inovio that it was placing Inovio's proposed *Phase 2/3* clinical trial on partial clinical hold.

### H. Inovio Resolves the Hold Comments and Is Cleared to Proceed with the Phase 2 Segment of Its Planned Phase 2/3 Clinical Trial.

On November 16, Inovio announced that it "received clearance from the U.S. Food & Drug Administration (FDA) to proceed with the Phase 2 segment of its planned Phase 2/3 clinical trial for INO-4800, its COVID-19 vaccine candidate." (Ex. I at 1.) The approval to proceed with the Phase 2 portion of the Phase 2/3 clinical trial was based upon the same Phase 1 clinical trial dataset that Inovio disclosed in its June 30, 2020 press release.

### I. Plaintiffs' Amendments to the Second Amended Complaint.

The SAC adds six challenged statements and three alleged corrective disclosures.[2] Despite months of discovery, including Defendants' production of over 38,000 documents, the SAC contains no new scienter allegations to support the newly challenged statements.

**Challenged Statements.** Plaintiffs challenge three statements made in Inovio's June 30 press release regarding Inovio's Phase 1 trial results, its plans to expand the Phase 1 trial to add older participants, and its plans to initiate a Phase 2/3 trial in the summer pending FDA approval. (¶ 109.) Plaintiffs also challenge three statements made on August 10, one in Inovio's press release

---

[2] The SAC also removes allegations regarding the April 30 and June 30 statements that the Court previously dismissed with prejudice and removes Robert Juba as a defendant for Count 1 because he did not make any of the statements challenged in the SAC.

and two on Inovio's earnings call. (¶ 113.) Each of the August 10 statements concerns Inovio's plans to begin a *Phase 2/3* clinical trial upon FDA approval. (*Id.*) Plaintiffs allege all six statements were false and misleading because Inovio did not disclose that on June 23, the FDA placed Inovio's proposed *Phase 3* clinical trial protocol on clinical hold. (¶¶ 110, 114.)

**Corrective Disclosures.** The SAC also adds three alleged corrective disclosures to support loss causation. (¶¶ 121, 125.) Two of the disclosures allegedly correct the newly challenged statements. (¶¶ 121, 125.) Plaintiffs allege that Inovio's August 10 disclosure that it expected to begin Phase 2/3 trials in September 2020 "indicated there had been a delay from the prior guidance of 'summer' of 2020." (¶ 121.) They also allege that Inovio's September 28 press release disclosing the partial clinical hold on the Inovio's proposed Phase 2/3 clinical trial protocol corrected Defendants' earlier guidance that it expected to receive FDA concurrence to start the Phase 2 portion of the Phase 2/3 trial by summer or September 2020. (¶ 125.)

The other newly alleged corrective disclosure concerns Dr. Kim's May 11 statement that Inovio was "on [the] right track" to meet its 2020 production goals. (¶¶ 104, 121.) Plaintiffs originally alleged that this statement was corrected on June 3—*i.e.*, when Inovio filed a lawsuit against VGXI that purportedly disclosed all of the omitted facts that allegedly rendered the May 11 statement misleading. (¶¶ 106, 118.) Plaintiffs now allege that Dr. Kim's statement on August 10 that "our focus is squarely on scaling up for 100 million doses that we feel are needed in *2021*" further corrected his May 11 statement about Inovio's *2020* production goals. (¶ 121.)

## III. LEGAL STANDARD

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh*

*Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

In pleading these elements, Plaintiffs must clear three hurdles. ***First***, the Complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this assessment, the "[C]ourt need not credit a complaint's bald assertions or legal conclusions." *KBZ Commc'ns Inc. v. CBE Techs. LLC*, 634 F. App'x 908, 910 (3d Cir. 2015); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). ***Second***, the Complaint must satisfy Rule 9(b), which requires Plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). ***Third***, the Complaint must satisfy the PSLRA, which "imposes two exacting and distinct pleading requirements" for falsity and scienter. *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).

