UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICK McDERMID, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. Action No. 2:20-cv-01402-GJP |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | DECLARATION OF TOR GRONBORG IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF |
| INOVIO PHARMACEUTICALS, INC., et al., | ) ) | ALLOCATION, AWARD OF ATTORNEYS' FEES AND EXPENSES, AND AWARDS TO |
| Defendants. | ) ) ) | PLAINTIFFS |

I, TOR GRONBORG, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California, and I have been admitted in this case *pro hac vice*.  I am a member of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), and counsel for Lead Plaintiff Manuel S. Williams and Representative Plaintiff Andrew Zenoff (collectively, "Plaintiffs") and the Class.  I have been actively involved in the prosecution and resolution of this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the above-captioned litigation.

2.      I submit this declaration in support of Plaintiffs' motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the Stipulation of Settlement dated August 22, 2022 (ECF 149-1) ("Stipulation" or "Settlement"),[1] which provides for a settlement of no less than $44,000,000 in cash and stock (the "Settlement Amount"); (b) the proposed Plan of Allocation; (c) Lead Counsel's application for an award of attorneys' fees and expenses; and (d) Plaintiffs' application for an award pursuant to 15 U.S.C. §78u-4(a)(4) in connection with their representation of the Class.

## I.      PRELIMINARY STATEMENT

3.      Lead Counsel has zealously litigated this Action from its commencement in March 2020 through settlement.  At every stage of the litigation, Defendants[2] challenged Plaintiffs' claims and asserted that they had comprehensive defenses.  The Settlement was achieved only after Lead Counsel, *inter alia*: (a) conducted a thorough investigation; (b) drafted several complaints; (c) successfully opposed Defendants' motion to dismiss; (d) conducted extensive discovery, including:

---

[1]      Capitalized terms not otherwise defined in this declaration have the same meaning set forth in the Stipulation.

[2]      The Defendants are Inovio Pharmaceuticals, Inc. ("Inovio" or the "Company"), J. Joseph Kim, Peter D. Kies, and Robert J. Juba, Jr.

(i) the review and analysis of over half a million pages of documents produced by Defendants and dozens of non-parties; (ii) deposing 14 current and former Inovio employees and Defendants' expert on loss causation; (iii) responding to discovery propounded by Defendants, consisting of document requests and interrogatories; and (iv) defending two depositions taken by Defendants of plaintiffs Williams and Zenoff; and (e) fully briefed and argued Plaintiffs' motion for class certification, which remained pending at the time of the Settlement.

4.       This Settlement is the product of hard-fought litigation and takes into consideration the significant risks faced by Plaintiffs if they continued to litigate the case.  Furthermore, the Settlement is the result of arm's-length negotiations between the parties facilitated by Gregory P. Lindstrom, a nationally recognized mediator of complex cases and class actions, employed by Phillips ADR, the preeminent firm specializing in securities class action mediations.  These negotiations were conducted by experienced counsel on both sides with a firm understanding of the strengths and weaknesses of their respective cases.

5.       Plaintiffs believe that this Settlement is a phenomenal result given the precarious financial condition of the Company and the risks and delays inherent in continued litigation.  The substantial discovery, motion practice, and trial preparation outlined herein informed Plaintiffs that, while their case had many strengths, it also had some weaknesses, which were conscientiously evaluated in determining what course of action was in the best interest of the Class.  As set forth below, despite the fact that many of Plaintiffs' allegations were supported by evidence, there remained numerous risks and uncertainties in the case.

6.       The gravamen of the Consolidated Class Action Complaint for Violation of the Federal Securities Laws is that, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder, Defendants issued false and misleading statements regarding the development of their COVID-19 vaccine candidate, INO-4800.

7.      On February 14, 2020, Defendant J. Joseph Kim, Inovio's CEO, appeared on Fox Business News and announced that Inovio had constructed a prototype vaccine candidate, code-named INO-4800, in three hours after accessing the DNA sequence of the virus.  Between February 14 and August 10, 2020, Inovio continued to make false and misleading statements regarding the development of INO-4800, including at the White House, in press releases, and in conference calls with investors.  In these statements, Inovio consistently claimed to be on track toward its goal of delivering millions of doses of their innovative vaccine in the near future.  While Inovio made these statements, Defendant Kies sold 35,000 shares of Inovio common stock for proceeds of approximately $927,500.

8.      Plaintiffs allege that these statements were false and misleading when made and that the market began to learn the truth as early as March 9, when the Company attempted to walk back Defendant Kim's claim that the vaccine had been "constructed" in just three hours, admitting that he had really meant that Inovio had merely "designed" a vaccine construct within three hours.  Over the next six months, Inovio gradually revealed that it did not have the manufacturing capacity to hit its dose production targets; had in fact sued its main manufacturing partner; had quietly abandoned its goal of producing 1 million doses by year end and had pivoted instead to its equally unachievable goal of 100 million doses by the end of 2021; and could not continue with its clinical trials until the FDA lifted the clinical hold.  A more detailed description of the allegations is set forth in the Second Amended Complaint.  ECF 129.

9.      In opting to settle the litigation, Plaintiffs and their counsel considered the risks associated with proving the alleged claims.  Defendants have maintained that their statements with respect to Inovio's Phase 2/3 trial of INO-4800 were not false or misleading.  *See, e.g.*, ECF 144 at 2-7.  Defendants also maintain that Plaintiffs cannot establish loss causation and damages because there is no link between the allegedly false statements and any movement in Inovio's stock price.

*E.g.*, *Id.* at 8-9.  For example, in opposing class certification, Defendants argued that Inovio's allegedly false statements regarding constructing INO-4800 in three hours had no price impact, nor did the statements regarding the alleged misrepresentation on March 24, 2020 and August 9-10, 2020.  *See* ECF 107 at 19-24.  Although Plaintiffs dispute Defendants' assertions, based on the document discovery and depositions taken, it was clear that Defendants would offer both evidence and legal arguments to bolster their defenses for summary judgment and trial.

10.     The parties also disputed the related issues of loss causation and damages.  While Plaintiffs would have disputed Defendants' contentions at summary judgment and trial, there was a substantial risk of recovering limited or no damages if the jury agreed in whole or in part with Defendants' arguments.

11.     In deciding to settle the litigation, Plaintiffs and their counsel weighed the witness testimony and documents they believed supported the allegations against the testimony of other witnesses and documents that could be used to undercut those allegations.  The parties disagreed on the importance of much of the witness testimony and evidence, and there is no way to predict which interpretations and inferences a jury would accept.

12.     On balance, considering all the circumstances and risks both sides faced were the parties to continue to trial, both Plaintiffs (for themselves and the Class) and Defendants concluded that settlement on the terms agreed upon was in their respective best interests.

13.     Lead Counsel has prosecuted the Action on a wholly contingent basis and has advanced or incurred substantial litigation expenses.  In doing so, Lead Counsel shouldered the substantial risk of an unfavorable result.  Lead Counsel has not yet received any compensation for its effort.

