UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PATRICK MCDERMID, Individually       :
and on behalf of all other           :   Case No. 20-CV-01402-GJP
similarly situated, ET AL.,          :
                                     :
                    Plaintiffs,      :   Philadelphia, Pennsylvania
                                     :   December 15, 2022
          vs.                        :   2:06 p.m.
                                     :
INOVIO PHARMACEUTICALS, INC., ET     :
AL.,                                 :
                                     :
                    Defendants.      :
                                     :
. . . . . . . . . . . . . . . . . . .:


TRANSCRIPT OF ORAL ARGUMENT ON PLAINTIFFS' MOTION FOR SETTLEMENT
 FOR FINAL APPROVAL OF PLAN OF ALLOCATION, MOTION FOR ATTORNEY'S
          FEES AND EXPENSES AND AWARDS TO PLAINTIFFS
           BEFORE THE HONORABLE GERALD J. PAPPERT
                UNITED STATES DISTRICT JUDGE

COURTROOM APPEARANCES:

For Plaintiffs:                 Carson B. Morris, Esq.
                                Saxton & Stump
                                280 Granite Run Drive, Suite 300
                                Lancaster, PA  17601

For Plaintiffs:                 Theodore J. Pintar, Esq.
                                Trig R. Smith, Esq.
                                Robbins Geller Rudman & Dows LLP
                                655 West Broadway, Suite 1900
                                San Diego, CA  92101

For Defendants:                 Patrick J. Loftus, Esq.
                                Duan Morris LLP
                                30 South 17th Street
                                Philadelphia, PA  19103

APPEARANCES: (Continued)


For Defendants:              Caitlin Bridget Munley, Esq.
                             Cooley LLP
                             1299 Pennsylvania Avenue NW
                             Suite 700
                             Washington, D.C.  20005


Court Recorder:              Jeffrey Lucini
                             Clerk's Office
                             U.S. District Court


Transcription Service:       Jessica B. Cahill, CER/CET-708
                             Maukele Transcribers, LLC
                             467 Maukele Place
                             Wailuku, Maui, HI  96793
                             Telephone: (808)298-8633


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

DECEMBER 15, 2022                                2:06 P.M.

THE COURT:  And so, Mr. Morris, how you doing --

MR. MORRIS:  I'm well.

THE COURT:  -- over there?  Mr. Pintar?  Did I say that right?

MR. PINTAR:  Good afternoon, Your Honor.  You did.  Thank you.

THE COURT:  And, Mr. Smith.

MR. SMITH:  Yes.  Good afternoon, Your Honor.

THE COURT:  How you doing?  Mr. Loftus, how are you?

MR. LOFTUS:  Good afternoon, Your Honor.

THE COURT:  And with you is --

MR. LOFTUS:  Caitlin Munley, from the Cooley firm.

THE COURT:  -- Ms. Munley.  How's it going?

MS. MUNLEY:  Good afternoon.

THE COURT:  So just before -- I know, out of the -- I think there were 576,695, does that sound right, notices that went out?

MR. PINTAR:  That's correct, Your Honor.

THE COURT:  There is -- as you know, there are three exclusions, at least as of yesterday when I was reading the paper.  Is it --

MR. PINTAR:  That increased to 11.

THE COURT:  There are now 11 exclusions?  Do we have all their names?

MR. PINTAR:  We do, Your Honor.

THE COURT:  Okay.  We'll get those.  And then there was one objection.  Are there -- have there since been any other objections?

MR. PINTAR:  No, Your Honor.

THE COURT:  All right.

MR. PINTAR:  Just the one from Justin Green.

THE COURT:  And Mr. Green -- and that was at ECF 157.  And I thought Mr. Green -- I know the lawyer in Texas, and I was pretty sure, I'm trying to find it, that Mr. Green, in his papers, said he was going to -- yes, okay.  Mr. Green's papers in his conclusion, it said he intends to appear at the settlement hearing.

Now, I was just coming out from chambers after my other proceeding, and my deputy told me that Mr. Green called and said he's not going to be here, but do we have a call in line?  And I hadn't established a call in line, you know, for the hearing today, so he's not going to be calling in either.  But we'll just make sure the record reflects that we have thoroughly considered his objections, and that you've addressed them, and that we'll handle it that way.

But I'm disappointed he's not here today to the extent he wanted to -- to the extent, if any, that he wanted to elaborate on his filings, though his filings are certainly quite thorough and give us more than enough information to assess the

nature of his objections and to enable you to respond to them.

All right.  Wherever you'd like to begin.

MR. PINTAR:  Again.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. PINTAR:  Ted Pintar from Robbins Geller Rudman and Dowd, for Plaintiffs.  It's a pleasure to be here.

THE COURT:  Good to have you.

MR. PINTAR:  We have a $44 million settlement, as the Court is aware, 30 million of which is in cash and 14 million in stock, or I should say at least 14 million.  It could be more if the stock price were to increase.

THE COURT:  But you've guaranteed a floor of 14?

MR. PINTAR:  That's exactly right.

THE COURT:  No matter what the share price is when --

MR. PINTAR:  That's exactly right, Your Honor.

THE COURT:  Yeah.

MR. PINTAR:  I want to first start out by just saying it's a really significant recovery compared to other security settlements involving pharmaceutical companies.  We cited several in our papers.  It compares very favorably.  Also, it compares favorably to the average or median, I should say, not average, median security settlement over the last -- we looked -- over the last ten years.  And the median settlement ranges from 7 million to 14 million.  So this is a significant amount of money, I think no matter how you slice it.