**Falsity.** To plead falsity, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)).

**Scienter.** To plead scienter, "the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 277–78 (quoting 15 U.S.C. § 78u–4(b)(2)). For statements of past or present fact, "[t]his scienter standard requires plaintiffs to allege facts giving rise to a strong inference of either reckless or conscious behavior." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009). "A strong inference of scienter is one that is cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* "In the case of the forward-looking statements, however, an inference of recklessness does not avail plaintiffs—that is, it must be placed on the nonculpable-explanation side of the balance when we

weigh competing inferences." *Id.* at 274. Under the PSLRA safe harbor, forward-looking statements "are not actionable unless [Plaintiffs] can 'prove that the forward-looking statement . . . was made with ***actual knowledge . . . that the statement was false or misleading***." *Id.*

## IV. ARGUMENT

Plaintiffs' new allegations regarding the allegedly misleading June 30 and August 10 statements and allegedly corrective August 10 and September 28 disclosures are inadequate to plead falsity, scienter, and loss causation.

### A. The Newly Challenged Statements Are Not Materially False or Misleading.

Each of the newly challenged statements on June 30 and August 10 is either opinion statements or forward-looking. As such, the falsity and scienter analyses are intertwined. With respect to each challenged statement, Plaintiffs fail to plead falsity and scienter.

#### 1. Defendants' June 30 statements regarding Inovio's Phase 1 clinical trial were not false or misleading.

Plaintiffs allege that Defendants' June 30 statements that Inovio is "very encouraged by the positive [Phase 1] interim safety and preliminary cellular and humoral immune response results to date" and that Inovio "expanded its Phase 1 trial to add older participants in additional cohorts" (¶ 109) were misleading because "Defendants knew, but failed to disclose, that Inovio had already been informed by the FDA that the trial for INO-4800 had been placed on partial clinical hold." (¶ 110.) As a matter of law, neither statement was rendered misleading by this alleged omission.

First, Plaintiffs do not (and cannot) allege that the partial clinical hold had any impact on Inovio's Phase 1 trial. To the contrary, as documented in the June 23 call report, the FDA expressly stated that "***there is no impact on ongoing COVID19-001 Phase 1 clinical trial*** which may continue as planned." (Ex. S at 1.) And although Plaintiffs quote portions of the June 26 hold letter where the FDA raises questions about the "potential for vaccine-induced enhanced disease"

11

(¶¶ 110, 112, 114), Plaintiffs do not allege that Defendants' statements even touched on this issue, much less that they affirmatively suggested there was no such potential.  As such, Defendants had no obligation to volunteer this information and the failure to disclose such information did not render Defendants' statements about the Phase 1 trial results or expansion misleading.  *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 155 (2d Cir. 2013) ("Defendants were not obligated to disclose that bapineuzumab patients showed little or no improvement in the short term because nothing in the June press release suggested that bapineuzumab had a short-term effect."); *see also Edinburgh*, 754 F.3d at 166–67 (discussing *Kleinman*).

Second, Defendants' interpretation of the Phase 1 trial data as "encourag[ing] and "positive" are opinions.  *See Edinburgh*, 754 F.3d at 170 ("Interpretations of clinical trial data are considered opinions."); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543 (S.D.N.Y. 2015) (description of clinical trial results as "encouraging" are "unambiguously statements of opinion"; "[c]ourts have repeatedly held publicly stated interpretations of the results of various clinical studies to be opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions.").  "Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *Edinburgh*, 754 F.3d at 170; *see also Smith v. Antares Pharma, Inc.*, 2020 WL 2041752, at *5 (D.N.J. Apr. 28, 2020) ("A company's press release releasing 'positive' study results is not misleading where the plaintiff fails to allege that the opinion lacked a reasonable basis.").

Plaintiffs do not allege that Defendants did not honestly and reasonably believe the Phase 1 trial results were positive.  The only "facts" they allege that could even arguably relate to the trial results are the FDA's questions about the "potential for vaccine-induced enhanced disease." (¶¶ 110, 112, 114.)  However, Plaintiffs do not (and cannot) dispute that the questions raised by

the FDA in the June 23, 2020 partial clinical hold letter were based on a ***partial*** Phase 1 dataset, and not on the full dataset that Inovio was addressing in its June 30 press release.  In any event "a biopharmaceutical corporation is not required to disclose a regulatory agency's inconclusive findings, even if they undercut that corporation's position, merely because the drug was described favorably or its strength was touted."  *Hoey v. Insmed Inc.*, 2018 WL 902266, at *14 (D.N.J. Feb. 15, 2018) (collecting cases).  As explained by in *In re MedImmune, Inc. Securities Litigation*:

> Mere questioning by the FDA imposed no duty upon Defendants either to trim back their opinions as to the efficacy of the drug or to report to the public the FDA staffers' questions as they arose. Continuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process. Questions may emanate from one or more staffers in random or sporadic fashion. Many, if not all, questions presumably get answered in the process. Requiring ongoing disclosure of FDA's questions would not only be disruptive to the review process; it could easily result in misleading the public more than not reporting the questions. Where mere disclosure of a question might cause the company's stock to decline in value, the eventual answer to the question might cause it to rise once again. Investors who sold that stock when the FDA's question was asked but before the company's answer was given might have legitimate cause for concern when a satisfactory answer came forth and the stock's price began to climb again.

873 F. Supp. 953, 966 (D. Md. 1995).

Tellingly, despite having received over 38,000 Inovio documents and emails in discovery, Plaintiffs do not (because they cannot) allege that Inovio was unable to satisfactorily address the FDA's questions regarding the potential for vaccine-induced enhanced disease with the same Phase 1 dataset that Inovio described in its June 30 press release as "encourag[ing] and "positive." Stated differently, "Plaintiff's allegations of falsity are not based on [Inovio]'s internal emails or other studies; for example, there are no allegations that [Inovio] contradicted, or doubted, the opinion which it represented to investors concerning [INO-4800]. Accordingly, to the extent that they stem from the [June 26 letter], Plaintiff's allegations fail to support a duty to disclose [and therefore] falsity has not been sufficiently pled." *Hoey*, 2018 WL 902266, at *15.

### 2. Defendants' June 30 and August 10 statements about plans to begin a Phase 2/3 clinical trial were not false or misleading.

Plaintiffs also allege that Defendants' June 30 and August 10 statements about Inovio's plans to begin a Phase 2/3 clinical trial were misleading because "Defendants knew, but failed to disclose, that Inovio had already been informed by the FDA that the trial for INO-4800 had been placed on partial clinical hold." (¶¶ 109–10, 113–14.) These allegations fail for at least three reasons: (1) Defendants had no duty to disclose the partial clinical hold on Inovio's proposed ***Phase 3 clinical trial protocol***; (2) Defendants' statements made clear that Inovio could not begin a Phase 2/3 trial without FDA approval; and (3) Inovio's projections as to when it expected to start a Phase 2/3 clinical trial are forward-looking statements protected by the PSLRA safe harbor.

### a. Defendants had no duty to disclose the partial clinical hold on the proposed Phase 3 clinical trial protocol.

Defendants had no independent duty to disclose the back and forth between Inovio and the FDA, including the June 26 partial clinical hold on its proposed Phase 3 trial protocol. Investors understand that "[c]ontinuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process," *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016), and companies "are not bound to disclose the ins and outs of that process to investors," *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *6 (C.D. Cal. Sept. 20, 2017). *See also Hoey*, 2018 WL 902266, at *14 ("[T]he law with respect to this issue is clear: a biopharmaceutical corporation need not share a regulatory agency's response or criticism to a trial and its results if it does not constitute a final determination." (collecting cases)).

The partial clinical hold on Inovio's proposed Phase 3 trial protocol was not a final decision from the FDA. To the contrary, the FDA expressly told Inovio that it chose that mechanism to communicate feedback because it "was deemed to be a ***more expeditious*** way of delineating and ***resolving*** any pending issues than a series of asynchronous, real-time, informal requests." (Ex. S

at 2.) Courts recognize that such "interim FDA feedback is not material because it does not express a binding agency decision and is subject to change as the FDA and pharmaceutical companies work together to develop viable clinical trials." *Sanofi*, 87 F. Supp. 3d at 542; *see also Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *11–12 (S.D. Ind. Jan. 4, 2016) ("[N]umerous courts have concluded that a defendant pharmaceutical company does not have a duty to reveal interim FDA criticism regarding study design or methodology."); *Hoey*, 2018 WL 902266, at *9 ("Numerous courts around the country have found that a study's alleged flaws or shortcomings need not be disclosed to a reasonable investor, on the basis that such information is not material.").