14.     As set forth in the memorandum in support of the motion for attorneys' fees and expenses, the requested 27.5% fee award is fair and consistent with similar cases.  The requested

percentage is justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed.

15.     Lead Counsel also seeks an award for expenses totaling $814,374.95 that were reasonably and necessarily committed to the prosecution of the Action.  These expenses include: (a) the fees and expenses of consultants and experts whose services Lead Counsel required in the successful prosecution and resolution of this case; (b) the costs associated with conducting fact and expert witness depositions, which included remote court reporter and videographer fees, but, notably, no travel expenses, as all depositions were conducted remotely on account of the pandemic; (c) photocopying, imaging, and managing a database of over half a million pages of documents; and (d) online factual and legal research.  These expenses were reasonable and necessary to obtain the successful result.

16.     In addition, as permitted under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs Williams and Zenoff seek awards of $77,450.00 and $75,712.50, respectively, in connection with their representation of the Class.  Their investment of time and effort greatly contributed to the successful prosecution and resolution of the Action.

17.     The following is a summary of the principal events which occurred during the course of the Action and the legal services provided by Plaintiffs' Counsel.

## II.     THE LITIGATION

### A.     The Commencement of the Action

18.     On March 12, 2020, original plaintiff Patrick McDermid filed the initial complaint in *McDermid v. Inovio Pharms., Inc., et al.*, No. 2:20-cv-01402-GJP, in the United States District Court for the Eastern District of Pennsylvania (the "Court").  ECF 1.  On June 18, 2020, the Court appointed Manuel S. Williams as Lead Plaintiff, and Robbins Geller Rudman & Dowd LLP as Lead Counsel.  ECF 54.

4885-4165-1005.v1

**B.     Lead Counsel's Investigation, the Consolidated Complaint, and the First Amended Complaint**

19.     Prior to and following the filing of the initial complaint, Lead Counsel directed an extensive investigation of the alleged securities law violations.  This investigation included, but was not limited to, a review and analysis of: (a) Inovio's public filings with the Securities and Exchange Commission ("SEC"); (b) transcripts of Inovio's public conference calls; (c) Inovio's press releases; (d) reports of securities analysts following Inovio; (e) independent media reports regarding Inovio and its efforts to develop a coronavirus vaccine; (f) publicly filed information concerning that vaccine; (g) economic analyses of Inovio's stock price movement and pricing and volume data; (h) consultation with pharmaceutical and medical experts; and (i) other publicly available material and data.

20.     Based on this investigation, Lead Counsel prepared a detailed Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Consolidated Complaint") on behalf of Inovio investors who purchased or otherwise acquired the common stock of Inovio during a proposed Class Period of February 14, 2020, through June 2, 2020, inclusive, and were damaged thereby.  The Consolidated Complaint was filed on August 3, 2020, and brought claims pursuant to §§10(b) and 20(a) of the 1934 Act and Rule 10b-5 promulgated thereunder.  ECF 60.  Following the filing of the Consolidated Complaint, however, additional relevant information became known to the investing public.

21.     Specifically, on August 10, 2020, Inovio informed investors that INO-4800 vaccine development and clinical study data read-outs would likely be delayed; Inovio's stock price dropped 28% in response.  Then, on August 14, 2020, Plaintiffs' Counsel obtained publicly available copies of the exhibits that had been introduced by the parties in Inovio's litigation in Pennsylvania state court against its primary contracted vaccine manufacturer, VGXI.  Those hearings allowed the Pennsylvania state court to decide Inovio's request for an injunction requiring VGXI to turn over its

intellectual property regarding the manufacture of INO-4800 to VGXI's competitors.  Some of those documents contained information relevant to Plaintiffs' claims.  And on August 26, 2020, an article in *The New England Journal of Medicine* describing details of the United States Government's efforts to develop a coronavirus vaccine – code-named Operation Warp Speed – did not include Inovio's DNA-based vaccine candidate among its descriptions of the vaccine candidates jockeying for position and funding, prompting another price drop in Inovio's stock.  Finally, on September 2, 2020, Muddy Waters Research issued a Tweet referencing the August 25, 2020 opinion in Inovio's lawsuit against VGXI, in which the court had declined to issue Inovio's desired injunction, further harming the company and providing additional details regarding Inovio's statements about its ability to deliver doses of its vaccine.  As a result, Inovio's stock price dropped yet again.  All of these developments were highly relevant and material to Lead Plaintiff's case, and he filed – with Defendants' consent – a motion seeking leave to file the First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("FAC") on September 17, 2020.  ECF 65.

22.     The Court granted the unopposed request, and Lead Plaintiff filed the FAC on September 21, 2020.  ECF 68.  The FAC added Andrew Zenoff as a representative plaintiff but otherwise did not add any claims or defendants.

### C.     Defendants' Motion to Dismiss the FAC

23.     Defendants moved to dismiss the FAC on November 5, 2020.  ECF 72.  In accordance with the PSLRA, formal discovery in the case was immediately stayed until the Court ruled on that motion to dismiss.  In support of their motion to dismiss, Defendants argued that the FAC failed to plead falsity, failed to plead a strong inference of scienter, and did not sufficiently allege loss causation with respect to statements about the vaccine construction timeline and Operation Warp Speed.  Defendants also argued that the statements regarding Inovio's manufacturing capacity and expected timelines were protected by the PSLRA safe harbor, as

- 7 -

forward-looking statements protected by cautionary language.  Defendants also argued that, as a result of the weaknesses in the substantive claims, the control person claim under §20(a) of the 1934 Act must also fail.

24.     On December 21, 2020, Plaintiffs filed their response in opposition to Defendants' motion to dismiss.  ECF 80.  Plaintiffs rebutted each of Defendants' positions, arguing: (a) the FAC alleged Defendants' statements regarding having fully constructed a vaccine in three hours were false; (b) the manufacturing statements did not fall within the PSLRA safe-harbor provision; (c) the manufacturing statements were materially misleading; (d) the Operation Warp Speed statements were misleading; (e) the FAC raises a strong inference of scienter; (f) the FAC properly alleges loss causation; and (g) as a result, the §20 claim is properly supported.  Plaintiffs also stressed in their opposition that several of Defendants' factual arguments were not properly before the Court at the motion to dismiss stage.  Lead Counsel spent significant time and resources performing the legal and factual research necessary to address Defendants' arguments and draft an effective opposition that demonstrated the FAC satisfied the pleading requirements of the PSLRA.

25.     On January 20, 2021, Defendants filed a reply in support of their motion to dismiss the FAC.  ECF 83.  Oral argument on Defendants' motion to dismiss was not held.  In parallel with the motion to dismiss briefing, the parties simultaneously briefed Defendants' request for judicial notice of various documents.  *See* ECFs 73, 81, 84.