And it was accomplished in just two plus years of litigation.  And as the Court knows, there were a lot of significant milestones accomplished in this litigation, including the completion of fact discovery.  And that's, I think, very quick for a securities case, which, as you know, can be very challenging to plead and prove.

The Court entered preliminary approval on August 31. Notice was disseminated pursuant to the Court's preliminary approval order.  As you just said, the Claims Administrator mailed over -- at last count, over 578,000 notice packages to nominees and potential class members.  The summary notice was published in the Wall Street Journal and transmitted over the business wire.  Notice was also posted on the settlement website, Inoviosecuritieslitigation.com.

As a result of this outreach, to date, we have 16,511 claims.  That number will go up significantly as we approach the claims deadline, which I think is May -- I'm sorry, December 19th, so next week.  There are 11 opt outs, and we've identified those opt outs on an exhibit to the proposed judgment, so the Court -- and I can hand that up if the Court needs a copy.

THE COURT:  Do you expect more claims, as well as opt outs, as well as exclusions, as well as objections, or has the time for any of those passed?

MR. PINTAR:  Yes, thank you.

THE COURT:  Yeah.

MR. PINTAR:  The time for objections and opt outs has passed.

THE COURT:  That's what I thought.  Okay.

MR. PINTAR:  I think that was November 23.

THE COURT:  Right.  Okay.

MR. PINTAR:  And we do expect significantly more claims.

THE COURT:  In your experience, they kind of --

MR. PINTAR:  Yeah.

THE COURT:  -- come in at the --

MR. PINTAR:  Yes, that's exactly right.

THE COURT:  Yeah.  Like writing checks to charity in late December, right?

MR. PINTAR:  That's exactly -- and it hockey -- I'm sorry.  It hockey sticks up --

THE COURT:  Okay.

MR. PINTAR:  -- as you get towards the claims deadline.  So we do expect that number to go up significantly.

And as the Court just mentioned, there's one objection to the settlement and the plan of allocation.  No objection to the fee and expense request or to the request for lead Plaintiff awards that were requested.

So today -- with all that said, today we're requesting entry of three orders, the final judgment and order of dismissal with prejudice, the order approving the plan of allocation, and

the order awarding attorney's fees and expenses.  I'm happy to run through final approval of the settlement, as well as our fee and expense request to hit the --

THE COURT:  Please.

MR. PINTAR:  I won't, obviously --

THE COURT:  And then when --

MR. PINTAR:

THE CLERK:  -- go through all the detail, but --

THE COURT:  I think we'll run through the approval of the settlement, the Girsh factors.  You've sum them up very nicely in your papers.  We can touch on those.  And then maybe that would be the time, since there's no objection to the fee and expense request or lead Plaintiff awards, maybe after running through the -- well, at whatever point you think it makes the most sense, maybe it's after going over the allocation, to address the objection.

MR. PINTAR:  Be happy to, Your Honor.

THE COURT:  We can do that --

MR. PINTAR:  And I agree.

THE COURT:  Yeah.  Okay.

MR. PINTAR:  I think that's the perfect --

THE COURT:  Okay.  Let's do it that way --

MR. PINTAR:  -- point at which to address it.  And I will touch on a few of the high points on the final approval of the settlement request and the Girsh factors.

Let me start off with the Warfare (phonetic) and Third Circuit case, which says there's a presumption of fairness if certain factors are met.  And those factors are arm's length settlement negotiation, sufficient discovery, experienced counsel.

THE COURT:  I forgot to hit on when I made -- when I brewed it, so there was a little delay.

MR. PINTAR:  And number four, a low number of objections.  And all four of those have been -- are met here.  So there is a presumption of fairness with this settlement.

Turning to Rule 23(e)(2) and the Girsh factors.  The first factor is, have we adequately represented the class?  And here in just two plus years of litigation, Your Honor, there was an extensive investigation by lead counsel which led to the filing of three separate complaints.  We fully briefed two rounds of motions to dismiss.  We fully briefed Plaintiffs' motion for class certification.  We completed fact discovery, which included over 500,000 pages of documents and 19 depositions.  We exchanged expert reports regarding class certification, and we attended the mediations, as you know.

THE COURT:  How many again -- how many mediation sessions again?  I know you told me.

MR. PINTAR:  Yeah, there were two, Your Honor.

THE COURT:  Two altogether.

MR. PINTAR:  I apologize, I don't have the dates in

front of me, but there were two.

THE COURT:  Yeah.

MR. PINTAR:  And I think, significantly, the case didn't settle after the second mediation.  This was hotly disputed on both sides, and we were fully prepared to take this case forward unless the class received what we thought was a fair amount.  And the mediator issued a mediator's proposal, ultimately, which both parties --

THE COURT:  Coming out of the second session?

MR. PINTAR:  Coming out -- it was shortly thereafter.

THE COURT:  Yeah.

MR. PINTAR:  But you're absolutely right.  And I think that's significant because that was the only way to bridge the gap and to bring the parties together.  It was -- to say arm's length is, I think, an understatement here.  There simply was -- it was hotly disputed.

And that, obviously, takes us to -- through the second factor, the Rule 23(e(2) factor, which is, was there an arm's length negotiation among experienced counsel?  Clearly there was with the mediations.  I believe our firm is extremely experienced.  Defense counsel is extremely experienced with securities litigation.  There was absolutely no hint of collusion with any aspect of the settlement negotiations.

And then the third factor under Rule 23(e)(2) is whether the relief is adequate, taking into consideration the

cost, the risk, the delay of trial and appeal.  And as this Court is no doubt aware, securities actions are notoriously complex and risky.  They're very difficult to prove, and they're very expensive.  This case is no different.  We incurred expenses over $800,000 in litigating this, and to continue litigating it would have been -- run into the several millions of dollars through trial and appeals.