Finally, Plaintiffs' allegation that Dr. Kim's and Mr. Kies' stock sales created an independent duty to disclose the partial clinical hold on the proposed Phase 3 trial protocol (¶ 112) is baseless. As discussed below, Plaintiffs do not (and cannot) dispute that these trades were made pursuant to 10b5-1 plans that were entered into prior to receipt of the partial clinical hold. (Exs. N–R.) As such, these sales did not trigger a duty to disclose. *See, e.g.*, 17 C.F.R. § 240.10b5-1.

### b. Inovio disclosed that it could not begin a Phase 2/3 clinical trial until it received FDA concurrence.

Defendants' statements about Inovio's plans to begin a Phase 2/3 clinical trial were not rendered misleading by the omission of the June 26 partial clinical hold on Inovio's proposed Phase 3 trial protocol. "[C]ourts must examine allegedly misleading statements in context, to determine whether they were indeed misleading." *Hoey*, 2018 WL 902266, at *8 (citing *Edinburgh*, 754 F.3d at 167); *see also Fan v. StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). Here, Defendants' statements repeatedly made clear that Inovio could not begin its Phase 2/3 trial until it received clearance from the FDA to proceed:

- "INOVIO . . . plans to initiate a Phase 2/3 efficacy trial this summer ***upon regulatory concurrence***." (¶ 109; Ex. E at 1.)

- "[W]e look forward to beginning our planned Phase II/III trials in September *upon FDA concurrence*."  (Ex. J at 6.)

- "*We are in very active discussions with the FDA* on the design, and we feel that we are very close to this process."  (¶ 113; Ex. J at 10.)

- "*FDA concurrence just means* it's an actual term for *FDA approval of any process in process steps*."  (¶ 113; Ex. J at 12.)

In light of these disclosures, no investor could have been misled as to the fact that FDA approval was required to proceed, and that Inovio had not yet received such approval.  *See Edinburgh*, 754 F.3d at 165 (affirming dismissal of complaint and citing "defendants' explicit warning" that its ability to start Phase 3 trials "would be 'subject to regulatory approval'" as one reason why the challenged statement was not false or misleading).

### c. The statements about Inovio's plans to conduct a Phase 2/3 clinical trial are protected by the PSLRA safe harbor.

Finally, the challenged statements are about Inovio's *plans* to begin *future* clinical trials, which are purely forward-looking statements and are "immunize[d] from liability" under the PSLRA safe harbor.  *Avaya*, 564 F.3d at 254; *see also* 15 U.S.C. § 78u-5(i)(1)(B) (defining "forward-looking statement" to include "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"); *accord Hackel v. AVEO Pharms., Inc.*, 474 F. Supp. 3d 468, 478 (D. Mass. 2020) ("Statements about a projected, or planned, timeline for future results" fit the definition of "forward-looking."); *Wang Yan v. ReWalk Robotics Ltd.*, 330 F. Supp. 3d 555, 572 (D. Mass. 2018) ("[S]tatement that ReWalk intended to conduct further clinical studies squarely falls within the statutory safe harbor for 'forward-looking' statements concerning 'the plans and objectives of management for future operations.'"), *aff'd sub nom.*, 973 F.3d 22 (1st Cir. 2020); *In re Tech. Chems. Sec. Litig.*, 2001 WL 543769, at *7–8 (S.D. Fla. Mar. 20, 2001) (statement that "the company *expects to begin* full clinical trials . . . during . . . 1996" was forward looking), *abrogated*

*on unrelated grounds by Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169 (S.D. Fla. 2005).

The purpose of the safe harbor is to "encourage market efficiency by encouraging companies to disclose future projections without fear that those projections, if they did not materialize, would result in an action for fraud." *ReWalk Robotics*, 330 F. Supp. 3d at 572. Accordingly, the safe harbor protects "any forward-looking statement"—whether it is allegedly "based on an untrue statement of a material fact *or omission of a material fact necessary to make the statement not misleading*"—so long as the statutory requirements are met. 15 U.S.C. § 78u-5(c)(1). To that end, the PSLRA "provides two distinct entrances to the safe harbor"—"any forward-looking statement is protected if it is *either* accompanied by 'substantive and tailored' cautionary statements *or* if the plaintiff fails to show 'actual knowledge of falsehood.'" *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490–91 (3d Cir. 2016). The June 30 and August 10 statements qualify under both.