26.     On February 16, 2021, the Court granted in part and denied in part Defendants' motion to dismiss, holding that allegations pertaining to the Operation Warp Speed statements must be dismissed but allowing Plaintiffs' other claims to proceed.  The Court held that Plaintiffs had "satisfied their burden of alleging why Kim's statements [regarding the three-hour construction timeline] were misleading" and had pled "enough facts to support a strong inference of scienter" as well as loss causation.  ECF 85 at 13-17.  Following the February 16, 2021 Order, Defendants filed

their Answer to the FAC on March 9, 2021.  The Answer denied all substantive allegations and asserted seventeen affirmative defenses.  ECF 88.

27.     Simultaneously, the parties had begun to meet and confer regarding case management, pre-trial scheduling, and fact discovery.  After engaging in negotiations, the parties filed a proposed pre-trial schedule, discovery plan, and case management statement, which the Court entered on March 22, 2021.  ECF 90.  The pretrial conference was held on March 25, 2021, *see* ECF 92, and the Scheduling Order was entered later that day, ECF 93.

### D.     Plaintiffs' Motion for Class Certification

28.     Plaintiffs moved for class certification on July 29, 2021.  ECF 99.  Plaintiffs Williams and Zenoff requested that the Court appoint them as class representatives based on their work prosecuting the securities law claims and combined purchases of over 33,000 shares of Inovio common stock during the Class Period.  Plaintiffs also requested that Robbins Geller be appointed as class counsel.  ECFs 99-101.  The motion for class certification addressed all of the requirements of Rule 23, as well as *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("efficient market") and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268-69 (2014) (upholding the "fraud-on-the-market" presumption of reliance).

29.     In support of their motion, Plaintiffs retained Dr. Steven P. Feinstein to conduct an event study of publicly available information about Inovio and to opine on the efficiency of the market for Inovio's stock.  ECF 101-1.  Based on his findings, Dr. Feinstein concluded that Inovio's common stock traded in an efficient market during the Class Period.  Lead Counsel spent substantial time consulting with Dr. Feinstein on his declaration and the class certification briefing.

30.     On October 8, 2021, Defendants opposed Plaintiffs' motion, claiming that Plaintiffs had not satisfied their burden under Rule 23 of showing a predominance of common questions because there was no demonstrable price impact from the allegedly false or misleading statements,

thus undermining Plaintiffs' presumption of class-wide reliance.  ECF 107.  Defendants also argued that the class period must be shortened and that Plaintiffs Williams and Zenoff did not satisfy the typicality and adequacy requirements.  *Id.*  In support of their opposition, Defendants relied on an expert report from economist Dr. René M. Stulz.  ECF 107-2.  Dr. Stulz opined that Dr. Feinstein had not established that Inovio's stock traded in an efficient market during the Class Period due to purported deficiencies in Dr. Feinstein's methodology and, moreover, that the market for Inovio stock behaved inefficiently.

31.     On November 19, 2021, Plaintiffs deposed Dr. Stulz via videoconference for the purposes of responding to arguments raised in Defendants' class certification opposition.

32.     On December 8, 2021, Plaintiffs filed their reply in further support of their motion to certify the class.  ECF 112 (public), 113 (under seal).  Plaintiffs argued that they had satisfied the requirements of Rule 23, had established market efficiency, had established the presumption of class-wide price reliance under *Basic* and *Halliburton*, that Defendants had not rebutted the presumption, and that the adequacy and typicality requirements of Rule 23(a) were also satisfied. Plaintiffs submitted a rebuttal declaration by Dr. Feinstein in connection with the reply.  ECF 112-3. Dr. Feinstein refuted the arguments and conclusions of Defendants' expert and reiterated that the market for Inovio common stock during the Class Period was efficient.  Lead Counsel spent additional time consulting with Dr. Feinstein on his rebuttal declaration and Plaintiffs' class certification reply briefing.

33.     After Plaintiffs filed their reply papers, Defendants approached Plaintiffs to inquire whether Plaintiffs would oppose Defendants' proposed sur-reply.  Following their meet-and-confer, the parties reached an agreement.  The parties then requested a hearing with the Court, which was held on December 13, 2021; at the hearing, the parties outlined their agreement and informed the Court that a stipulation and proposed order would be filed promptly.  Under the terms of that

stipulation, Plaintiffs agreed that they would not oppose the Defendants' sur-reply, limited to the issue of price impact; the Court entered the proposed order on December 16, 2021.  ECF 116.

34.     Defendants filed their sur-reply on January 21, 2022.  ECF 119.

35.     The Court scheduled a hearing on the motion for class certification to be held on June 23, 2022.  ECF 143.  On June 9, 2022, after the parties informed the Court that their ongoing settlement negotiations were likely to be fruitful, the June 23 hearing was ordered removed from the calendar.  ECF 147.  The motion remained pending at the time of settlement.

**E.     The Second Amended Complaint**

36.     Meanwhile, Plaintiffs sought leave to amend the complaint.  On January 28, 2022, Plaintiffs filed their motion for leave to file the Second Amended Consolidated Class Action Complaint. ECF 121.  Although they initially opposed Plaintiffs' motion and refused to agree to the filing of an uncontested motion for leave to amend, Defendants eventually filed a notice of non-opposition on February 11, 2022.  ECF 127.  The Court granted the unopposed motion on February 17, 2022 (ECF 128) and the SAC was deemed filed that same day.  ECF 129.

37.     The SAC did not add any claims, defendants, or plaintiffs.  Rather, the SAC challenged additional statements that, in Plaintiffs' view, discovery had shown to be false or misleading.  Specifically, these statements pertained to the partial clinical hold that Inovio had received from the FDA on June 23, 2020, but had not disclosed to the public until September of that year.  The SAC also alleged additional corrective disclosures.

38.     Defendants moved to dismiss the SAC on March 21, 2022 (ECF 133), arguing that the newly challenged statements were not false or misleading because, *e.g.*, Inovio had no duty to disclose the partial clinical hold, had truthfully stated that it could not begin a Phase 2/3 clinical trial until it received FDA concurrence, and the statements were protected by the PSLRA safe harbor.  *Id*.

Defendants made numerous other arguments for dismissal, including that Plaintiffs failed to adequately allege scienter and loss causation as to the newly added false statements.

39.     Plaintiffs filed their response in opposition to the motion to dismiss on April 20, 2022.  ECF 135.  In rebutting each of Defendants' arguments, Plaintiffs stressed that, having elected to speak at all about the Phase 2/3 clinical trials, Defendants were obligated to disclose the clinical hold, and that the statements about the clinical trial were not protected by the PSLRA safe harbor provision.  Plaintiffs also countered Defendants' arguments pertaining to scienter and loss causation. Crucially, Plaintiffs emphasized that their allegations were directly contrary to Defendants' defenses – and that, on a motion to dismiss, it is Plaintiffs' characterization of the evidence, not Defendants', that is to be credited and evaluated for sufficiency.  ECF 135.

40.     Defendants filed their reply in further support of their motion to dismiss on May 10, 2022.  ECF 144.

41.     Prior to the Court deciding the motion to dismiss or motion for class certification, the parties reached a settlement.  The motion seeking preliminary approval of the Settlement was filed August 22, 2022.  ECF 148.