The Defendants disputed every element falsity, scienter, loss causation, and damages.  And I think importantly here, and I know we mentioned it in our papers, but there was a significant risk with respect to the financial condition of Inovio --

THE COURT:  Right.

MR. PINTAR:  -- which, again, I think it reflects the expertise of Plaintiffs' counsel and counsel on both sides to get this case resolved because to continue litigating it, the insurance proceeds dwindle and the company's wherewithal to kick in additional shares or money.

THE COURT:  How is the company doing today?

MR. PINTAR:  I will let Defendants' counsel --

THE COURT:  Okay.

MR. PINTAR:  -- sort of give a better -- but I will tell you the stock price, I checked this morning, is about a buck 80 in that range.  I think it's very challenged.

THE COURT:  How did -- remind me how that compares to

the after effect on the stock price of the Defendants, as you put it, anyway, pulling back a little bit from their purported initial statements?  What did the stock price -- I know it went up.  What did it end up coming back down to and leveling off at? Do you remember?

MR. PINTAR:  I don't have that number, Your Honor.

THE COURT:  That's okay.

UNIDENTIFIED SPEAKER:  I got it here.

MR. PINTAR:  Yeah.

THE COURT:  Okay.

MR. PINTAR:  We can pull that out, Judge.

THE COURT:  Okay.

MR. PINTAR:  That's easy enough.

THE COURT:  That's fine.

MR. PINTAR:  So we had to balance the financial condition of the company as well as the insurance proceeds in negotiating this settlement.  And I really think that we hit a sweet spot where we maximized the recovery to the class without burning too much of that insurance and selling at a time when the company had the wherewithal to kick in some money.

With respect to the range of reasonableness of the settlement, I don't want to repeat what I just said, but the settlement compares very favorably with pharmaceutical settlements involving securities -- securities cases involving pharmaceutical companies, as well as the median security

settlements over the last ten years, which range from 7 to 14 million.  So we're clearly multiples above that.

THE COURT:  And it's at least 44 million in cash and stock, right?

MR. PINTAR:  That's exactly right.

THE COURT:  Not a minimum of 44 million in cash and stock.

MR. PINTAR:  Well --

THE COURT:  Is there a difference there?

MR. PINTAR:  -- there is, because if the stock price were to increase, obviously, the value of the settlement would be north of 44 million.  So the 44 million is a floor --

THE COURT:  Yeah.

MR. PINTAR:  -- is what we were trying to convey.

THE COURT:  Do you know what the 14 million in stock with the share price was that was pegged to?

MR. PINTAR:  It was pegged at $2 a share.

THE COURT:  Okay.

MR. PINTAR:  So --

THE COURT:  That's right.  That's right.

MR. PINTAR:  -- it's 14 -- 7 million shares, $14 million is the floor with the potential to go up.  And what we did is we -- and this is in the stipulation, I think, at paragraph 2.4, such that at the -- when the judgment is entered, we look at what the stock price is.  If it's below $2, they

either have to kick in more money --

THE COURT:  Right.

MR. PINTAR:  -- or kick in additional shares.

THE COURT:  Right.  Okay.

MR. PINTAR:  Okay.  And then the remaining Girsh factor, Your Honor, is the reaction of the class.  And we think it's overwhelmingly positive.  As you noted, there's one objection, only 11 opt outs, and both Plaintiffs support the settlement.

I'm happy at this point to address the objection --

THE COURT:  Yeah.

MR. PINTAR:  -- if the Court is --

THE COURT:  I think -- yeah.

MR. PINTAR:  -- ready.  Yes.  So --

THE COURT:  And so let's just break out -- let's get onto the record for Mr. Green, his specific objections and the reason therefore, and then -- and I've read, you know, the submissions.  But just to be sure, you know, we're addressing these on the record, and then your response.

MR. PINTAR:  Absolutely, Your Honor.

THE COURT:  Okay.

MR. PINTAR:  I think there are three main objections. If I could sort of summarize what they are.

THE COURT:  Yeah.

MR. PINTAR:  First -- thank you.

First, he's saying that some class members will have no recovery under the settlement, but yet they are releasing their claims.  The second -- and let me just summarize what they are, and then I'll address each one.  The second objection is to the sufficiency of the notice --

THE COURT:  Uh-huh.

MR. PINTAR:  -- primarily that the potential outcome is not in the notice, such that, according to Mr. Green, class members do not know what they're giving up in terms of what the class could receive at trial when they are deciding whether to opt out of the class.

And then the final objection is to the procedures for objecting, which he argues are unduly burdensome.  Having to mail the objections versus submitting them on Pacer.  Submitting trade information, so that we can determine whether the objector is a class member providing objection history.  I think those were the primary aspects of his objection.

So if I could, Your Honor, I'd like to just address those one at a time --

THE COURT:  Yeah.  Please.

MR. PINTAR:  -- and these are --

THE COURT:  And you did see -- I apologize for interrupting you.  You did see a surreply --

MR. PINTAR:  I did, Your Honor.

THE COURT:  -- that he filed?

MR. PINTAR:  And I would like to comment on that.

THE COURT:  That went on the docket actually today. But you have had that.  You had a chance to look it over and prepared to discuss.

MR. PINTAR:  I have, Your Honor.

THE COURT:  Great.  Okay.  Good.  Okay.

MR. PINTAR:  And I would like to discuss that when I'm --

THE COURT:  Sure.