### i. The statements were identified as forward-looking and accompanied by meaningful cautionary language.

Inovio informed investors about its plans to begin Phase 2/3 clinical trials upon regulatory concurrence in press releases and on an earnings call. (¶¶ 109, 113.) In each press release and during the introductory remarks to the earnings call, Inovio explained that its "plans to develop DNA medicines," including "the planned initiation [of] clinical trials" were forward-looking statements and cautioned investors that "[a]ctual events or results may differ from th[ose] expectations" based on a number of factors, including those set forth in Inovio's annual and quarterly SEC filings. (Ex. F at 6; Ex. G at 12; Ex. J at 4.)

The Forms 10-K and 10-Q, in turn, expressly cautioned investors that Inovio may never receive FDA approval to begin its planned clinical trials, and even if it does, those trials may be

delayed which could have a negative impact on Inovio's stock price:[3]

- "We do not know whether planned clinical trials will begin on time or be completed on schedule, if at all . . . The commencement and completion of clinical trials can be delayed for a number of reasons, including delays related to: obtaining regulatory approval to commence a clinical trial."

- "[W]e could experience delays in product development and clinical trials."

- "Our product candidates could . . . fail to receive necessary regulatory clearances to proceed with further clinical development."

- "[T]he FDA . . . may disagree with the design or implementation of our clinical trials."

- "Clinical trials may also be delayed as a result of ambiguous or negative interim results."

- "[D]elays in the commencement or completion of clinical trials may adversely affect the trading price of our common stock."

(Ex. K at 44, 49–50; Ex. L at 35, 40–41; Ex. M at 41, 46–47.)

When it comes to statements about clinical trial timelines, courts routinely find language similar to that included in Inovio's risk warnings to be sufficiently tailored and meaningful to provide protection under the safe harbor. *See, e.g.*, *Hackel*, 474 F. Supp. 3d at 479–80 (risk warning that "[w]e cannot guarantee that any clinical trials will be conducted as planned or completed on schedule, if at all" found to "fit[] squarely within the safe harbor, as it explicitly identified the expected timeline of topline results as uncertain"); *Kuhne v. Gossamer Bio, Inc.*, 2021 WL 1529934, at *6 (S.D. Cal. Apr. 19, 2021) (statements that "[w]e cannot guarantee that any clinical trials will be conducted as planned or completed on schedule, if at all" and "[w]e do not know whether our planned trials will begin on time or be completed on schedule, if at all," were "adequate with respect to potential delay or completion of a Phase 3 trial, and that reasonable minds could not differ on its adequacy, especially given that Gossamer did not guarantee that it

---

[3] "Cautionary statements disclosed in SEC filings may be incorporated by reference; they do not have to be in the same document as the forward-looking statements." *Aetna*, 617 F.3d at 282.

would start a Phase 3 trial").

This outcome does not change merely because Plaintiffs' claims are based on alleged omissions. *See Hoey*, 2018 WL 902266, at *9 ("[C]autionary language, if sufficient, renders the alleged [forward-looking] **omissions or misrepresentations** immaterial as a matter of law.").

*Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447 (1st Cir. 2017) is particularly instructive on this point. In that case, the plaintiff alleged that InVivo's press release announcing FDA approval to begin human studies and expectations as to when those studies would begin was misleading because "[t]he press release did not reveal that FDA approval was conditional, or list any of the conditions, or explain that the FDA had recommended changes to the study protocol in order to allow the staged study to support future studies." *Ganem*, 845 F.3d at 452. "In short, Ganem's theory of material misrepresentation is that InVivo's omissions about the content of the FDA approval letter rendered the company's temporal predictions materially misleading." *Id.* at 455. The court rejected this theory, noting the statements fell within the safe harbor because the press release specifically identified statements about "the expected commencement date of any approved human clinical trials" as forward-looking, and cautioned that results may differ based on, among other things, "risks and uncertainties relating to the Company's ability to obtain FDA approval to conduct human clinical trials." *Id.* at 452.

The same outcome is warranted here.

> ### ii. *Plaintiffs do not allege that any Defendant <u>actually knew</u> that Inovio would not meet its projected timeline.*

Because the statements are protected by the first prong of the safe harbor, the Court's analysis can stop here. *See OFI Asset Mgmt.*, 834 F.3d at 502 ("[W]here a future-looking statement is accompanied by sufficient cautions, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter.").