**F.     Fact Discovery**

42.     Immediately after the Court's ruling on the initial motion to dismiss, Lead Counsel began conferring with defense counsel regarding fact discovery.  Throughout the class certification briefing and the second motion to dismiss briefing, and continuing up until the parties reached a settlement, Plaintiffs engaged in rigorous, detailed, thorough, and highly effective fact discovery. During that time, Lead Counsel obtained, reviewed, and analyzed nearly half a million pages of documents from Defendants and non-parties, and deposed numerous fact witnesses.

- 12 -

### 1.    Protective Orders

43.    To protect against the disclosure of potentially sensitive personal or proprietary records, Lead Counsel drafted a comprehensive protective order to govern the treatment of confidential evidence produced in this case and negotiated with Defendants' counsel over the terms of the proposed order.  The parties also negotiated the extent to which, and the conditions under which, confidential information could be shown to deponents, non-parties, and others not previously privy to such information.  The parties were able to reach agreement on all of their respective areas of concern and filed a Joint Stipulation and proposed Protective Order.  On May 7, 2021, the Court entered the Protective Order.  ECF 95.  Thereafter, the parties negotiated a special supplemental protective order specifically to govern information produced by non-party VGXI, Inc., Inovio's onetime vaccine manufacturing partner.  The parties again reached agreement on the terms of that supplemental order, and the Court entered it on January 7, 2022.  ECF 117.

### 2.    Written Discovery Directed to Defendants

#### a.    Document Requests

44.    On March 22, 2021, following the parties' Rule 26 conference, Plaintiffs served their First Set of Requests for Production of Documents ("RFPs"), consisting of 60 discrete requests germane to the claims and defenses asserted by the parties.  Plaintiffs propounded their Second Set of Requests for Production of Documents on September 13, 2021, consisting of six additional requests for browser history pertaining to several relevant issues in the case.  In their responses, Defendants objected to nearly every request for production on the grounds of relevance, over-breadth, ambiguity, and/or seeking privileged information.

45.    Lead Counsel engaged in numerous meet and confer discussions with Defendants' counsel to address their objections to the RFPs throughout the course of this litigation.  Only once did the parties need to approach the Court with a discovery dispute pertaining to the production of

- 13 -

documents that they were unable to resolve on their own.  On April 22, 2022, Plaintiffs filed a letter

brief with the Court pertaining to a dispute about a potential spoliation issue that arose during a

deposition.  ECF 137.  Defendants replied to that letter the same day.  ECF 138.  The Court held a

hearing on May 3, 2022, to resolve the dispute.  ECF 141.

> ### b.    Negotiations Concerning the Production of Defendants' Electronically Stored Information

46.    Multiple additional meet and confer discussions were also necessary to address the

identification and production of relevant Electronically Stored Information ("ESI").  Virtually all of

the relevant materials were maintained electronically, making these discussions particularly

important to the prosecution of this case.  Based on consultation with in-house ESI experts, Lead

Counsel posed detailed questions to Defendants concerning Inovio's information technology

systems, focused on the general electronic systems maintained by and for Inovio and the location of

potentially responsive ESI.  Lead Counsel diligently pursued this information for months and

engaged in numerous conferences with Defendants regarding the specific information sought.

47.    The focus of these discussions included:  custodial and non-custodial sources of ESI;

search terms and date ranges to be used in identifying relevant ESI; ESI retention and deletion

policies and practices; file server and document management systems and policies; the use of backup

tapes or systems; retention of instant messages and text messages, including newer many-to-many

communications systems such as Slack; the initiation of a litigation hold; and the volume of data by

custodian, date, and file type.  These discussions further expanded when relevant ESI was found

contained in certain witnesses' personal email accounts.

48.    Lead Counsel initiated and participated in written and telephonic exchanges with

Defendants' counsel regarding the use of de-duplication, file type filtering, date filtering, and review

by thread-view as potential methods to efficiently search, review, and produce the documents from

agreed upon custodians.  In response to Defendants' concerns regarding the burden of review for

- 14 -

privilege, Lead Counsel provided suggestions as to how to further reduce Defendants' burden, including the use of search terms.

49. The parties worked cooperatively to reach agreement on search terms, which required numerous meet and confer discussions and negotiations spanning months. This process involved running and testing various alternatives to Plaintiffs' and Defendants' proposed searches in an effort to reach a mutually agreeable set of search terms. At each step, Lead Counsel utilized the services of in-house e-discovery experts and researched the capabilities of the vendor Defendants had retained to manage the production of ESI.

50. In order to keep discovery progressing while they continued to engage in meet and confer discussions, the parties agreed to proceed with a rolling production of Defendants' documents. This procedure allowed Lead Counsel to receive and review these materials as quickly and efficiently as possible. However, given the volume of the documents, the fact discovery deadline was extended to allow Defendants additional time to complete their productions and for Plaintiffs' Counsel to review and analyze these productions before commencing with depositions. *See* ECFs 93, 120, 140 (original scheduling order and two amendments).

### c.    Interrogatories

51. Plaintiffs served one set of interrogatories on Defendants during the litigation, consisting of 16 discrete requests concerning the parties' claims and defenses. The interrogatories sought information regarding the identification of relevant documents and witnesses and to garner evidence in support of their claims. Plaintiffs served these interrogatories on Defendants on February 28, 2022. The parties met and conferred regarding these interrogatories and Defendants' responses and objections thereto.

- 15 -

### d.     Requests for Admission

52.     Plaintiffs served two sets of Requests for Admission ("RFAs") on Defendants to narrow the scope of evidentiary issues in dispute.  The First Set of RFAs was served on May 25, 2021, consisting of 45 requests.  Plaintiffs then propounded their Second Set of RFAs on January 11, 2022, consisting of 49 additional requests concerning all claims and defenses.  The parties met and conferred following Plaintiffs' receipt of Defendants' responses and objections to both sets of requests.

### 3.     Discovery Disputes with Defendants

53.     Lead Counsel devoted substantial time to analyzing documents produced in discovery, preparing for and conducting meet and confer conferences with counsel for Defendants, and preparing correspondence memorializing those conversations in order to narrow the scope of discovery disputes while still aggressively pursuing the discovery rights of the Class.  While the parties were able to resolve the vast majority of their differences, some disputes were not able to be resolved without the Court's attention.

54.     On April 22, 2022, Plaintiffs filed a letter with the Court detailing two discovery disputes: first, whether Defendants would be barred from raising a reliance-on-counsel defense after discovery had already closed; and second, whether a spoliation instruction was warranted given that a crucial eyewitness's notebook had gone missing.  ECF 137.  Defendants replied to that letter the same day, ECF 138, and the Court resolved the dispute via telephonic conference on May 3, 2022, ECF 141.

55.     Another dispute arose with regard to each side's respective responses and objections to interrogatories.  Between May 6 and 16, 2022, the parties exchanged several emails detailing their respective positions.  This disagreement eventually resolved without the need for Court intervention.