MR. PINTAR:  -- after I'm done with these points that he initially raised.

So the argument about what class members can receive is really an issue with the plan of allocation as opposed to the settlement.  I don't think that he is saying $44 million is not a sufficient settlement.  I think what he's arguing is the allocation of that is not fair, since some class members will not receive a portion of that money.

And the plan of allocation calculates what we call a recognized loss consistent with section 19(b), the PSLRA, and the Supreme Court's decision in Dura.  And what section 10(b) of the PSLRA say is, losses must be proximately caused by the alleged misrepresentation or omission.  And the Supreme Court interpreted that language to say it's simply not enough to purchase stock at inflated price.  No loss occurs until the fraud has begun to be revealed and artificial inflation begins to leak out.

And that is exactly where Mr. Green is, as similarly situated class members. They purchased at an inflated price, but they sold at an inflated price. So they may have made money, they may be even, or they may even have a market loss, but they do not have a legally recognized loss under section 10(b).

THE COURT: What do you make of his response that you're not asking the Court to approve a securities damage award, but instead are asking the Court to approve a settlement agreement and release of claims --

MR. PINTAR: Right.

THE COURT: -- and that that's why the PSLRA argument is not correct?

MR. PINTAR: Right. So, yes, we are asking the Court to approve the settlement. And when you look at the settlement, it's on behalf of the class. And so we look at that together as an entity. And then, separately, we look at whether -- how the plan of allocation divides that up. As I said at the beginning, this is really a plan of allocation argument.

And importantly, Judge Coates up in the Southern District of New York in WorldCom, specifically addressed this issue. And what she said is class members with no losses, for example, those not damaged by a corrective disclosure, need not be compensated for the release to be effective. And the reason -- the rationale is they're simply not giving up a legally cognizable damage amount for that release.

And so when you look at the release, you look at it on a class wide basis as opposed to individual class members.  For instance, there are many class members who are going to be -- in almost any security settlement, this is going to be the case.  So what we did was we looked at every Third Circuit settlement going back 20 years that our firm has been involved in.  There were about 20 settlements, and that includes the Endo settlement that we cited in our papers, the Valiant in front of Judge Shipp in New Jersey and many, many others.  They all -- all of the plans of allocation include the same statement, which is, if you sold before a corrective disclosure, you don't get anything under the settlement.

So this is true of any securities class action.  And as I said, Judge Cote in WorldCom, squarely addressed this and found that there is absolutely no problem with this because they're not giving anything up.  I think you have to look at the class as a whole and whether the release is fair to the class as a whole, as well as whether the settlement amount is valid, and reasonable, and sufficient to the class as a whole.  This is really just an allocation issue.

And we also do this in our settlements, and I know it's very common, but if class members submit a claim, and it's less than the recognized losses -- or, I'm sorry, the distribution amount is less than $10, they're not going to receive anything.  And the reason we do that is because the cost of mailing a $4

check or $3 check as well as the follow-up, because those checks tend not to be cashed, the cost of that would far exceed the amount of benefit for those folks.  And that too, has been upheld.  So that's my thought on the first issue.

THE COURT:  And how about his objections to being called a professional objector?

MR. PINTAR:  Thank you, Your Honor.  I'm glad you asked that, because I didn't want to leave without addressing that.  So a week ago, our firm received a telephone call from Mr. Green, and he spoke with Mr. Gronborg and Mr. Smith.  Mr. Smith is here today with me.

But just to put this in context, because we didn't just put that reference in the reply brief for nothing.  But he called to ask if he could resolve his objection.  His objection.  We explained why the objection was without merit, and we asked him because he's in Corpus Christi, Mr. Bandas is very well known in Corpus Christi as a professional objector, and that's not my description.  Many courts have described him as a professional objector, but we asked him if he was acquainted with Mr. Bandas, and he said, of course.  And he said he would withdraw his objection for $75,000.

THE COURT:  Just to him?

MR. PINTAR:  Just to him.

THE COURT:  Interesting.

MR. PINTAR:  And -- but he said --

THE COURT:  What about the other class members?  What would they get out of that?

MR. PINTAR:  Goose egg.  Zero.

THE COURT:  Is that something that he can do as -- and I thought in his papers, he purports to represent the class.

MR. PINTAR:  Thank you.  Thank you.

THE COURT:  Okay.

MR. PINTAR:  You took the words right out of my mouth.

THE COURT:  Okay.

MR. PINTAR:  So it would seem to me that's quite an ethical conflict to say, well, on the one hand, you're representing the class.  I'll bow out and go away for $75,000.  And interestingly enough, he said, if I were Chris Bandas, the price tag would be $750,000.

So clearly he's acquainted with Mr. Bandas.

THE COURT:  So you've been doing this a long time.

MR. PINTAR:  Yes.

THE COURT:  And your firm as well, and certainly objections are always -- well, not always.  Objections can be a routine part of this process.

MR. PINTAR:  Yes.

THE COURT:  Is it typical, in your experience, to receive a call like that from an objector?

MR. PINTAR:  It's not the first time it's happened, but I think it's unusual to be that brash about it and that matter of

fact about holding up the class.  And it's --

THE COURT:  You know what, I want to be clear.  Mr. Green opted not to come today.

MR. PINTAR:  Right.

THE COURT:  And we didn't have a call in line for him, so I don't want him to think, should he read this, that this is relevant to my decision, but I wanted to address it was relevant to address his surreply.

MR. PINTAR:  Right.

THE COURT:  And -- okay.  I understand.

MR. PINTAR:  Okay.

THE COURT:  Yeah.

Speaker B: Okay.