However, the statements are ***also*** protected by the separate "actual knowledge" prong of the safe harbor because Plaintiffs do not plead that any Defendant actually knew—as of June 30 or August 10—when Inovio would receive FDA approval to begin the Phase 2 portion of their proposed Phase 2/3 clinical trial, or that such approval would not come until November.

The "actual knowledge" standard for forward-looking statements is more exacting than the scienter inquiry required for statements of past or present fact. *See Avaya*, 564 F.3d at 274. Plaintiffs cannot simply allege that Defendants were reckless. *See id.* ("[A]n inference of recklessness . . . must be placed on the nonculpable-explanation side of the balance when we weigh competing inferences."); *accord In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1298 (D. Colo. 2013) (allegations that a defendant "***should have known*** the projections were unattainable . . . do not pass muster under the stringent 'actual knowledge' test"), *aff'd,* 776 F.3d 1103 (10th Cir. 2015). Instead, Plaintiffs must plead facts that support "***a strong inference*** that defendants acted with ***actual knowledge that their projections were false or misleading***." *Avaya*, 564 F.3d at 259.

In this regard, the focus is not on whether Defendants have actual knowledge of an allegedly omitted fact, but whether Defendants omitted that fact with actual knowledge that it would render the projections false or misleading. *See id.*; *see also In re Campbell Soup Co. Sec. Litig.*, 2020 WL 7022655, at *8 (D.N.J. Nov. 30, 2020) (finding allegations that Defendants knew about a product "recall and decrease in beverage sales following such recall is not the same as actual knowledge that C-Fresh's projections o[n] the division as a whole were false"); *In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp. 2d 751, 764–65 (N.D. Ohio 2003) (holding "statements about Empyrean's plans to commence Phase III trials" were forward-looking and protected under the safe harbor, in part, because "plaintiffs fail to allege facts indicating that the statements were made with the actual intent to deceive").

Again, *Ganem* is instructive. In that case, the plaintiff alleged "that InVivo's statements regarding commencement of the study were misleading because the FDA letter required InVivo to make eight specific modifications to its initial feasibility study for that study to support a future, separate study, and implementing such modifications would make InVivo's proposed timeline impossible to meet." *Ganem*, 845 F.3d at 456. The court held "this argument fails for the simple reason that Ganem alleges no facts suggesting that InVivo could not make these eight changes within the proposed timeline, a necessary showing for the statements to have been misleading when made." *Id.* at 456. Absent such allegations, the court found that the plaintiff was "left only with the inference that because, in retrospect, the test lagged significantly behind the proposed timeline, the timeline must have always been impossible to achieve." *Id.* at 457. But "'fraud by hindsight' does not satisfy the pleading requirements in a securities fraud case," and "[t]he securities laws do not make it unlawful for a company to publicize an aggressive timeline or estimate for a proposed action without disclosing every conceivable stumbling block to realizing those plans." *Id.* at 457.

The same is true here. The SAC contains no allegations that Defendants actually intended to deceive investors about Inovio's plans to begin a Phase 2/3 trial. Nor does it contain any allegations that Defendants knew in June or August that Inovio would not receive FDA approval to begin its Phase 2/3 clinical trials in summer or September 2020, as projected. Indeed, despite having access to over 38,000 Inovio emails and other documents produced by Defendants in this action, Plaintiffs allege ***no new facts*** that either the June 30 or August 10 statements were made with an actual "***intent to deceive, manipulate, or defraud***." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007). There is a good reason for that; no such facts exist. *See Avaya*, 564 F.3d at 263 ("Omissions and ambiguities count against inferring scienter.").

Lacking any direct support for scienter, Plaintiffs rely on the same stock sales identified in the prior complaint to plead scienter, albeit repackaged into new paragraphs. (*Compare* ¶¶ 111–12 *with* ¶¶ 29, 33, 126.) Plaintiffs, however, are well aware that both Dr. Kim's and Mr. Kies' stock sales were made pursuant to 10b5-1 trading plans that were entered into ***prior*** to the FDA's notification that Inovio's proposed Phase 3 clinical trial protocol was on partial clinical hold. (¶¶ 29, 33; Exs. Q–R.) Meaning, Dr. Kim and Mr. Kies had no discretion over those sales at the time they were executed, and thus, they cannot support any inference of fraudulent intent. *See In re Synchronoss Techs., Inc. Sec. Litig.*, 2020 WL 2786936, at *17 (D.N.J. May 29, 2020) (stock sales under 10b5-1 plans "of minimal value in establishing an inference of scienter"); *In re NutriSystem, Inc. Derivative Litig.*, 666 F. Supp. 2d 501, 518 (E.D. Pa. 2009) (10b5-1 plans "counter any inference" of scienter).