4885-4165-1005.v1

56.     During Dr. Shah Brown's first deposition, it became apparent that she had responsive documents in her possession, custody, or control – specifically, her handwritten notes taken during the Class Period – which had not been produced in the ordinary course of document discovery. Plaintiffs requested those notes be produced and requested additional deposition time with Dr. Shah Brown.  The parties conferred on these requests and reached an agreement.  Defendants then produced her handwritten notes pursuant to a document subpoena.  During the second deposition, defense counsel clarified that the documents were produced to Plaintiffs with certain pages, which in Defendants' view were privileged or non-responsive, omitted.  Plaintiffs then requested that the notebooks be re-produced "as they are kept in the usual course of business," that is, with original pagination preserved, and with privileged or non-responsive information merely redacted rather than with entire pages excised.  After several rounds of negotiation on this point, the parties reached an agreement and resolved their dispute without Court intervention.

### 4.     Written Discovery Directed Toward Third Parties

57.     A significant amount of relevant information was in the possession, custody, or control of third parties.  As with Defendants' production, Lead Counsel expended significant time and resources negotiating the scope of the document requests with third parties, addressing any objections to the requests by the third parties, arranging for the production of responsive documents, and reviewing, organizing, and analyzing the documents.

58.     Following the Court's February 16, 2021 Order partially denying Defendants' motion to dismiss, Lead Counsel served subpoenas on the following third parties:

| Person/Entity | Date | Relationship to Litigation |
|---|---|---|
| Clarivate Analytics (US), LLC | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Acuris, Inc. f/k/a Infinata, Inc. | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Cantor Fitzgerald and Co., Inc. | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |

| Person/Entity | Date | Relationship to Litigation |
|---|---|---|
| HC Wainwright & Co., LLC | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Lafferty & Lahey Partners, LLC | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Maxim Group, LLC | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Institutional Shareholder Services, Inc. | 4/1/2021 | Proxy advisory firm |
| Oppenheimer & Co., Inc. | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Stifel, Nicolaus & Co., Inc. | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| RBC Capital Markets, LLC | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Roth Capital Partners, LLC | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Piper Sandler Companies | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Watchdog Research, Inc. | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Streetwise Reports, LLC | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| The Benchmark Company, LLC | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Zacks Investment Research, Inc. | 4/1/2021 | Investment bankers and/or securities analyst for Inovio |
| Ology Bioservices, Inc. | 4/8/2021 | Biopharmaceutical manufacturer of vaccines and Inovio's partner recipient of Department of Defense funding |
| Thermo Fisher Scientific, Inc. | 4/8/2021 | Biopharmaceutical manufacturer of vaccines and one of Inovio's touted manufacturing partners |
| VGXI, Inc. | 4/8/2021 | Inovio's main contract manufacturer and chief supplier of INO-4800 |
| United States Department of Defense | 7/22/2021 | Provided $11.9 million to fund Inovio's collaboration with Ology |
| GMJ Global, LLC (parent company of TogoRun) | 10/6/2021 | Public relations firm hired by Inovio during the Class Period |
| McGuireWoods LLP | 10/6/2021 | Consulting firm hired by Inovio during the Class Period |
| Omnicom Group, Inc. | 10/29/2021 | Public relations firm hired by Inovio during the Class Period |
| Patheon Manufacturing Services, LLC | 11/23/2021 | Subsidiary of Thermo Fisher Scientific that is capable of manufacturing DNA vaccines |

4885-4165-1005.v1

| Person/Entity | Date | Relationship to Litigation |
|---|---|---|
| PricewaterhouseCoopers LLP | 3/29/2022 | Consulting firm hired by Inovio during the Class period to advise on manufacturing capacity issues |
| Coalition for Epidemic Preparedness Innovations (CEPI) | 3/29/2022 | Nonprofit research agency that provided funding for Inovio's vaccine initiatives |

### 5.    Plaintiffs' Review and Analysis of Discovery Materials

59.    As a result of Plaintiffs' document requests to Defendants, subpoenas to third parties, and Lead Counsel's extensive meet and confer discussions with Defendants and the third parties, Plaintiffs obtained over half a million pages of documents.  Careful examination and analysis of these documents, in preparation for deposition and trial, required a considerable effort by Lead Counsel.

60.    First, Lead Counsel uploaded these documents on a database to manage the volume of documents produced, requiring Lead Counsel to advance certain costs to establish and maintain the database.  Then, Lead Counsel utilized its e-discovery document hosting and analysis system.  In addition to hosting over 590,000 pages, this system was used for identifying and tracking the documents most likely to be used in depositions and at trial (whether by Plaintiffs or Defendants), identifying relevant witnesses for deposition or additional discovery requests, and establishing procedures to identify additional documents and information that had not been produced.

61.    Attorneys and staff reviewed documents and used search terms, date filters, custodian fields, and other metadata to analyze thousands of documents related to key issues in the case. Throughout the document review process, counsel for Plaintiffs analyzed the information contained in the documents, determined the documents' relevance, and located the evidence needed to present the case at trial and rebut Defendants' defenses.

6.        **Depositions**

62.        In preparation for trial, Lead Counsel identified 19 individuals and entities, not including experts, whose testimony Plaintiffs wanted for trial and negotiated an extension of the Federal Rule of Civil Procedure 30(a)(2)(A)(i) deposition limit accordingly.  Lead Counsel prepared questions and identified and analyzed documents to use in its examinations.  Prior to the Settlement, Lead Counsel deposed all nineteen of those witnesses, fourteen of whom were current and former Inovio executives and employees, and five of whom were current and former employees of relevant third parties.  Due to the ongoing pandemic, the following depositions all took place remotely:

| Deponent | Position | Date | Location |
|---|---|---|---|
| René Stulz | Defendants' Economics and Market Efficiency Expert | 11/19/2021 | Remote |
| Daniel Covatta | Managing Director, Stifel Financial. Investment banker who worked on Inovio's at-the-market offering. | 1/20/2022 | Remote |
| Benjamin Matone | Director of Investor Relations, Inovio | 2/9/2022 | Remote |
| Ami Shah Brown (two sessions) | Senior VP of Regulatory Affairs, Inovio | 2/10/2022; 4/26/2022 | Remote |
| Laurent Humeau | Chief Scientific Officer, Inovio | 2/11/2022 | Remote |
| Katherine Seals | Senior Manager, Drug CMO, Quality Assurance, Inovio | 2/17/2022 | Remote |
| Marisa Sepulveda | Senior Director, Global Regulatory Affairs, CMC, Inovio | 2/17/2022 | Remote |
| Shawn Bridy | VP of Business Development, Inovio | 3/1/2022 | Remote |
| Robert Juba, Jr. | VP of Biological Manufacturing and Clinical Supply Management, Inovio | 3/4/2022 | Remote |
| Keiko Simon | VP of Alliance and Program Management, Inovio | 3/9/2022 | Remote |
| Robert V. House | SVP of Government Contracts, Ology Bioservices | 3/10/2022 | Remote |
| Jeffery Richardson | VP of Communications & Strategic Relations, Inovio | 3/11/2022 | Remote |
| Jacqueline Shea | Chief Operating Officer and Executive Vice President, Inovio | 3/22/2022 | Remote |
| Dorothy Peterson | Chief Operating Officer, VGXI, Inc. | 3/24/2022 | Remote |
| J. Joseph Kim | Chief Executive Officer, Inovio | 3/25/2022 | Remote |
| ShuPing Yang | Senior Director of Clinical Development, Inovio | 3/29/2022 | Remote |
| Peter Kies | Chief Financial Officer, Inovio | 3/29/2022 | Remote |