Speaker A:  Very well.  And again, that's my ultimate decision on the request for approval of the settlement obviously is not going to involve what Mr. Green may have said to you and why he said it, but I did want to make sure that you were given an opportunity to address his surreply.

MR. PINTAR:  Thank you, Your Honor.

THE COURT:  Yeah.

MR. PINTAR:  And yes, that's -- I appreciate that.  We did absolutely want to do that.

His second primary objection is the notice, the sufficiency of the notice.  And as we indicated in our reply, and this is very typical in securities class actions, the notice

explains that the parties do not agree on the amount of recoverable damages. It is, as I said, standard. It was, in the Endo settlement, as well as the Valiant notice. And that makes it particularly difficult, Your Honor, to put bottom line numbers in the notice, and I cannot cite you to a particular case, but I will tell you that it is in every securities settlement.

But maybe more importantly, while he says we don't know what we would have received, the plan of allocation is in the notice, and the plan of allocation explains exactly what the maximum recoverable amount is. And he used the plan of allocation to figure out that his recognized loss was zero. Others can follow the plan of allocation and determine what their maximum losses are.

And so the settlement, simply put, provides exactly what he says is missing. And in addition, the notice says what the average recovery per share is under the settlement, which is $0.23. So you can literally compare the maximum amount of the plan of allocation with the average amount under the settlement and determine whether you want to stay in or opt out. So that number is there and --

THE COURT: Let me ask you this. A 23 cent per share recovery based on a settlement that was pegged to a two dollar share price, right.

MR. PINTAR: Right.

THE COURT: How does that compare, if at all, If there

are any comparisons in these types of settlements where you have stock as a component of the settlement, you peg it to a share price, and then the return, if you will, in the settlement is, is there a percentage of that kind of target share price that courts look to?  Is that ever an issue or a factor in your experience?

MR. PINTAR:  No, not really, because it's apples and oranges.  You could imagine

THE COURT:  Yeah.

MR. PINTAR:  -- if we were talking about Apple stock versus Inovio stock versus Amazon --

THE COURT:  Yeah.

MR. PINTAR:  -- whatever, those share prices are going to vary dramatically.  But I will tell you that I did some math on the net settlement amount.  So if you took the 44 million less, all the expenses, including our requested fees, expenses, the Plaintiff award, et cetera, backed all of that out the --let me just see if I can -- I have that right here.

So the average claim amount, which obviously we're going to get a similar claim, but based on what we have right now, the average claim recovery would be $1700.  So that's a significant amount of money.  Now, some are going to be lower, some are going to be higher.  But I guess my point is this is a significant amount of money.  No matter how you slice it, that average amount is clearly above average and --

THE COURT:  That was a better way to frame the answer

to a question that wasn't -- to a question that wasn't practically correct, yeah.  That's more helpful.  Thank you.

MR. PINTAR:  okay.  Great.  And then, Your Honor, just to close the loop on the Green objection, he's arguing that the objection procedures are unduly burdensome.  And the notice conforms to --

THE COURT:  Right.

MR. PINTAR:  -- the procedures set forth in the Court's August 31 preliminary approval order.  And clearly those objection procedures are within the discretion of the Court.  They're virtually identical to the same -- to the procedures set forth and approved in Endo.

THE COURT:  Well, and I would assume many of the -- in this area, much of certainly at least material language in these notices is fairly consistent, if not the form and substance of the notices themselves, correct?

MR. PINTAR:  Correct.

MR. PINTAR:  Yeah.  Okay.

MR. PINTAR:  And the notice is geared towards -- sort of the mid-range between very sophisticated institutions and retail investors.  And this is not a consumer case complaining about faulty widgets or coupon settlements or something like that.  This is a fairly sophisticated, knowledgeable group of class members who obviously took the time to excuse me, to invest in the stock.

So the procedures are certainly, as you said, consistent among these types of settlements. But they're also, I think, perfectly appropriate for this group of class members. The mailing of the objections or the requirement that the objections be mailed or dropped off at the Court versus Pacer, again, sort of reflect that most class members don't have access to Pacer.

THE COURT: I was going to say, why would that be easier for class members to file on Pacer?

MR. PINTAR: I have no idea. And clearly, as Mr. Green did, you can file it on Pacer and that's fine, too. Nobody's going to turn it away.

THE COURT: Right.

MR. PINTAR: We were trying to make it as straightforward as possible.

THE COURT: Well, he's a lawyer, so he knows how to use Pacer.

MR. PINTAR: That's right.

THE COURT: Yeah. Your Honor

MR. PINTAR: That's right. And then the inclusion of trading information for the objection, he also complains about. But that information is probably the most important because we have to determine whether he, one, is a class member and two, whether he has standing to object to the settlement. If there's no claim, in other words, if he didn't purchase during the class

period, whatever it is, if he's not a class member, we have to know that.  There's also, I think, an argument, if he didn't file a claim or doesn't file a claim, that that would impact his standing as well.  So it's a very important issue, particularly on appeal.  The Courts of appeal will look absolutely at it to assure that the objector has standing.

And then the objection history.  I think we sort of talked about the issue with Mr. Bandas, but professional objectors, you know, can be a problem, and it is important to identify any other objections that a class member or their counsel have made.  So we have a sense to put that objection in context.

I think the Third Circuit, and I think the 7th Circuit have been very proactive in identifying and flushing those out and identifying them for what they are.  It doesn't mean -- let me put it this way, because I've been doing settlements for quite a while, but if somebody has a legitimate objection, if we did not do something right, I want to know.  I want to fix that.  There's absolutely zero interest in putting anything by a class member or making it more difficult.