## B. Plaintiffs' New Allegations Fail to Plead Loss Causation.

The SAC also adds two corrective disclosure dates—August 10 and September 28—in an attempt to plead loss causation. Specifically, Plaintiffs allege that (1) Dr. Kim's August 10 statement about Inovio's ***2021*** production goals corrected his May 11 statement that Inovio was "on [the] right track" to meet its ***2020*** production goals; (2) the August 10 disclosures that Inovio planned to begin Phase 2/3 clinical trials in "September" pending regulatory concurrence partially corrected Inovio's June 30 statement that Inovio planned to begin Phase 2/3 clinical trials in the "summer" pending regulatory concurrence; and (3) Inovio's September 28 press release corrected Defendants' June 30 and August 10 statements about the expected timing for Phase 2/3 clinical trials. None, however, qualify as a corrective disclosure and, as such, fail to plead to loss causation.

### 1. Dr. Kim's August 10 update on Inovio's 2021 production goals does not correct his May 11 statement about Inovio's 2020 production goals.

Due to the overwhelming need for vaccines in the face of a global pandemic, Inovio

announced plans to scale-up its manufacturing capabilities. Inovio set a goal of producing 1 million doses of INO-4800 by the end of 2020. And on May 11, Dr. Kim informed investors that Inovio was "on [the] right track" towards meeting that goal. (¶ 104.) He also announced a more ambitious goal: that Inovio was "preparing and increasing our scale to be able to provide hundreds of millions of doses" in 2021. (*Id.*)

On Inovio's August 10 earnings call, Dr. Kim provided an update on Inovio's progress. He announced that Inovio "ha[s] made significant strides in expanding our global coalition to manufacture large-scale quantities of INO-4800 and smart devices to deliver them" and that Inovio "look[ed] forward to . . . meeting our target to provide at least 1 million doses of our DNA vaccine this year and 100 million doses in 2021." (Ex. J at 5.) Later in the call, Jacqueline Shea, Inovio's Chief Operating Officer, reiterated this sentiment:

> As Joseph mentioned, ***we have an established plan in place*** for manufacturing at least 1 million 1 mg doses of INO-4800 this year and the target of 100 million doses by 2021. . . Also, as Joseph mentioned, Inovio made significant strides in expanding our global coalition of collaborators, partners, manufacturers and funders to rapidly advance and manufacture large-scale quantities of INO-4800 to meet the demands of this pandemic.

(*Id.* at 7.) Plaintiffs ignore these statements, focusing instead on Dr. Kim's comment later in the call that Inovio's "focus is squarely on scaling up for 100 million doses that we feel are needed in 2021." (¶ 121.) Plaintiffs view this as "a step backwards" from Dr. Kim's May 11 statement that Inovio was "on [the] right track." (ECF 112 at 14; *see also* ¶ 121.) But Plaintiffs are comparing apples and oranges. Dr. Kim did not say that Inovio was "on [the] right track" to produce 100 million doses in ***2021***. His "on [the] right track" statement was specifically about "preparing 1 million doses" by the end of ***2020***. (¶ 104.) With respect to Inovio's goal of producing 100 million doses in 2021, Dr. Kim said on May 11 that Inovio was "preparing and increasing our scale" (*id.*), which is perfectly consistent with his August 10 statement that Inovio's "focus is squarely on

23

scaling up for 100 million doses that we feel are needed in 2021" (¶ 121). Although a corrective disclosure "need not precisely mirror the earlier misrepresentation," it "must at least relate back to the misrepresentation." *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090 *6 (E.D. Pa. Sept. 3, 2010). Plaintiffs fail to satisfy this basic requirement because the August 10 statement they claim is "corrective" refers to *a different goal* (for a *different year* and *different quantity*) than Dr. Kim's allegedly misleading May 11 statement.