| Deponent | Position | Date | Location |
|---|---|---|---|
| Joseph Clark | Regional Manager of Business Development (Pennsylvania), Patheon / Thermo Fisher Scientific, Inc. | 3/30/2022 | Remote |
| Gloria Janata | Owner, Chief Executive Officer, and President, TogoRun, Inc. | 3/30/2022 | Remote |
| Kate Broderick | SVP of Research and Development, Inovio | 4/5/2022 | Remote |

63.     The depositions taken by Lead Counsel were critical in developing evidence regarding Defendants' alleged fraud.

### 7.     Plaintiffs' Response to Defendants' Discovery

64.     Over the course of the fact discovery period, Plaintiffs responded to multiple discovery requests from the Defendants, including 54 requests for production of documents, 13 interrogatories, and 62 requests for admission directed to Plaintiff Williams, and 51 requests for production of documents, 15 interrogatories, and 67 requests for admission directed to Plaintiff Zenoff.   Plaintiffs responded and objected to all of these discovery requests, and the parties subsequently met and conferred many times, ultimately resolving all disputes.

### G.     Expert Witnesses and Consultants

65.     To assist Lead Counsel in investigating and proving Plaintiffs' claims and navigating the complex issues involved in this matter, the services of certain experts and consultants were required.   The work performed by these experts and consultants provided valuable insight to Lead Counsel in evaluating the merits of Plaintiffs' case as well as guidance for settlement during the course of the litigation.

### 1.     Dr. Steven P. Feinstein, Ph.D., CFA and Crowninshield Financial Research

66.     Dr. Feinstein, founder and President of Crowninshield Financial Research, Inc. ("CFR"), is an Associate Professor of Finance at Babson College, and has published extensively regarding corporate valuation, derivatives, and investments.   Prior to entering academia, Dr.

Feinstein was an economist at the Federal Reserve Bank of Atlanta.  Dr. Feinstein has provided analysis and testimony in numerous class action securities lawsuits, ERISA cases, the qui tam yield burning cases, derivatives valuations, and complex business litigation.  Plaintiffs utilized the services of Dr. Feinstein and CFR to examine and explain how Inovio's stock trades in an efficient market, to conduct a thorough event study examining all industry, market, and Company-specific news during the Class Period, and to review and analyze documents related to events surrounding Inovio's public statements pertaining to its coronavirus vaccine candidate development program.  In addition, Dr. Feinstein and the staff at CFR prepared an expert report and rebuttal report on behalf of Plaintiffs at the class certification stage, and assisted Lead Counsel in preparing to depose Defendants' expert, Dr. Stulz, and addressing his arguments regarding market efficiency.  Dr. Feinstein and CFR also prepared and analyzed multiple damages models used for purposes of mediation and the proposed Plan of Allocation.

### 2. Dr. Vyacheslav Fos

67.     Dr. Vyacheslav Fos is Professor of Finance at Boston College, Carroll School of Management.  Robbins Geller retained Dr. Fos to perform an analysis of Inovio's financial condition and rate of cash burn, and to render an opinion regarding whether Inovio's at-the-market stock offerings during the Class Period were important to the survival of the business as a going concern. Dr. Fos was also asked to analyze Inovio's history of similar at-the-market offerings.

### 3. Dr. Stephen F. Amato

68.     Dr. Amato is Department Chair and Full Teaching Professor of Regulatory Affairs and Quality Assurance at Northeastern University's College of Professional Studies.  Dr. Amato also serves as a Managing Director and Chief Regulatory Strategist for Life Sciences Advisors, LLC. Robbins Geller retained Dr. Amato to explain to the jury what an FDA clinical hold is and opine on what impact the June 2020 clinical hold had on the Company.

### 4.    Lankau Consulting LLC

69.    Peter Lankau has more than 40 years of experience in the pharmaceutical industry, including experience in consulting with pharmaceutical companies regarding sales, research and development, and product manufacturing.  Mr. Lankau is the principal at Lankau Consulting LLC, an advisory and consulting firm, which provides advice and expertise in multiple functional areas of the pharmaceutical industry, including commercial manufacturing strategies and implementation. Robbins Geller retained Mr. Lankau to opine on whether Inovio maintained sufficient operational capabilities to produce 1 million doses of INO-4800 in 2020, and 100 million doses in 2021.

### 5.    Todd Henderson

70.    Mr. Henderson is the Michael J. Marks Professor of Law at the University of Chicago Law School.  He is a corporate law academic and has taught at Chicago Law School since 2004.  He has also taught at the University of Chicago Graduate School of Business "Directors' Consortium" executive education program for corporate directors, on subjects such as corporate governance and executive compensation.  Robbins Geller retained Mr. Henderson to examine the stock trades of each Individual Defendant and other high-ranking Inovio executives and opine as to whether the trading behavior of each Individual Defendant and other Inovio executives immediately prior to and during the Class Period was unusual in light of Plaintiffs' allegations in the case.

### 6.    Dr. Bryan R. Cullen

71.    Dr. Bryan R. Cullen, Ph.D., is the James B. Duke Distinguished Professor of Molecular Genetics and Microbiology at the Duke University School of Medicine, a position he has held since 1994.  Dr. Cullen is one of the most cited scientific scholars in the world and as of mid-2022 was the world's second-most-cited virologist.  He has authored or co-authored 4 books, 19 book chapters, and over 330 peer-reviewed scientific publications in the fields of molecular biology, immunology, and virology.  Robbins Geller hired Dr. Cullen to review all data pertaining to Inovio's

- 23 -

development and clinical trials of its purported Covid-19 vaccine, to write an expert report, to examine and respond to any potential opposing report on these topics, and to testify at trial.  Dr. Cullen would have opined on the efficacy of Inovio's vaccine as well as Inovio's claims with regard to its development timeline.

### 7.    Dr. Nicholas P. Jewell

72.    Dr. Jewell is a Professor of Biostatistics at the University of California, Berkeley. Since 1981, he has taught statistics at Berkeley, and has held academic appointments at Princeton University of Edinburgh, Oxford University, the London School of Hygiene and Tropical Medicine, and the University of Kyoto.  Dr. Jewell is a Fellow of the American Statistical Association, the Institute of Mathematical Statistics and the American Association for the Advancement of Science. Robbins Geller retained Dr. Jewell to consult with the litigation team regarding the statistical results observed and reported in connection with Inovio's Phase I clinical study of INO-4800.