But this sort of notion that you can just file an objection and make money off of it, and as you point out and purport to represent the class is simply wrong.  And I think that the objection history gives some context to the objection and at least gives us a picture of what's going on.  It doesn't

necessarily mean -- they may have made multiple objections and they all may have been legitimate, and above board, and all the rest, but at least it gives us a hint as to what's going on. I think it's very important. So that is --

THE COURT: I'm glad you addressed that. Thank you.

MR. PINTAR: Sure. So that's what I have to say about the Green objection. And then the only remaining area, if it pleases the Court, I'd like to address our fee and expense request.

THE COURT: Yes, please. And I had a question. So you said we're up to 11 exclusions --

MR. PINTAR: Correct.

THE COURT: -- which is certainly their right. In your experience, for an audience this big, I'm assuming that that's a pretty small number, but I don't want to assume without the benefit of your input.

MR. PINTAR: You're absolutely right.

THE COURT: Okay.

MR. PINTAR: It is. So in the Third Circuit, the relevant factors are found in the Gunter opinion. But I think the bottom line is whether the fee and expense request really the fee request is fair and reasonable. And let me just touch on a few of -- what I think are the key factors.

And one, I think the most important factor, and at the end of the day, what class members really care about is the

result, because they want to maximize their distribution under the settlement. And here the settlement, as I've said a couple of times, I won't repeat it, it's very significant when compared to relevant factors. It is a significant amount of money, including when looking at the amount of insurance proceeds and the financial wherewithal of the company.

So I think we did -- we accomplished a really nice result in an amount and in the time it took to get that to this Court for approval. If we look at the --

THE COURT: You know, and I think it's important, the docket will reflect it and the various filings in the cases will reflect it. But kind of going back to the hotly contested or hotly litigated. I mean, I think it is important, for the record, to reflect the fact that the Court was involved in a number of discussions with counsel, be they discovery issues, other issues that the Court took up, and hotly litigated, I think, is a very polite way of saying it, right. I mean, it was hotly contested. It was aggressively litigated on both sides. And I use aggressive in the best sense of the word.

MR. PINTAR: Sure.

THE COURT: And, you know, so -- and the docket will obviously reflect, you know, the number of telephone conferences and other issues. But I think in fairness to both sides and to the members of the class, from the Court's perspective, this was -- and I haven't had many of these in my going on nine years

already on the bench -- but I cannot recall another securities class action settlement that had the level of sophistication on both sides and the number of issues that required either Court resolution, intervention, handholding or just listening.

MR. PINTAR:  Thank you, Your Honor.

THE COURT:  You're welcome.

MR. PINTAR:  The second, obviously, major factor is the Plaintiffs' approval and the reaction of the class.  Here we have the lead Plaintiffs supporting the fee request.  And, interestingly, there's a presumption of reasonableness where the fee request is consistent with the retainer agreement with the Plaintiffs, and the Plaintiffs support the request.  And that is in the ViroPharma decision that we cited.

THE COURT:  Yeah.

MR. PINTAR:  And, again, no objections to the fee or expense request or the lead Plaintiff award request.

The third factor is, you know, how efficient -- what kind of skill did counsel demonstrate during the litigation?  And one of the factors courts look at is, you know, how efficient they were.  And we've touched on that, and you've mentioned it. But to litigate and resolve this case in just two plus years of litigation I think is very significant, and it reflects counsel's expertise --

THE COURT:  And a chunk of that time -- you know, a chunk of that time, kind of met, if you will, was, you know, all

the time with the mediator and leading into that, right?

MR. PINTAR:  That's absolutely right.

THE COURT:  So in addition to all of the active litigation, right, there was a lot of time and effort and preparation going into and coming out of those mediation sessions as well.  I think that's relevant too.

MR. PINTAR:  I think -- that's exactly right.  The mediations are preceded, as I'm sure you're aware, by very detailed mediation statements where we have to have gone through the documents that were produced here, over 500,000 pages of documents, and combing the deposition testimony to make our case.  Not just ultimately to present to the Court, but to present to the mediator, to really establish the strength of our claims.  And we take that very seriously, and there's a lot of work that goes into it to prepare that so that we can demonstrate that ultimately we will prevail at trial.  And that has a tremendous impact on the result that's achieved.

THE COURT:  And a lot of lawyer time and hours.

MR. PINTAR:  Yes.  Absolutely.

The contingency risk, courts have found to be a very significant factor.  We mentioned -- I mentioned this earlier, but securities cases are not just inherently risky and complex, but they're very difficult cases to prove, and they're very expensive.  There's simply no guarantee of success.  We cited a number of cases that either were lost or were compromised after

trial.  And you just never know.

There is a tremendous risk of non-payment that should factor into a fee award.  Here, every stage of the case presented obstacles, very complex, jargon laden documents that we went through and that impacted not just the document review, but the depositions.  We had to get our arms around the industry, and the company, and the market to really understand this case.

And these cases tend to be extremely expert intensive.  Scienter always a challenge to prove in a securities case when you get into any sort of state of mind element.

Loss causation was very complicated because of the number of corrective disclosures.  So there's a lot of targets for Defendants to shoot at and that, as you can appreciate, impacts the amount of damages.  And so we have to do our homework with our expert to make sure that we can make the best case possible for each corrective disclosure to ensure loss, causation, and damages.  But it's a very complex area of law.

And then I would like to touch on just awards in other cases, other similar securities cases not just by this Court, but in this Circuit in similar actions.  I think that in hard connect, Your Honor identified the range of fees in class actions as roughly 19 percent to 45 percent, a range that has been repeated in a number of cases, and that one-third fees are in line with similar cases.