### 2. The August 10 disclosures do not correct the June 30 alleged misrepresentation.

Plaintiffs also allege that Inovio's August 10 disclosure projecting a September start date for its Phase 2/3 trial partially corrected its June 30 statement projecting a "summer" start date because this demonstrated a delay. (¶ 121.) The law, however, is clear that "the mere failure to meet . . . forecasts is insufficient to establish loss causation." *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd sub nom.*, 766 F.3d 172 (2d Cir. 2014); *see also In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("[A] failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect."). To the extent Plaintiffs are suggesting this "delay" was the materialization of an undisclosed risk, that also fails. As discussed above, Inovio never concealed the risk that "clinical trials can be delayed for a number of reasons, including delays related to: obtaining regulatory approval to commence a clinical trial." (Ex. K at 50; Ex. L at 40; Ex. M at 46.)

### 3. The September 28 disclosure does not correct the June 30 or August 10 alleged misrepresentations.

On September 28, Inovio announced that its proposed *Phase 2/3* clinical trial protocol had had been placed on partial clinical hold. (¶ 125; Ex. H.) Plaintiffs allege this is a corrective disclosure because "the FDA had informed Inovio of the partial clinical hold more than three months earlier, on June 26." (¶ 125.) But that is simply not true. As Plaintiffs are well-aware, the

June 26 partial clinical hold was specific to Inovio's proposed *Phase 3* clinical trial protocol. Plaintiff do not (and cannot) allege that the June 26 partial clinical hold applied to a *Phase 2/3* clinical trial. (*See* ¶¶ 60, 110, 112, 114 (the hold related only to the "initiation of [Inovio's] proposed Phase 3 trial").) Nor is there any dispute that skipping a Phase 2 trial and proceeding directly to a Phase 3 trial is different than conducting a Phase 2/3 trial.

Certainly, the September partial clinical hold on Inovio's Phase 2/3 clinical trial was a disappointment to both the Company and investors, but it was not corrective because Inovio did not receive notice from the FDA that its proposed Phase 2/3 clinical trial was on partial clinical hold until September 25. As such, it could not have been disclosed on June 30 or August 10. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (plaintiff must show "a causal connection between the material misrepresentation and the loss").

### C. Robert Juba Should Be Dismissed.

Plaintiffs no longer challenge any statements made by Mr. Juba, and accordingly, he is no longer a defendant for Count 1. He remains in this case solely as an alleged "controlling person" for Count 2. He should be dismissed entirely. Although Plaintiffs allege in conclusory fashion that "Juba is a control person of Inovio within the meaning of §20(a) of the Exchange Act" (¶ 37), there are no factual allegations to support this claim. To the contrary, according to Plaintiffs, "Defendants Kim and Kies had the power to influence and control and did influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading." (¶ 163.) In short, Plaintiffs concede that Mr. Juba did not control Inovio, Dr. Kim, or Mr. Kies.

### V. CONCLUSION

The Court should dismiss the newly challenged June 30 and August 10, 2020 statements, the newly alleged August 10 and September 28, 2020 corrective disclosure dates, and Robert Juba.

Dated: March 21, 2022

Respectfully Submitted,

DUANE MORRIS LLP

By: *s/ Patrick Loftus*

Patrick Loftus (PA60417)
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1367 (phone)
(215) 689-3591 (fax)
loftus@duanemorris.com

COOLEY LLP
Koji F. Fukumura (PA73831)
Heather Speers (*Pro Hac Vice*)
4401 Eastgate Mall
San Diego, CA 92121-1909
(858) 550-6000 (phone)
(858) 550-6420 (fax)
kfukumura@cooley.com
hspeers@cooley.com

Caitlin B. Munley (PA318757)
Georgina J. Inglis (*Pro Hac Vice*)
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
(202) 842-7800 (phone)
(202) 842-7899 (fax)
cmunley@cooley.com
ginglis@cooley.com

Luke Cadigan (*Pro Hac Vice*)
500 Boylston Street
14th Floor
Boston, MA 02116-3736
(617) 937-2300 (phone)
(617) 937-2400 (fax)
lcadigan@cooley.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on March 21, 2022, I filed this document on the Court's docket using the Court's CM/ECF system. Based on the Court's records, all counsel of record were served with a copy of the foregoing document by electronic means.

*s/ Patrick Loftus*

DUANE MORRIS LLP
Patrick Loftus (PA60417)
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1367 (phone)
(215) 689-3591 (fax)
loftus@duanemorris.com