## III.    THE RISKS OF LITIGATION

73.    Plaintiffs, by and through Lead Counsel, zealously litigated this case, and the Settlement was reached only after Lead Counsel had a thorough understanding of the strengths and potential weaknesses of the claims alleged in the SAC.  At the time of Settlement, all fact discovery was complete and the parties were in the midst of preparing to take expert discovery and begin litigating summary judgment.   Accordingly, Plaintiffs and Lead Counsel had a thorough understanding of the strengths of their claims, the strengths of Defendants' defenses, and the potential damages suffered by the Class.

74.    Numerous hurdles remained before trial.  At the time of the Settlement, Plaintiffs' motion for class certification and Defendants' motion to dismiss the SAC were both fully briefed and remained pending.  While Plaintiffs strongly believed the Class would be certified, if Plaintiffs were unable to certify a class, the litigation likely could not be sustained.  Then, there was always the risk

that if a Class was certified, the Court might not maintain the litigation, or particular claims, on a class-wide basis through trial.

75.     While Plaintiffs firmly believe that the documentary and testimonial evidence they intended to offer at trial fully supports their claims, they also understand that there is no way of predicting which interpretations, inferences, or testimony the jury would have accepted at trial. Defendants have adamantly denied any culpability throughout the Action and were prepared to mount defenses that could potentially bar a Class-wide recovery.  If the jury sided with Defendants on even one of their defenses, the Class would recover nothing.

### A.     Falsity

76.     Plaintiffs alleged that certain statements by Defendants regarding the development of INO-4800 were false and misleading when made.  Defendants, on the other hand, maintained that their statements were truthful and not misleading, that, *e.g.*, "design" and "construct" were synonymous within the context of vaccine manufacturing, that they accurately described their expected manufacturing timelines and defended those statements within the PSLRA safe harbor, and that Inovio was not required to disclose any more than it did with regard to the Phase 2/3 clinical trials for INO-4800.  While the parties disagreed about the merits of these arguments, Plaintiffs recognized that if a jury found them compelling, Plaintiffs would be hard pressed to demonstrate at trial that Defendants' statements were materially false or misleading.

### B.     Scienter

77.     In addition to the risks Plaintiffs faced establishing falsity, Defendants were also prepared to mount a defense asserting that Plaintiffs could not establish that Defendants made any false or misleading statements with the requisite intent.  Defendants argued in their motion to dismiss the SAC, which remained pending at the time of settlement, that Plaintiffs could not show that Defendants knew the partial clinical hold needed to be disclosed on June 30 or August 10 to

avoid misleading investors.  Defendants asserted that they lacked scienter because they reasonably believed the partial clinical hold did not need to be disclosed.  Were a jury to find these arguments reasonable, it would be difficult for Plaintiffs to prove Defendants acted with fraudulent intent.

### C.     Loss Causation and Damages

78.     Even if a jury found Plaintiffs succeeded in proving falsity and scienter, there remained a risk related to Plaintiffs' ability to prove loss causation and damages.  Defendants have argued: (1) that loss causation could not be established because the August 10, 2020 statement cannot have corrected the May 11, 2020 statement, as the two statements addressed slightly different subjects; (2) that the August 10, 2020 statement regarding an expected trial start date of "September" is not inconsistent with earlier assurances that the trial would begin in the "summer"; and (3) that Inovio's September 28, 2020 press release disclosing the partial clinical hold did not correct the June 30, 2020 or August 10, 2020 statements regarding the clinical trials.  Defendants likely would have further argued that the methodology Plaintiffs' expert used to prove damages at trial (the same methodology Defendants disputed at class certification) was unreliable.  No doubt, Defendants' arguments, like Plaintiffs', would be buttressed by expert witnesses, and issues relating to loss causation and damages would have likely come down to an inherently unpredictable "battle of the experts."

79.     While Plaintiffs would have had the burden of identifying and isolating the fraud-related damages suffered by Class Members, Defendants only had to identify a flaw with the methodology utilized by Plaintiffs' experts and prevail on a *Daubert* motion or win the inevitable battle of the experts before the jury.  Defendants would have argued that the case either should not reach a jury or that the jury had no choice but to determine that there were little or no cognizable damages.

80.     Although Plaintiffs were confident that they would have been able to support their claims with qualified and persuasive expert testimony, jury reactions to competing experts are difficult to predict, and Defendants would have presented highly experienced experts to support their various defenses to liability.  Accordingly, in the absence of a settlement, there was a very real risk that the Class would have recovered an amount significantly less than the total Settlement Amount – or even nothing at all.

81.     In short, the parties disagreed on the merits of this case, including whether or not damages were suffered and recoverable.  Defendants strongly defended this lawsuit with experienced and diligent attorneys from Cooley LLP and consistently denied that they were liable in any respect. Recovery of any amount at trial was far from certain.

82.     Then, assuming Plaintiffs prevailed at trial, it is likely that Defendants would file post-trial motions and appeals to limit or overturn any Plaintiffs' verdict.  The post-trial motion and appeals process would likely span several years, during which time the Class would receive no payment.  An appeal would carry with it the risk of reversal, in which case the Class would receive no payment despite having prevailed on the claims at trial.

83.     While Lead Counsel had developed strong documentary and testimonial evidence, it faced both factual and legal challenges in presenting this matter to a jury and potentially on appeal. Based on all these factors, as well as the extensive experience of Lead Counsel in the litigation of securities class actions, Lead Counsel submits that the Settlement, which provides a very substantial recovery to Class Members, is far more beneficial than any of the realistic alternatives offered by continued litigation.

## IV.     SETTLEMENT NEGOTIATIONS AND TERMS

84.     The parties began preliminary settlement discussions last summer, just prior to beginning class certification briefing, and held the first of two mediation sessions with Gregory P.

- 27 -

Lindstrom, a nationally renowned mediator of complex securities class actions, on July 13, 2021. The second mediation session was held on February 15, 2022.  Prior to both mediations, the parties submitted and exchanged detailed mediation statements, exhibits, and materials prepared by the parties' loss causation and damages consultants that outlined each side's critical facts and legal principles.

85.     In connection with the mediation process, Plaintiffs conducted arm's-length negotiations with respect to a potential compromise and settlement of the Action with a view to achieving the best relief possible consistent with the interests of the Class.  The settlement discussions were led, on behalf of Plaintiffs, by undersigned counsel and Trig Smith, both of whom have extensive experience in litigating and resolving complex cases in federal courts.  The lead negotiators on the defense side from Cooley LLP, led by Koji Fukumura, had similar substantial experience in resolving complex securities class actions.  Following the second mediation session, the parties received an unsolicited mediator's proposal from Mr. Lindstrom, which had not been previously raised by either side and had not been previously negotiated.  Each side considered the proposal and independently decided to accept.