We're not asking for one-third here.  Obviously, we're

asking for a significantly lower percentage.  But in the Pharmasia (phonetic) case, the 2013 case that we cited, the Court awarded 27.5 percent of a $164,000,000 recovery.  The Aetna decision in this district, the Court awarded 30 percent of $82.5 million.  And in Veritas, the Third Circuit affirmed a 30% fee on a $21.5 million recovery.  And we think our request compares very favorably with these and many other securities cases in the Third Circuit and in this district.

And then finally, Your Honor, the Lodestar cross-check with the time and labor expended by Plaintiff's counsel, the multiplier here is 2.69.  That is squarely within the Third Circuit's accepted range of between one and four that was identified by the Third Circuit in Veritas, by the Third Circuit in Prudential, and I think this Court recognized the same thing in CardConnect.

THE COURT:  Uh-huh.  1.69 there.  Yeah.

MR. PINTAR:  That's correct.

THE COURT:  Yeah.  Uh-huh.  It's a much smaller pot.

MR. PINTAR:  Much smaller.

THE COURT:  Yeah.

MR. PINTAR:  But we think that the Lodestar cross-check confirms the reasonableness of our fee request.

That said, Your Honor, I'm happy to answer any questions, any other questions the Court has?

THE COURT:  I had one on the lead Plaintiff awards

75,000.  In prior -- I know CardConnect, I don't think there was nearly as much work put in by the lead Plaintiffs, I recall from that one.

Describe the work that was done by the two folks seeking the awards and how that compares to other cases that you've had, and whether that's an appropriate number, given --

MR. PINTAR:  Right.

THE COURT:  -- given their role or responsibilities and their risks.

MR. PINTAR:  Absolutely, Your Honor.

And I would like my partner, Mr. Trig Smith, to address that, since he worked directly with those folks and can tell you firsthand everything that --

THE COURT:  You can stay right there, Trig, if it's easier.

MR. SMITH:  Okay.

THE COURT:  Yeah.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  Yeah.

MR. SMITH:  And just a -- it's a pleasure to be in front of you today.  It's nice to see your face.  And if I may, for the record, I just want to throw a compliment to our --

THE COURT:  It's not nice to see his face.

MR. SMITH:  -- defense counsel here.

THE COURT:  He can come --

MR. SMITH:  Yes, and highly professional, very aggressive.  They did a bang up job.  It's always a pleasure to litigate against Cooley and that team.

Yes, I did work personally with the individual Plaintiff.  The Plaintiff, Mr. Williams and the proposed class rep, Mr. Zenoff [phonetic].  Both were highly active, highly engaged.  Both went through significant work in terms of responding to discovery requests.  Both prepared significantly for their depositions.  Both sat for their depositions.  They were long, highly detailed, appropriately aggressive questions.

Mr. Zenoff, for example, had just had back surgery, but he decided to plow through it.  They were both active.  They remain engaged, particularly Mr. Williams, the lead Plaintiff he was a great ally.  We speak weekly.  He was always involved in the case, involved in, you know, major decisions.  He was a wonderful person to work with.

I've worked with a lot of retail investors in these types of cases, and I just want to commend these two gentlemen. They were highly active.  They participated in the process of mediation.  They were engaged all along the way.  They were fantastic representatives for the class.

THE COURT:  I appreciate that.  Okay.  I also had a question -- I don't remember it being an issue or coming up before, but I noticed part of the materials is a stipulation calling for the remaining balance to go to CLS as a Cy Pres

recipient. And I guess what would be the -- kind of a three part question.

MR. PINTAR: Sure.

THE COURT: How common is it for the structure of a settlement like this to look like that with that kind of stipulation, number one? Number two, I am aware of certain jurisprudence and commentary raising at least some concerns about the appropriateness of certain Cy Pres recipients and kind of could you address that, and how, and why CLS?

MR. PINTAR: Sure. So let me just sort of add some context to a Cy Pres Award in a securities case. As you know, all the money gets paid out, but certain people don't cash their checks. So we do another round of residual distribution, and that will continue. Sometimes we'll do three residual distributions to exhaust our efforts to get the money out.

So at the end of the line, sometimes we're faced with something on the order of less than $5,000 where the costs--

THE COURT: Even in the settlement of this magnitude?

MR. PINTAR: Yes. It doesn't matter the magnitude, you always --

THE COURT: Okay. So we're talking about -- in your experience, a de minimis amount, no matter what the pot is.

MR. PINTAR: That's exactly right.

THE COURT: Okay.

MR. PINTAR: Because we will continue -- for instance,

in Enron, a multibillion dollar settlement, we were doing residual distributions ten plus years after the settlement because of the amount of money.  So we keep doing them as long as we can financially -- it's financially feasible.  It's not de minimis.  We'll keep doing those distributions.

And so eventually, though, you do get down to a nub of less than $5,000, let's say, where it's not feasible because the claims administration costs eat up that amount of money.  And so we try and find a suitable Cy Pres recipient for that.  And here, CLS, I think, is an organization that we've donated to before, and we're very comfortable with them and --

Speaker A: Cy Pres is, you know, near as possible, right?

MR. PINTAR:  That's right.

THE COURT:  So does CLS, for example, do any securities litigation work or what -- and I'm not --

MR. PINTAR:  So --

THE COURT: -- criticizing them at all --

MR. PINTAR:  Yes.

THE COURT:  -- and I assume that there's a CLS or their counterparts in most districts where you have settled these cases, right.

MR. PINTAR:  Yes.