86.     Following this preliminary agreement in principle, the parties then negotiated, drafted, finalized, and signed the formal settlement agreement detailing the terms of the proposed Settlement, which was submitted to the Court with the Motion for Preliminary Approval of Class Action Settlement filed on August 22, 2022.  *See* ECF 148.  On August 31, 2022, the Court granted preliminary approval of the Settlement as well as of the form and manner of notice of the Settlement to the Class.  ECF 150.

87.     The Settlement set forth in the Stipulation resolves the claims of the Class against all Defendants.  The Stipulation provides that Inovio will pay or cause to be paid $44,000,000 in cash and stock, inclusive of attorneys' fees and costs.  Thirty million dollars ($30,000,000) will be paid in

4885-4165-1005.v1

cash, and Inovio will pay seven million (7,000,000) shares of its common stock valued at $2 per share.  The exact recovery to individual Class Members will depend on variables, including the value of Inovio common stock on the date the settlement is funded, the number of shares of Inovio common stock the Class Member purchased or acquired, and when and at what price such purchases or acquisitions were made.  In the event that 100% of the eligible common stock of Inovio purchased or acquired by Class Members participate in the Settlement, the estimated average distribution per share of Inovio common stock will be approximately $0.23 before deduction of any Court-approved fees and expenses.  Historically, actual claim rates are lower than 100%, resulting in higher per-share distributions.

### A.    The Settlement Is in the Best Interests of the Class and Warrants Approval

88.    Plaintiffs believe they would have prevailed on the merits at trial.  Defendants were just as adamant that Plaintiffs would not have prevailed.  There was a very real risk that Plaintiffs would not have convinced a jury that Defendants acted with scienter or that the alleged misrepresentations and omissions were materially false and misleading when made.

89.    Having considered the foregoing, and evaluated Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and its extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement of this matter before the Court is fair, reasonable, and adequate, and in the best interest of the Class.

90.    The Settlement here represents an extremely good result.  Given Inovio's capital structure and cash position at the time the Settlement was reached, a complete victory at trial with a damages award of even just 10% of the estimated overall damages could have sent Inovio into bankruptcy.  In light of the significant risks associated with the Company's financial uncertainty, a recovery of at least $44 million for the Class is remarkable.  Given both the risks at trial and the

recognition that not all damaged Class Members will seek recovery, the size of the recovery strongly supports approval.

**B.      The Plan of Allocation**

91.      The Net Settlement Fund will be distributed to Class Members who, in accordance with the terms of the Stipulation, are entitled to a distribution and who submit a valid and timely Proof of Claim form.  The Plan of Allocation provides that a Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if the Class Member has an overall net loss on all of his, her, or its transactions in Inovio common stock during the Class Period.

92.      For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel conferred with its economics and damages expert, Dr. Feinstein, and the proposed Plan of Allocation reflects an assessment of the damages that could have been recovered by Class Members had Plaintiffs prevailed at trial.  The plan is premised on the out-of-pocket measure of damages and is designed to measure the difference between what Class Members paid for Inovio common stock during the February 14 to August 10, 2020 Class Period and what the price of Inovio stock would have been had the allegedly omitted information regarding INO-4800 had been disclosed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10th day of November, 2022, at San Diego, California.

_____
TOR GRONBORG

<u>CERTIFICATE OF SERVICE</u>

I, Lawrence F. Stengel, hereby certify that on November 10, 2022, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

s/ <i>Lawrence F. Stengel</i>
LAWRENCE F. STENGEL

SAXTON & STUMP
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Telephone: 717/556-1000
717/441-3810 (fax)

Email: lfs@saxtonstump.com

# Mailing Information for a Case 2:20-cv-01402-GJP MCDERMID v. INOVIO PHARMACEUTICALS, INC. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **ANDREW DAVID ABRAMOWITZ**
  aabramowitz@bm.net,jgionnette@bm.net

- **PETER M. ADAMS**
  padams@cooley.com,daland@cooley.com,ktorres@cooley.com

- **MICHAEL ALBERT**
  malbert@rgrdlaw.com

- **MATTHEW J. BALOTTA**
  mbalotta@rgrdlaw.com,e_file_sd@rgrdlaw.com,scaesar@rgrdlaw.com

- **JEFFREY C BLOCK**
  jeff@blockesq.com

- **LONNIE A. BROWNE**
  lbrowne@rgrdlaw.com

- **LUKE T. CADIGAN**
  lcadigan@cooley.com

- **SHANON J. CARSON**
  scarson@bm.net,emagnus@bm.net

- **MATTHEW S. DECKER**
  MDecker@duanemorris.com

- **MICHAEL C. DELL'ANGELO**
  mdellangelo@bm.net,eyork@bm.net,csimon@bm.net,jgionnette@bm.net

- **MICHAEL D. DONOVAN**
  mdonovan@donovanlitigationgroup.com

- **KOJI F. FUKUMURA**
  kfukumura@cooley.com,jroyer@cooley.com,hlaing@cooley.com,efilingnotice@cooley.com,efiling-notice@ecf.pacerpro.com,ecombs@cooley.com,chourani@cooley.com

- **BARBARA L. GIBSON**
  bgibson@kohnswift.com,cmusloski@kohnswift.com

- **JACOB A. GOLDBERG**
  jgoldberg@rosenlegal.com,etexidor@rosenlegal.com

- **MARK S. GOLDMAN**
  goldman@lawgsp.com,lamar@lawgsp.com

- **TOR GRONBORG**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com,scaesar@rgrdlaw.com

- **GEORGINA J. INGLIS**
  ginglis@cooley.com

- **PATRICK J. LOFTUS**
  loftus@duanemorris.com,lverbitski@duanemorris.com,autodocketPHL@duanemorris.com

- **SEAN MCGUIRE**
  smcguire@rgrdlaw.com,e_file_SD@rgrdlaw.com,scaesar@rgrdlaw.com

- **CAITLIN BRIDGET MUNLEY**
  cmunley@cooley.com,efilingnotice@cooley.com,efiling-notice@ecf.pacerpro.com

- **DANIELLE S. MYERS**
  danim@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **THEODORE J. PINTAR**
  TedP@rgrdlaw.com,PamM@lerachlaw.com

- **DARREN J. ROBBINS**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **TRIG R. SMITH**
  trigs@rgrdlaw.com,lbrowne@rgrdlaw.com,e_file_sd@rgrdlaw.com,scaesar@rgrdlaw.com

- **HEATHER SPEERS**
  hspeers@cooley.com

- **LAWRENCE F. STENGEL**
  lfs@saxtonstump.com,cag@saxtonstump.com,cbm@saxtonstump.com

- **CRAIG E. TENBROECK**
  ctenbroeck@cooley.com,maraujo@cooley.com

- **STEPHEN J. TETI**
  steti@blockesq.com,stephen-teti-1589@ecf.pacerpro.com

- **JACOB A. WALKER**
  jake@blockleviton.com,jacob-walker-5598@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)