THE COURT:  So just why them and what other organizations, if any, would be deemed to be nearer as possible?

MR. PINTAR:  I appreciate what you're asking, and

you're right on.  In the 9th Circuit, for example, the 9th Circuit had said it has to be an organization which makes sense in the context of the litigation.

THE COURT:  And Third Circuit has no such rule?

MR. PINTAR:  That's correct.  And so to be blunt, we try and find a very worthy organization.  Now if the Court would like something closer, there is, for example, which we just used in a settlement earlier this year in the Impax litigation in front of Judge Gilliam in the Northern District of California because he asked the same question.

THE COURT:  Okay.

MR. PINTAR:  And he was very concerned about this.  And we offered Investor Protection Trust, which is a national organization which does advocate for and assist in securities litigation.  And Your Honor, we certainly -- and I don't want for speak for Defendants, because this is part of the stipulation, but we have no objection to using Investor Protection Trust here.  Or if there's another organization that this Court would prefer.

For instance, there is, and I think it's at Northwestern University where they have a law clinic that assists with securities -- individual securities cases that I saw used in another settlement.  But we certainly have no objection to using or designating --

THE COURT:  Do courts, in your experience, often dictate that or make suggestions or?

MR. PINTAR:  Quite frankly, no.  But again, it's --

THE COURT:  And, again, I have -- there's nothing against CLS, of course

MR. PINTAR:  Right.  right.

THE COURT:  -- but, you know, sometimes I got a long history with Cy Pres going back to the Attorney General's office, right.  So I found that sometimes it's kind of like, all right, we got to do -- you know, we've got this residual, who do we give it to, and people say, hey, these guys are good this residual.  Who do we give it to?  And people say, hey, these guys are good.  Those guys are good.  I don't know how Cy (phonetic) it is near to the prey, you know, but --

MR. PINTAR:  Sure.  Sure.

Speaker A: Okay.  So that was one of my concerns.

MR. PINTAR:  But again, we have no objection to the Investor Protection Trust, which clearly is --

THE COURT:  And how does that work, the Investor Protection Trust?

MR. PINTAR:  It's been a few months since I looked at their website --

THE COURT: -- okay.

MR. PINTAR:  -- but I believe it's a national organization that assists with folks with securities issues and helps with securities cases.  Not the class action cases, but

with the individual --

THE COURT:  Okay.

MR. PINTAR:  -- folks that call and have issues or questions and whatnot.  But it is a securities investor advocacy group that I think is clearly on all fours with the subject matter of our case.

THE COURT:  Okay.  We'll take a look at that.  Thank you.

MR. PINTAR:  Okay. Appreciate that.

And that's really all I have, Your Honor, unless -- again I'm happy to answer any other questions that the Court may have.

THE COURT:  I think you hit -- I had sketched out here areas I wanted to be sure we touched on.  I believe between everything you said and, you know, our back and forth, we hit on them all.  Tom, was there any that stood out to you that we hadn't addressed?  No.  Okay.  Mr. Pindar, thank you very much.

MR. PINTAR:  Thank you.

THE COURT:  Very well done.  I appreciate it.  Thank you.  From the defense side?

MS. MUNLEY:  Your Honor, I don't have anything to add to Mr. Pintar's.  Very good arguments.  Happy to answer any questions.

THE COURT:  All right.  So you're going to leave the heavy lifting to this guy?  Oh, my God.

MR. LOFTUS: I'm just going to note for the record, Your Honor, Pat Loftus from Duan Morris. It's a pleasure to be here in your Courtroom.

THE COURT: Honor. Honor for the Court. Look, number one, thank you. You guys have done -- you know, separate and apart from, you know, obviously, the close scrutiny we'll give to all aspects of the papers as augmented by your presentations today. You know, everybody has done a ton of work on this case going back now, you know, two years.

And as I mentioned before, it was from, you know, the very first issue that I had the lawyers on the phone with, and the designation of counsel, and the motion to dismiss and all that stuff. It has been a fiercely litigated contest with good litigators.

So while -- I mean, I did a minimal amount of work compared to everything you all have done for a couple of years, including -- and I remember that the mediator that was chosen was very well regarded person, you know, as well, as I recall. And, you know, I am kind of sensitive to all the work that goes into and comes out of those mediation sessions to make sure that you're taking the fullest advantage of the opportunity.

So, you know, in addition to pushing this case forward on the litigation front, I recognize that as well. But, no, this has been good. We read everything yesterday, and we touched on today, I think everything we need to. I was glad to get those

objections addressed so that I understood, you know, everyone's side on that.  And we'll get to the task of formalizing our decision on this in due course.  I got a couple of things in the queue, but we'll do our best to get to this as soon as we can.

Other than that, have a happy holidays.  Safe travel wherever you're going back to.  You going back to West Coast today?

MR. PINTAR:  We are, Your Honor.

THE COURT:  All right.  Safe travel.

UNIDENTIFIED SPEAKER: Thank you, Judge.

THE COURT:  You're going west too?

MR. MORRIS:  Back to Lancaster.

THE COURT:  Not as far.

MR. MORRIS:  That's right.

THE COURT:  Yeah, thanks for everything.  Thank you for coming.

UNIDENTIED SPEAKER:  Thank you.

MR. PINTAR:  Thank you, Your Honor.

MR. SMITH:  Thank you, Your Honor.

MR. LOFTUS:  Thank you, Your Honor.

(Proceedings concluded at 3:06 p.m.)

CERTIFICATE

I, Jessica B. Cahill, Court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated: December 17, 2022

_____

Jessica B. Cahill, CER/CET-708